# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SECURITY NATIONAL PROPERTIES | ) | Case No. 11-13277 (KG) |
| FUNDING III, LLC, et al.,[1] | ) | |
| | ) | Joint Administration Requested |
| Debtors. | ) | |
| | ) | |

## DECLARATION OF JOHN PILAND
## IN SUPPORT OF FIRST DAY RELIEF

I, John L. Piland, hereby declare (the "Declaration") under penalty of perjury:

1.      I am the Chief Financial Officer and Senior Vice President of Security National Master Manager, LLC, which is the manager of Security National Properties Funding III, LLC, ITAC 190, LLC, Security National Properties Funding, LLC, Security National Properties Funding II, LLC, Sequoia Investments III, LLC, Sequoia Investments V, LLC, Sequoia Investments XIV, LLC, Sequoia Investments XV, LLC, Sequoia Investments XVIII, LLC, and Security National Properties-Alaska, LLC (collectively, the "Debtors"). In connection with my duties for the Debtors, I am familiar with the Debtors' day-to-day operations, business affairs and books and records.

2.      I submit this declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of (i) the Debtors' voluntary petitions for relief under chapter 11

---

[1]     These jointly administered cases are those of the following debtors: Security National Properties Funding III, LLC (4558), ITAC 190, LLC (4378), Security National Properties Funding, LLC (4037), Security National Properties Funding II, LLC (9204), Sequoia Investments III, LLC (7204), Sequoia Investments V, LLC (5313), Sequoia Investments XIV, LLC (1115), Sequoia Investments XV, LLC (3814), Sequoia Investments XVIII, LLC (6160), and Security National Properties – Alaska, LLC (6563). The mailing address for all of the Debtors for the purpose of these cases is 3050 Westfork Drive, Baton Rouge, LA 70816.

of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Commencement Date") and (ii) the relief, in the form of motions, that the Debtors have requested of the Court (the "First Day Motions"). Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion.

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' senior management and other of the Debtors' advisors, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If I were called to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

4.      This Declaration is intended to provide a summary overview of the Debtors and these chapter 11 cases. Sections I through IV of this Declaration provide a description of the Debtors' businesses, prepetition debt, property level debt, financial information, and the events leading up to the commencement of these chapter 11 cases. Section V summarizes the First Day Motions and the relief sought, which the Debtors believe is crucial to their successful reorganization.

## I.
## DEBTORS' BUSINESSES AND ASSETS

5.      The Debtors, which are headquartered in Eureka, California, are owners and operators of 33 commercial real estate properties, including 20 office properties and 9 retail assets, as well as mobile home, industrial, and mixed-use assets, in Alabama, Alaska, Illinois, Kansas, Maine, Michigan, Minnesota, Mississippi, Montana, Nebraska, New York, North Carolina, South Carolina, Texas, and Wyoming. A schedule of the properties with a brief

description of each is attached hereto as **Exhibit A**. In all, the Debtors own over more 4 million square feet of commercial property.

6. On a collective basis, the Debtors have focused their business strategy on the acquisition of underperforming commercial assets and subsequent stabilization of these properties through aggressive leasing and cost-cutting measures. As needed, the Debtors also have made various capital improvements that further support the long-term value of their respective properties. The Debtors and their advisors estimate that the current consolidated value of these real property assets is at least $176,000,000, which is the value assigned to these properties following appraisals by the Lenders (as defined below) in 2009. Since that time, the Debtors have improved occupancy rates and the net operating income on these properties.

7. Most of the Debtors acquired their respective properties from 1993 through 2006. The Debtors generally hold their properties long-term; however, strategic sales also are pursued. The properties are managed by Security National Properties Servicing Company, LLC, a non-debtor affiliate, which is described in greater detail in Section V.

8. Security National Properties-Alaska, LLC is a Delaware limited liability company, which owns a portion of the membership interests in Security National Properties Funding III, LLC. ITAC 190, LLC is a North Carolina limited liability company. The remaining entities are Alaska limited liability companies. Security National Properties Funding III, LLC owns all or a majority of the membership interests most of the other Debtors.

## II.
## PREPETITION DEBT

9.     On or about October 18, 2006, certain of the Debtors entered into that certain Credit Agreement dated as of such date (the "Credit Agreement"), by and among Security National Properties Funding III, LLC ("SNPF III"), as borrower, Security National Properties Holding Company, LLC (a non-debtor affiliate) as parent guarantor, and other guarantors identified therein (also known as "Qualified Property Owners" or "QPOs"), Bank of America, N.A. ("BofA"), in its capacity as Administrative Agent (the "Agent") for itself and parties who are lenders under the Credit Agreement (collectively, including BofA, the "Lenders") and Banc of America Securities LLC, as Sole Lead Arranger and Sole Book Manager. Upon information and belief, the Lenders consist of the following: TD Bank, N.A., Bank of Scotland, PNC Bank, N.A, successor to National City Bank, Regions Bank, The Bank of Asia, Ltd., Compass Bank, and Comerica Bank. The Credit Agreement has been amended since its execution a number of times, most recently when the Seventh Amendment was executed on or about April 20, 2010 (as amended, restated, supplemented, or otherwise modified from time to time, the "Prepetition Credit Agreement").

10.    The Prepetition Credit Agreement provides for a revolving credit facility in the principal amount of $200,000,000, of which $159,991,940.51 is presently outstanding. On information and belief, the Lenders assert that they hold properly perfected liens in SNPF III's personal property, as well as a pledge of SNPF III's membership interests in certain of the Debtors which are its subsidiary limited liability companies.

11.    These subsidiary limited liability companies, identified as Qualified Property Owners under the Prepetition Credit Agreement, also signed guaranties supporting the Prepetition Credit Agreement. On information and belief, the Lenders assert mortgages or deeds

of trust on the respective real property assets ("Qualified Properties"), as shown on the attached **Exhibit A**, owned by the various Qualified Property Owners to secure the obligations of SNPF III under the Prepetition Credit Agreement. To the extent these mortgages or deeds of trust are valid and enforceable, the Lenders' ability to recover from the Qualified Property Owners is limited to their right to collect the 95% of the original asset value assigned to such the Qualified Properties as set forth in the Prepetition Credit Agreement.

12.     The Prepetition Credit Agreement as amended provides for the collection of rents from the Qualified Properties through a lockbox arrangement. From the cash collected via the lockbox arrangement, the Debtors fund their operations and continue to pay interest to the Lenders at the pre-default interest rate pursuant to the Prepetition Credit Agreement through the Petition Date.

13.     Ordinary Course Trade Payables and Other Unsecured Claims. As of the Petition Date, the Debtors estimate that their total unsecured claims are approximately $4,000,000 in ordinary course trade payables to various vendors and real estate property taxes.

## III.
## EVENTS LEADING TO FILING OF CHAPTER 11

14.     The significant and persisting downturn in the real estate market in the current economy is a well-documented fact. Notwithstanding the downturn in the economy, the Debtors have been able to weather the real estate market – the Debtors' properties continue to cash flow and are leasing new tenants – but they have not been able to weather a downturn in the financial market associated with commercial properties. The unpredictability of the financial markets has impacted these Debtors and ultimately led to the filing of these chapter 11 cases, as a result of (a) the Lenders' unwillingness to extend the term of the Credit Agreement absent unrealistic principal curtailment requirements, (b) prospective buyers being unable to secure financing to

purchase properties available for sale from the Debtors, and, ultimately, (c) the Lenders' decision to seek a sale of the note underlying the Prepetition Credit Agreement.

## A.     The Maturity Default and the Seventh Amendment

15.     The Seventh Amendment to the Prepetition Credit Agreement extended the maturity date of the loan from January 29, 2010 to January 29, 2012. The Seventh Amendment also included additional amendments that (a) adjusted the applicable interest rate, (b) approved the release of certain Qualified Properties, (c) required monthly reporting, (d) revised financial covenants and Debt Service Coverage Ratio (as defined therein), (e) instituted a lockbox for the collection and sweeping of cash and (f) established terms for certain protective advances. Additionally, the Seventh Amendment required principal curtailments by November 1, 2010 in the amount of $8,050,000, by February 28, 2011 in the amount of $12,000,000, by on October 1, 2011 in the amount of $10,000,000.

16.     The required principal payments were based upon the fact that, at the time of execution of the Seventh Amendment, there was a contract for sale of a Qualified Property known as the Northway Mall located in Anchorage, Alaska, for a purchase price of $34,000,000. The Agent was aware that, in the event the sale of the Northway Mall did not close, SNPF III would not be in a position to pay the required principal curtailments. The Agent indicated to SNPF III that by signing the Seventh Amendment both parties were "kicking the can down the road" and would deal with any ramifications of the Northway Mall sales contract not closing at some point in the future.

17.     As an alternative means to generate sufficient cash to make the required principal curtailments, the Debtors listed nine (9) additional properties for sale. Including the sales

contract for Northway Mall, the Debtors were able to produce 5 sales contracts on 5 different properties and ultimately closed, as described below, on 2 of the sales contracts.

18.    After several extensions of the closing date for the Northway Mall sale contract with the consent of the Agent, the buyer officially notified the Debtors in October 2010 that they were unable to secure the funds that would allow the sale to close. SNPF III immediately notified the Agent. The buyer forfeited approximately $400,000 of deposits, which were swept by the Agent.

19.    Once SNPF III notified the Agent of the termination of the Northway Mall sale contract, the parties began to negotiate a stand still letter providing SNPF III additional time to secure the payment of the initial required principal payment of $8,050,000. A stand still letter agreement on November 23, 2010, was reached that provided SNPF III through January 31, 2011 to pay the initial required principal curtailment of $8,050,000.

20.    SNPF III was able, through the sale of two commercial office buildings, which were the only two of five contracts to close as described above, to pay the required principal payment of $8,050,000. In fact, SNPF III paid a total of $9,466,939.52 by the January 31, 2011 due date. SNPF III paid $3,184,274.45 on January 13, 2011 and $6,282,665.07 on January 31, 2011. SNPF III was fortunate to close the two sales as the sale that resulted in the proceeds of approximately $3.1 million. The buyer was required by its lender to fund 50% of the sales price with equity and the sale that resulted in the proceeds of approximately $6.3 million was a sale to a governmental agency that was required to spend appropriated dollars for specific purposes.

21.    The economic environment for commercial real estate in which the Debtors were attempting to sell assets in was one of the worst environments for sellers in recent times. Valuations of commercial properties were plummeting, rental rates were falling and occupancy

levels were deteriorating. The market environment benefitted tenants and investors. Tenants were negotiating lease extensions early and demanding lower rental rates and new tenant improvements. Investors with cash were price gouging sellers that had no choice but to sell. Investor pricing on the Debtors' real properties were well below the release prices dictated by the Loan Agreement and reasonable market prices.

**B.      Negotiations with the Agent**

22.      In late February 2011, BofA notified SNPF III that BofA's Administrative Agent duties were being transferred to BofA's Special Assets group in anticipation of the Debtors' inability to make the second principal curtailment required by the Seventh Amendment. During a meeting in early March 2011 requested by SNPF III, the Agent informed SNPF III that it would require the Debtors to liquidate the portfolio of Qualified Properties and pay the loan in full. Due to the lackluster commercial real estate market conditions, SNPF III's representatives explained that such a plan was unreasonable – that, in fact, an immediate liquidation of the assets in the current market could produce insufficient proceeds to repay the principal balance. SNPF III went on to explain that the loan would be paid in full from cash flows of the Qualified Properties if the Lenders allowed the Debtors to work the properties and increase their occupancy. The meeting adjourned with the understanding that SNPF III and the Agent would exchange additional information as necessary and would work on resolution of the Prepetition Credit Agreement.

23.      During the course of the approximately 90 days following the March 2, 2011 SNPF III provided BofA's Special Assets group with additional information on the Qualified Properties as requested. The Agent retained Jones Lang LaSalle Americas, Inc. (JLL) to perform a valuation analysis of the portfolio in a liquidation scenario. The parties continued to negotiate

and execute stand still letters on a monthly basis, through and including the end of September 2011.[2] The parties also negotiated a Pre-Negotiation Agreement which the Debtors believed to be in anticipation of a long-term forbearance. SNPF III provided an initial restructuring proposal to the Agent in early July 2011, proposing terms for an amortizing loan with certain benchmarks and principal curtailments, which the parties negotiated briefly without success.

24.     Negotiations were interrupted when SNPF III learned that one or more of the Lenders were seeking a sale of SNPF III's loan. When SNPF III requested the Agent confirm that the loan was for sale, the Agent indicated that they had merely requested pricing levels from their trading desk and that the trading desk must have contacted outside firms for verbal feedback on pricing levels for the loan. The Agent reassured SNPF III that no formal marketing of the loan was being conducted.

25.     On or about September 12, 2011, the Agent informed SNPF III that a meeting was not necessary unless a meaningful proposal was presented prior to scheduling a meeting, and the Agent requested that SNPF III provide a restructuring proposal. SNPF III prepared the requested restructuring proposal and submitted the proposal to the Agent on September 21, 2011, with supporting financial information.

26.     The parties were negotiating this proposal as late as October 7, 2011, when the Agent informed SNPF III that it was gathering bids for a sale of the loan in the very short term, in direct contradiction to its prior representations that it was not seeking such a sale and that a restructuring proposal was the preferred alternative.

27.     The Debtors are concerned that the Lenders may sell the Loan to one or more entities, which could disrupt the cash flows associated with the Qualified Properties and harm the

---

2      Such stand still letter agreements were regularly delivered at the end of the month.

value of the overall enterprise. This concern has necessitated the filing of these chapter 11 petitions in order to give the Debtors the opportunity to pursue a restructuring of its obligations while preserving the value of its assets. Reserving all their applicable rights to propose a plan providing alternative treatment, the Debtors' present intention is file a plan of reorganization which extends the term of the existing secured debt and provides for payment in full over time.

## IV.
## USE OF CASH COLLATERAL AND ADEQUATE PROTECTION

### A. Summary of Relief Requested

28.     The Debtors seek interim and final orders authorizing the use of cash collateral, pursuant to section 363 of the Bankruptcy Code. The cash collateral to be used consists of cash on hand and continuing rents from tenants at the Debtors' properties and other revenues, wherever such cash may be located. The parties with an alleged interest in Cash Collateral are BofA, the Lenders and Banc of America Securities LLC, as Sole Lead Arranger and Sole Book Manager. The Debtors are requesting the interim use of cash collateral to pay disbursements in an amount consistent with the Debtors' receivables and payables for the upcoming 13-week period, in accordance with a budget attached as Exhibit C to the Cash Collateral motion. In accordance with prepetition practices as set forth in the Cash Management Motion, the Debtors will sweep incoming cash and pay operating expenses for the entire enterprise. In addition, the Debtors will pay certain prepetition obligations as necessary to preserve the value of the estates, as further described in each of the Debtors first day motions, again in amounts consistent with their 13-week cash projection.

29.     The standards for authorizing the Debtors to utilize Cash Collateral are satisfied in this instance because the Debtors' ongoing business operations will adequately

protect and preserve the value of Cash Collateral securing the Debtors' prepetition obligations. Pursuant to section 361 of the Bankruptcy Code, if necessary, the Agent and the Lenders will be further adequately protected by (i) the continued operation and maintenance of the Debtors' businesses and the Qualified Properties, (ii) payment of any accrued prepetition interest at the non-default, contract rate and will pay post-petition interest at a rate of 4.5%, provided, however, that (a) if it is subsequently determined that Lenders are undersecured or unsecured, any postpetition interest received by the Lenders shall be applied to the principal amounts outstanding under the loan or (b) if it is subsequently determined that the Lenders are sufficient over-secured with an equity cushion, the Debtors reserve their rights to amend the 13-Week Projection to remove all interest payments.

**B.   Risk of Irreparable Harm and Need for Immediate Relief**

30.   The Debtors require the immediate use of cash on hand, continuing rents and other income generated from their properties in order to maintain their day-to-day operations. Absent such relief from the Court, the Debtors will not have sufficient sources of working capital and financing to ensure uninterrupted business operations and will suffer a substantial loss of value to the detriment of all parties in interest. The Debtors do not have sufficient unencumbered assets which they could liquidate on short notice to fund their operations. Accordingly, the use of cash collateral is absolutely necessary to pay the costs of maintaining critical services to each of the Debtors' properties, including building safety services such as fire and security alarms, security services, janitorial services, utilities, and building maintenance. Without use of cash collateral to pay management costs and service providers, the Debtors will be unable to operate their Qualified Properties and will be required close them, causing

enormous disruption to tenants and customers and fundamentally impairing the value of the Debtors' properties and the collective value of the Debtors. Without the liquidity provided by use of cash collateral, the Debtors' objective of restructuring its business as a going concern, while maintaining the value of the assets for the benefit of its creditors, will fail without a fair opportunity to achieve the purposes of the chapter 11 process.

31.    The interests of the Lenders will be protected and enhanced by the Debtors' use of cash collateral because such relief will ensure the uninterrupted operation of each of the Qualified Properties, thus protecting the rental revenue at each property and protecting the value of the property itself by ensuring continued expenditures for necessary maintenance and upkeep. No retail shopping center or office building that has gone dark would be of greater value than one which continues to operate. The disruption and loss of value caused by shutting down a single shopping center would be substantial. The disruption and loss of value by shutting down a large portion of the Debtors' thirty-three properties would be calamitous.

32.    If the Debtors do not pay for the management services that allow the Debtors' properties to operate smoothly, this will necessitate a non-debtor affiliate, Security National Properties Servicing, LLC ("Properties Servicing")[3] to make significant staff reductions and could ultimately force that company to cease operations because Properties Servicing requires the payments made by the Debtors to fund the payroll and benefits of its employees. Because these employees are the ones who manage and preserve the Debtors' properties, any disruption to Properties Servicing's cash flow would have a detrimental effect on the Debtors and the Qualified Properties.

33.    As demonstrated by the 13-week budget, the Debtors have sufficient cash on hand

---

[3]    Contemporaneously herewith, the Debtors have filed the Debtors' Motion for Authorization to Continue Under Pre-Petition Management Agreements.

and projected cash flow to continue all business operations without an immediate need for additional financing beyond use of cash collateral.

## C.    The Interests of the Lenders Are Adequately Protected

34.    The Lenders' interests in cash collateral are adequately protected on both an interim basis and for the likely duration of the chapter 11 cases. The starting point for this analysis is the Debtors' cash forecast. In comparison to other businesses, and particularly other distressed businesses, the Debtors' ability to accurately forecast its cash flows is comparatively high because its revenues are based upon long-term leases and therefore are more stable than those in other industries. Expenses likewise are subject to fewer variables and short-term fluctuations than those in other industries. The result of the forecasting process is a 13-week budget that I believe is realistic and achievable. In addition, the current cash flows as reflected in the 13-Week Projection are lower than what would be expected for subsequent periods due to extraordinary capital expenditures for tenant improvements. While tenant improvement costs are often a necessity in today's leasing market, I do not anticipate future tenant improvements to be as significant as those shown in the current 13-Week Projection.

35.    As adequate protection the Debtors proposed to grant, solely during the Interim Period and only to the extent the Lenders can prove a diminution in the value of their collateral, replacement liens (the "Replacement Liens") pursuant to section 361 and 363 of the Bankruptcy Code in (a) post-petition rents generated by the Qualified Properties and (b) the Qualified Properties. Such Replacement Liens shall have the same priority as the Lenders' prepetition liens in the Cash Collateral and be in an amount equal to the aggregate diminution in value, if any, of the Lenders' Cash Collateral. As additional

adequate protection, the Debtors propose (but shall not be directed) to pay (in cash or in kind in the sole discretion of the Debtors) any accrued prepetition interest to the Lenders at the non-default, contract rate and will pay (whether in cash or in kind in the sole discretion of the Debtors) post-petition interest at a rate of 4.5% based upon the assumption that the Lenders are sufficiently over-secured with an equity cushion; provided, however, that if it is subsequently determined that Lenders are undersecured or unsecured, any postpetition interest payment received by the Lenders shall be subject to disgorgement and any postpetition PIK interest shall be disallowed and expunged.

36.    In addition, the Debtors will continue to pay all operating and maintenance expenses of the properties securing the Prepetition Credit Agreement during the chapter 11 cases, thereby preserving and enhancing the value of these properties. These expenses include both the costs specific to each property, such as management costs, utility payments, security and janitorial services, and all other direct expenses of operating the Qualified Properties. The forecast demonstrates that, on an aggregate basis, the Debtors' properties are generating cash flow in excess of operating expenses and that cash will accumulate during the chapter 11 cases, thereby protecting the security interests of all the mortgage lenders in cash collateral.

## V.    FIRST DAY RELIEF

37.    An important element to the success of the Debtors' chapter 11 cases is approval of each of the Debtors' requests for First Day Motions submitted concurrently herewith for the purposes described herein. Generally, the First Day Relief has been designed to facilitate: (a) continuing the Debtor's operations in chapter 11 with as little disruption as possible; (b) maintaining the confidence and support of vendors, tenants, and certain other key constituencies;

and (c) establishing procedures for the smooth and efficient administration of these cases. I have reviewed the First Day Motions, including the exhibits thereto, and I believe that the relief sought therein is tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to maximize the value of their estates for their creditors and other stakeholders.

38.     Capitalized terms used, but not otherwise defined below, shall have the meanings set forth in the applicable motion or application.

**A.      Debtors' Motion For Joint Administration Of Chapter 11 Cases Pursuant To Rule 1015(B) Of The Federal Rules Of Bankruptcy Procedure And Local Bankruptcy Rule 1015-1**

39.     The Debtors seek the entry of an order on the first day authorizing and directing the joint administration of their chapter 11 cases for procedural purposes only. The Debtors anticipate that numerous notices, applications, motions, other pleadings, hearings, and orders in these cases will affect all of the Debtors. With ten affiliated debtors, each with its own case docket, the failure to administer these cases jointly would result in numerous duplicative pleadings filed for each issue and served upon separate service lists. Such duplication of substantially identical documents would be extremely wasteful. The Debtors seek joint administration of their cases.

**B.      Debtors' Motion For Entry Of An Order Pursuant To 28 U.S.C. § 156(C), Bankruptcy Rule 2002(F), And Local Rule 2002-1(F) Authorizing The Retention Of GCG, Inc., As Claims, Noticing, And Balloting Agent To The Debtors And Debtors-In-Possession**

40.     The Debtors seek immediate entry of an order authorizing them to retain and employ GCG, Inc. as Claims, Noticing and Balloting Agent to, among other things: (a) serve as the Court's noticing agent to mail notices to the estates' creditors and parties in interest, (b) provide computerized claims, objection and balloting database services and (c) provide expertise and consultation and assistance in claim and ballot processing and other administrative tasks.

The number of creditors and other parties in interest in the Debtors' chapter 11 cases may impose administrative and other burdens upon the Court and the Clerk's Office. To relieve the Court and the Clerk's Office of these burdens, the Debtors seek to engage GCG, Inc. as Claims, Noticing and Balloting Agent in these chapter 11 cases.

### C. Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. § 341 And 28 U.S.C. § 156(c) Authorizing The Debtors To File (A) Consolidated List Of Creditors And (B) Consolidated List Of Debtors' Top Thirty Creditors

41.     By this motion (the "Consolidated Creditors Motion"), the Debtors respectfully request the entry of an order (a) authorizing the Debtors to file (i) a consolidated list of creditors and (ii) a consolidated list of the Debtors' thirty largest unsecured creditors.

42.     The Debtors have identified over a thousand entities to which notice of certain proceedings in the chapter 11 cases must be provided. The Debtors anticipate that such notices will comprise, without limitation, notice of: (a) the filing of the Debtors' voluntary petitions under chapter 11 of the Bankruptcy Code, (b) the initial meeting of the Debtors' creditors in accordance with section 341 of the Bankruptcy Code, (c) applicable bar dates for the filing of claims, (d) the hearing on adequacy of a disclosure statement in respect of a plan of reorganization, and (e) the hearing to confirm a plan of reorganization (collectively, the "Notices").

43.     Rule 1007-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") provides that in a voluntary chapter 11 case, the debtor must file "a list containing the name and complete address of each creditor in such format as directed by the Clerk's Office Procedures."

44.     The Debtors presently maintain various computerized lists of the names and addresses of their respective creditors that are entitled to receive the Notices and other

documents in the chapter 11 cases. The Debtors believe that the information, as maintained in computer files (or those of their agents), may be consolidated and utilized efficiently to provide interested parties with the Notices and other similar documents, as contemplated by Local Rule 1007-2.

**D.    Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. § 521, Fed. R. Bankr. P. 1007(c) And 9006(b) And Del. Bankr. L.R. 1007-1 For Entry Of An Order Granting The Debtors An Extension Of Time To File Schedules Of Assets And Liabilities And Statements Of Financial Affairs**

45.    The Debtors respectfully request the entry of an order pursuant to Bankruptcy Rules 1007(c) and 9006(b) and Local Rule 1007–1 extending the time within which they are required to file the Schedules and Statements for an additional thirty days, without prejudice to the Debtors' ability to request additional time should it become necessary.

46.    Due to the nature of the Debtors' businesses, the limited staff available to perform the required internal review of the Debtors' business and affairs and the pressure of numerous other matters incident to the commencement of the chapter 11 cases, the Debtors submit that the automatic extension of time to file the Schedules and Statements provided by Bankruptcy Rule 1007(c) and Local Rule 1007–1 will not be sufficient. Indeed, it would be onerous, if not impossible, to complete the Schedules and Statements within that deadline.

47.    The Debtors believe that they have over one thousand creditors. Further, the conduct and operation of the Debtors' business operations require the Debtors to maintain numerous books and records. Given the size of their business operations, the number of creditors, and the fact that certain prepetition invoices have not yet been received or entered into the Debtors' financial accounting systems, the Debtors have not finished compiling the information required to complete the Schedules and Statements.

48.    The Debtors respectfully submit that focusing the attention of key accounting and

legal personnel on critical operational and chapter 11 compliance issues during the early days of the chapter 11 cases will help the Debtors make a smooth transition into the chapter 11 cases and, therefore, ultimately will help maximize the value of the Debtors' estates to the benefit of creditors. Nevertheless, recognizing the importance of the Schedules and Statements in the chapter 11 cases, the Debtors intend to complete the Schedules and Statements as quickly as possible under the circumstances.

**E.** **Debtors' Motion For An Order Under Sections 105, 345, 363, 364, 1107, And 1108 Of The Bankruptcy Code And Local Rule 2015-2 Authorizing (I) Maintenance Of Existing Bank Accounts; (II) Continued Use Of Existing Cash Management System; (III) Continued Use Of Existing Business Forms And Records; And (IV) Confirmation Of Compliance With Section 345(B) Of The Bankruptcy Code**

49.     Pursuant to this motion (the "Cash Management Motion"), the Debtors seek immediate entry of an order authorizing the: (i) maintenance of existing bank accounts; (ii) continued use of their existing cash management system; (iii) continued use of their existing business forms and records; and (iv) confirmation the Debtors' compliance with section 345(b) of the Bankruptcy Code.

*1.     The Debtors' Bank Accounts and Existing Cash Management System*

50.     The basic structure of the cash management system described in the Debtors' Cash Management Motion constitutes the Debtors' ordinary, usual, and essential business practices. The cash management system is similar to those commonly employed by corporate enterprises comparable to the Debtors in size and complexity.

51.     In the ordinary course of the businesses, the Debtors maintain four operational bank accounts (collectively, the "Bank Accounts"). A list of the Bank Accounts and redacted account numbers is attached as Exhibit A to the Cash Management Motion. The Debtors do not maintain any non-cash investments and they transact their business through cash, check, and

credit card receipts.

52. Three Bank Accounts are held at BofA and one account is held at Wells Fargo, N.A ("<u>Wells</u>"). There is a Deposit Account Control Agreement in place between BofA and Security National Properties Funding III, LLC, providing for the operation and allocation of risk involved in the maintenance of the Bank Accounts maintained at BofA.

53. Under the Debtors' consolidated cash management system, BofA collects all tenant checks[4] into a Lockbox Account. Twice weekly, on Monday and Thursday, collected funds are swept from the Lockbox Account into the Debtors' Sweep Account with BofA. The BofA Operating Account is then funded twice weekly from the Debtors' cash available in the Sweep Account, also on Monday and Thursday, pursuant to a request by the Debtors. The Debtors then transfer those funds to a Wells Fargo Account and write checks and transfer wires through this account to pay various expenses. A flowchart generally outlining the Debtors' cash management system is attached to the Cash Management Motion as Exhibit B.

54. During the course of these chapter 11 cases, the Debtors may make changes to their current cash management system and/or amend BofA's existing controls over the Bank Accounts that are in place.

2. *Existing Business Forms and Records*

55. In the ordinary course of the Debtors' business, the Debtors use a variety of checks and other business forms. By virtue of the nature and scope of the Debtors' business operations, it is vital that the Debtors be permitted to continue to use their existing checks and

---

4 The exception is tenant checks from two trailer park properties known as Aspen and Rangeview, which are owned by Security National Properties Funding II, LLC. Those rent checks are collected on site by the manager and deposited into, respectively, a Wells Fargo account held by non-debtor affiliate Aspen Park, Inc., and a Northrim Bank account held by non-debtor affiliate Rangeview Tra Tel, Inc. Notwithstanding the deposit of cash into accounts held by these non-debtor affiliates, the cash is the property of Security National Properties Funding II, LLC.

other business forms without alterations or change. Alterations such as adding a "debtor-in-possession" designation to these forms could disrupt the cash management system.

56.      The Debtors issue checks printed by the Debtors in their principal place of business using a check-writing software program. The Debtors may be able to add text to these printed checks through their check-writing software denoting their status as "Debtors-in-Possession," however as of the Petition Date, they have been unable to verify that addition of such text is possible. The Debtors will attempt to add the text "Debtors-in-Possession"; however, they are nonetheless seeking a temporary waiver of this requirement with respect to their checks in the event they are unsuccessful in adding this text to their checks printed post-petition.

57.      In the ordinary course of their businesses, the Debtors maintain certain books and records in connection with the operations of their businesses. Continuing with such books and records subsequent to the Petition Date rather than closing those and opening new books will enable the Debtors to avoid unnecessary cost and burden.

       *3.     The Debtors' Bank Accounts and Financial Institutions*

58.      The Debtors may have daily balances in excess of $250,000. As such, the Debtors seek a waiver on an interim basis of the deposit guidelines set forth in section 345(b) of the Bankruptcy Code in order to continue their pre-petition practices, without prejudice to the Debtors' ability to seek a further interim or final waiver.

**F.      Debtors' Motion For Entry Of Interim And Final Orders Pursuant To Sections 105(a) And 366 Of The Bankruptcy Code (I) Prohibiting Utilities From Altering, Refusing, Or Discontinuing Services On Account Of Prepetition Invoices, (II) Deeming Utilities Adequately Assured Of Future Performance, And (III) Establishing Procedures For Determining Adequate Assurance Of Payment**

59.      Pursuant to this Motion (the "<u>Utilities Motion</u>"), the Debtors' seek the immediate

entry of order (a) prohibiting the Utility Providers from altering, refusing, or discontinuing service, (b) deeming utilities adequately assured of future performance, and (c) establishing procedures for requests for additional adequate assurance of payment.

60.     In the ordinary course of business, the Debtors regularly incur utility expenses for water, electricity, and gas. The aggregate average monthly costs for these services are in excess of $494,000. These utility services are provided by various utility companies (the "Utility Providers"). A list of these Utility Providers by Debtor is attached as Exhibit A to the Utilities Motion.

61.     The Debtors are generally current with their Utility Providers as of the Petition Date. The Debtors have a lengthy payment history with the Utility Providers indicating consistent timely payment of utility services. However, as of the Petition Date, the Debtors may have had (a) pre-petition accounts payable for utilities, (b) outstanding checks issued to pay pre-petition charges for utilities that had not cleared its accounts prior to the Petition Date, or (c) liabilities for pre-petition utilities that had not yet been billed.

62.     The Debtors' businesses involve the management of real property, which requires consistent services from the Utility Providers. Should any Utility Provider refuse or discontinue service even for a brief period of time, operations would be disrupted and rent revenues could be compromised as a result. Any such disruption would damage tenant relationships, revenues, and profits and generally would result in a depletion of the Debtors' estates. As the Debtors seek to reorganize, preservation of the value of the estates is paramount. In this regard, it is in the best interest of the Debtors, their estates, and creditors of the Debtors to maintain certain continuous and uninterrupted utility service for the Debtors.

### G. Debtors' Motion For An Order Under 11 U.S.C. §§105(a), 363(b) And 503(b)(1) Authorizing The Debtors To Honor Tenant Obligations

63.     Pursuant to this Motion (the "Tenant Obligations Motion"), the Debtors request entry of an order authorizing the Debtors to pay or otherwise satisfy tenant improvement allowances, landlord build-out costs, and tenant commercial broker fees arising under prepetition tenant leases.

64.     The Debtors seek authority, in their discretion, to satisfy up to $3.2 million of prepetition Tenant Obligations in the ordinary course of business through either: (i) a cash payment or (ii) renegotiated, modified, and/or amended lease terms providing for, among other things, a reduced rental rate.

#### 1.     Tenant Improvements

65.     A tenant improvement allowance is a specified maximum amount that a landlord agrees to reimburse a tenant, as lessee, to construct, renovate, or expand property subject to a lease agreement. To receive a disbursement of a tenant improvement allowance, a tenant will initially incur the construction costs, and then submit appropriate documentation to the landlord verifying, among other things, that: (i) the leased property is lien free; (ii) the tenant incurred construction related costs in accordance with the lease; and (iii) the construction is reasonably satisfactory to the landlord and the landlord's architect. In many instances, the full amount of a tenant improvement allowance is amortized into the rental rate of a lease. For a variety of reasons, ultimately, tenants may receive only a portion of their agreed tenant improvement allowance. As a result, the amount of the tenant improvement allowance under a lease serves as a cap, but not a floor, on the aggregate amount of the Debtors' reimbursement obligation. In addition to tenant improvement allowances, the Debtors also enter into leases that require the landlord (the Debtors) to complete certain build-outs, renovations, or other construction by a

specified date.

66.  Tenant Improvements are commonly provided in the commercial lease industry. Among other reasons, Tenant Improvements are used by the Debtors as an incentive to induce popular and/or large retail stores and other large, significant tenants to sign profitable long-term lease agreements at the Debtors' Qualified Properties. As explained below, the failure to honor and pay Tenant Improvements would cause immediate and irreparable harm to the Debtors' business by, among other things, impairing the Debtors' overall enterprise value and negatively impacting the Debtors' relationships with their tenants.

### 2.  Broker Fees

67.  Commercial brokers provide essential services for the Debtors including, among other things, identifying and bringing valuable tenants to the Debtors' properties. Commercial lease agreements between the Debtors and tenants typically require the Debtors, as landlords, to pay the Broker Fees of the agent representing a tenant. If the Debtors fail to pay the Broker Fees it will result in a default under the applicable lease agreements with tenants and could damage the Debtors' relationships with their national and regional tenants and commercial brokers.

### 3.  Payment of Tenant Obligations

68.  Based on the Debtors' books and records, the Debtors may owe up to $3.2 million in potential Tenant Obligations under prepetition leases that either have or will become due in the next several months. As of the Commencement Date, the Debtors do not believe any Tenant Obligations are currently due and owing to certain tenants and commercial brokers having submitted the required documentation, satisfied the specified prerequisites, and, thus, triggered the Debtors' payment obligations under the applicable leases; however, the Debtors seek authority to pay any such amounts out of an abundance of caution. The Debtors estimate they

owe approximately $3.2 million relating to Tenant Improvements undertaken, in whole or in part, prior to the Commencement Date, but for which (i) the work may not have been completed prepetition, and/or (ii) the tenant has not submitted the required documentation or satisfied other contractual prerequisites to obtain reimbursement.

69.     Based on historical practice, the aggregate amount of potential outstanding Tenant Obligations may be reduced by, among other things, (i) the actual amount of Tenant Improvement costs incurred by tenants in accordance with the applicable leases, which may be less than the amount stated in a lease; (ii) only partial satisfaction of the requirements to obtain reimbursement, thus reducing the landlord's obligation; (iii) renegotiated leases with tenants whereby the Tenant Obligations have been reduced or eliminated, whether through a reduced rent rate or otherwise; or (iv) waiver of the right to reimbursement as a result of the tenant's failure to complete the required process or satisfy the contractual prerequisites to obtain reimbursement.

70.     As a consequence of the commencement of these chapter 11 cases, tenants may be concerned about the Debtors' ability to (i) pay Tenant Obligations arising under prepetition lease agreements or (ii) renegotiate prepetition lease terms, including rental rates, after the Commencement Date. In addition, all or a portion of the Debtors' Tenant Obligations under prepetition leases arguably may be considered prepetition obligations of the Debtors. While the Debtors anticipate ultimately assuming most, if not all, of their leases with tenants pursuant to section 365 of the Bankruptcy Code, to avoid immediate and irreparable harm, the Debtors seek the entry on interim and final orders confirming the Debtors' authority to pay or otherwise satisfy prepetition Tenant Obligations in the ordinary course of business or through renegotiated, modified, and/or amended lease terms providing for, among other things, a reduced rental rate.

**H.  Debtors' Motion for Authorization to Continue Performance Under Prepetition Management Agreement**

71.     Pursuant to this motion (the "Management Agreement Motion"), the Debtors seek entry of an order authorizing the Debtors to continue to perform under the terms of the Management Agreement

72.     The Debtors do not have employees that manage or preserve their properties; instead, the management of the Debtors' respective properties is conducted by Security National Properties Servicing Company, LLC ("Properties Servicing"), a non-debtor affiliate. Properties Servicing manages the Debtors' properties in exchange for a monthly payment from the Debtors in the amount of $350,000 (the "Management Agreement").[5]  Other non-debtor affiliates pay Properties Servicing to service their respective properties; however, the $350,000 amount (the "Management Fee") represents that amount that is allocated to the Debtors' assets. This arrangement was approved by the Debtors' lenders (the "Lenders").

73.     The Management Fee, together with certain other management fees paid by non-debtor affiliates, supports the payroll and benefits of the employees of Properties Servicing, along with certain allocated overhead costs associated with the management of the Debtors' properties.

74.     The employees of Properties Servicing have unique and irreplaceable knowledge of the Debtors' operations, including an intimate knowledge of the various building systems and requirements. Most of these employees are on-site at the Debtors' various properties and interact with tenants on a day-to-day basis. The relationships that they have developed with the Debtors' tenants help ensure the prompt payment of rents and, more importantly, result in long-term leases

---

[5]     The Debtors do not believe there are any prepetition amounts outstanding under the Management Agreement, and are, therefore, not seeking such relief in this Motion.

that contribute to the stabilization of the Debtors' properties. If the Debtors were forced to seek management services from a new provider, there would be a significant disruption in the Debtors' operations, which would have an appreciable detriment to the value of the Debtors' properties. It is for this reason, the continuation of the Management Fee is essential to the success of these chapter 11 cases.

I. **Debtors' Motion For Entry Of An Order Pursuant To 11 U.S.C. §§ 105(a), 363, 364, 503(b), 1107(a) And 1108 And Fed. R. Bankr. P. 6003 And 6004 Authorizing The Debtors To (I) Honor Prepetition Obligations To And (II) Continue Prepetition Practices With Certain Critical Vendors**

75. By this motion (the "Critical Provider Motion"), the Debtors respectfully request the entry of an order authorizing, but not directing, the Debtors, in their business judgment and sole discretion, to (a) pay the Critical Provider Claims in an aggregate amount not to exceed $520,822.72. (the "Critical Provider Cap") and (b) continue during the postpetition period their prepetition practices with the Critical Providers.

76. The ability of the Debtors to continue the operation of their properties going forward will depend largely upon uninterrupted, continued access to the services provided by certain providers of essential services and supplies. The Debtors are mindful of their fiduciary obligations to preserve and maximize the value of their estates. The Debtors have assessed the critical services at their properties and identified certain suppliers of goods and services that are so essential to the Debtors' operations that the loss of their particular services would cause immediate and irreparable harm to the Debtors' business (collectively, the "Critical Providers"). Examples of Critical Providers include, but are not limited to, providers of (a) janitorial services and supplies, (b) security services, (c) fire and alarm monitoring of the Debtors' properties, and (d) elevator services. The Debtors have traditionally outsourced these essential services provided by the Critical Providers. Without the Critical Providers, the Debtors risk significant interruption

to the provision of essential services and would be required to spend a significant amount of funds to hire additional employees to perform them.

77.     As part of the Debtors' operation of commercial properties, the Debtors rely on a number of Critical Providers to supply janitorial services and supplies. Janitorial service providers perform recurring cleaning services for the Debtor/landlord-controlled areas of their properties, including interior service courts, mall common areas, entrance ways, food courts, restrooms, owned office premises, walkways and vestibules, and interior and exterior trash collection areas. These Critical Providers also provide uniforms, supplies (e.g., cleaning chemicals, paper, and plastic), and capital equipment (e.g., large riding scrubbers) for the efficient completion of tasks.

78.     Critical Providers of security services are licensed by state and municipalities and provide personnel, uniforms, supplies, equipment, and training to patrol and oversee defined premises for the personal safety of customers, patrons, and employees of the Debtors. These Critical Providers of security services also protect assets, including personal and real property of the Debtors, their tenants, and visitors.

79.     The Debtors also utilize Critical Providers to install and monitor computerized alarm systems on the Debtors' properties.

80.     In addition, the Debtors' properties contain numerous individual elevators. To properly and reliably operate and meet building codes, this equipment must be maintained by a qualified professional under a monthly service contract. As such, the providers of these elevator-related services are Critical Providers.

81.     In each instance, failure to pay the Critical Providers would likely result in a severe disruption or even cessation of certain operations and, thus, undermine certain of the

Debtors' properties and the revenues derived therefrom. Even if the Debtors were able to convince the Critical Providers to continue to supply goods and services to the Debtors absent payment of these prepetition claims, the Critical Providers will likely agree to do so only on trade terms much less favorable than those customarily extended to the Debtors. The Debtors estimate that, as of the Petition Date, the total outstanding amount owed to Critical Providers is approximately $520,822.72 (the "Critical Provider Claims").

## VI. CONCLUSION

82.    The Debtors' ultimate goal in this chapter 11 case is to maximize the value of its estates for the benefit of its creditors and other stakeholders. To minimize any loss of value of the Debtors' businesses during the Debtors' transition to operating in chapter 11, the Debtors' immediate objective is to engage in business as usual with as little interruption or disruption to the Debtors' operations as possible. I believe that if the Court grants the First Day Motions, the Debtors' prospects for achieving the Debtors' overriding goal of maximizing value for its creditors and other stakeholders will be substantially enhanced.


I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 17, 2011.

<div style="margin-left: 40%;">

SECURITY NATIONAL PROPERTIES FUNDING III, LLC, ITAC 190, LLC, SECURITY NATIONAL PROPERTIES FUNDING, LLC, SECURITY NATIONAL PROPERTIES FUNDING II, LLC, SEQUOIA INVESTMENTS III, LLC, SEQUOIA INVESTMENTS V, LLC, SEQUOIA INVESTMENTS XIV, LLC, SEQUOIA INVESTMENTS XV, LLC, SEQUOIA INVESTMENTS XVIII, LLC, and SECURITY NATIONAL PROPERTIES–ALASKA, LLC

</div>

By: John L. Piland
Title: Chief Financial Officer and Senior Vice President of Security National Master Manager, LLC