## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| SECURITY NATIONAL PROPERTIES FUNDING III, LLC, *et al.*,[1] | Case No. 11-13277 (KG) |
| Debtors. | Jointly Administered |
|  | **Hearing Date**: Requested on or before January 11, 2013 |
|  | **Objections Due: January 9, 2013 at 4 p.m. (ET) [REQUESTED]** |

## MOTION OF DEBTORS FOR ORDERS (A) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION UNSECURED FINANCING AND GRANTING ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. § 364 AND (B) SCHEDULING A FINAL HEARING AND ESTABLISHING RELATED NOTICE REQUIREMENTS

Security National Properties Funding III, LLC, ITAC 190, LLC, Security National Properties Funding, LLC, Security National Properties Funding II, LLC, Sequoia Investments III, LLC, Sequoia Investments V, LLC, Sequoia Investments XIV, LLC, Sequoia Investments XV, LLC, Sequoia Investments XVIII, LLC, and Security National Properties-Alaska, LLC, each as a debtor and debtor in possession (collectively, the "Debtors") in the above-captioned cases (collectively, the "Chapter 11 Cases"), respectfully represent as follows:

### BANKRUPTCY RULE 4001 CONCISE STATEMENT

1.      By this motion (the "DIP Motion") and for the reasons set forth below, pursuant to sections 105(a), 363(b), 364(b) and 503(b)(1) of title 11 of the United States Code,

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Security National Properties Funding III, LLC (4558), ITAC 190, LLC (4378), Security National Properties Funding, LLC (4037), Security National Properties Funding II, LLC (9204), Sequoia Investments III, LLC (7204), Sequoia Investments V, LLC (5313), Sequoia Investments XIV, LLC (4387), Sequoia Investments XV, LLC (3814), Sequoia Investments XVIII, LLC (6160), and Security National Properties-Alaska, LLC (6563).  The mailing address for all of the Debtors for the purpose of these cases is 3050 Westfork Drive, Baton Rouge, LA 70816.

11 U.S.C. §§ 101 *et seq.* (as amended, the "Bankruptcy Code"), Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedures of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors respectfully request entry of (A) an interim order substantially in the form attached as **Exhibit A** (the "Interim DIP Order") (i) authorizing the Debtors to obtain postpetition unsecured financing, (ii) granting administrative priority claims to the Lender (as defined below), (iii) scheduling a hearing to consider the relief requested in this DIP Motion on a final basis (the "Final Hearing"), and (iv) granting related relief; and (B) an order granting the relief requested in this DIP Motion on a final basis (the "Final DIP Order," and together with the Interim DIP Order, the "DIP Orders").[2]

2.      Pending the Final Hearing and entry of the Final DIP Order, the Debtors respectfully request that the DIP Facility (as defined below) be approved on an interim basis pursuant to the terms of the Unsecured Note, in substantially the form attached to the Interim DIP Order as Exhibit A (including the Budget annexed as Exhibit 1 thereto, the "Unsecured Note").

3.      Pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, the following are the material provisions of the Unsecured Note and the Interim DIP Order.[3]  As discussed in

---

[2]      The Debtors will provide a proposed Final DIP Order to the Court, Bank of America (as defined below), the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), and all parties in interest upon appropriate notice in advance of the Final Hearing.

[3]      Unless otherwise specified, capitalized terms used but not defined in this concise statement shall have the meanings ascribed to such terms in the Unsecured Note or the Interim DIP Order, as applicable. The summaries and descriptions of the terms and conditions of the Unsecured Note and the Interim DIP Order set forth in this DIP Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of significant terms of the Unsecured Note and the Interim DIP Order. In the event of any conflict between this DIP Motion and the Unsecured Note and the

detail herein, the Debtors believe that the terms of the Unsecured Note and the Interim DIP

Order are appropriate and justified in the context of, and the circumstances relating to, these

Chapter 11 Cases:

| | |
|---|---|
| **Makers:**<br><br>Unsecured Note at p. 1. | Security National Properties Funding III, LLC, ITAC 190, LLC, Security National Properties Funding, LLC, Security National Properties Funding II, LLC, Sequoia Investments III, LLC, Sequoia Investments V, LLC, Sequoia Investments XIV, LLC, Sequoia Investments XV, LLC, Sequoia Investments XVIII, LLC, and Security National Properties-Alaska, LLC |
| **Lender:**<br><br>Unsecured Note at p. 1. | Security National Properties Holding Company, LLC, an affiliate of the Debtors (the "Lender") |
| **DIP Facility:**<br><br>Unsecured Note at pp. 2 & 3. | The Note provides for funding to the Makers of up to $2,000,000 (the "Maximum Amount"). Borrowings under the Unsecured Note (each such event being called an "Advance") will be available to the Makers as follows (the "DIP Facility"):<br><br>▪ Up to $1,200,000 of the Maximum Amount upon entry of the Interim DIP Order; and<br><br>▪ Balance of the Maximum Amount, but reduced by any amounts drawn under Section 1.B.(i) of the Unsecured Note, upon entry of the Final DIP Order.<br><br>In order to request an Advance under the Unsecured Note, the Makers shall provide Lender with a borrowing request, which shall (1) be irrevocable, (2) be in writing and signed by Makers, (3) be in compliance with the Budget (taking into account the Permitted Variance) and Section 2 of the Unsecured Note, (4) not occur more than once per calendar week, (5) include the amount requested to be borrowed and the requested timing of such borrowing, and (6) state that no Event of Default has occurred or is reasonably likely to occur with the passage of time. The making of any Advance shall be subject to Lender's sole determination that the conditions to borrowing under the Unsecured Note have been satisfied. |
| **Priority:**<br><br>Unsecured Note at p. 4. | All obligations of the Makers under the Unsecured Note shall, pursuant to section 364(b) of the Bankruptcy Code, constitute allowed expenses of administration with the priority set forth in section 503(b)(l) of the Bankruptcy Code. |
| **Use of Funds:** | Subject to the Budget and the Permitted Variance thereto, the proceeds of the Unsecured Note shall be used solely to: (a) fund post-petition operating expenses |

Interim DIP Order, the Unsecured Note or the Interim DIP Order, as applicable, shall control in all respects. The Unsecured Note and the Interim DIP Order do not contain any provisions that must be disclosed pursuant to Bankruptcy Rule 4001(c)(1)(B).

| | |
|---|---|
| Unsecured Note at p. 3. | and other general corporate needs of the Makers, including working capital needs; (b) pay the allowed fees and expenses of attorneys and other professionals retained by the Makers; (c) pay allowed fees and charges against the Makers under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930; (d) make payments to the Senior Lenders (or to the Administrative Agent on their behalf) permitted or required to be made by any order, pursuant to section 363(c)(2) of the Bankruptcy Code, authorizing the Makers to use cash collateral in which the Administrative Agent or Senior Lenders have an interest, provided that the Lender has consented in writing to the entry of such cash collateral order; (e) make payments to governmental units (as defined in section 101(27) of the Bankruptcy Code) for any tax obligation relating to real or personal property in which any Maker has an interest; and (f) to make such other payments authorized by the Bankruptcy Court and consented to by the Lender. |
| **Rate of Interest:**<br><br>Unsecured Note at p. 4. | The interest rate on the outstanding principal balance hereunder shall accrue at an annual rate equal to 4.6%. All interest shall be due and payable no earlier than the Maturity Date. |
| **Term:**<br><br>Unsecured Note at p. 4. | The "Maturity Date" of the Unsecured Note, unless otherwise agreed in writing by Lender, shall be the earlier of: (a) the Effective Date of the Plan; (b) the occurrence of an Event of Default (as defined below); and (c) June 30, 2013. |
| **DIP Facility Status:**<br><br>Unsecured Note at p. 4. | Makers and Lender agree that the Unsecured Note is a "DIP Facility" pursuant to the terms of the Plan Support Agreement and the Plan, and that all principal and interest then outstanding under the Unsecured Note are subject to being waived and forgiven by the Lender pursuant to the terms of the Plan Support Agreement and Plan. |
| **Events of Default:**<br><br>Unsecured Note at p. 5. | Each of the following shall be a default under the Unsecured Note (collectively, the "Events of Default"): (a) failure to make a payment of any amount due hereunder on the Maturity Date and such failure continues for ten days without being cured; (b) the conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code; (c) appointment of a trustee for any of the Makers; (d) the Bankruptcy Court shall enter any order granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code to a holder of any security interest to permit foreclosure (including under Article 9 of the Uniform Commercial Code and/or applicable state law) on any of the assets of any Maker or to exercise any remedy with respect to any membership interest in any Maker ; (e) the appointment of an examiner with expanded powers in any Maker's Chapter 11 Case; (f) an unstayed Interim DIP Order is not entered by the Bankruptcy Court on the docket in the lead Chapter 11 Case by January 11, 2013; (g) an unstayed Final DIP Order is not entered by the Bankruptcy Court on the docket in the lead Chapter 11 Case on or before February 28, 2013; (h) an unstayed interim order in a form acceptable to Lender that extends for the period through February 28, 2013, the Makers' right to use of cash collateral in which the Administrative Agent asserts an interest is not entered by the Bankruptcy Court on the docket of the lead Chapter 11 Case by January 11, 2013 (the "Twelfth Interim Cash Collateral Order"); (i) an unstayed final order in a form acceptable to Lender |

that extends for the period through the earlier of March 31, 2013 or the Effective Date of the Plan, the Makers' right to use of cash collateral in which the Administrative Agent asserts an interest is not entered by the Bankruptcy Court on the docket of the lead Chapter 11 Case by February 28, 2013 (the "Final Cash Collateral Order"); (j) any order of the Bankruptcy Court or any appellate court shall be entered staying, reversing, modifying or vacating, in whole or in part, the Interim DIP Order, the Final DIP Order, Twelfth Interim Cash Collateral Order, and/or the Final Cash Collateral Order; (k) any order shall be entered denying a motion, application or request of any Debtor to use of cash collateral in which the Administrative Agent asserts an interest shall be entered at any time prior to the Maturity Date; (l) the entry of an order of the Bankruptcy Court denying confirmation of the Plan; and (m) any order of the Bankruptcy Court or any appellate court shall be entered staying, reversing, modifying or vacating any order confirming the Plan.

### *Highlighted Provisions Under Rule 4001-2(a)(i)*

4.      Local Rule 4001-2(a) states in pertinent part that:

(i) All Financing Motions must (a) recite whether the proposed form of order and/or underlying cash collateral stipulation or loan agreement contains any provision of the type indicated below, (b) identify the location of any such provision in the proposed form of order, cash collateral stipulation and/or loan agreement and (c) justify the inclusion of such provision:

(A) Provisions that grant cross-collateralization protection (other than replacement liens or other adequate protection) to the prepetition secured creditors (i.e., clauses that secure prepetition debt by postpetition assets in which the secured creditor would not otherwise have a security interest by virtue of its prepetition security agreement or applicable law);

(B) Provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters;

(C) Provisions that seek to waive, without notice, whatever rights the estate may have under 11 U.S.C. § 506(c);

(D) Provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of

action arising under 11 U.S.C. §§ 544, 545, 547, 548 and 549;

(E) Provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b);

(F) Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out; and

(G) Provisions that prime any secured lien without the consent of that lienor.

Del. Bankr. Local Rule 4001-2(a)(i).

5.      Neither the Unsecured Note nor the Interim DIP Order contain any provision indicated in Local Rule 4001-2(a).

## JURISDICTION

6.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue of these proceedings in this Court is proper under 28 U.S.C. §§ 1408 and 1409.

7.      The statutory bases for the relief sought herein are sections 105(a), 363(b) 364(b), and 503(b)(1) of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Rule 4001-2.

## BACKGROUND

8.      On October 13, 2011 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the Chapter 11 Cases.  No trustee, examiner, or creditors' committee has been appointed in the

Chapter 11 Cases.  The Debtors continue to manage and operate their businesses as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code.

9.      The Debtors, which are headquartered in Eureka, California, are owners and operators of thirty-three commercial real estate properties (collectively, the "Properties"), including twenty office properties and nine retail assets, as well as mobile home, industrial, and mixed-use assets in Alabama, Alaska, Illinois, Kansas, Maine, Michigan, Minnesota, Mississippi, Montana, Nebraska, New York, North Carolina, South Carolina, Texas, and Wyoming.

10.     The events leading up to the Petition Date and certain of the facts and circumstances supporting the relief requested herein are set forth in the *Declaration of John Piland in Support of First Day Relief* (the "Piland Declaration") [D.I. 14] filed on October 17, 2011 and incorporated herein by reference.

## SUMMARY OF THE DEBTORS' PRE-PETITION SECURED INDEBTEDNESS

11.     On or about October 18, 2006, certain of the Debtors entered into that certain Credit Agreement dated as of such date (the "Pre-Petition Loan Agreement") by and among Security National Properties Funding III, LLC ("SNPF III"), as borrower, Security National Properties Holding Company, LLC, as parent guarantor, and other guarantors identified therein (also known as "Qualified Property Owners" or "QPOs"), Bank of America, N.A. in its capacity as Administrative Agent ("Bank of America") for itself and parties who are lenders under the Pre-Petition Loan Agreement (collectively, including Bank of America, the "Senior Lenders") and Banc of America Securities LLC, as Sole Lead Arranger and Sole Book Manager. Upon information and belief, as of the Petition Date, the following were Senior Lenders: Bank of America, TD Bank, N.A., Bank of Scotland, PNC Bank, N.A., successor to National City Bank,

Regions Bank, The Bank of Asia, Ltd., Compass Bank, and Comerica Bank.[4]  The Pre-Petition

Loan Agreement has been amended since its execution a number of times, most recently when

the Seventh Amendment was executed on or about April 20, 2010.

12.    The Pre-Petition Loan Agreement provides for a revolving credit facility

in the principal amount of $200,000,000, of which $159,991,940 was outstanding as of the

Petition Date. On information and belief, the Senior Lenders assert that they hold properly

perfected liens in SNPF III's personal property, as well as a pledge of SNPF III's membership

interests in certain of the Debtors which are its subsidiary limited liability companies.

13.    These subsidiary limited liability companies, identified as Qualified

Property Owners under the Pre-Petition Loan Agreement, also signed guaranties supporting the

Pre-Petition Loan Agreement.  On information and belief, the Senior Lenders assert mortgages

or deeds of trust on the respective real property assets ("Qualified Properties") owned by the

various Qualified Property Owners to secure the obligations of SNPF III under the Pre-Petition

Loan Agreement. To the extent these mortgages or deeds of trust are valid and enforceable, the

Senior Lenders' ability to recover from the Qualified Property Owners is limited to their right to

collect 95% of the original asset value assigned to the Qualified Properties as set forth in the Pre-

Petition Loan Agreement.

14.    The Pre-Petition Loan Agreement provides for the collection of rents from

the Qualified Properties through a lockbox arrangement.  Prior to the Petition Date, the Debtors

---

[4]    Based on the representations of Bank of America, the Debtors understand that Regions
Bank and Bank of Scotland each sold their positions and are no longer Senior Lenders.
Based on the representations of Bank of America, the Debtors further understand that
Top Fund II, LLC and Banc of America Credit Products, Inc. have become Senior
Lenders.

used the cash collected via the lockbox arrangement to fund their operations and pay interest to the Senior Lenders at the pre-default interest rate pursuant to the Pre-Petition Loan Agreement.

## SUMMARY OF THE DEBTORS' POST-PETITION CASH COLLATERAL RELIEF

15.     On October 17, 2011, the Debtors filed the *Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 361 and 363: (i) Authorizing the Debtors to Use Cash Collateral, (ii) Scheduling a Final Hearing, and (iii) Granting Related Relief* [D.I. 12] (the "Cash Collateral Motion") and on October 18, 2011, the Bankruptcy Court approved the Cash Collateral Motion on an interim basis (the "Interim Cash Collateral Order") [D.I. 27].   The Bankruptcy Court has subsequently entered ten further Interim Cash Collateral Orders [D.I. 64, 94, 119, 152, 179, 193, 264, 279, 353 and 431].   Under the Interim Cash Collateral Orders, the Bankruptcy Court authorized the Debtors to use Cash Collateral (as defined in the Interim Cash Collateral Orders) for operations and other expenditures reflected on the budgets attached thereto, and as updated periodically pursuant thereto, to maintain, preserve, and enhance the value of the Properties.   Through the use of rents, the Debtors have made repairs and significant improvements to the Properties and paid taxes, utilities costs, and insurance.

16.     The most recent Interim Cash Collateral Order extends the Debtors' use of Cash Collateral until January 11, 2013.

## THE PLAN SUPPORT AGREEMENT AND PLAN

17.     On April 24, 2012, the Debtors filed the *Proposed Joint Chapter 11 Plan of Reorganization of Security National Properties Funding III, LLC and its Debtor Affiliates* [D.I. 196] (the "Initial Plan") and the *Disclosure Statement for Joint Chapter 11 Plan of Reorganization of Security National Properties Funding III, LLC and its Debtor Affiliates* [D.I. 197].

18.     At the time the Debtors filed the Initial Plan, the Debtors had reached an understanding with their equity holders under which certain of the Debtors' equity holders would act as a sponsor of the Initial Plan pursuant to a Plan Support Agreement (defined below).  While the terms of the Plan Support Agreement were not fully documented at the time the Debtors filed the Initial Plan, it was the intent of the Debtors' equity holders to make a significant cash investment in the Debtors in order to preserve and enhance the long term value of the Debtors' equity and make additional working capital available to the Debtors.  In particular, at the time the Initial Plan was filed, the Debtors' equity holders had committed to, among other things, invest $3,700,000 in the Debtors on the effective date of the Initial Plan (the "New Investment").  The terms of the New Investment also contemplated that the Debtors' equity holders may advance a portion of the $3,700,000 investment to the Debtors prior to the effective date of the Initial Plan in the form of a debtor in possession loan, with any such loan to be forgiven on the effective date of the Initial Plan.

19.     On October 1, 2012, the Debtors filed the *Amended Joint Chapter 11 Plan of Reorganization of Security National Properties Funding III, LLC and its Debtor Affiliates* (the "Amended Plan") [D.I. 329].[5]  Attached as Exhibit A to the Amended Plan was an executed copy of the Plan Support Agreement between Security National Properties Holding Company, LLC and Security National Properties Servicing Company, LLC (together, the "Plan Sponsors") and the Debtors.  The Plan Support Agreement memorialized the agreement outlined in the Initial Plan.  In addition, the Plan Sponsors increased the amount of the New Investment from

---

[5]     The Debtors filed the *Amended Disclosure Statement for Amended Joint Chapter 11 Plan of Reorganization of Security National Properties Funding III, LLC and its Debtor Affiliates* [D.I. 330].

$3,700,000 to a maximum of $5,000,000.  Furthermore, the Plan Support Agreement provided as follows regarding potential debtor in possession financing:

> DIP Facility Forgiveness. In the event a DIP Facility has been put in place on or before the Effective Date of the Amended Plan, any outstanding balance of that DIP Facility as of the Effective Date will be forgiven.

*See* Plan Support Agreement, p. 2.  The term "DIP Facility" is defined in the Second Amended Plan (defined below) as "any post-petition financing facility provided by one or more of the Plan Sponsors or other Affiliates of the Debtors, including all documents related thereto, each as amended and supplemented."  *See* Second Amended Plan, Art. I.A.42.  As stated above, the terms of the Unsecured Note provide that it is a DIP Facility.  *See* Unsecured Note, p. 4.

20.    On October 26, 2012, the Debtors filed the *Second Amended Joint Chapter 11 Plan of Reorganization of Security National Properties Funding III, LLC and its Debtor Affiliates* (the "Second Amended Plan") [D.I. 380] and the *Disclosure Statement for Second Amended Joint Chapter 11 Plan of Reorganization of Security National Properties Funding III, LLC and its Debtor Affiliates* (the "Second Amended Disclosure Statement") [D.I. 380].  On October 31, 2012, the Court approved the Second Amended Disclosure Statement.  *See Order Approving Debtors' Amended Motion for Entry of an Order (a) Approving the Disclosure Statement, (b) Establishing the Voting Record Date, Voting Deadline and Other Dates, (c) Approving Procedures for Soliciting, Receiving and Tabulating Votes on the Plan and for Filing Objections to the Plan and (d) Approving the Manner and Forms of Notice and Other Related Documents* [D.I. 382].  The Debtors are currently in the process of soliciting votes on the Second Amended Plan.  A hearing to consider, among other things, confirmation of the Second Amended Plan is currently set for February 20, 21, 22, 27 and 28, 2013.

## THE DEBTORS' NEED FOR POST-PETITION FINANCING

21.     The Debtors have been and remain committed to a business plan for their Properties that is positioning the Debtors to boost occupancy rates at their Properties and maximize operating revenue realized from those Properties.  The Debtors have already seen significant improvements to both the value of the Properties and the rental income they generate. The Debtors expect these metrics to continue to improve over the life of the Properties.  The Second Amended Plan is premised on this business plan, which the Debtors expect will both generate sufficient liquidity to service a reasonable level of debt at a reasonable interest rate and leave the Debtors with sufficient free cash flow to reinvest in the Properties, as appropriate.

22.     As set forth in the Budget (attached as Exhibit 1 to the Unsecured Note), over the next several months, the Debtors anticipate making approximately $740,000 in expenditures for tenant improvements and approximately $302,000 in other capital expenditures at their Properties.  These commitments to continue to improve and maintain the Properties will help make it possible, together with the efforts of SNP Servicing's personnel and others acting for the Debtors, to obtain increased occupancy rates and operating revenues from the Properties.

23.     The Debtors' business plan is necessarily cash-intensive and requires a near-term commitment to meet tenant improvement obligations, make capital expenditures and take other steps to promote the future viability of the Debtors' business.  The Debtors have always contemplated that they would need external funding in order to emerge from bankruptcy. Therefore, the Debtors and the Plan Sponsors entered into the Plan Support Agreement, which, as discussed above, sets forth the Plan Sponsors' agreement to provide the Debtors with the New Investment on the effective date of the Second Amended Plan.

24.     As the New Investment is contingent on the occurrence of the effective date on the Second Amended Plan and as Bank of America and the Senior Lenders have made known their intentions to oppose the Second Amended Plan, the Debtors have not been able to forecast with certainty when the New Investment will become available to the Debtors.  Indeed, at the time the Initial Plan was filed, the Debtors contemplated an August 2012 confirmation hearing, but due to several attempts to resolve the disputes between the Debtors, Bank of America and the Senior Lenders, the Debtors' confirmation hearing was subsequently adjourned several times.  The confirmation hearing is presently scheduled for the last two weeks of February 2013.

25.     Since the Debtors have been unable to forecast with certainty when the New Investment will become available, the Debtors have made every effort to manage their cash conservatively over the course of the Chapter 11 Cases while simultaneously pursuing their business plan for the Properties.  While these efforts have been successful to date, the Debtors have incurred significant expenses due to ordinary course tax obligations, tenant improvements and capital expenditures, which must be paid during the first quarter of 2013.  Indeed, the Debtors have incurred nearly $1,500,000 in various ordinary course real estate and other tax obligations that must be paid in January 2013.  Furthermore, the Debtors have incurred significant administrative expenses associated with the Chapter 11 Cases, including filing fees, US Trustee fees, fees payable the noticing, claims and balloting agent and professional fees payable to estate professionals, which have further impacted their near term liquidity.

26.     The scenario that has now come to pass is one that is contemplated by the Plan Support Agreement, which allows for the Plan Sponsors to receive a credit against their New Investment obligation to the extent that amounts a Plan Sponsor lends the Debtors under a

DIP Facility are forgiven under the Debtors' plan. *See* Plan Support Agreement, p. 2. Once it became clear that the Debtors' exit from bankruptcy would be delayed and that the Debtors could benefit from the additional liquidity to be provided by a DIP Facility, the Debtors and Plan Sponsors began discussing the terms under which such funding would be provided to the Debtors in advance of plan confirmation. As a result of those discussions, the Debtors and the Lender have agreed upon the material terms reflected in the Unsecured Note.

### RELIEF REQUESTED

27.     By this DIP Motion and for the reasons set forth herein, pursuant to sections 105(a), 363(b), 364(b) and 503(b)(1) of title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014 and Local Rule 4001-2, the Debtors respectfully request that the Court (A) authorize the Debtors, on an interim basis pending the Final Hearing and entry of the Final DIP Order, to (i) obtain postpetition unsecured financing up to an aggregate principal amount of $1,200,000 pursuant to the Unsecured Note, and (ii) grant administrative priority claims to the Lender; (B) authorize the Debtors, on a final basis, to (i) obtain postpetition unsecured financing up to an aggregate principal amount of $2,000,000 pursuant to the Unsecured Note, and (ii) grant administrative priority claims to the Lender; (C) schedule the Final Hearing; and (D) grant related relief, in each case, on the terms and subject to the conditions described in this DIP Motion and set forth in the proposed DIP Orders and the Unsecured Note.

### BASIS FOR RELIEF REQUESTED

28.     Section 364(b) of the Bankruptcy Code authorizes a debtor to obtain unsecured credit outside the ordinary course of business after notice and a hearing.[6] Credit

---

[6]     Specifically, section 364(b) of the Bankruptcy Code provides that:

obtained under section 364(b) of the Bankruptcy Code is allowable as a non-priority administrative claim pursuant to section 503(b)(1)(A) of the Bankruptcy Code. "Subsection (b) permits the court to authorize the trustee to obtain unsecured credit and incur unsecured debts other than in the ordinary course of business, such as . . . to obtain a substantial loan in an operating case." H.R. Rep. No. 595, 1st Sess. 346–47 (1977), reprinted in 1978 U.S.C.C.A.N. 5787, 5963, 6303.

**Application of the Business Judgment Standard**

29.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See, e.g.*, *Trans World Airlines, Inc. v. Travellers Int'l AG (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment."); *Ames Dep't Stores*, 115 B.R. at 38 (noting that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment); *Barbara K. Enters.*, 2008 WL 2439649, at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court"); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981) (holding that courts generally will not second-guess a debtor in possession's business decisions when those decisions involve "a business judgment made in

---

> The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503 (b)(1) of this title as an administrative expense.

11 U.S.C. § 364(b).

good faith, upon a reasonable basis, and within the scope of his authority under the Code"). In fact, "[m]ore exacting scrutiny would slow the administration of the Debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

30.     Generally, the business judgment standard requires that a debtor in possession be afforded discretion to act with regard to business decision making. *See Simasko Prod. Co.*, 47 B.R. at 449 ("[D]iscretion to act with regard to business planning activities is at the heart of the debtor's power.") (citations omitted).

31.     Specifically, to determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also Curlew Valley Assocs.*, 14 B.R. at 513-14 (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code.") (citation omitted).

32.     The Debtors' decision to enter into the proposed Unsecured Note satisfies this standard. Entry into the Unsecured Note and obtaining the financing available thereunder are necessary to the preservation of estate assets and is in the best interest of the Debtors' creditors and all parties in interest. Moreover, the terms of the Unsecured Note are fair and reasonable and are in the best interests of the Debtors' estates. Given the relatively small amount of financing that the Debtors anticipate needing, the Debtors do not believe that they could secure financing on any better terms than those proposed in the Unsecured Note. Indeed, the

Debtors believe that the Lender is the only entity that is willing to provide the Debtors with an unsecured loan given the amounts outstanding on the Pre-Petition Loan Agreement. Thus, entry into the DIP Facility is an exercise of the Debtors' sound business judgment.

33.    Whatever standard is applied, the Debtors' entry into the Unsecured Note and financing pursuant to its terms should be approved. The Lender is charging no fees under the Unsecured Note for providing the Debtors with this additional liquidity. Moreover, although the Unsecured Note is ***unsecured***, the interest rate to be paid to the Lender is just 4.6% - the same as what the Debtors have proposed pursuant to the Second Amended Plan would be the interest rate payable to the Senior Lenders as part of the New Senior Debt to be issued under the Second Amended Plan, debt which will be fully ***secured*** by liens and mortgages against the Debtors' Properties and other assets that are at least as favorable as those the Agent currently has. Accordingly, no reason exists not to approve this proposed DIP Facility.

**The Debtors' Entry into the Unsecured Note Does Not Prejudice the Security Interests of Bank of America and the Senior Lender; In Fact, the Unsecured Note Will Preserve the Secured Position Held by Bank of America and the Senior Lenders**

34.    The liens, mortgages and security interests of the Administrative Agent are not affected by the Debtors' entry into the Unsecured Note. The Lender has agreed to advance funds to the Debtors under the Unsecured Note on an unsecured basis with basic administrative expense priority. Furthermore, the enhanced liquidity available through the Unsecured Note will help the Debtors pay certain of the Debtors' tax obligations, which if not paid, would likely cause various taxing authorities to assert liens on the Properties senior to those asserted by the Administrative Agent. Indeed, the funding available through the Unsecured Note effectively acts as additional adequate protection for Bank of America and the Senior Lenders by preserving the priority of their liens, mortgages and security interests.

17

35.    Moreover, through the Unsecured Note, the Debtors' operations are receiving a significant cash injection, which **Bank of America** has argued is necessary for the Debtors to propose a confirmable reorganization plan.  *See Motion of Bank of America, N.A. for (a) Valuation of Collateral and (b) Relief from the Automatic Stay* [D.I. 271], ¶ 12 ("Bank of America has further concluded that, without a significant equity injection, the Debtors (a) are incapable of supporting the Loan under market terms and (b) will not be able to confirm a plan over the objection of the Lenders.").

36.    For these reasons, the Debtors should be granted authority to enter into the Unsecured Note and obtain funds from the Lender on the unsecured, administrative priority basis described above, pursuant to section 364(b) of the Bankruptcy Code.

## THE DEBTORS SHOULD BE PERMITTED TO MAKE AN INTERIM BORROWING UNDER THE UNSECURED NOTE

37.    This Court is empowered to conduct a preliminary expedited hearing on the DIP Motion and authorize the Interim DIP Order.  Specifically, Bankruptcy Rule 4001(c) governs the procedures for securing authorization to obtain debtor in possession financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14 day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

Fed. R. Bankr. P. 4001(c).

38.    In examining requests for interim relief under this rule, courts apply the same business judgment standard applicable to other business decisions. *See, e.g., Ames Dep't Stores*, 115 B.R. at 36; *Simasko*, 47 B.R. at 449.  Under this standard, the Debtors' request for

entry of the Interim DIP Order, in the time periods and for the financing amounts requested herein, is appropriate.

39.     Pending a final hearing, which the Debtors anticipate may not occur until mid to late February, the Debtors require $1,200,000 under the Unsecured Note for, *inter alia*, working capital expenses, taxes and other administrative costs of the Chapter 11 Cases.  As discussed above, the Debtors have incurred significant expenses which must be paid in January 2013, including nearly $1,000,000 in ordinary course tax obligations which must be paid during the first two weeks of the month.  Due to the timing of these expenses, interim relief is necessary and will enable the Debtors to operate their business in a manner that will permit them to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

40.     The Debtors are requesting by this Motion and by a contemporaneously filed scheduling motion,[7] that the Court schedule an interim hearing on or before January 11, 2013 to consider the Debtors' request for authorization to obtain interim financing under the Unsecured Note up to a maximum aggregate principal amount of $1,200,000 to maintain operations and comply with terms and conditions of the Unsecured Note.

## **GOOD FAITH**

41.     The Debtors submit that the terms and conditions of the Unsecured Note are fully reasonable and the best available to the Debtors under the circumstances.  The Debtors

---

[7]     *See Motion for an Order Under 11 U.S.C. §§ 102(1) and 105 and Bankruptcy Rule 4001(b) (I) Shortening Notice and Scheduling Time for an Interim Hearing Relating to Motion of Debtors for Orders (a) Authorizing Debtors to Obtain Post-petition Unsecured Financing and Granting Administrative Expense Status Pursuant to 11 U.S.C. § 364 and (b) Scheduling a Final Hearing and Establishing Related Notice Requirements and (ii) Scheduling a Further Interim Hearing on the Debtors' Use of Bank of America's Cash Collateral.*

and the Lender negotiated the terms and conditions of the Unsecured Note in good faith. Moreover, the Debtors' decision to enter into the Unsecured Note was an exercise of the Debtors' prudent business judgment. Therefore, the Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code to the extent any or all of the provisions of the Unsecured Note, or any interim or final order of this Court pertaining thereto, are hereafter modified, vacated, stayed or terminated by subsequent order of this or any other court.

### REQUEST TO WAIVE BANKRUPTCY RULES 6004(a) AND 6004(h)

42.    In order to successfully implement the foregoing, the Debtors respectfully request that the Court waive the notice requirements provided for by Bankruptcy Rule 6004(a) and the fourteen-day stay provided for by Bankruptcy Rule 6004(h). The Debtors believe, for the reasons set forth above, that ample justification exists for the Court to waive Bankruptcy Rules 6004(a) and 6004(h).

### REQUEST FOR FINAL HEARING

43.    Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors request the Court to set a date for the Final Hearing that is no later than February 13, 2013.

### NOTICE

44.    Notice of the DIP Motion has been provided by the Debtors, whether by facsimile, email, overnight courier, or hand delivery, to certain parties in interest, including: (i) the Office of the United States Trustee for the District of Delaware; (ii) those parties listed on the consolidated list of creditors holding the thirty largest unsecured claims against the Debtors, as identified in their chapter 11 petitions; (iii) counsel for Bank of America; and (iv) the general service list in these Chapter 11 Cases. The parties have made reasonable efforts to afford the best notice possible under the circumstances. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

20

## NO PRIOR REQUEST

45.    No prior request for the relief sought in the DIP Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court (i) enter an order substantially in the form of the Interim DIP Order annexed hereto as **Exhibit A**; (ii) schedule the Final Hearing, (iii) after the Final Hearing, enter a Final DIP Order substantially in the form of the Interim DIP Order and as filed with the Court prior to the Final Hearing; and (iv) grant such other and further relief as is just and proper.

Dated:  January 2, 2013
        Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

  _/s/ Andrew R. Remming_
Robert J. Dehney (No. 3578)
Gregory W. Werkheiser (No. 3553)
Andrew R. Remming (No. 5120)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899-1347
Telephone:  (302) 658-9200
Facsimile:  (302) 658-3989
rdehney@mnat.com
gwerkheiser@mnat.com
aremming@mnat.com

*Attorneys for the Debtors and
Debtors in Possession*