**EXHIBIT A**

**[Blackline Plan]**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SECURITY NATIONAL PROPERTIES FUNDING III, LLC, *et al.*, | Case No. 11-13277 (KG) |
| | Joint Administration |
| Debtors. | |

~~SECOND~~ THIRD **AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
SECURITY NATIONAL PROPERTIES FUNDING III, LLC AND ITS DEBTOR AFFILIATES**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Robert J. Dehney (No. 3578)
Gregory W. Werkheiser (No. 3553)
Andrew R. Remming (No. 5120)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989

*Counsel for the Debtors and Debtors in Possession*

Dated: ~~October 26~~ January 14, ~~2012~~ 2013
          Wilmington, Delaware

**TABLE OF CONTENTS**

ARTICLE I – DEFINED TERMS AND RULES OF INTERPRETATION ...................................... 1
    A.    Defined Terms .................................................................................................. 1
    B.    Rules of Interpretation ....................................................................................... 21
    C.    Exhibits ............................................................................................................ 21
ARTICLE II – ADMINISTRATIVE AND PRIORITY CLAIMS .............................................. 21
    A.    Administrative Claims (As to All Debtors) ...................................................... 21
    B.    Professional Fee Claims .................................................................................... 22
    C.    Priority Tax Claims ........................................................................................... 22
ARTICLE III – CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS ......... 22
    A.    Substantive Consolidation ................................................................................ 22
    B.    Special Provision Governing Unimpaired Claims and Tenant Deposit Claims ............................. 23
    C.    Voting and Nonconsensual Confirmation .......................................................... 23
    D.    Classification, Treatment and Voting Status
            if Substantive Consolidation Ordered -
            Summary of Classification and Treatment of
            Classified Claims and Equity Interests .............................................................. 23
    E.    Classification, Treatment and Voting Status if Non-Consolidation Election Made or Substantive
            Consolidation Not Ordered - Summary of Classification and Treatment of Classified Claims and
            Equity Interests ................................................................................................ 28
ARTICLE IV - MEANS FOR IMPLEMENTATION OF THE PLAN ...................................... 29
    A.    Plan Funding ..................................................................................................... 29
    B.    Appointment of Estate Representatives ............................................................. 29
    C.    Rights and Powers of the Reorganized Debtors ................................................ 29
    D.    Directors/Officers of the Debtors on the Effective Date .................................... 30
    E.    Operations of the Debtors Between the Confirmation Date and the Effective Date ...................... 30
    F.    Transfer and Vesting of Property ...................................................................... 30
    G.    Establishment of the Administrative Claims Bar Date ...................................... 30
    H.    Term of Injunctions or Stays ............................................................................ 30
    I.    Resolution of Adequate Protection Overpayments ............................................ 30
ARTICLE V – PROVISIONS GOVERNING DISTRIBUTIONS ............................................ 31
    A.    Initial Distribution Date .................................................................................... 31
    B.    Disputed Claims Reserves ................................................................................ 31
    C.    Subsequent Distributions .................................................................................. 32
    D.    Delivery of Distributions .................................................................................. 32
    E.    Manner of Cash Payments Under the Plan ........................................................ 33
    F.    Time Bar to Cash Payments by Check .............................................................. 33
    G.    Compliance with Tax Requirements ................................................................. 33
    H.    No Payments of Fractional Dollars and Minimum Distributions ....................... 33
    I.    Interest on Claims ............................................................................................. 34
    J.    No Distributions in Excess of Allowed Amount of Claim ................................. 34
    K.    Setoff and Recoupment .................................................................................... 34
ARTICLE VI – DISPUTED CLAIMS ................................................................................ 34
    A.    No Distribution Pending Allowance ................................................................. 34
    B.    Resolution of Disputed Claims ......................................................................... 34
    C.    Objection Deadline ........................................................................................... 34
    D.    Estimation of Claims ........................................................................................ 34
ARTICLE VII – TREATMENT OF EXECUTORY CONTRACTS .......................................... 35
    A.    Assumption and Rejection of Executory Contracts ........................................... 35
    B.    Cure of Defaults for Assumed Executory Contracts ......................................... 35
    C.    Rejection of Executory Contracts ..................................................................... 36
    D.    Claims on Account of the Rejection of Executory Contracts ............................. 36
    E.    Insurance Policies ............................................................................................. 36
    F.    Contracts and Leases Entered Into After the Petition Date ................................ 36
    G.    Reservation of Rights ....................................................................................... 36
ARTICLE VIII – CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE .... 37
    A.    Conditions to Confirmation .............................................................................. 37

B.      Conditions to Effective Date.....................................................................37
C.      Waiver of Conditions...............................................................................37
**ARTICLE IX – DISCHARGE, RELEASE, INJUNCTION AND RELATED PROVISIONS**......37
    A.      Compromise and Settlement.....................................................................37
    B.      Discharge of Debtors................................................................................38
    C.      Releases....................................................................................................38
    D.      Exculpation..............................................................................................39
    E.      <u>Proposed</u> Senior Lender Settlement.........................................................39
    F.      Preservation of Causes of Action ............................................................41
    G.      Injunctions...............................................................................................42
    H.      Release of Liens ......................................................................................43
**ARTICLE X – RETENTION OF JURISDICTION** .............................................................43
**ARTICLE XI – MISCELLANEOUS PROVISIONS**................................................................44
    A.      Final Fee Applications..............................................................................44
    B.      Payment of Statutory Fees .......................................................................44
    C.      Modification of Plan................................................................................44
    D.      Revocation or Deferral of Plan.................................................................45
    E.      Successors and Assigns............................................................................45
    F.      Governing Law and Construction ............................................................45
    G.      Reservation of Rights ..............................................................................45
    H.      Section 1146 Exemption..........................................................................45
    I.      Section 1125(e) Good Faith Compliance .................................................46
    J.      Further Assurances...................................................................................46
    K.      Service of Documents..............................................................................46
    L.      Filing of Additional Documents...............................................................46
    M.      No Stay of Confirmation Order................................................................46
    N.      Payment of U.S. Trustee Fees .................................................................46

**~~SECOND~~ THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF SECURITY NATIONAL PROPERTIES FUNDING III, LLC AND ITS DEBTOR AFFILIATES**

Security National Properties Funding III, LLC and its debtor affiliates as debtors and debtors in possession (collectively, the "Debtors")[1] propose the following joint plan of reorganization for the resolution of the outstanding claims against, and equity interests in, the Debtors. These Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court. The Plan contemplates the consolidation of the Debtors for voting, plan confirmation and distribution purposes but does not contemplate the merger or consolidation of the Debtors as legal entities. Capitalized terms used in the Plan and not otherwise defined herein shall have the meanings ascribed to such terms in Article I.A of the Plan.

Reference is made to the Disclosure Statement, ~~filed contemporaneously with the Plan,~~ for a discussion of the Debtors' history, businesses, results of operations, historical financial information, projections and future operations, as well as a summary and analysis of the Plan and certain related matters, including distributions to be made under this Plan. Additional information summarizing modifications and amendments to the Second Amended Plan that now appear in the Plan can be found in the Plan Amendment Motion. Each of the Debtors is a proponent of the Plan contained herein within the meaning of section 1129 of the Bankruptcy Code. Subject to the provisions of section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors reserve the right to alter, amend, modify, revoke or withdraw the Plan prior to the Effective Date.

## ARTICLE I – DEFINED TERMS AND RULES OF INTERPRETATION

A.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "Accrued Professional Compensation" means, at any given moment, all accrued and/or unpaid fees and expenses (including, without limitation, fees or expenses allowed or awarded by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330(a) or 331 of the Bankruptcy Code, arising under sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(6) of the Bankruptcy Code or otherwise rendered prior to the Effective Date, or thereafter in connection with: (a) applications Filed pursuant to sections 328, 330 and 331 of the Bankruptcy Code; (b) motions seeking the enforcement of the provisions of the Plan or Confirmation Order, by all Professionals in the Chapter 11 Cases that the Bankruptcy Court has not denied by a Final Order, to the extent that any such fees and expenses have not previously been paid regardless of whether a fee application has been filed for any such amount; and (c) applications for allowance of Administrative Claims. To the extent that the Bankruptcy Court or any higher court denies by a Final Order any amount of a Professional's fees or expenses, then those amounts shall no longer be Accrued Professional Compensation.

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: Security National Properties Funding III, LLC (4558), ITAC 190, LLC (4378), Security National Properties Funding, LLC (4037), Security National Properties Funding II, LLC (9204), Sequoia Investments III, LLC (7204), Sequoia Investments V, LLC (5313), Sequoia Investments XIV, LLC (4387), Sequoia Investments XV, LLC (3814), Sequoia Investments XVIII, LLC (6160), and Security National Properties-Alaska, LLC (6563). The mailing address for all of the Debtors for the purpose of these cases is 3050 Westfork Drive, Baton Rouge, LA 70816.

2.      "Adequate Protection Overpayments" means the amount by which (x) the aggregate of all Adequate Protection Payments made by the Debtors to the Agent and/or the Senior Lenders during the period from the Petition Date through and including the Effective Date exceed (y) Qualifying Value Diminution.

3.      "Adequate Protection Payments" means the Cash payments made by the Debtors to the Agent and/or the Senior Lenders during the period from the Petition Date through the Effective Date pursuant to any order or other agreement authorizing the Debtors' use of Cash Collateral in which the Agent and/or Senior Lenders hold or assert an interest, including payments made pursuant to any of the nine interim cash collateral orders entered in these Chapter 11 Cases [D.I. 28, 64, 94, 119, 152, 179, 193, 264, 279~~,~~ , 353, 431 & ~~353~~456]. As of ~~October 22~~January 11, ~~2012~~ 2013 the Debtors have paid Bank of America, the Agent and/or the Senior Lenders not less than $~~7,079,642.86~~ 8,919,549.86 in Adequate Protection Payments.

4.      "Administrative Claims Bar Date" means the first Business Day that is 45 days after the Effective Date and is the deadline for a Holder of an Administrative Claim (other than an Ordinary Course Administrative Claim, a Section 503(b)(9) Claim, an Administrative Claim for Accrued Professional Compensation, or an Administrative Claim of the Claims Agent) to file a request with the Bankruptcy Court for payment of such Administrative Claim. For the avoidance of doubt, Section 503(b)(9) Claims were required to be filed by the Bar Date of March 1, 2012 and remain subject to such Bar Date. All fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930 are not subject to the Administrative Claims Bar Date.

5.      "Administrative Claim" means a Claim arising under section 507(a)(2) of the Bankruptcy Code for costs and expenses of administration under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for goods and other services and leased premises) and (b) all fees and charges assessed against the Estates under chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930. For the avoidance of doubt, subject to the other terms and conditions of the Plan and the occurrence of the Effective Date of the Plan, any Claims of SNP Servicing for Management Fees in connection with services provided since the Petition Date shall be Allowed Administrative Claims.

6.      "Adverse SLUC Ruling" means a Final Order of the Bankruptcy Court judicially determining that the Plan may not classify Senior Lender Unsecured Claims separately from General Unsecured Claims.

7.      "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.

8.      "Affiliate Claim" means a Claim of a Non-Debtor Affiliate against a Debtor.

9.      "Agent" means Bank of America, N.A., as administrative agent for the Senior Lenders under the Pre-Petition Loan Agreement.

10.     "Allocated Deficiency Amount" means with respect to a Senior Lender Unsecured Claim against a given Debtor, the fraction of the Collateral Shortfall such Debtor is responsible for. Although the Debtors do not concede that any Collateral Shortfall exists, for the purposes of the Plan, if a Collateral Shortfall is judicially determined to exist, the Debtors will calculate each Debtor's Allocated Deficiency Amount based on the formula described in **Exhibit B** to this Plan, except that the Allocated Deficiency Amount for SNPF III shall be equal to $1.00. The term Allocated Deficiency Amount shall only apply if the Debtors make the Non-Consolidation Election or substantive consolidation is not ordered. If the Debtors do not make the Non-Consolidation Election and substantive consolidation is ordered, the term Deficiency Amount shall apply. Based upon the Stipulated Current Values of the Properties established pursuant to the Stipulation, no Collateral Shortfall exists and the Allocated Deficiency Amount for each Debtor is zero.

11.     "Allowed" means, with respect to any Claim or Equity Interest, except as otherwise provided herein: (a) as to which no objection to allowance or request for estimation has been interposed on or before the latter of (i) the Claims Objection Bar Date or (ii) the expiration of such other applicable period of limitation fixed

2

by the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, (b) a Claim or Equity Interest that has been scheduled by the Debtors in their Schedules other than disputed, contingent or unliquidated, but only as to the amount listed on the Schedules for such Claim; (c) a Claim or Equity Interest that either is not Disputed or has been allowed by a Final Order; (d) a Claim or Equity Interest that is allowed: (i) in any stipulation of amount and nature of Claim executed prior to the entry of the Confirmation Order and approved by the Bankruptcy Court; (ii) in any stipulation with the Reorganized Debtors of the amount and nature of Claim or Equity Interest executed on or after the entry of the Confirmation Order; or (iii) in or pursuant to any contract, instrument or other agreement entered into or assumed in connection herewith; (e) a Claim or Equity Interest that is allowed pursuant to the terms hereof; or (f) a Disputed Claim as to which a proof of claim has been timely Filed and as to which no objection has been Filed by the Claims Objection Bar Date.  For the avoidance of doubt, except as otherwise provided in the Stipulation, no Senior Lender Secured Claim or Senior Lender Unsecured Claim shall be an Allowed Claim except to the extent it is allowed by a Final Order of the Bankruptcy Court or pursuant to this Plan upon the occurrence of the Effective Date. For the further avoidance of doubt, any Claims of SNP Servicing for Management Fees in connection with services provided since the Petition Date shall be an allowed Administrative Claim, subject to the terms of this Plan.

12.    "Alternative GUC Claims Cap" means the maximum amount of Cash required to be paid to the Holders of Allowed Class 6 General Unsecured Claims under the Plan if there has been an Adverse SLUC Ruling and the Debtors exercise their right to collapse Class 3 (Senior Lender Unsecured Claims) with Class 6 (General Unsecured Claims).  The Alternative GUC Claims Cap shall be $2,000,000; provided, however, that the Debtors, with the consent of the Plan Sponsors, may increase the Alternative GUC Claims Cap in their sole and absolute discretion at any time prior to the Effective Date of the Plan.   See definition of "GUC Claims Cap" for the maximum amount of Cash required to be paid to the Holders of Allowed General Unsecured Claims under the Plan if there has not been an Adverse SLUC Ruling.

13.    "Bank of America" means Bank of America, N.A., Banc of America Securities LLC, and any other entity that was, is currently or in the future may be a party to the Pre-Petition Loan Agreement that is also an Affiliate of Bank of America N.A.

14.    "Bankruptcy Code" means sections 101, *et seq.* of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code, as amended from time to time.

15.    "Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

16.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, promulgated under 28 U.S.C. § 2075, the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware, and general orders and chambers procedures of the Bankruptcy Court, each as applicable to the Chapter 11 Cases and as amended from time to time.

17.    "Bar Date" means March 1, 2012 as the date set by the Bar Date Order as the deadline to file proofs of Claim, except for Administrative Claims.

18.    "Bar Date Order" means the *Order Granting Debtors' Motion to Establish Bar Dates for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof*, dated January 26, 2012 [D.I. 139].

~~19.  "BOA Appraisal" means those certain completed appraisals of the Properties by Cushman & Wakefield as described in paragraph 15 of the Stay Relief Motion and Exhibit A thereto, without giving effect to any subsequent updates, amendments or revisions of such appraisals.~~

19.    ~~20.~~ "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as that term is defined by Rule 9006(a) of the Federal Rules of Bankruptcy Procedure).

20.    ~~21.~~ "Cash" means legal currency of the United States of America or equivalents thereof, including bank deposits and checks.

3

21. 22. "Cash Collateral" has the meaning ascribed to it in section 363(a) of the Bankruptcy Code.

22. 23. "Cash Investment Yield" means the net yield, if any, from the investment of Cash held pending distribution to creditors in accordance with the provisions of the Plan.

23. 24. "Causes of Action" means any and all claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, defenses, counterclaims, crossclaims and the like (including, without limitation, all claims and any avoidance, recovery, subordination or other actions against Insiders and/or any other Entities under the Bankruptcy Code, the Swap Causes of Action, and all claims and causes of action against Bank of America, the Agent, and/or the Senior Lenders), matured or unmatured, known or unknown, then existing or thereafter arising, of any of the Debtors, the Debtors-in-Possession, and/or the Estates that are or may be pending on the Effective Date against any person or entity other than any Debtor, based in law or equity, including, without limitation, under the Bankruptcy Code, whether direct, indirect, derivative or otherwise and whether asserted or unasserted as of the Confirmation Date; provided, however, that "Causes of Action" shall exclude any Causes of Action released in this Plan.

24. 25. "Chapter 11 Cases" means the chapter 11 cases commenced when the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on the Petition Date and assigned the following case numbers: 11-13276 (KG), 11-13277 (KG), 11-13278 (KG), 11-13279 (KG), 11-13280 (KG), 11-13281 (KG), 11-13282 (KG), 11-13283 (KG), 11-13284 (KG) and 11-13285 (KG), which are jointly administered under case number 11-13277 (KG).

25. 26. "Claim" means a "claim" (as that term is defined in section 101(5) of the Bankruptcy Code) against a Debtor.

26. 27. "Claims Agent" means GCG, Inc., the court-appointed claims agent in these Chapter 11 Cases.

27. 28. "Claims Objection Bar Date" means the last day for filing objections to Claims, which day shall be the latest of (a) 180 days after the Effective Date, (b) 30 days after entry of a Final Order under section 502(j), or (c) such other later dates as may be established by order of the Bankruptcy Court upon a motion (or subsequent motion) of the Debtors or the Reorganized Debtors.

28. 29. "Class" means a category of Holders of Claims or Equity Interests as set forth in Article III herein pursuant to section 1122(a) of the Bankruptcy Code.

29. 30. "Collateral" means any property or interest in property of a Debtor's Estate subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law. For the avoidance of doubt, except as otherwise provided in the Stipulation, as to the Agent and Senior Lenders, the Debtors and the Reorganized Debtors reserve all rights to assert a challenge at any time to any Lien and/or Claim asserted by the Agent and/or Senior Lenders, including but not limited to, a challenge to the validity, extent, priority, or perfection of such Liens.

30. 31. "Collateral Shortfall" means the amount, if any, by which (x) the total Obligations (as defined in the Pre-Petition Loan Agreement) owed to the Agent and/or the Senior Lenders under the Pre-Petition Loan Documents as of the Petition Date exceed (y) the aggregate value of the Collateral of the Agent and/or Senior Lenders as of the Petition Date. Based upon the Stipulated Current Values of the Properties established pursuant to the Stipulation, no Collateral Shortfall exists.

31. 32. "Confirmation" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases subject to all conditions specified in Article VIII.A. having been (a) satisfied or (b) waived pursuant to Article VIII.C.

4

32. 33. "Confirmation Date" means the date on which the Confirmation Order is entered by the Bankruptcy Court on the docket of the Chapter 11 Cases.

33. 34. "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

34. 35. "Consummation" means the occurrence of the Effective Date.

35. 36. "Contract" means any agreement, contract, or lease, whether for real or personal property, between or among one or more of the Debtors and a third party.

36. 37. "Creditor" shall have the meaning in section 101(10) of the Bankruptcy Code.

37. 38. "Cure Claims" means Claims of creditors related to Contracts that are assumed in the Plan pursuant to section 365 of the Bankruptcy Code.

38. 39. "Debtor Releasees" means each of the Debtors, the Reorganized Debtors, the Plan Sponsors, and their respective current and former Representatives, as applicable.

39. 40. "Debtor," "Debtors" or "Debtors-in-Possession" means, individually and collectively, Security National Properties Funding III, LLC, ITAC 190, LLC, Security National Properties Funding, LLC, Security National Properties Funding II, LLC, Sequoia Investments III, LLC, Sequoia Investments V, LLC, Sequoia Investments XIV, LLC, Sequoia Investments XV, LLC, Sequoia Investments XVIII, LLC, and Security National Properties-Alaska, LLC.

40. 41. "Deficiency Amount" means an amount equal to the total Collateral Shortfall.  The Debtors do not concede that any Collateral Shortfall exists. Based upon the Stipulated Current Values of the Properties established pursuant to the Stipulation, no Collateral Shortfall exists and the Deficiency Amount will be zero. The term Deficiency Amount shall not apply if the Debtors make the Non-Consolidation Election or substantive consolidation is not ordered.  If the Debtors make the Non-Consolidation Election or substantive consolidation is not ordered, the term "Allocated Deficiency Amount" shall apply.

41. 42. "DIP Facility" means any post-petition financing facility provided by one or more of the Plan Sponsors or other Affiliates of the Debtors, including all documents related thereto, each as amended and supplemented. For the avoidance of doubt, funding has been or may be made available to the Debtors by SNP Holding pursuant to the Unsecured Promissory Note, dated January 11, 2013, constitutes a DIP Facility.

43. "DIP Orders" means all orders entered approving and facilitating the DIP Facility, if any.

42. 44. "Disclosure Statement" means the *Disclosure Statement for Second Amended Joint Chapter 11 Plan of Reorganization of Security National Properties Funding III, LLC and Its Debtor Affiliates*, dated October 26, 2012 [D.I. 380], prepared and distributed in accordance with the Bankruptcy Code, Bankruptcy Rules and any other applicable law, and approved by the Bankruptcy Court in the Disclosure Statement Order, as it is amended, supplemented or modified from time to time.

43. 45. "Disclosure Statement Order" means the order approving the Disclosure Statement, establishing noticing and voting procedures and granting related relief, as entered by the Bankruptcy Court on October 27, 2012.

44. 46. "Disputed" means, with respect to any Claim or Equity Interest, or any portion thereof: (a) is listed on the Schedules (as the Schedules may be amended) as unliquidated, disputed or contingent, unless a proof of Claim has been timely filed; (b) as to which a Debtor, any other party in interest, or the Reorganized Debtors has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules before the Claims Objection Bar Date; (c) as to which a proof of claim or interest was required to be filed but as to which a proof of claim or interest was not timely or properly filed, or (d) as otherwise disputed by the

Debtors or Reorganized Debtors in accordance with applicable law or the Plan, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.

45.  47."Disputed Claim Amount" means (a) if a liquidated amount is set forth in the proof of claim relating to a Disputed Claim, (i) the liquidated amount set forth in the proof of claim relating to the Disputed Claim; (ii) an amount agreed to by the Debtors or the Reorganized Debtors, as applicable, and the Holder of such Disputed Claim; or (iii) if a request for estimation is filed by any party, the amount at which such Disputed Claim is estimated by the Bankruptcy Court; (b) if no liquidated amount is set forth in the proof of claim relating to a Disputed Claim, (i) an amount agreed to by the Debtors or the Reorganized Debtors, as applicable, and the Holder of such Disputed Claim or (ii) the amount estimated by the Bankruptcy Court with respect to such Disputed Claim; or (c) if the Disputed Claim was listed on the Schedules as unliquidated, contingent or disputed and no proof of claim was filed, or deemed to have been filed, by the applicable Bar Date and the Claim has not been resolved by written agreement of the parties or an order of the Court, zero.

46.  48."Disputed Claims Reserve" means the reserve of Cash established and maintained by the Debtors and the Reorganized Debtors to pay Disputed Claims that would be required to receive Distributions in Cash upon allowance by the Bankruptcy Court.

47.  49. "Distribution Date" means the date upon which a Distribution is made in accordance with the Plan to Holders of Allowed Claims entitled to receive Distributions under the Plan.

48.  50."Distributions" means the distributions of Cash or other consideration to be made under and in accordance with the Plan.

49.  51."Effective Date" means the date that is no later than the tenth Business Day after the date all conditions to the Effective Date set forth in Article VIII.B are either satisfied or waived as set forth in Article VIII.C.

50.  52."Entity" means an "entity" as that term is defined in section 101(15) of the Bankruptcy Code.

51.  53."Equity Interest" means any equity interest in a Debtor that existed immediately prior to the Petition Date.

52.  54."Estate" means the estate of each Debtor created on the Petition Date by section 541 of the Bankruptcy Code.  If substantive consolidation is ordered, the term "Estate" shall refer to the consolidated estates of all Debtors whose estates have been substantively consolidated pursuant to such order.

53.  55."Executory Contract" means a Contract that qualifies as an "executory contract" or "unexpired lease" under section 365 of the Bankruptcy Code.

54.  56."Face Amount" means (a) when used in reference to a Disputed Claim, the Disputed Claim Amount and (b) when used in reference to an Allowed Claim, the Allowed amount of such Claim.

55.  57."File" or "Filed" or "Filing" means, with respect to any pleading, the entry of such pleading on the docket of the Chapter 11 Cases and properly served in accordance with the Bankruptcy Rules.

56.  58."Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

57.  59."Final Order" means an order, determination, or judgment entered on the docket of the Bankruptcy Court, or any other court of competent jurisdiction, that has not been reversed, stayed, modified, or amended, and as to which: (a) the time to appeal, petition for certiorari, or move for reargument, rehearing, or reconsideration has expired and no timely filed appeal or petition for review, rehearing, remand or certiorari is pending; or (b) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order, determination, or judgment was appealed or from which certiorari was sought, provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under

the Bankruptcy Rules or other rules governing procedure in cases before the Bankruptcy Court may be filed with respect to such order shall not cause such order not to be a Final Order.

58.    60. "General Unsecured Claim" means any Claim against any Debtor that is not an Administrative Claim, a Secured Governmental Unit Claim, a Priority Tax Claim, a Senior Lender Secured Claim, a Senior Lender Unsecured Claim (except if there has been an Adverse SLUC Ruling and the Debtors choose to classify Senior Lender Unsecured Claims with General Unsecured Claims, then Senior Lender Unsecured Claims shall be included within the definition of General Unsecured Claims), an Other Secured Claim, an Unsecured Priority Claim, an Intercompany Claim or an Affiliate Claim.

59.    61. "Guarantor Debtors" means ITAC 190, LLC, Security National Properties Funding, LLC, Security National Properties Funding II, LLC, Sequoia Investments III, LLC, Sequoia Investments V, LLC, Sequoia Investments XIV, LLC, Sequoia Investments XV, LLC, and Sequoia Investments XVIII, LLC.

60.    62. "GUC Claims Cap" means the maximum amount of Cash required to be paid to the Holders of Allowed General Unsecured Claims under the Plan if there has not been an Adverse SLUC Ruling. The GUC Claims Cap shall be $1,850,000; provided, however, that the Debtors, with the consent of the Plan Sponsors, may increase the GUC Claims Cap in their sole and absolute discretion at any time prior to the Effective Date of the Plan.    See definition of "Alternative GUC Claims Cap" for the maximum amount of Cash required to be paid to the Holders of Allowed General Unsecured Claims under the Plan if there has been an Adverse SLUC Ruling.

61.    63. "Holder" means an Entity holding a Claim or Equity Interest.

62.    64. "Impaired" means "impaired" within the meaning of sections 1123(a) and 1124 of the Bankruptcy Code, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests.

63.    65. "Initial Distribution Date" means the first Distribution Date under the Plan. Unless otherwise agreed by the Reorganized Debtors in writing after the Effective Date, the Initial Distribution Date for any Class of Claims (other than Class 6 General Unsecured Claims) will not be earlier than 5 days after the Effective Date. As to General Unsecured Claims classified and treated in Class 6 (or absent substantive consolidation, Classes 6A through J), the Reorganized Debtors may establish the Initial Distribution Date as late as sixty (60) Business Days after the Effective Date.

64.    66. "Insider" has the meaning set forth in section 101(31) of the Bankruptcy Code.

65.    67. "Intercompany Claims" means Claims held by a Debtor against another Debtor.

66.    68. "Lien" means any lien, security interest, pledge, title retention agreement, encumbrance, charge, mortgage or hypothecation to secure payment of a debt or performance of an obligation.

67.    69. "Management Agreement" means that certain servicing agreement dated October 12, 2006 between Security National Properties Servicing Company, LLC and Security National Properties Funding II, LLC, Security National Properties Funding, LLC, Sequoia Investments II, LLC, Sequoia Investments III, LLC, Sequoia Investments XIV, LLC, Sequoia Investments XV, LLC, Sequoia Investments XVI, LLC, ITAC 190, LLC, and Security National Properties - Bath, LLC. The Management Agreement shall be deemed amended in accordance with the terms of the New Investment by the Plan Sponsors as of the Effective Date.

68.    70. "Management Fee" means a monthly fee for management of the Properties paid to SNP Servicing pursuant to the Management Agreement, as amended in accordance with the terms of the New Investment by the Plan Sponsors as of the Effective Date. Subject to the occurrence of the Effective Date and the other terms and conditions of the Plan, any Claims of SNP Servicing for Management Fees relating to services provided since the Petition Date shall be Allowed Administrative Claims.

69.    71. "New Investment" means the investment to be made in the Reorganized Debtors by the Plan Sponsors pursuant to the terms of the Plan Support Agreement. The terms of the New Investment shall be reasonably acceptable to the Debtors and shall include, among other things, (i) forgiveness of any then-outstanding

7

DIP Facility balance; (ii) a ~~cash~~ Cash infusion on the Effective Date from SNP Holding, or its designee, in an amount between $3.5 million and $5 million less the forgiven balance of the DIP Facility, which cash infusion shall be used exclusively ~~for tenant improvements, capital expenditures, and, if necessary, periodic payments to Holders of Allowed Priority Tax Claims, Secured Governmental Unit Claims, and General Unsecured Claims as provided under this Plan~~ pursuant to the Cash Infusion Waterfall set forth in Plan Article I.A.73; (iii) limited guaranty of the New Senior Debt by SNP Holding on substantially the same terms as the existing SNP Holding Guaranty; (iv) the commitment by SNP Servicing to provide the Debtors with management services of the type historically provided under the Management Agreement at a Management Fee ~~equal to $4,200,000 for calendar year 2012 and reduced to $3,600,000 for calendar year 2013 and $3,000,000 for each year~~ reduced to $300,000 per month for each month of 2013 commencing after the Effective Date of the Plan and $250,000 per month during 2014 and thereafter for the remaining term of the Management Agreement, which Management Fee shall be subordinated to payment of the New Senior Debt; ~~and~~ (v) subordination of Affiliate Claims as set forth herein; and (vi) in the sole discretion of the Plan Sponsors, such additional funding or liquidity that the Plan Sponsors deem appropriate in their sole discretion, including, but not limited to the provision of a Sub-Debt Facility. The amount of the Cash infusion within the foregoing range shall be fixed in the reasonable discretion of SNP Holding, but shall be not less than the amount necessary to supplement the Debtors' current and future sources of Cash in order to satisfy the requirements of sections 1123 and 1129 of the Bankruptcy Code for Confirmation of the Plan. The Cash infusion shall be transferred from SNP Holding to the Debtors on or before the Effective Date of the Plan. The funded amount of the Cash infusion shall be held by SNPF III in a separate bank account free from all controls, monitoring, restrictions and the like of Bank of America, the Agent, and/or the Senior Lenders and, except for specific Plan obligations described herein for which the Cash ~~Infusion~~ infusion is to be used, shall be and remain free and clear of Liens and Claims of Bank of America, the Agent, the Senior Lenders, other Holders of Claims and other parties-in-interest.

       70.      ~~72.~~"New Loan Agreement" means ~~that certain~~ , if **Class 2 Rejects the Plan,** that certain Credit Agreement, dated as of [            ], among Security National Properties Funding III, LLC, as the Borrower, and Bank of America, N.A., as Administrative Agent, and the other Senior Lenders party thereto, substantially in the form filed as part of the Plan Supplement and as may be amended, modified or supplemented from time to time. Alternatively, if **Class 2 Accepts the Plan,** the term "New Loan Agreement" shall mean the secured promissory note and/or credit agreement between the Debtors (as borrowers or guarantors, as applicable, depending upon whether the Senior Lender Settlement is consummated) the Senior Lenders, as initial lenders, and Bank of America as the initial administrative agent thereunder, which note and/or agreement will evidence the New Senior Debt.

       71.      ~~73.~~"New Loan Amount" means the principal amount of the New Senior Debt, as stated in the description of the New Senior Debt that appears in these Definitions. The New Loan Amount is subject to being reduced (a) by crediting the appraised value (as stated in this Plan) of Orchards Mall and Soup Lots upon consummation of the conveyance of Orchards Mall and Soup Lots to the Agent and/or the Senior Lenders or their designee, (b) absent consummation of the Senior Lender Settlement, by crediting Adequate Protection Overpayments in accordance with Article IV.I of the Plan.

       72.      ~~74.~~"New Loan Documents" means the agreements and related documents and instruments evidencing the terms of the New Senior Debt as of the Effective Date, including the New Loan Agreement, and related schedules, exhibits, agreements and other documents.

       73.      ~~75.~~"New Senior Debt" means obligations to be incurred to the Agent and/or the Senior Lenders as of the Effective Date, as evidenced by the Senior Secured Loan Documents, in full satisfaction and release of the Senior Lender Secured Claims and all obligations of the Debtors and Plan Sponsors under or in connection with the Pre-Petition Loan Documents. The terms of the New Senior Debt differ depending upon whether Class 2 votes to accept or reject the Plan. The material terms of the New Senior Debt include the following:

| Borrowers: | *If Class 2 votes to Accept the Plan:* Each Reorganized Debtor shall be a Borrower under the New Loan Agreement. Each such Borrower shall be jointly and severally liable for the entire indebtedness under the New Loan Agreement. |
|---|---|

| | |
|---|---|
| | *If Class 2 votes to Reject the Plan:* The sole Borrower shall be SNPF III. |
| **Lenders:** | Bank of America and each of the other Senior Lenders |
| **Agent:** | Bank of America |
| **New Loan Amount:** | *If Class 2 votes to Accept the Plan:* $164,341,863.11~~-.~~<br><br>~~- (minus):  Amounts credited in connection with the Debtors' tender of Orchards Mall and Soup Lots, as described in Article III.D.2.b of the Plan.~~<br>*If Class 2 votes to Reject the Plan:* $164,341,863.11,<br>    **- (minus):** Any Collateral Shortfall.<br>    **+ (plus):** Unpaid interest and fees under the Pre-Petition Loan Facility accruing for the period from the Petition Date through the Confirmation Date, solely to the extent that the Bankruptcy Court by a Final Order has determined pursuant to section 506(b) of the Bankruptcy Code (subject to all defenses of the Debtors, the Reorganized Debtors, the Estates and other parties-in-interest) that the Agent and Senior Lenders are entitled to such postpetition interest and fees as part of the Senior Lender Secured Claims. For the avoidance of doubt, unpaid post-petition interest and fees under the Pre-Petition Loan Facility shall **not** be added to the New Loan Amount if there is a Collateral Shortfall.<br>    **- (minus):** Adequate Protection Overpayments as determined pursuant to Articles III.D.2.b and IV.I of the Plan.<br><br>~~- (minus):  Amounts credited in connection with the Debtors' tender of Orchards Mall and Soup Lots, as described in Article III.D.2.b of the Plan.~~ |
| **Interest Rate:** | *If Class 2 votes to Accept the Plan:* Fixed rate of ~~4.6% per annum~~ 5.00% per annum for initial 48 months of Term of New Senior Debt.  For remainder of Term of the New Senior Debt, the interest rate shall float based on a formula to be agreed upon by Bank of America and the Debtors or the Reorganized Debtors.  In the event that the Debtors and/or the Reorganized Debtors and Bank of America cannot agree on such formula, the Court shall retain jurisdiction in order to resolve such dispute.<br><br>*If Class 2 votes to Reject the Plan:* Fixed rate of ~~4.6%~~ 5.25% per annum for the Term of the New Senior Debt; provided, however, that the Debtors reserve the right to modify the Interest Rate at any time prior to seven (7) days before the Voting Deadline for any reason, including updated long-term interest rate projections from the Federal Reserve. |
| **Maturity Date:** | *If Class 2 votes to Accept the Plan:* The later of December 31, 2017, and the last day of the fifth full year after the Effective Date of the Plan, unless the Maturity Date is extended by Reorganized Debtors' exercise of one or more of |

| | the Extension Options. |
|---|---|
| | ***If Class 2 votes to Reject the Plan:*** The later of December 31, 2019, and the last day of the seventh full year after the Effective Date of the Plan, unless the Maturity Date is extended by Reorganized Debtors' exercise of one or more of the Extension Options. |
| **Extension Options:** | 3 additional ²Two 1-year extension options subject to satisfactory compliance with the required principal curtailments and covenant compliance.  Maturity will be extended if Borrower(s) are not in default and the New Senior Debt's LTV is less than or equal to 80%, based upon then-current appraisals.  Additionally, the Debt Yield Test (as defined in the New Loan Agreement) is above 10%.  A fee of 25 basis points will be due for each extension and paid over 12 equal monthly installments.  Moreover, in order to obtain each extension, Borrower(s) must be in substantial compliance with all other terms and conditions of the New Loan Agreement.  Borrower(s) and/or their affiliates shall have the option to make a partial prepayment of the New Senior Debt or add additional collateral to satisfy the LTV and Debt Yield tests.  Additional collateral will be valued at the average of Senior Lenders' and Borrower(s)' independent appraisers' valuations unless Borrower(s) choose, in their sole discretion to accept Senior Lenders' appraisal valuation. |
| **Prepayment:** | The New Senior Debt may be prepaid in part or in full at any time without penalty. |
| **Amortization:** | New Senior Debt will amortize on a 25 year schedule. |
| **Covenants:** | Debt Yield Test, calculated as Net Operating Income prior to Management Fee divided by the Outstanding Loan Balance, based on a trailing 12 month basis, of not less than 10% Initial Test Period to begin December 31, 2013.  If Debt Yield Test is below 10%, tested on a quarterly basis thereafter, Borrowers shall pay down the Loan As stated in the New Loan Agreement, including requirement to maintain Debt Yield of 10% or greater (or 11% or greater following Release of Qualified Property to an Affiliate of Borrowers (or Borrower or a Debtor Guarantor, as applicable).  If Debt Yield is below 10%, Borrowers (or Borrower and Debtor Guarantors, as applicable) shall pay down the loan or add cash-flowing collateral in an amount which would be sufficient to maintain the Debt Yield Test not test of no less than 10%. |
| **Release Prices:** | Allocated New Loan Amounts will be established at the closing of the New Senior Debt for each property based on the BOA Appraisals (each an "Allocated Loan Amount" and |

---

²     Capitalized terms used in Article I.A.75 but not defined therein or elsewhere in the Plan shall have the meanings ascribed to them in the New Loan Agreement.

|  | collectively the "Allocated Loan Amounts").  Allocated Loan Amounts shall remain fixed throughout the term of the Loan.  The Release Price for each property shall be the greater of 100% of the Allocated Loan Amount or the Net Sale Proceeds; provided, however, in no event shall the Release Price be greater than the Outstanding Loan Balance.  Sales The Release Price with respect to each Property, except for Orchards Mall and Soup Lots, shall equal the Stipulated Current Value.  Sales and transfers of Properties are permitted to affiliated entities provided that the Debt Yield Test test after the sale or transfer is a minimum of 11%.

Following the Effective Date, the Reorganized Debtors and Bank of America shall agree upon Release Prices for Orchards Mall and Soup Lots (respectively, the "Orchards Mall Release Price" and the "Soup Lots Release Price").  Within six months of the Effective Date, the Reorganized Debtors shall market Orchards Mall and Soup Lots for sale.  If the Debtors sell Orchards Mall for the Orchards Mall Release Price, Bank of America and/or the Senior Lenders shall release/discharge its liens on Orchards Mall in connection with Bank of America's and/or the Senior Lenders' receipt of the Orchards Mall Release Price.  If the Debtors sell Soup Lots for the Soup Lots Release Price, Bank of America and/or the Senior Lenders shall release/discharge its liens on Soup Lots in connection with Bank of America's and/or the Senior Lenders' receipt of the Soup Lots Release Price. If the Reorganized Debtors and Bank of America are unable to agree upon the Orchards Mall Release Price and/or the Soup Lots Release Price within 45 days after the Effective Date, then the Reorganized Debtors and/or Bank of America may request the Bankruptcy Court to determine the disputed Release Price, which determination shall be based upon an Independent Appraisal (as defined in the New Loan Agreement) that has been prepared or updated within 180 days of the request to the Bankruptcy Court and other factors that the Bankruptcy Court determines to be relevant.  The Bankruptcy Court shall retain jurisdiction to resolve any disputes regarding the Orchards Mall Release Price and/or the Soup Lots Release Price. |
| **Collateral:** | *If Class 2 votes to Accept the Plan:* **If Class 2 votes to Accept the Plan:**

The repayment of the New Senior Debt obligations shall be secured by (a) a first mortgage/deed of trust on all of the Properties, (b) a security interest in all of the Borrowers' personal property that is equivalent to what the Agent and the Senior Lenders had under the Pre-Petition Loan Agreement and (c) an assignment of leases and rents with respect to each of the Properties.  As Additional Collateral, the Debtors will provide the Agent Bank of America and the Senior Lenders pledges of the Equity Interests in all Debtors except for SNPF III that are equivalent to what the Agent and the Senior Lenders had under the Pre-Petition Loan Agreement. |

~~*If Class 2 votes to Reject the Plan:* The maximum principal amount secured by any Property in connection with the New Senior Debt shall remain subject to any limits contained in the Pre-Petition Loan Documents (e.g., 95% of Asset Value); provided, however, that at any time prior to Confirmation of the Plan the Debtors in their sole discretion after consultation with the Plan Sponsors may increase the maximum principal amount secured by any Property up to 100% as the Debtors deem necessary, appropriate or desirable. Additional Collateral shall include (a) each Debtor's personal property as to which the Agent and the Senior Lenders had valid, perfected, enforceable and unavoidable Liens under the Pre-Petition Loan Documents, and (b) pledges of the Equity Interests in all Debtors except for SNPF III that are equivalent to what the Agent and Senior Lenders had under the Pre-Petition Loan Agreement. Whether or not Class 2 votes to accept the Plan, the~~ The Cash infusion to be provided by the Plan Sponsors as part of the New Investment shall be held by SNPF III in a separate bank account free from all controls, monitoring, restrictions and the like of Bank of America, ~~the Agent,~~ and/or the Senior Lenders and ~~except for specific Plan obligations described herein for which the Cash infusion is to be used,~~ shall be and remain free and clear of Liens and Claims of Bank of America, ~~the Agent~~, the Senior Lenders, other Holders of Claims and other parties-in-interest. Subject to the terms of the Plan Support Agreement, the Debtors may use the Cash infusion to pay any of the following obligations in the priority set forth below (the "Cash Infusion Waterfall"):

  a)  First, to the extent that distributions to Holders of Allowed Claims (other than Class 2 Senior Lender Secured Claims or Class 3 Senior Lender Unsecured Claims) have not been made or cannot otherwise be made as scheduled pursuant to the Plan because net operating income from the Properties has been or will be inadequate to make such distributions, the Cash infusion shall be used and applied to make such distributions. The Cash infusion shall be used and applied to make such distributions in the order of priority contemplated by the Plan.

  b)  Second, to the extent any tenant improvement or tenant related capital expenditure obligations with respect to the Properties have not been paid or cannot otherwise be made because net operating income from the Properties has been or will be inadequate to make such expenditures, the Cash infusion shall be used and applied to make such expenditures.

  c)  Third, to the extent that leasing commissions relating to the Properties have not been paid or cannot otherwise be paid because net operating income from the Properties has been or will be inadequate to make such payments, the Cash infusion shall be used and

12

| | |
|---|---|
| | applied to make such payments. |
| | d) Fourth, to the extent any operating expenses relating to the Properties (excluding any Management Fee) have not been paid or cannot otherwise be paid because net operating income from the Properties has been or will be inadequate to make such payments, the Cash infusion shall be used and applied to make such payments. |
| | e) Fifth, to the extent that any scheduled monthly payment of principal and/or interest has not been paid or cannot otherwise be paid because net operating income from the Properties has been or will be inadequate to make such payment, the Cash infusion shall be used and applied to make such payments. |
| | f) Sixth, the Reorganized Debtors, in their reasonable discretion, may use the Cash infusion to establish one or more reserves for future obligations relating to the Properties, including the funding of future payments of the types described in a) through e) above. |
| | ***If Class 2 votes to Reject the Plan:*** Collateral terms shall be the same as described above, except that the Debtors and Reorganized Debtors shall have the option to grant junior liens in connection with any Sub-Debt Facility. |
| **Guarantees:** | ***If Class 2 votes to Accept the Plan:*** Each Debtor will be a Borrower under the New Senior Debt. To the extent that SNP Holding has guaranteed obligations for the Pre-Petition Loan Facility, SNP Holding, as Plan Sponsor, will guarantee the New Senior Debt obligations on substantially the same terms. |
| | ***If Class 2 votes to Reject the Plan:*** |
| | Each Guarantor Debtor shall guaranty repayment of all obligations under the New Senior Debt.  All obligations of each Guarantor Debtor as a guarantor for the New Senior Debt obligations shall be the joint and several obligations of each other Guarantor Debtor. |
| | ***If Class 2 votes to Reject the Plan:*** Each Guarantor Debtor shall guaranty obligations under the New Senior Debt only to the same extent that it guaranteed obligations pursuant to the Pre-Petition Loan Documents; provided, however, that at any time prior to Confirmation of the Plan, the Debtors in their sole discretion after consultation with the Plan Sponsors may cause any Guarantor Debtor to guaranty additional New Senior Debt obligations to the Agent and Senior Lenders as the Debtors deem necessary, appropriate or desirable.  To the extent that SNP Holding has guaranteed obligations for the Pre-Petition Loan Facility, SNP Holding, as Plan Sponsor, will guarantee the New Senior Debt obligations on |

13

| | substantially the same terms. |
|---|---|
| **Recourse:** | ***If Class 2 votes to Accept the Plan:*** The New Senior Debt will be fully recourse as to all Borrowers. |
| | ~~***If Class 2 votes to Reject the Plan:*** Except as otherwise stated in this description of the New Senior Debt, existing Recourse structure will continue in the New Senior Debt; provided, however, that at any time prior to Confirmation of the Plan, the Debtors in their discretion after consultation with the Plan Sponsors may cause any Guarantor Debtor to guaranty additional liability to the Senior Lenders for New Senior Debt obligations as the Debtors deem necessary, appropriate or desirable to satisfy any requirements to obtain Confirmation of the Plan.~~ ***If Class 2 votes to Reject the Plan:*** The New Senior Debt will be fully recourse as to the Borrower and the Debtor Guarantors. |
| **Principal Curtailment:** | ~~Excess cash flow at the end of each calendar year generated solely by the Properties (after (i) payment of all operating expenses, including the Management Fee, (ii) making all payments required by the Plan, and (iii) funding a capital reserve of up to $5,000,000) will be used to curtail principal, provided, however, this is without prejudice to the Debtors' ability to pay down principal more quickly in their sole and absolute discretion.~~ To the extent a "Year End Surplus" (as defined below) exists at the end of a calendar year, such Year End Surplus shall be applied to the payment of outstanding principal under the New Senior Debt.  In connection with the New Senior Debt, "Year End Surplus" means for such calendar year the amount by which cash and cash equivalents received by the Borrower and the Qualified Property Owners solely from the ownership and operation of the Properties then included in the Asset Pool exceeds the following during such year: |
| | (a)    expenses paid during such year (including all Management Fees) with respect to the Properties then included in the Asset Pool; |
| | (b)    distributions to Holders of Allowed Claims (other than Class 2 Senior Lender Secured Claims or Class 3 Senior Lender Unsecured Claims) made pursuant to the Plan of Reorganization during such year; |
| | (c)    expenditures for tenant improvement and tenant related capital expenditure obligations made during such year with respect to the Properties then included in the Asset Pool; |
| | (d)    leasing commissions relating to the Properties then included in the Asset Pool paid to Unrelated Third Parties during such year; |
| | (e)    required payments made on the Obligations during such year, including interest and principal; |

14

|  | (f) the amount of cash and cash equivalents that the Borrower and/or Qualified Property Owners, in their reasonable discretion, determine should be funded to reserves for operation of the Properties, including: (a) distributions to the Holders of Allowed Claims in accordance with the Plan of Reorganization; (b) tenant improvement and/or tenant related capital expenditures relating to the Properties then included in the Asset Pool; (c) leasing obligations relating to the Properties then included in the Asset Pool; (d) interest and/or principal on the Loan; and (e) Management Fees; and |
|---|---|
|  | (g) amount of cash and cash equivalents that the Borrower and/or Qualified Property Owners, in their reasonable discretion, determine should be funded to a reserve for other capital expenditures. The amount of such capital expenditure reserve shall not exceed $5,000,000 at any point in time. |
|  | For 2013, the Year End Surplus shall be calculated based upon a period commencing as of the Effective Date of the Plan of Reorganization and ending December 31, 2013. For subsequent years, the Year End Surplus shall be calculated using a traditional calendar year. |
| **Distributions:** | No distributions to Insiders or Affiliates shall be permitted during the term of the New Senior Debt except as provided in the New Loan. For the avoidance of doubt, neither of the following shall be deemed a distribution to an Insider or Affiliate: (i) Payment of the Management Fee; and (ii) sale or other transfer of any Property to an entity owned or controlled by an Insider or Affiliate so long as the Release Price, Debt Yield and other requirements of the New Credit Agreement are satisfied. |
| **Appraisals:** | Appraisals of the Properties will be ordered by Agent annually at Borrowers' expense. Independent Appraisals will be ordered annually or as otherwise required by the New Loan Agreement at Borrower's expense, except as otherwise provided in the New Loan Agreement. |
| **Financial Reporting:** | Consistent with the existing loan documents, provided however, that covenant testing shall begin as set forth above. |
| **Operating Bank Accounts:** | Consistent with the existing loan documents. |
| **Cash Management:** | Consistent with the existing loan documents. |

Capitalized terms used in this definition of "New Senior Debt" but not defined herein or elsewhere in the Plan shall have the meanings ascribed to them in the New Loan Agreement. To the extent provisions of this Plan and the New Loan Agreement are inconsistent, the New Loan Agreement shall control. The Debtors are seeking approval of the New Loan Documents through the Plan, and the entry of the Confirmation Order shall constitute approval of the New Loan Documents.

74. 76.“Non-Consolidation Election” means the election by the Debtors, in their sole discretion in consultation with the Plan Sponsors, to not pursue the substantive consolidation of the Estates as set forth in Article III.A. Notice of the Non-Consolidation Election, if made, will be filed with the Bankruptcy Court on or before the Effective Date.

75. 77.“Non-Debtor Affiliates” means Affiliates of the Debtors other than the Debtors.

76. 78.“Orchards Mall” means that Property located at 1800 Pipestone Road, Benton Harbor, Michigan 49022, which is owned by Debtor Sequoia Investments V, LLC.

77. 79.“Ordinary Course Administrative Claim” means an Administrative Claim with respect to liabilities incurred by a Debtor in the ordinary course of business during the Chapter 11 Cases to the extent due and owing in accordance with the terms and conditions of any agreements relating thereto; provided, however, that in no event shall a post-petition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, tenant complaints, employment law (excluding claims arising under workers’ compensation law), secondary payor liability or any other disputed legal or equitable claim based on tort, statute, contract, equity or common law, be considered to be an Ordinary Course Administrative Claim.

78. 80.“Other Secured Claim” means a Claim, other than a Secured Governmental Unit Claim or a Senior Lender Secured Claim, against the Debtors that is secured by a lien on property in which the Estates have an interest, which liens are valid, perfected and enforceable under applicable law or by reason of a Final Order, or that are subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder’s interest in the Estates’ interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

79. 81.“Person” shall mean any individual, corporation, limited liability company, general partnership, limited partnership, limited liability partnership, association, joint stock company, joint venture, estate, trust, unincorporated organization, government or any political subdivision thereof or any other entity as such term is defined in section 101(15) of the Bankruptcy Code.

80. 82.“Petition Date” means October 13, 2011.

81. 83.“Plan” means this plan of reorganization under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules or herewith, as the case may be.

82. “Plan Amendment Motion” means the *Debtors’ Motion For Order, Pursuant To 11 U.S.C. §§ 105(a), 1125 And 1127 And Fed. R. Bankr. P. 3019, (I) As To All Creditors And Parties In Interest Other Than Class 2 (Senior Lender Secured Claims) And Class 3 (Senior Lender Unsecured Claims), (A) Determining That The Debtors Are Not Required To Resolicit Votes Accepting The Third Amended Plan, (B) Deeming Votes Previously Cast To Accept The Second Amended Plan To Be Votes Cast For The Third Amended Plan, And (C) Determining Further Disclosure With Respect To The Third Amended Plan Is Unnecessary; And (II) As To The Holders Of Class 2 And Class 3 Claims, Retroactive To The Motion Filing Date, Approving The Information About The Third Amended Plan Contained In The Motion As A Supplemental Disclosure Statement And Deeming The Second Amended Disclosure Statement As Modified By The Supplemental Disclosure Statement To Provide Such Classes With Adequate Information And To Be The Approved Disclosure Statement For Class 2 And Class 3.*

83. 84.“Plan Sponsors” means SNP Holding, or its designee, and SNP Servicing, or its designee.

84. 85.“Plan Supplement” means the supplement to the Plan, in form and substance reasonably acceptable to the Debtors and the Plan Sponsors, containing without limitation: (a) any material amendments to the Plan Support Agreement; (b) to the extent that there are any material changes in the terms of the Reorganized Debtors’ respective corporate or entity governance documents, the forms of such corporate or entity governance documents that shall apply to the Reorganized Debtors; (c) the forms of the New Loan Documents; (d) the Rejected Contracts

16

Schedule (as the same may be amended from to time through the Confirmation Date); (e) the supplemental liquidation analysis; and (f) such other documents that the Debtors, with the consent of the Plan Sponsors, determine are necessary to include in the Plan Supplement for implementation of the Plan.

85.    86. "Plan Support Agreement" means that agreement between the Debtors and Plan Sponsors under which the Plan Sponsors will, among other things, make the New Investment in the Debtors. The Plan Support Agreement is attached hereto as **Exhibit A**. The Plan Support Agreement may be amended by agreement of the Debtors and Plan Sponsors from time to time through the date for filing the Plan Supplement without leave of Court and, thereafter, with leave of Court.

86.    87. "Pre-Petition Loan Documents" means the Pre-Petition Loan Agreement, the QPO Guarantees, the QPO Security Documents, the Pledge Agreements, the SNP Holding Guaranty, together with all related exhibits, schedules, agreements, forbearance agreements and other documents, as the same may have been amended from time to time. The capitalized terms in this definition, to the extent not defined elsewhere in this Plan, have the meanings ascribed to such terms in the Pre-Petition Loan Agreement.

87.    88. "Pre-Petition Loan Agreement" means that certain Credit Agreement by and among Security National Properties Funding III, LLC, Bank of America, N.A., in its capacity as Administrative Agent for itself and each of the other Lenders who are parties to the Credit Agreement and Banc of America Securities, LLC, as Sole Lead Arranger and Sole Book Manager, as amended.

88.    89. "Pre-Petition Loan Facility" means the pre-petition loan and credit facility, as evidenced by, among other things, the Pre-Petition Loan Documents.

89.    90. "Pre-Petition QPO Guaranty" means a QPO Guaranty (as defined in the Pre-Petition Loan Agreement) executed by any Debtor, that is in existence and enforceable as of the Petition Date.

90.    91. "Priority Tax Claims" means Claims of governmental units of the kind specified in section 507(a)(8) of the Bankruptcy Code. Priority Tax Claims specifically do not include Claims for payment of real property taxes secured by a Lien on a Debtor's real or personal property, such secured claims shall be considered Secured Governmental Unit Claims.

91.    92. "Professional Fee Claim Bar Date" means the date that is 45 days after the Confirmation Date.

92.    93. "Professional" means any Person employed pursuant to a Final Order in accordance with sections 327, 328 or 1103 of the Bankruptcy Code, and to be compensated for services rendered and awarded reimbursement of expenses incurred prior to and including the Effective Date pursuant to sections 327, 328, 329, 330 or 331 of the Bankruptcy Code.

93.    94. "Property" or "Properties" means one or all, as appropriate, of those certain 33 commercial real estate properties owned by the Debtors, which are more fully described in the New Loan Agreement.

94.    95. "Qualifying Value Diminution" means the total of (a) the net diminution in value, if any, of the Agent and Senior Lenders' Cash Collateral under the Pre-Petition Loan Documents as measured from the Petition Date through and including the Confirmation Date, and (b) to the extent that by Final Order the Bankruptcy Court has conditioned the continuation of the automatic stay in the Debtors' Chapter 11 Cases upon the requirement that adequate protection be provided to the Agent or Senior Lenders, the cumulative diminution in value of the Collateral (other than Cash Collateral) of the Senior Lenders, if any, accruing between the date of Filing of the Stay Relief Motion and the Confirmation Date.

95.    96. "Quarterly Distribution Date" means the date occurring approximately every three months on which the Reorganized Debtors make a Distribution on account of Allowed Claims to the extent a Distribution is permitted or required under the Plan.

96.    97."Rejected Contracts Schedule" means the schedule of rejected Executory Contracts that will initially be filed with the Plan Supplement and may be amended, modified or supplemented (including by adding or removing Executory Contracts) at any time thereafter through and including the Confirmation Date.

97.    98."Releasing Parties" means any Entity that grants a release or is deemed to grant a release pursuant to the terms of the Plan.

98.    99."Reorganized Debtors" means the Debtors in the period from and after the Effective Date.

99.    100."Representatives" means, with regard to an Entity, that Entity's current and former officers, directors, employees, advisors, members, attorneys, professionals, accountants, investment bankers, financial advisors, consultants, agents and other representatives (including each of their respective officers, directors, employees, independent contractors, members and professionals).

100.    101."Schedules" mean the schedules of assets and liabilities, schedules of executory contracts and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, each as may be amended from time to time, including after the Effective Date.

101.    "Second Amended Plan" means the *Second Amended Joint Chapter 11 Plan of Reorganization of Security National Properties Funding III, LLC and Its Debtor Affiliates,* dated October 26, 2012 [D.I. 380]

102.    "Section 503(b)(9) Claim" means a Claim entitled to priority as an Administrative Claim pursuant to section 503(b)(9) of the Bankruptcy Code.

103.    "Secured Governmental Unit Claim" means a Claim held by a "governmental unit" as such term is defined in section 101(27) of the Bankruptcy Code that is secured by a Lien in a Debtor's Property, including, but not limited to, those Claims for payment of real property taxes secured by a Lien on a Debtor's Property.

104.    "Senior Lender Releasees" means each of Bank of America, the Agent, the Senior Lenders and their respective current and former Affiliates and Representatives.

105.    "Senior Lender Releases" means the additional releases of the Debtor Releasees and Senior Lender Releasees that would be effective in connection with the Senior Lender Settlement, if consummated pursuant to the Plan.

106.    "Senior Lender Secured Claims" means the Claims of the Senior Lenders, evidenced by the Pre-Petition Loan Agreement and all guarantees, pledges, assignment(s) of rent, deed(s) of trust, amendments, modifications, and supplements related thereto, including any and all obligations of the Debtors, their affiliates and related entities, both individual and collectively, to the Senior Lenders. The Except as otherwise provided in the Stipulation, the Senior Lender Secured Claims are a Disputed ClaimClaims.

107.    "Senior Lender Settlement" means, as described more fully in Article IX.E of the Plan, the proposed settlement of all disputes by and among the Debtors, the Plan Sponsors, Bank of America, the Agent and the Senior Lenders pursuant to which Bank of America, the Agent and the Senior Lenders will, among other things, receive, subject to the Effective Date: (a) more favorable terms for the New Senior Debt (as described in the definition of New Senior Debt), (b) the ability to retain and indefeasibly apply all Adequate Protection Payments made by or on behalf of any Debtor from the Petition Date through the Confirmation Date without reducing the New Loan Amount and (c) the benefit of the Senior Lender Releases, including the release of the Swap Causes of Action. Bank of America, the Agent and each of the Senior Lenders shall be deemed to have accepted the Senior Lender Settlement and shall be bound by all of its terms, together with all other terms of the Plan, if Class 2 (Senior Lender Secured Claims) accepts the Plan pursuant to section 1126(c) of the Bankruptcy Code and the Disclosure Statement Order. If Class 2 votes to accept the Plan, subject to the Effective Date, the Agent, Bank of America and each of the Senior Lenders shall be deemed to: (a) waive any Distribution under the Plan or otherwise on account of any Senior Lender Unsecured Claim; and (b) give the Senior Lender Releases. As stated below in Article IX.E of the Plan, the Debtors, with the

consent of the Plan Sponsor, reserve the right to modify the terms of the Senior Lender Settlement any time prior to the entry of the Confirmation Order or thereafter as otherwise permitted pursuant to section 1127 of the Bankruptcy Code. If the Debtors make a material modification to the Senior Lender Settlement Terms, they shall File a notice stating the terms to be modified (the "SLS Modification Notice") and serve the same on the Agent, Bank of America and the Senior Lenders.  After the filing and service of SLS Modification Notice, the Agent, Bank of America and the Senior Lenders shall have until the later of the Voting Deadline or three (3) Business Days after the filing and service of SLS Modification Notice to vote on the Plan or change an existing vote on the Plan.  No other notice, disclosure or other opportunity to vote or re-vote shall be required for the modifications described in the SLS Modification Notice to become part of the Senior Lender Settlement and Plan.

108.    "Senior Lender Unsecured Claims" means the Claims of the Senior Lenders equal to the aggregate Collateral Shortfall, if any.   Senior Lender Unsecured Claims are a Disputed ~~Claim~~Claims.

109.    "Senior Lenders" means Bank of America, N.A., as agent and lender, and other Lenders (as defined in the Pre-Petition Loan Agreement).

110.    "SNP Holding" means Security National Properties Holding Company, LLC, a non-Debtor Affiliate of the Debtors.

111.    "SNP Holding Guaranty" means that certain Limited Guaranty executed by SNP Holding in connection with the Pre-Petition Loan Agreement to the extent it is in existence and enforceable as of the Petition Date.

112.    "SNP Servicing" means Security National Properties Servicing Company, LLC, a non-Debtor Affiliate of the Debtors.

113.    "SNPF III" means Security National Properties Funding III, LLC, one of the Debtors.

114.    "Soup Lots" means that Property located at 1102 and 1114 Dodge Street, Omaha, Nebraska 68102, which is owned by Debtor Security National Properties Funding, LLC.

115.    "Stay Relief Motion" means that certain *Motion of Bank of America, N.A. for (A) Valuation of Collateral and (B) Relief from the Automatic Stay,* dated July 27, 2012 and docketed at entry 271 in the docket of the Chapter 11 Cases.

116.    "Stipulated Current Value" means, with respect to each Property, the value given to such Property in the column titled "Current Value" on the chart contained in the Stipulation for such Property.

117.    "Stipulation" means that certain *Stipulation Between the Debtors and Bank of America, N.A., Individually and as Administrative Agent, Regarding (i) Amended Scheduling Order and (ii) Certain Agreements Regarding Matters Established for Purposes of the Valuation and Confirmation Hearing* approved by the Court on December 11, 2012 pursuant to that certain *Order Approving Stipulation Between the Debtors and Bank of America, N.A., Individually and as Administrative Agent, Regarding (i) Amended Scheduling Order and (ii) Certain Agreements Regarding Matters Established for Purposes of the Valuation and Confirmation Hearing* [D.I. 455].

118.    "Sub-Debt Facility" means a credit facility potentially to be provided by SNP Holding or its designee with maximum availability not to exceed $5,000,000.  Repayment of obligations under the Sub-Debt Facility may be secured by (a) a junior mortgage/deed of trust on all of the Properties, (b) a junior security interest in all of the Borrowers' personal property that is equivalent to what the Agent and the Senior Lenders had under the Pre-Petition Loan Agreement and (c) a junior assignment of leases and rents with respect to each of the Properties.  For the avoidance of doubt, all obligations under the Sub-Debt facility shall be subordinated in payment and lien priority to the New Senior Debt.

119.    ~~116.~~"Swap Causes of Action" means any and all Causes of Action, matured or unmatured, known or unknown, against Bank of America and/or its Representatives that arise out of or relate in any way to the Swap Transactions.  The Swap Causes of Action may include, without limitation, (a) fraudulent inducement, in

connection with the marketing and sale of the Swap Transactions, (b) breach of fiduciary duty, (c) frustration of commercial purpose, (d) breach of an agreement to provide financial services, (e) intentional fraud, (f) negligent misrepresentation, (g) constructive fraud, (h) breach of the implied duty of good faith and fair dealing, (i) unfair and deceptive trade practices, (j) causes of action based on Bank of America's manipulation of the London Interbank Offered Rate ("LIBOR"), (k) causes of action based on the violation of state and federal banking statutes and regulations in connection with the non-disclosure of the out-of-market pricing of the Swap Transactions, LIBOR manipulation and other conduct, and (l) causes of action based on the violation of state and federal securities statutes and regulations. While the Debtors believe that Bank of America and its Representatives engaged in wrongdoing in connection with the Swap Transactions, at this time, the Debtors have not completed their investigation of potential Swap Causes of Action. The Debtors and/or the Reorganized Debtors reserve their right to further investigate, pursuant to Bankruptcy Rule 2004 and other means, any and all potential Swap Causes of Action, as well as the role, if any, that Bank of America's knowledge or awareness of its exposure for potential liability on Swap Causes of Action played in its actions as Agent and Senior Lender in connection with the Pre-Petition Loan Facility and in connection with these Chapter 11 Cases.

120.    117. "Swap Transactions" includes the following interest rate swap transactions:

a.  that certain interest rate transaction entered into between Bank of America, N.A. and SNPF III, with a trade date of October 30, 2006, bearing Bank of America Reference No. 4866546;

b.  that certain interest rate transaction entered into between Bank of America, N.A. and Debtor Security National Properties Funding, LLC with a trade date of July 18, 2005, bearing Bank of America Reference No. 4284711;

c.  that certain interest rate transaction entered into between Bank of America, N.A. and Debtor Security National Properties Funding, LLC with a trade date of July 18, 2005, bearing Bank of America Reference No. 4284789;

d.  that certain interest rate transaction entered into between Bank of America, N.A. and Debtor Security National Properties Funding, LLC with a trade date of July 18, 2005, bearing Bank of America Reference No. 13454319; and

e.  that certain rate collar transaction entered into between Security National Properties Funding LLC and Fleet National Bank (predecessor in interest to Bank of America) with a trade date of January 16, 2004, bearing Bank of America Reference No. 82507FB/164005.

The Debtors are currently investigating the Swap Causes of Action and, therefore, the Debtors' and/or the Reorganized Debtors reserve the right to modify the definition of Swap Transaction for any reason, including if the Debtors or the Reorganized Debtors identify additional transactions under which a Swap Cause of Action exists. For the avoidance of doubt, this definition of Swap Transaction shall not limit or otherwise modify the Debtors' and/or the Reorganized Debtors' rights with respect to Swap Causes of Action in any manner whatsoever.

121.    118. "Tenant" means a Person that is a tenant or sub-tenant counterparty with a Debtor to a, as landlord or sub-landlord, to a lease or sub-lease of either (i) non-residential real property or (ii) a residential unit at the Properties known as Aspens Mobile Home Park or Rangeview Mobile Home Park.

122.    119. "Tenant Deposit Claim" means a claim held by a Tenant against a Debtor for the return of a security deposit held by a Debtor pursuant to a lease or sub-lease agreement.

123.    120. "U.S. Trustee" means the United States Trustee appointed under Article 591 of title 28 of the United States Code to serve in the District of Delaware.

124.    121. "Unimpaired" means not "impaired" within the meaning of section 1124 of the Bankruptcy Code, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests.

125.    122. "Unsecured Priority Claims" means Claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than Priority Tax Claims.

126.    123. "Voting Deadline" means the deadline of 4:00 p.m. Prevailing Eastern Time on December 17, 2012, to accept or reject the Plan.

B.    *Rules of Interpretation*

1.    For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neutral gender shall include the masculine, feminine and the neutral gender; (b) any reference herein to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words "herein" and "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined, but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2.    The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed hereby.

3.    All references herein to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

4.    Without limiting the foregoing, the Plan and Disclosure Statement's use of the singular or plural in reference to Senior Lender Secured Claims, Senior Lender Unsecured Claims, or the Holders thereof is not an admission by the Debtors as to whether (a) there are or are not multiple Senior Lender Secured Claims, Senior Lender Unsecured Claims or Holders of the foregoing and (b) which Entity or Entities have the authority to vote any Senior Lender Secured Claim or Senior Lender Unsecured Claim.  All such matters are reserved for later adjudication in connection with the Plan.

C.    *Exhibits*

1.    The Plan Supplement and exhibits to the Plan, to the extent not filed with the Plan itself, ~~shall be Filed with the Clerk of the Bankruptcy Court on or before December 10, 2012~~were filed contemporaneously with the Plan on January 14, 2013.  The filing of the Plan Supplement and any such exhibits is without prejudice to the Debtors' ability to amend, supplement or otherwise modify any of those materials.   Such materials may be inspected in the office of the Clerk of the Bankruptcy Court during normal hours of operation of the Bankruptcy Court.  Holders of Claims or Equity Interests may also obtain a copy of such exhibits, once filed, from the Debtors by a written request sent to the following address:

> MORRIS, NICHOLS, ARSHT & TUNNELL LLP
> 1201 North Market Street
> P.O. Box 1347
> Wilmington, DE 19899-1347
> Attn: Andrew R. Remming, Esq.

# ARTICLE II – ADMINISTRATIVE AND PRIORITY CLAIMS

A.    *Administrative Claims (As to All Debtors)*

Except as otherwise provided in this Plan or the Confirmation Order, subject to the Administrative Claims Bar Date and other requirements of this Plan, on or as soon as reasonably practicable after the later of (i) the Initial Distribution Date or (ii) 30 days following the date on which an Administrative Claim becomes an Allowed Administrative Claim, the Holder of such Allowed Administrative Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for such Allowed Administrative Claim, (a) Cash equal to the unpaid portion of the Allowed amount of the Allowed Administrative Claim or (b) such other less favorable treatment as to which the Debtors or Reorganized Debtors and such Holder shall have agreed upon in writing; provided, however, that Allowed Ordinary Course Administrative Claims shall be paid in the ordinary course of business in accordance with the terms and conditions of any agreements relating to such Ordinary Course Administrative Claims.

B.    *Professional Fee Claims*

All Professionals employed by the Debtors in these Chapter 11 Cases shall file all requests for allowance of compensation and reimbursement of expenses pursuant to sections 328, 330 or 503(b) of the Bankruptcy Code for Accrued Professional Compensation through the Effective Date by no later than the Professional Fee Claim Bar Date. The Reorganized Debtors shall have 30 days from the Professional Fee Claim Bar Date to formally object to any such fee requests.  The Confirmation Order shall establish the date the Bankruptcy Court shall hear and determine all applications for final allowances of compensation or reimbursement of expenses under section 328, 330 or 503(b) of the Bankruptcy Code.

C.    *Priority Tax Claims*

Except to the extent that an Allowed Priority Tax Claim has been paid prior to the Initial Distribution Date, each Holder of an Allowed Priority Tax Claim shall be entitled to receive, in full satisfaction, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, as shall have been determined by the Debtors or Reorganized Debtors in their sole discretion, (i) on the Initial Distribution Date, Cash equal to the unpaid portion of such Allowed Priority Tax Claim, (ii) deferred Cash payments over time pursuant to section 1129(a)(9)(C) of the Bankruptcy Code in an aggregate principal amount equal to the Face Amount of such Allowed Priority Tax Claim, plus interest on the unpaid portion thereof at the rate of interest determined under applicable nonbankruptcy law as of the calendar month in which the Plan is confirmed, or (iii) such other less favorable treatment as to which the Debtors or Reorganized Debtors and such Holder shall have agreed upon in writing.

## ARTICLE III – CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

A.    *Substantive Consolidation*

Subject to the Debtors making the Non-Consolidation Election, the Plan shall serve as a motion by the Debtors seeking entry of a Bankruptcy Court order substantively consolidating all of the Estates into a single consolidated Estate for all purposes associated with Confirmation and Consummation.

If the Debtors do not make the Non-Consolidation Election and substantive consolidation of all of the Estates is ordered, then on and after the Effective Date, all assets and liabilities of the Debtors shall be treated as though they were merged into the Estate of SNPF III for all purposes associated with Confirmation and Consummation, and all guarantees by any Debtor of the obligations of any other Debtor shall be eliminated so that any Claim and any guarantee thereof by any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor shall be treated as one collective obligation of the Debtors. Substantive consolidation shall not affect the legal and organizational structure of the Debtors or their separate corporate existences or any prepetition or postpetition guarantees, Liens, or security interests that are required to be maintained under the Bankruptcy Code, under the Plan, any contract, instrument, or other agreement or document pursuant to the Plan, or, in connection with contracts or leases that were assumed or entered into during the Chapter 11 Cases. Any alleged defaults under any applicable agreement with the Debtors, the Reorganized Debtors, or their Affiliates arising from substantive consolidation under the Plan shall be deemed cured as of the Effective Date.

Notwithstanding the foregoing paragraph, in the event the Debtors make the Non-Consolidation Election prior to the Effective Date or substantive consolidation is not ordered, (i) the Estates will not be substantively consolidated

22

for any purpose whatsoever, and (ii) all Claims against and Equity Interests in a particular Debtor will be placed in separate Classes as set forth below in Article III.E and will remain the separate Claims and Equity Interests of each such Debtor.

Notwithstanding the substantive consolidation provided for herein, nothing shall affect the obligation of each and every Debtor to pay quarterly fees to the U.S. Trustee pursuant to 28 U.S.C. § 1930 until such time as a particular Chapter 11 Case is closed, dismissed, or converted.

This Plan summarizes the classification and treatment of Claims and Equity Interests on both a substantively consolidated and non-consolidated basis.  Article III.D below summarizes the classification and treatment of Claims and Equity Interests if substantive consolidation is ordered.  Article III.E below summarizes the Classification and Treatment of Claims and Equity Interests if the Non-Consolidation Election is made or substantive consolidation is not ordered.

B.      *Special Provision Governing Unimpaired Claims and Tenant Deposit Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Reorganized Debtors in respect of any Claim classified in an Unimpaired Class, including, without limitation, all rights in respect of objections to such Claims and any legal and equitable defenses to or rights of setoff or recoupment against any such Claim. For the avoidance of doubt, Tenant counterparties to assumed real property leases will not receive any distribution relating to Tenant Deposit Claims, if applicable, as Tenant Deposit Claims shall be reinstated and rendered Unimpaired in accordance with section 1124(2) of the Bankruptcy Code.

C.      *Voting and Nonconsensual Confirmation*

In accordance with section 1126(c) of the Bankruptcy Code and the Disclosure Statement Order, and except as provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the Holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan.

The Debtors (with the consent of the Plan Sponsors) reserve the right to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code.  To the extent that any Class votes to reject the Plan or is deemed to reject the Plan, the Debtors (with the consent of the Plan Sponsors) further reserve the right to modify the Plan in accordance with Article XI.C herein.

D.      *Classification, Treatment and Voting Status if Substantive Consolidation Ordered - Summary of Classification and Treatment of Classified Claims and Equity Interests*

The following table applies if substantive consolidation is ordered and summarizes the classification and treatment of Claims against and Equity Interests in each Debtor for all purposes, including voting, confirmation and Distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(l) of the Bankruptcy Code.[3][2]  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that such Claim or Equity Interest or any portion thereof qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.  Each Class set forth below is treated hereunder as a distinct Class for voting and distribution purposes.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims or Priority Tax Claims, as described in Article II.

| **Class** | **Claim** | **Status** | **Voting Rights** |
|---|---|---|---|
| 1. | Secured   Governmental   Unit | Not Impaired | Not Entitled to Vote |

---

[3][2]      The table is for informational purposes only and is qualified in its entirety by Article III.D.1-9.

23

| | Claims | | |
|---|---|---|---|
| 2. | Senior Lender Secured Claims | Impaired | Entitled to Vote |
| 3. | Senior Lender Unsecured Claims | Not Impaired; provided, however, that in the event of an Adverse SLUC Ruling, the Senior Lender Unsecured Claims shall be reclassified as a General Unsecured Claims and treated as Impaired. | Not Entitled to Vote; provided, however, that in the event of an Adverse SLUC Ruling, the Senior Lender Unsecured Claims shall be reclassified as a General Unsecured Claims and will be entitled to vote the Deficiency Amount. |
| 4. | Other Secured Claims | Not Impaired | Not Entitled to Vote |
| 5. | Unsecured Priority Claims | Not Impaired | Not Entitled to Vote |
| 6. | General Unsecured Claims | Impaired | Entitled to Vote |
| 7. | Intercompany Claims | Not Impaired /Impaired | Not Entitled to Vote |
| 8. | Affiliate Claims | Impaired | Entitled to Vote |
| 9. | Equity Interests | Not Impaired | Not Entitled to Vote |

1.  *Secured Governmental Unit Claims (Class 1)*

    a.  *Classification*: Class 1 consists of the Secured Governmental Unit Claims.

    b.  *Treatment*: On, or as soon as reasonably practicable after the later of (a) the Initial Distribution Date or (b) the Distribution Date immediately following the date on which a Secured Governmental Unit Claim becomes an Allowed Secured Governmental Unit Claim, the Holder of such Allowed Secured Governmental Unit Claim shall receive at the election of the Reorganized Debtors, in full satisfaction, settlement, release and discharge of and in exchange for, such Allowed Secured Governmental Unit Claim, (i) Cash equal to the value of its Allowed Governmental Unit Claim, (ii) the return of the Holder's Collateral securing the Secured Governmental Unit Claim, (iii) payment in full as provided under sections 1129(a)(9)(C) and (D) of the Bankruptcy Code on the schedule provided for payment of General Unsecured Claims, or (iv) such other less favorable treatment to which the Debtors or Reorganized Debtors and such Holder shall have agreed upon in writing. To the extent such payments are paid over time, such payments shall be calculated to result in payment in full of the Allowed Secured Governmental Unit Claim with all accrued interest.

    c.  *Voting*: Class 1 is Unimpaired and, therefore, the Holders of Secured Governmental Claims are deemed to have accepted the Plan.

2.  *Senior Lender Secured Claims (Class 2)*

    a.  *Classification*: Class 2 consists of Senior Lender Secured Claims. The Senior Lender Secured Claims are Disputed Claims, except as otherwise provided in the Stipulation and except to the extent allowed pursuant to the Plan on the Effective Date.

    b.  *Treatment*:

        (i) If Class 2 votes to accept the Plan, except to the extent a Holder agrees to other, less favorable treatment, each Holder of an Allowed Senior Lender Secured Claim in Class 2, if any, shall, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Senior Lender Secured Claim, receive the following on the Effective Date (or as soon as practicable thereafter):

            (A) The New Senior Debt, on the more favorable terms and conditions for the Agent and Senior Lenders as described in the definition of New Senior Debt and in Article I.A.75 I.A.73 of the Plan;

24

(B) The conveyance by Sequoia Investments V, LLC and Security National Properties Funding, LLC, respectively, to the Agent and Senior Lenders or their designee, by deed in lieu of Orchards Mall and Soup Lots; provided, however, that upon the consummation of such conveyance of Orchards Mall and Soup Lots, the appraised value of Orchards Mall (i.e., $4,540,000) and Soup Lots (i.e., $1,750,000) will be credited to reduce the New Loan Amount on a dollar for dollar basis;

(C)(B) Authorization for the Agent and Senior Lenders to retain and indefeasibly apply the Adequate Protection Payments made by any Debtor from the Petition Date through the Confirmation Date; and

(D)(C) The Senior Lender Releases under the Plan.

(ii) If Class 2 votes to reject the Plan, except to the extent a Holder agrees to other, less favorable treatment, each Holder of an Allowed Senior Lender Secured Claim in Class 2, if any, shall, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Senior Lender Secured Claim, receive the following on the Effective Date (or as soon as practicable thereafter):

(A) The New Senior Debt without the more favorable terms and conditions for the Agent and Senior Lenders as described in the definition of New Senior Debt and in Article I.A.75 I.A.73 of the Plan; and

(B) The conveyance by Sequoia Investments V, LLC and Security National Properties Funding, LLC, respectively, to the Agent and Senior Lenders or their designee, by deed in lieu of Orchards Mall and Soup Lots; provided, however, that upon the consummation of such conveyance of Orchards Mall and Soup Lots, the appraised value of Orchards Mall (i.e., $4,540,000) and Soup Lots (i.e., $1,750,000) will be credited to reduce the New Loan Amount on a dollar for dollar basis;

(C)(B) Solely to the extent determined by a Final Order to be necessary for the Plan to satisfy the requirements of section 1129(b)(2)(A) of the Bankruptcy Code or the Debtors agree in writing in their sole discretion after consultation with the Plan Sponsors, the Agent and Senior Lenders shall be entitled to retain and apply some or all of the Adequate Protection Overpayments as set forth in Article IV.I; provided, however, to the extent that allowing the Agent and Senior Lenders to retain the Adequate Protection Overpayments is adjudicated not to be necessary for the Plan to satisfy the requirements of section 1129(b)(2)(A) of the Bankruptcy Code, in the sole and absolute discretion of the Debtors, after consultation with the Plan Sponsors, the portion of the Adequate Protection Overpayments not needed to satisfy the requirements of section 1129(b)(2)(A) of the Bankruptcy Code shall be either (x) turned over to the Debtors or the Reorganized Debtors, as applicable, or (y) credited to reduce the New Loan Amount on a dollar for dollar basis.

c.    *Voting*: Class 2 is Impaired and, therefore, the Holders of the Senior Lender Secured Claims are entitled to vote to accept or reject the Plan.

3.    *Senior Lender Unsecured Claims (Class 3)*

a.    *Classification*: Class 3 consists of the Senior Lender Unsecured Claims, if any.

b.    *Treatment*: Except to the extent a Holder agrees to other, less favorable treatment, each Holder of an Allowed Senior Lender Unsecured Claim in Class 3 shall, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Senior Lender Unsecured Claim, be treated as follows:

c.

i.    If Class 2 votes to accept the Plan, the Agent, for the benefit of itself and the Holders of Allowed Senior Lender Unsecured Claims, shall receive $1 on the Effective Date; **or**

25

ii. If Class 2 votes to reject the Plan, the following shall apply:

A. if there **has not been** an Adverse SLUC Ruling, Holders of Allowed Senior Lender Unsecured Claims shall receive payment in Cash in full on the Effective Date (or as soon as practicable thereafter) equal to the Holder's *pro rata* share of the Deficiency Amount, which payment shall be funded from (a) first, any unused portion of the Adequate Protection Overpayments (as determined pursuant to Article IV.I of the Plan) and (b) second, Cash; **or**

B. if there **has been** an Adverse SLUC Ruling, the Senior Lender Unsecured Claims shall be reclassified as General Unsecured Claims in an amount equal to the Deficiency Amount and treated in the same manner as General Unsecured Claims.

c. ~~d.~~ *Voting*: Class 3 is Unimpaired and, therefore, Holders of Senior Lender Unsecured Claims, if any, are deemed to have accepted the Plan; provided, however, that in the event of an Adverse SLUC Ruling, Class 3 shall be reclassified as General Unsecured Claims and, therefore, (i) is Impaired; and (ii) entitled to vote to accept or reject the Plan in an amount equal to each Holder's *pro rata* share of the Deficiency Amount.

4. *Other Secured Claims (Class 4)*

a. *Classification*: Class 4 consists of the Other Secured Claims.

b. *Treatment:* Except to the extent a Holder agrees to other, less favorable treatment, each Holder of an Allowed Other Secured Claim in Class 4 shall, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Other Secured Claim, at the sole option of the Debtors or the Reorganized Debtors, as applicable:

i. have its Allowed Class 4 Claim reinstated and rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code, notwithstanding any contractual provision or applicable non-bankruptcy law that entitles the Holder of such Allowed Class 4 Claim to demand or receive payment of such Allowed Class 4 Claim prior to the stated maturity of such Allowed Class 4 Claim from and after the occurrence of a default; or

ii. receive Cash in an amount equal to such Allowed Class 4 Claim, including any interest on such Allowed Class 4 Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Initial Distribution Date, or as soon as practicable thereafter, and the first subsequent Distribution Date, or as soon as practicable thereafter, after such Allowed Class 4 Claim becomes an Allowed Class 4 Claim.

c. *Voting*: Class 4 is Unimpaired and, therefore, Holders of Other Secured Claims are deemed to have accepted the Plan.

5. *Unsecured Priority Claims (Class 5)*

a. *Classification*: Class 5 consists of all Unsecured Priority Claims.

b. *Treatment*: Except to the extent a Holder agrees to other, less favorable treatment, each Holder of an Allowed Unsecured Priority Claim in Class 5 shall, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed Unsecured Priority Claim, be paid in respect of such Claim the full amount thereof in Cash on the later of the Initial Distribution Date, or as soon as practicable thereafter, or, if not an Allowed Unsecured Priority Claim on the Effective Date, the first subsequent Distribution Date, or as soon as practicable thereafter, after such Claim becomes an Allowed Unsecured Priority Claim.

c. *Voting*: Class 5 is Unimpaired and, therefore, Holders of Unsecured Priority Claims are deemed to have accepted the Plan.

6.  *General Unsecured Claims (Class 6)*

    a.  *Classification*: Class 6 consists of all General Unsecured Claims.

    b.  *Treatment*: Except to the extent a Holder agrees to other, less favorable treatment, each Holder of an Allowed General Unsecured Claim in Class 6 shall, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Holder's Allowed General Unsecured Claim, receive the following treatment:

        i.  if there **has not been** an Adverse SLUC Ruling, Holders of Allowed General Unsecured Claims other than Intercompany Claims and Affiliate Claims shall be paid, subject to the GUC Claims Cap, the full amount of their Allowed General Unsecured Claims in six equal Distributions commencing on the later of the Initial Distribution Date or the first subsequent Quarterly Distribution Date (or as soon thereafter as practicable) after such Claim becomes an Allowed General Unsecured Claim and continuing on the next five Quarterly Distribution Dates; **or**

        ii.  if there **has been** an Adverse SLUC Ruling, Holders of Allowed General Unsecured Claims other than Intercompany Claims and Affiliate Claims shall be paid, subject to the Alternative GUC Claims Cap, six equal Distributions commencing on the later of the Initial Distribution Date or the first subsequent Quarterly Distribution Date (or as soon thereafter as practicable) after such Claim becomes an Allowed General Unsecured Claim and continuing on the next five Quarterly Distribution Dates.

    c.  *Voting*: Class 6 is Impaired and, therefore, Holders of General Unsecured Claims are entitled to vote to accept or reject the Plan.

7.  *Intercompany Claims (Class 7)*

    a.  *Classification*: Class 7 Consists of all Intercompany Claims.

    b.  *Treatment*:  If substantive consolidation is ordered, on the Effective Date, Holders of Intercompany Claims shall not be entitled to, and shall not receive or retain any property or interest in property under the Plan on account of such Intercompany Claims.[4]

    c.  *Voting*: If substantive consolidation is ordered, Class 7 will be Impaired by the Plan, and each Holder of an Intercompany Claim will be conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and will not be entitled to vote to accept or reject the Plan.[5]

8.  *Affiliate Claims (Class 8)*

    a.  *Classification*: Class 8 Consists of all Affiliate Claims.

    b.  *Treatment*:  Subject to the Effective Date of the Plan, Affiliate Claims shall be subordinated to payment of all other Allowed Claims, as provided under this Plan; provided, however, the Debtors and the Holders of Affiliate Claims each shall retain their respective offset rights (including rights of setoff and recoupment) relating to such Affiliate Claims, which offset rights shall be unaffected by such subordination under the Plan.

---

[4]    See Article III.E. of the Plan for treatment of Intercompany Claims if the Non-Consolidation Election is made or substantive consolidation is not ordered.

[5]    See Article III.E. of the Plan for voting status of Intercompany Claims if the Non-Consolidation Election is made or substantive consolidation is not ordered.

    c.   *Voting*:  Class 8 is Impaired and, therefore, Holders of Affiliate Claims are entitled to vote to accept or reject the Plan.

9.   *Equity Interests (Class 9)*

    a.   *Classification*: Class 9 consists of Equity Interests in each of the Debtors.

    b.   *Treatment*: Holders of Equity Interests shall retain their Equity Interests under the Plan.

    c.   *Voting*: Class 8 is Unimpaired and, therefore, Holders of Equity Interests are deemed to have accepted the Plan.

    E.   *Classification, Treatment and Voting Status if Non-Consolidation Election Made or Substantive Consolidation Not Ordered - Summary of Classification and Treatment of Classified Claims and Equity Interests*

*Classification*: If the Debtors make the Non-Consolidation Election or substantive consolidation is not Ordered, notwithstanding anything to the contrary in Article III.D of this Plan, each class of Claims shall be further classified into separate sub-classes based on the Debtor against which such Claim is Scheduled or Filed, as applicable. The sub-classes for each Class of Claims shall be as follows:

| Debtor | Applicable Classes of Claims |
|---|---|
| Security National Properties Funding III, LLC | 1A, 2A, 3A, 4A, 5A, 6A, 7A, 8A, and 9A |
| ITAC 190, LLC | 1B, 2B, 3B, 4B, 5B, 6B, 7B, 8B, and 9B |
| Security National Properties Funding, LLC | 1C, 2C, 3C, 4C, 5C, 6C, 7C, 8C, and 9C |
| Security National Properties Funding II, LLC | 1D, 2D, 3D, 4D, 5D, 6D, 7D, 8D, and 9D |
| Sequoia Investments III, LLC | 1E, 2E, 3E, 4E, 5E, 6E, 7E, 8E, and 9E |
| Sequoia Investments V, LLC | 1F, 2F, 3F, 4F, 5F, 6F, 7F, 8F, and 9F |
| Sequoia Investments XIV, LLC | 1G, 2G, 3G, 4G, 5G, 6G, 7G, 8G, and 9G |
| Sequoia Investments XV, LLC | 1H, 2H, 3H, 4H, 5H, 6H, 7H, 8H, and 9H |
| Sequoia Investments XVIII, LLC | 1I, 2I, 3I, 4I, 5I, 6I, 7I, 8I, and 8I |
| Security National Properties-Alaska, LLC | 1J, 2J, 3J, 4J, 5J, 6J, 7J, 8J, and 9J |

*Treatment*: If the Debtors make the Non-Consolidation Election or substantive consolidation is not Ordered, then, except for Intercompany Claims in Classes 7A through 7J, the Treatment of each Class of Claims shall be identical to that set forth in Article III.D above.

Intercompany Claims in Classes 7A through 7J shall be treated as follows: On the Effective Date, Intercompany Claims may be reinstated as of the Effective Date or, at the sole and absolute discretion of the Debtors or the Reorganized Debtors, after consultation with the Plan Sponsors, cancelled, and no distribution shall be made on account of such Intercompany Claims.

*Voting Status*: If the Debtors make the Non-Consolidation Election or substantive consolidation is not Ordered, then the voting status of each Class of Claims shall be identical to that described in Article III.D above, except for the following:

(a) Each Claim (whether deemed to accept or reject the Plan or entitled to vote to accept or reject the Plan) shall be considered as a Claim solely within its Debtor-specific sub-class for the purpose of voting on the Plan. Thus, for example, a General Unsecured Claim against Sequoia Investments III, LLC would be entitled to have its Claim counted for voting purposes in sub-class 6E only and not in sub-class 6A, 6B, 6C, 6D, 6F, 6G, 6H, 6I or 6J.

(b) Intercompany Claims in Sub-Classes 7A through 7J will be unimpaired and each Holder of an Intercompany Claim in such Sub-Classes will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and will be deemed to have voted to accept the Plan.

## ARTICLE IV - MEANS FOR IMPLEMENTATION OF THE PLAN

In addition to the provisions set forth elsewhere in the Plan, the following shall constitute the means of execution and implementation of the Plan.

A.    *Plan Funding*

The Debtors' Cash on hand as of the Effective Date shall be used to pay Allowed Administrative Claims (including Allowed Administrative Claims for Accrued Professional Compensation and Allowed Ordinary Course Administrative Claims), Allowed Priority Tax Claims, and all Allowed Claims in Classes 1, 4 (in the event the Collateral is not returned to the Allowed Claim Holder), 5 and 7.  The Reorganized Debtors shall use the Reorganized Debtors' cash flow derived from the operation of the Properties to (i) make all payments to Class 2 Senior Lender Secured Claims as required by terms of the New Loan Agreement; and (ii) make any Cash payments required to be made to Class 3 Senior Lender Unsecured Claims.  Pursuant to the terms of the Plan Support Agreement and the New Loan Agreement, the Debtors' Cash on hand, the New Investment, and the Debtors' cash flow derived from the operation of the Properties after payment of all operating expenses and capital expenditures shall be used to make Distributions to Holders of Allowed General Unsecured Claims and Holders of Allowed Priority Tax Claims and Secured Governmental Unit Claims paid pursuant to sections 1129(a)(9)(C) and (D) of the Bankruptcy Code in accordance with the terms of this Plan.  The reduced and subordinated Management Fee is expected to increase cash available for payments required under the Plan.  Additionally, as part of the New Investment, the Plan Sponsors have reserved the ability to provide the Reorganized Debtors with such additional funding or liquidity that the Plan Sponsors deem appropriate in their sole discretion, including, but not limited to the provision of a Sub-Debt Facility.

B.    *Appointment of Estate Representatives*

The Plan will be administered by the Reorganized Debtors as set forth herein.

C.    *Rights and Powers of the Reorganized Debtors*

The Reorganized Debtors shall be deemed the Estates' representative in accordance with section 1123 of the Bankruptcy Code and shall have all the rights and powers set forth herein.

The Reorganized Debtors shall be authorized and empowered as a representative of the Estates to act to institute, prosecute, settle, compromise, abandon or release all Causes of Action, including without limitation the Swap Causes of Action, at their own expense.  The Reorganized Debtors shall be authorized and empowered with respect to all Claims as a representative of the Estates and shall have the powers of a trustee under sections 704 and 1106 of the Bankruptcy Code and Rule 2004 of the Bankruptcy Rules, including without limitation, the right to (1) effect all actions and execute all agreements, instruments and other documents necessary to implement the provisions of the Plan; (2) liquidate any assets; (3) make Distributions to Holders of Allowed Claims in accordance with this Plan; (4) object to Claims and prosecute, settle or otherwise resolve such objections and, as applicable, assert any defenses and rights of setoff or recoupment of the Estates; (5) establish and administer any necessary reserves for Disputed Claims that may be required; (6) perform administrative services related to implementation of this Plan; (7) complete and file the federal, state and local tax returns, and pursuant to section 505(b) of the Bankruptcy Code, request an expedited determination of any unpaid tax liability of such Debtor or its Estate for any tax incurred during the administration of such Debtor's Chapter 11 Case, as determined under applicable tax laws; (8) prepare and file post-confirmation reports

with the U.S. Trustee and pay any post-confirmation fees owing to the U.S. Trustee and (9) employ and compensate professionals, which professionals may include Professionals that have represented the Debtors in these Chapter 11 Cases, and other agents necessary for the aforementioned tasks.  The Reorganized Debtors shall be permitted to pay any necessary expenses incurred, including compensation of professionals, in accordance with this Plan without seeking Court approval.

D.       Directors/Officers of the Debtors on the Effective Date

The authority, power and incumbency of the persons acting as directors, officers and/or managing members of the Debtors as of the Petition Date shall continue following the Effective Date.

E.       Operations of the Debtors Between the Confirmation Date and the Effective Date

The Debtors shall continue to operate as Debtors-in-Possession during the period from the Confirmation Date through and until the Effective Date.

F.       Transfer and Vesting of Property

On the Effective Date all of the Debtors' right, title and interests in the Properties and all other property of the Estates, whether it be real or personal, except to the extent such property is otherwise transferred or released pursuant to provisions of this Plan, shall be transferred to and vest in the Reorganized Debtors free and clear of all Claims and Liens, except as follows: (a) the Properties and other property of the Reorganized Debtors shall be encumbered by Liens to the extent that such Liens are granted for the benefit of the Agent and the Senior Lenders in connection with the New Senior Debt; (b) to the extent that the Debtors' property is encumbered by Liens securing an Allowed Class 4 Other Secured Claim and the Debtors or Reorganized Debtors agree at their sole option and in writing that such Allowed Class 4 Other Secured Claim should be reinstated and rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, such Liens shall reattach to such encumbered property.  Without limiting the foregoing, all Causes of Action (other than those specifically released pursuant to the Plan), including the Swap Causes of Action, shall be transferred to and vest in the Reorganized Debtors free and clear of all Claims and Liens.

G.       Establishment of the Administrative Claims Bar Date

1.       The Plan establishes the Administrative Claims Bar Date, which will be approved by the Bankruptcy Court pursuant to the Confirmation Order.

2.       On or before 4:00 p.m., Prevailing Eastern Time, on the Administrative Claims Bar Date, each Holder of an Administrative Claim (other than an Ordinary Course Administrative Claim, a Section 503(b)(9) Claim, an Administrative Claim for Accrued Professional Compensation, or an Administrative Claim of the Claims Agent) shall file with the Bankruptcy Court a request for payment of Administrative Claim by electronic filing, mailing, hand delivering or delivering by courier service such request for payment of Administrative Claim to the Bankruptcy Court and serve a copy so as to be received substantially contemporaneous with filing on counsel to the Debtors and the Office of the United States Trustee for the District of Delaware.  For the avoidance of doubt, Section 503(b)(9) Claims were required to be filed by the Bar Date of March 1, 2012 and remain subject to such Bar Date.

H.       Term of Injunctions or Stays

Unless otherwise provided, all injunctions or stays provided for in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Chapter 11 Cases are closed.

I.       Resolution of Adequate Protection Overpayments

Except if Class 2 votes to accept the Plan or as the Debtors or Reorganized Debtors and the Agent and Senior Lenders may otherwise agree through an exchange of signed writings or otherwise ordered by the Bankruptcy Court: (a) within sixty (60) days after the Effective Date, the Debtors may file a motion, on notice to the Agent, requesting the Bankruptcy Court to estimate the amount of the Adequate Protection Overpayments; (b) subject to the Bankruptcy

Court's availability, within thirty (30) days after the Debtors' filing and service of such estimation motion, the Bankruptcy Court shall estimate the amount of the Adequate Protection Overpayments; and (c) within seven (7) days after the Bankruptcy Court's entry of an order estimating the amount of the Adequate Protection Overpayments, the Agent and Senior Lenders shall turn over to a third-party escrow agent (or pay into the Bankruptcy Court's registry account if the parties cannot agree on the choice of a third-party escrow agent) Cash in an amount equal to the amount of the estimated Adequate Protection Overpayments.  The Cash equal to the estimated amount of the Adequate Protection Overpayments shall be held by such third-party escrow agent (or held by the Bankruptcy Court in its registry account), subject to the entry of a Final Order adjudicating on a final basis the amount of the Adequate Protection Overpayments and directing the distribution of the Adequate Protection Overpayments in accordance with the Plan; provided, however, that the failure of the Debtors or Reorganized Debtors to move to estimate the amount of the Adequate Protection Payments as set forth above shall not prejudice their right to recover the Adequate Protection Payments or any other remedy available with respect to the Adequate Protection Overpayments.

Except (x) if Class 2 votes to accept the Plan or (y) as the Debtors and the Agent may otherwise agree in a writing signed by both parties, the Adequate Protection Overpayments shall be administered in order of priority as follows under the Plan:

(i)    First, solely to the extent the Bankruptcy Court determines by a Final Order that the Agent and Senior Lenders' application of such Adequate Protection Overpayments is necessary to satisfy the requirements of section 1129(b)(2)(A) of the Bankruptcy Code, the required portion of the Adequate Protection Overpayments shall be returned to and/or retained by the Agent and Senior Lenders, as applicable, and applied by the Agent and Senior Lenders on account of their Senior Lender Secured Claims; provided, however, that the application of such portion of the Adequate Protection Payments shall reduce the New Loan Amount on a dollar for dollar basis;

(ii)    Second, to fund distributions to the Holders of Allowed Senior Lender Unsecured Claims in a total amount not to exceed the aggregate of the Deficiency Amount or the Allocated Deficiency Amount, as applicable;[6] and

(iii)    Third, to fund distributions to the Holders of Allowed General Unsecured Claims, subject to the GUC Claims Cap or the Alternative GUC Claims Cap, as applicable.

(iv)    Fourth, the Adequate Protection Overpayments shall be returned to and retained by the Debtors.

## ARTICLE V – PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Initial Distribution Date*

On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors shall make, or shall make adequate reserves for, the Distributions required to be made under the Plan with respect to Allowed Claims.

B.    *Disputed Claims Reserves*

1.    Establishment of Disputed Claims Reserves

As to any Claim required to receive its Distributions in the form of Cash, on the Initial Distribution Date and on each subsequent Distribution Date, the Debtors or Reorganized Debtors shall withhold on a *pro rata* basis from property that would otherwise be distributed to Classes of Claims or unclassified Claims entitled to Distributions under the Plan on such date, in a separate Disputed Claims Reserve, such amounts as may be necessary to equal the

---

[6]    As stated above in Articles III.D.3 and III.E.3, in the event of an Adverse SLUC Ruling, the Senior Lender Unsecured Claims shall be reclassified as General Unsecured Claims in an amount equal to the Deficiency Amount or the Allocated Deficiency Amount, as applicable, and treated in the same manner as General Unsecured Claims.  Accordingly, in the event of an Adverse SLUC Ruling, this Article IV.I(ii) shall not apply.

anticipated amount of the initial Distributions to which Holders of such Disputed Claims would be entitled under this Plan if such Disputed Claims were allowed in their Disputed Claims Amount on the Initial Distribution Date. To the extent that such Claims remain Disputed Claims on subsequent Distribution Dates, the Reorganized Debtors shall increase the Disputed Claim Reserves by amounts necessary to reflect the amounts of the subsequent Distributions to which Holders of such Disputed Claims would be entitled under this Plan if such Disputed Claims were allowed in their Disputed Claim Amount as of such subsequent Distribution Dates. The Debtors or Reorganized Debtors may request, if necessary, estimation for any Disputed Claim that is contingent or unliquidated, or for which the Debtors or Reorganized Debtors determine to reserve less than the Face Amount. The Debtors or Reorganized Debtors shall withhold the applicable portion of the Disputed Claims Reserve with respect to such Claims based upon the estimated amount of each such Claim as estimated by the Bankruptcy Court. If the Debtors or Reorganized Debtors elect not to request such an estimation from the Bankruptcy Court with respect to a Disputed Claim that is contingent or unliquidated, the Debtors or Reorganized Debtors shall withhold the applicable Disputed Claims Reserve based upon the good faith estimate of the amount of such Claim by the Debtors or Reorganized Debtors. If practicable, the Debtors or Reorganized Debtors will invest any Cash that is withheld as the applicable Disputed Claims Reserve in an appropriate manner to ensure the safety of the investment. Nothing in this Plan or the Disclosure Statement shall be deemed to entitle the Holder of a Disputed Claim to postpetition, post-Confirmation or post-Effective Date interest on such Claim, however.

2.   <u>Maintenance of Disputed Claims Reserves</u>

To the extent that the property placed in a Disputed Claims Reserve consists of Cash, that Cash shall be deposited in an interest-bearing account, or other account with fewer fees, whichever preserves the corpus of such Disputed Claims Reserve the most, at the Reorganized Debtors' sole discretion. The Reorganized Debtors shall hold property in the Disputed Claims Reserves in trust for the benefit of the Holders of Disputed Claims in the relevant Class of Claims ultimately determined to be Allowed. Each Disputed Claims Reserve shall be closed by the Reorganized Debtors when all Distributions and other dispositions of Cash or other property required to be made hereunder will have been made in accordance with the terms of the Plan and all Disputed Claims on account of which such Disputed Claims Reserve was created and funded shall be deemed extinguished upon the last such Disputed Claim becoming Allowed or disallowed by a Final Order of the Bankruptcy Court. Upon closure of a Disputed Claims Reserve for a particular Class of Claims (or category of unclassified Claims), all Cash (including any Cash Investment Yield) or other property held in that Disputed Claims Reserve shall be used to pay any remaining unpaid amounts due to Claimants for the applicable Class in accordance with Article III.D. or III.E., as ~~applicble~~applicable, or shall be returned to the Reorganized Debtors if all such Allowed Claims have been fully satisfied as set forth in Article III.D. or III.E., as applicable.

*C.   Subsequent Distributions*

Any Distribution that is not made on the Initial Distribution Date or subsequent Distribution Dates or on any other date specified herein because the Claim that would have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be held by the Reorganized Debtors in a Disputed Claims Reserve pursuant to Article V.B herein and Distributed as soon as practicable and in accordance with the terms of this Plan, after such Claim is Allowed by a Final Order of the Bankruptcy Court.

*D.   Delivery of Distributions*

1.   <u>General Provisions; Undeliverable Distributions</u>

Subject to Bankruptcy Rule 9010 and except as otherwise provided herein, Distributions to the Holders of Allowed Claims shall be made by the Reorganized Debtors at (a) the address of each Holder as set forth in the Schedules, unless superseded by the address set forth on proofs of Claim filed by such Holder or (b) the last known address of such Holder if no proof of Claim is filed or if the Reorganized Debtors have been notified in writing of a change of address. If any Distribution is returned as undeliverable, the Reorganized Debtors may, in their sole discretion, make such efforts to determine the current address of the Holder of the Claim with respect to which the Distribution was made as the Reorganized Debtors deem appropriate, but no Distribution to any Holder shall be made unless and until the Reorganized Debtors have determined the then-current address of the Holder, at which time the Distribution to such Holder shall be made to the Holder without interest from and after the Effective Date through the

date of Distribution.  Amounts in respect of any undeliverable Distributions made by the Reorganized Debtors shall be returned to, and held in trust by, the Reorganized Debtors until the Distributions are claimed or are deemed to be unclaimed property under section 347(b) of the Bankruptcy Code as set forth below in Article V.D.2.  The Reorganized Debtors shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; provided, however, that their discretion may not be exercised in a manner inconsistent with any express requirements of the Plan.

2.    Unclaimed Property

Except with respect to property not Distributed because it is being held in a Disputed Claims Reserve, Distributions that are not claimed by the expiration of 1 year from the date of the last Distribution to the Holder of such Claim shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and, if on account of an Allowed General Unsecured Claim in Class 6, may be used to make payment on other Claims in such Class. After the expiration of that one (1) year period, (a) the Claims with respect to which those Distributions are made shall be automatically cancelled and (b) the right of any Entity to those Distributions shall be discharged and forever barred and waived.  Nothing contained in the Plan shall require the Reorganized Debtors to attempt to locate any Holder of an Allowed Claim.

E.    *Manner of Cash Payments Under the Plan*

Cash payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank selected by the Reorganized Debtors or by wire transfer from a domestic bank, at the option of Reorganized Debtors.

F.    *Time Bar to Cash Payments by Check*

Checks issued by the Reorganized Debtors on account of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof.  Requests for the reissuance of any check that becomes null and void pursuant to this Article V.F. shall be made directly to the Reorganized Debtors by the Holder of the Allowed Claim to whom the check was originally issued.  Any Claim in respect of such voided check shall be made in writing on or before the later of the first anniversary of the Effective Date or the first anniversary of the date on which the Claim at issue became an Allowed Claim.  After that date, all Claims in respect of void checks shall be discharged and forever barred and the proceeds of those checks shall become unclaimed property in accordance with section 347(b) of the Bankruptcy Code.

G.    *Compliance with Tax Requirements*

In connection with making Distributions under this Plan, to the extent applicable, the Reorganized Debtors shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all Distributions pursuant to this Plan shall be subject to such withholding and reporting requirements.  The Reorganized Debtors may withhold the entire Distribution due to any Holder of an Allowed Claim until such time as such Holder provides the necessary information to comply with any withholding requirements of any governmental unit.  Any property so withheld will then be paid by the Reorganized Debtors to the appropriate authority.  If the Holder of an Allowed Claim fails to provide the information necessary to comply with any withholding requirements of any governmental unit within 6 months from the date of first notification to the Holder of the need for such information or for the Cash necessary to comply with any applicable withholding requirements, then such Holder's Distribution shall be treated as an undeliverable Distribution in accordance with Article V.D.1 hereof.

H.    *No Payments of Fractional Dollars and Minimum Distributions*

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan.  Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.  The Reorganized Debtors shall not be obligated to make any Distributions of less than $10.00.

I.      *Interest on Claims*

Except as specifically provided for in this Plan or the Confirmation Order, interest shall not accrue on Claims and no Holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim.  Except as expressly provided herein or in a Final Order of the Bankruptcy Court, no prepetition Claim shall be Allowed to the extent that it is for post-petition interest or other similar charges.

J.      *No Distributions in Excess of Allowed Amount of Claim*

Notwithstanding anything to the contrary contained in the Plan, no Holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of that Claim.

K.      *Setoff and Recoupment*

The Debtors or Reorganized Debtors may, but shall not be required to, setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any claims or defenses of any nature whatsoever that any of the Debtors, the Estates, or the Reorganized Debtors may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors, the Reorganized Debtors on behalf of the Debtors, the Estates, or the Reorganized Debtors as a successor in interest of any right of setoff or recoupment that any of them may have against the Holder of any Claim. The Bankruptcy Court shall retain jurisdiction to consider any dispute related to any such setoff or recoupment. Without limiting the foregoing, the Debtors or Reorganization Debtors shall have the right to setoff against and recoup from any Claim of or Distributions to be made to Bank of America pursuant to the Plan in respect of any Swap Cause of Action or any other Cause of Action not expressly released pursuant to this Plan.

**ARTICLE VI – DISPUTED CLAIMS**

A.      *No Distribution Pending Allowance*

Notwithstanding any other provision of the Plan, the Reorganized Debtors shall not Distribute any Cash or other property on account of any Claim that is Disputed unless and until such Claim or portion thereof becomes Allowed.

B.      *Resolution of Disputed Claims*

The Reorganized Debtors have the right after the Effective Date to make and File objections to all Claims.

C.      *Objection Deadline*

All objections to Disputed Claims, shall be Filed and served upon the Holders of each such Claim not later than the Claims Objection Bar Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing.  The Reorganized Debtors reserve the right to move to extend this objection deadline.

D.      *Estimation of Claims*

At any time after the Effective Date, the Reorganized Debtors may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount

shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the Claim, the Reorganized Debtors may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

## ARTICLE VII – TREATMENT OF EXECUTORY CONTRACTS

      A.      *Assumption and Rejection of Executory Contracts*

On the Effective Date, all Executory Contracts of the Debtors will be deemed assumed by the Reorganized Debtors in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts that:

      i.      have been rejected by order of the Bankruptcy Court;

      ii.      are the subject of a motion to reject pending on the Effective Date;

      iii.      are identified on the Rejected Contracts Schedule; or

      iv.      are rejected pursuant to the terms of this Plan.

Except as otherwise provided herein or agreed to by the Debtors with the applicable counterparty in writing, each assumed Executory Contract shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated hereunder. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or the validity, priority, or amount of any Claims that may arise in connection therewith.  To the extent any provision in any Executory Contract assumed pursuant to this Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by the Reorganized Debtors' assumption of such Executory Contract, then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-debtor party thereto to terminate such Executory Contract or to exercise any other default-related rights with respect thereto. Each Executory Contract and Unexpired Lease assumed pursuant to this Article VII shall revest in and be fully enforceable by the Reorganized Debtors in accordance with its terms, except as modified by the provisions of this Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law. Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions and rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code.

      B.      *Cure of Defaults for Assumed Executory Contracts*

Any monetary defaults under each Executory Contract to be assumed pursuant to this Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by the treatment provided to Holders of Allowed Cure Claims. At least 20 days prior to the Confirmation Hearing, the Debtors shall file and serve upon counterparties to such Executory Contracts, a notice of the proposed assumption (the "Proposed Assumption Notice"), which will: (1) list the applicable cure amount, if any; and (2) describe the procedures for filing objections thereto. Any objection by a counterparty to an Executory Contract to a proposed assumption or related cure amount must be filed, served and actually received by the Debtors at least 7 days prior to the Confirmation Hearing. Any counterparty to an Executory Contract that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such matters and will be deemed to have forever released and waived any objection to the proposed assumption and cure amount.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article

IX.G hereof.  In the event of a dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract to be assumed or (3) any other matter pertaining to assumption, (a) such claim shall be deemed a Disputed Cure Claim until the entry of a Final Order or orders resolving the dispute and approving the assumption and (b) the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made within 28 days following the entry of a Final Order or orders resolving the dispute and approving the assumption.  If an objection to Cure the Debtors' proposed cure amount or any other term of the Debtors' proposed assumption of a Contract is sustained by the Bankruptcy Court, the Debtors or Reorganized Debtors, as applicable, in their sole option, may elect to reject such Executory Contract in lieu of assuming it.

>C.    Rejection of Executory Contracts

All Executory Contracts listed on the Rejected Contracts Schedule as of the Confirmation Date shall be deemed rejected as of entry of the Confirmation Order, which shall constitute an order of the Bankruptcy Court approving the rejections described in this Article VII pursuant to sections 365 and 1123 of the Bankruptcy Code.

>D.    Claims on Account of the Rejection of Executory Contracts

All proofs of Claim with respect to Claims arising from the rejection of Executory Contracts, pursuant to this Plan or the Confirmation Order, if any, must be filed with the Claims Agent within 30 days after the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.[7][6]  All Allowed Claims arising from the rejection of Executory Contracts shall be classified as General Unsecured Claims.  Any Entity that is required to file a Proof of Claim arising from the rejection of an Executory Contract that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtors, the Reorganized Debtors or their Estates, and the Debtors, the Reorganized Debtors and their Estates and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article IX.G hereof.

>E.    Insurance Policies

Each insurance policy shall be assumed by the applicable Reorganized Debtor effective as of the Effective Date, pursuant to section 365 of the Bankruptcy Code, to the extent such insurance policy is executory, unless such insurance policy previously was rejected by the Debtors pursuant to a Bankruptcy Court order or is the subject of a motion to reject pending on the Effective Date.

>F.    Contracts and Leases Entered Into After the Petition Date

Contracts and leases entered into after the Petition Date by any Debtor may be performed by the Reorganized Debtors in the ordinary course of business.

>G.    Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease on the Rejected Contracts Schedule or the Proposed Assumption Notice, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or that any Debtor or Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

---

[7][6]    For the avoidance of doubt, the bar date described in Article VII.D shall not apply to operate to extend any bar date, including the Bar Date, for any claim based on the Debtors' rejection of arising out of or relating to an n Executory Contract that was required to be filed prior to such earlier bar date, including, but not limited to, the Bar Date.

**ARTICLE VIII – CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE**

     A.      *Conditions to Confirmation*

The following conditions precedent to the occurrence of the Confirmation Date must be satisfied:

(a) the Confirmation Order shall have been entered in form and substance reasonably satisfactory to the Debtors and the Plan Sponsors, and shall, among other things:

     (i) provide that the Debtors and the Reorganized Debtors are authorized and directed to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures and other agreements or documents created in connection with the Plan; and

     (ii) provide that notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall be immediately effective, subject to the terms and conditions of the Plan.

(b)     The Debtors and the Plan Sponsors have agreed in their reasonable discretion that the Debtors will have sufficient Cash as of the Effective Date to pay the Senior Lender Unsecured Claims, if any, in full from Cash generated by operation of the Properties and other sources of funding available under the Plan.

     B.      *Conditions to Effective Date*

The following are conditions precedent to the Effective Date that must be satisfied or waived:

(i) The Confirmation Order shall have become a Final Order;

(ii) The New Loan Documents shall be in form and substance reasonably acceptable to the Debtors and the Plan Sponsors, and to the extent that any of such documents contemplates execution by one or more persons, any such document shall have been executed and delivered by the respective parties thereto, and all conditions precedent to the effectiveness of each such document and to funding and credit thereunder shall have been satisfied or waived;

(iii) All material authorizations, consents and regulatory approvals required, if any, in connection with consummation of the Plan shall have been obtained; and

(iv) All material actions, documents and agreements necessary to implement the Plan shall have been effected or executed.

     C.      *Waiver of Conditions.*

Notwithstanding the foregoing, the Debtors (with the consent of the Plan Sponsors) reserve, in their sole discretion, the right to waive the occurrence of any condition precedent to Confirmation or the Effective Date or to modify any of the foregoing conditions precedent, except for the entry of an order Confirming the Plan. Any such written waiver of a condition precedent set forth in this Article may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan. Notwithstanding the satisfaction or waiver of each condition precedent to the Effective Date, the Effective Date shall not occur until the Debtors (with the consent of the Plan Sponsors) file with the Bankruptcy Court a notice stating that the Effective Date has occurred.  Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

**ARTICLE IX – DISCHARGE, RELEASE, INJUNCTION AND RELATED PROVISIONS**

     A.      *Compromise and Settlement*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Equity Interests. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable and in the best interests of the Debtors, the Estates and Holders of Claims and Equity Interests.

**B.**     *Discharge of Debtors*

**The rights afforded in this Plan and the treatment of all Claims and Equity Interests herein shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Equity Interests of any nature whatsoever against the Debtors and the Debtors-in-Possession, or their assets, Properties, or interests in property. Except as otherwise provided herein, on the Effective Date, all Claims against the Debtors and the Debtors-in-Possession shall be satisfied, discharged, and released in full. The Reorganized Debtors shall not be responsible for any obligations of the Debtors or the Debtors-in-Possession except those expressly assumed by the Reorganized Debtors pursuant to this Plan. All Entities shall be precluded and forever barred from asserting against the Debtors and the Reorganized Debtors, or their assets, Properties, or interests in property any other or further Claims or Claims based upon any act or omission, transaction, or other activity, event, or occurrence of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date, except as expressly provided in this Plan.**

**C.**     *Releases*

**1.**     *Releases by the Debtors***. Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Debtor Releasees, including, without limitation, the services of the Debtor Releasees in facilitating the expeditious implementation of the Plan, each of the Debtors hereby provides a full release to the Debtor Releasees (and each such Debtor Releasee so released shall be deemed released and discharged by the Debtors) from any and all Claims or Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, event or other occurrence or circumstances, including actions in connection with indebtedness for money borrowed by the Debtors, existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including, without limitation, those that any of the Debtors would have been legally entitled to assert or that any Holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of any of the Debtors or Estates and further including those in any way related to the Estates, the Chapter 11 Cases or the Plan;** *provided, however***, that the foregoing provisions of this Article IX.C.1 shall not operate to waive or release** any Debtor Releasee **from any Causes of Action expressly set forth in and preserved by the Plan or any defenses thereto.**

**2.**     *Releases by Certain Holders of Claims***. Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for good and valuable consideration, each Holder of a Claim who voted in favor of the Plan shall be deemed to unconditionally release and forever waive all Claims, Causes of Action, debts, obligations, demands, liabilities, suits, judgments, damages, rights and causes of action, whatsoever, other than the right to enforce the obligations under the Plan and the contracts, instruments, releases and other agreements and documents delivered thereunder, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, then existing or thereafter arising, in law, equity or otherwise that are based in whole or in part upon any act, omission, transaction, event, or other occurrence respecting any of the Debtors or their Estates or in connection with the Chapter 11 Cases, the Plan, the Disclosure Statement, the negotiation or for any act or omission that occurred or could have occurred on or prior to the Effective Date against any of the Debtor Releasees.**

**3.**     **Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in this Article IX.C pursuant to Bankruptcy Rule 9019 and its finding that they are: (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the**

**Claims and Causes of Action thereby released; (b) in the best interests of the Debtors and all Holders of Claims and Equity Interests; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to any of the Releasing Parties asserting any Claim or Cause of Action thereby released.**

### D.    *Exculpation*

**Notwithstanding anything contained in the Plan to the contrary, the Debtor Releasees shall neither have nor incur any liability to any Holder of a Claim or Interest, or a governmental entity on behalf of a Holder of a Claim or Equity Interest, for any act taken or omitted to be taken in connection with, or related to, the restructuring of the Debtors arising prior to the Effective Date, including but not limited to the formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or Disclosure Statement or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the Plan;** *provided, however,* **that the foregoing provisions of this Article IX.D shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct;** *provided, further,* **that each Debtor Releasee shall be entitled to rely upon the advice of counsel concerning its duties;** *provided, further,* **that the foregoing provisions of this Article IX.D shall not apply to any acts, omissions, Claims, causes of action or other obligations expressly set forth in and preserved by the Plan or any defenses thereto.**

### E.    *Proposed Senior Lender Settlement*

The Plan includes the proposed settlement and compromise of all disputes by and among the Debtors, the Plan Sponsors, Bank of America, the Agent, the Senior Lenders and each of their respective Affiliates. Although the Debtors are confident that they could prevail in a contested confirmation fight and in other litigation with Bank of America, the Agent and the Senior Lenders, the Debtors have proposed this Senior Lender Settlement as an inducement to Bank of America, the Agent and the Senior Lenders to avoid the expense, burden, delay and unnecessary consumption of judicial resources associated with such litigation. Acceptance of the Plan in accordance with section 1126(c) of the Bankruptcy Code and the Disclosure Statement Order by Class 2 (Senior Lender Secured Claims) shall bind the Debtors, the Plan Sponsors, the Agent, Bank of America, the Senior Lenders and other parties-in-interest to the terms of the Senior Lender Settlement as set forth below.

#### 1.    Terms of the Senior Lender Settlement

*Provisions Related to the Senior Lenders*

(a)    Effective immediately upon the casting of a Senior Lender Secured Ballot by a Senior Lender to accept the Plan, such Senior Lender shall be deemed to have voted each and every one of its respective Claims in support of Confirmation of the Plan. Such Senior Lender may not subsequently change or withdraw that vote (except as expressly permitted by this Plan or permitted by a Final Order of the Bankruptcy Court based solely on the Debtors having made subsequent material amendments to the Plan that frustrate the purpose of the Senior Lender Settlement).

(b)    Subject to the Effective Date, Bank of America, the Agent and each of the Senior Lenders shall be deemed to have waived any Distribution under the Plan or otherwise on account of any Senior Lender Unsecured Claim other than one dollar ($1.00).

(c)    Subject to the Effective Date, each of Bank of America, the Agent, each of the Senior Lenders, for and on behalf of themselves and their respective Affiliates and Representatives (in such capacities and not individually), shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever against each of the Debtor Releasees, their respective Affiliates and such Affiliates' Representatives in connection with or related to the Debtors, the conduct of the Debtors' business, the Swap Transactions, the Pre-Petition Loan Documents (including, but not limited to, the

Pre-Petition Loan Agreement, the Pre-Petition QPO Guaranties and the SNP Holding Guaranty), the Chapter 11 Cases, or the Plan (other than the rights under the Plan or reserved in the Plan and the contracts, instruments, releases and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date. Within fourteen (14) days after the Effective Date, each of Bank of America, the Agent and each of the Senior Lenders shall execute and deliver to the Debtors and Plan Sponsors a written release document evidencing the terms of this Senior Lender Release; provided, however, that no Person's failure to execute or deliver the separate document evidencing the terms of the Senior Lender Release shall undermine the effectiveness of the Senior Lender Release.

*Provisions Related to the Debtors*

(a) Subject to the Effective Date, the Agent and Senior Lenders shall be entitled to the more favorable terms for the New Senior Debt (as described in the Plan definition of New Senior Debt), which consist of, among other things, (i) more favorable rights with respect to collateral securing repayment of New Senior Debt obligations and (ii) more favorable recourse provisions in connection with the New Senior Debt.

(b) Subject to the Effective Date, Sequoia Investments V, LLC and Security National Properties Funding, LLC, respectively, shall convey to the Agent and Senior Lenders, or their designee, by deed in lieu, Orchards Mall and Soup Lots; provided, however, that upon the consummation of such conveyance of Orchards Mall and Soup Lots, the appraised value of Orchards Mall (i.e., $4,540,000) and Soup Lots (i.e., $1,750,000) will be credited to reduce the New Loan Amount on a dollar for dollar basis.

(c(b) Subject to the Effective Date, the Agent and the Senior Lenders shall be entitled to retain and indefeasibly apply all Adequate Protection Payments made by or on behalf of any Debtor from the Petition Date through the Confirmation Date without reduction of the New Loan Amount.

(dc) Subject to the Effective Date, each of the Debtors and each of the Plan Sponsors, for and on behalf of themselves and their respective Affiliates and Representatives (in such capacities and not individually), shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action (including the Swap Causes of Action), and liabilities whatsoever against each of the Senior Lender Releasees, their respective Affiliates and such Affiliates' Representatives in connection with or related to the Debtors, the conduct of the Debtors' business, the Swap Transactions, the Pre-Petition Loan Documents (including, but not limited to, the Pre-Petition Loan Agreement, the Pre-Petition QPO Guaranties and the SNP Holding Guaranty), the Chapter 11 Cases, or the Plan (other than the rights under the Plan or reserved in the Plan and the contracts, instruments, releases and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date. Within fourteen (14) days after the Effective Date, each of the Reorganized Debtors and each of the Plan Sponsors shall execute and deliver to the Agent a written release document evidencing the terms of this Senior Lender Release; provided, however, that no Person's failure to execute or deliver the separate document evidencing the terms of the Senior Lender Release shall undermine the effectiveness of the Senior Lender Release.

*Modification of Senior Lender Settlement Terms*

The Debtors, with the consent of the Plan Sponsor, reserve the right to modify the terms of the Senior Lender Settlement any time prior to the entry of the Confirmation Order or thereafter as otherwise permitted by section 1127 of the Bankruptcy Code. If the Debtors make a material modification to the Senior Lender Settlement Terms, they shall File a notice stating the terms to be modified (the "SLS Modification Notice") and serve the same on the Agent, Bank of America and the Senior Lenders. After the filing and service of SLS Modification Notice, the Agent, Bank of America and the Senior Lenders shall have until the later of the Voting Deadline or three (3) Business

Days after the filing and service of SLS Modification Notice to vote on the Plan or change an existing vote on the Plan. No other notice, disclosure or other opportunity to vote or re-vote shall be required for the modifications described in the SLS Modification Notice to become part of the Senior Lender Settlement and Plan.

2.   <u>Acceptance of the Senior Lender Settlement</u>

If Class 2 (Senior Lender Secured Claims) accepts the Plan in accordance with section 1126(c) of the Bankruptcy Code and the Disclosure Statement Order, Bank of America, the Agent and the Senior Lenders shall be deemed to have accepted the Senior Lender Settlement and shall be bound by all of its terms, as well as the other terms of the Plan.

*F.*   *Preservation of Causes of Action*

1.   <u>Vesting of Causes of Action</u>

(a)   Except as otherwise provided in the Plan or Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, all Causes of Action, including without limitation the Swap Causes of Action, that the Debtors may hold against any Entity shall vest upon the Effective Date in the Reorganized Debtors.

(b)   Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Reorganized Debtors shall have the exclusive right to institute, prosecute, abandon, settle or compromise any Causes of Action, in their sole discretion and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases. Nothing herein shall impose any duty on the Reorganized Debtors to pursue all or any Causes of Action.

(c)   Causes of Action and any recoveries therefrom shall remain the sole property of the Reorganized Debtors and Holders of Claims or Equity Interests shall have no right to any such recovery.

2.   <u>Preservation of All Causes of Action Not Expressly Settled or Released</u>

(a)   Unless a Cause of Action against a Holder or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtors (including, without limitation, Causes of Action not specifically identified or described in the Plan or elsewhere or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances which may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan or Confirmation Order, except where such Causes of Action have been released in the Plan (including, without limitation, and for the avoidance of doubt, the releases contained in Article IX.C.1) or any other Final Order (including the Confirmation Order).  In addition, the right of the Reorganized Debtors is expressly reserved to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

(b)   Subject to the immediately preceding paragraph, any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that any such obligation, transfer, or transaction may be reviewed by the Reorganized Debtors subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether: (i) such Entity has filed a proof of Claim against the Debtors

41

in the Chapter 11 Cases; (ii) an objection has been filed with respect to any such Entity's proof of Claim; (iii) any such Entity's Claim was included in the Schedules; or (iv) any such Entity's scheduled Claim was identified in the Schedules as disputed, contingent or unliquidated.

(c)       Notwithstanding anything in the Plan to the contrary, the Debtors, each of their respective Estates, and the Reorganized Debtors, on behalf of themselves, their parents, subsidiaries, affiliates and related entities, and each of their respective directors, managing directors, officers, trusts, trustees, members, attorneys, consultants, other professionals, partners, associates, principals, divisions, employers, employees, insurers, agents, representatives, consultants, guarantors, indemnitors, indemnitees, sureties, heirs, assigns, and successors preserve, reserve and do not waive any and all Claims or Causes of Action (including without limitation the Swap Causes of Action) and any other debts, obligations, rights, suits, damages, challenges, actions, remedies and liabilities whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing as of the Effective Date or thereafter arising, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise against Bank of America, the Agent and/or the Senior Lenders, both individually and collectively, and any of Bank of America's, the Agent's and/or the Senior Lenders' parents, subsidiaries, affiliates and related entities, and each of their respective directors, managing directors, officers, trusts, trustees, members, attorneys, consultants, other professionals, partners, associates, principals, divisions, employers, employees, insurers, agents, representatives, consultants, guarantors, indemnitors, indemnitees, sureties, heirs, assigns, and successors.

G.    *Injunctions*

**1.    From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtors, the Debtors-In-Possession, the Estates, the Reorganized Debtors, or the Plan Sponsors, their respective successors and assigns, and their respective assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order.**

**2.    Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtors, the Debtors-in-Possession, the Estates, the Reorganized Debtors, the Plan Sponsors, their respective successors and assigns and their respective assets and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.**

**3.    The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Equity Interests of any nature whatsoever against the Debtors or any of their assets or properties.  On the Effective Date, all such Claims against, and Equity Interests in, the Debtors shall be satisfied and released in full except for such treatment provided by the Plan.**

**4.    Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Parties and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released hereby from:**

**(a)    commencing or continuing in any manner any action or other proceeding of any kind against any Debtor, the Reorganized Debtors, the Plan Sponsors, their respective successors and assigns and their respective assets and properties;**

**(b)    enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Debtor, the Reorganized Debtors, the Plan Sponsors, their respective successors and assigns and their respective assets and properties;**

**(c)    creating, perfecting or enforcing any encumbrance of any kind against any Debtor, the Reorganized Debtors, the Plan Sponsors, or the property or estate of any Debtor, Reorganized Debtor or Plan Sponsor;**

(d)      **asserting any right of setoff or subrogation of any kind against any obligation due from any Debtor or Reorganized Debtor or against the property or estate of any Debtor or Reorganized Debtor, except to the extent a right to setoff or subrogation is asserted (i) with respect to a timely filed proof of Claim and adjudicated to be valid and enforceable by a Final Order of the Bankruptcy Court prior to the Confirmation Date or (ii) by Holders of Affiliate Claims as set forth herein; or**

(e)      **commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled hereunder.**

    *H.      Release of Liens*

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, liens, pledges or other security interests against property of the Estates, other than Liens specifically provided for in this Plan to the Holders of Claims in Classes 2 and 4, shall be fully released and discharged and all of the rights, title and the Debtors' interest in such property shall be distributed or transferred in accordance with this Plan.

The Reorganized Debtors following the Effective Date may dispose of the Properties, or any portion thereof, or refinance and pay off in full the then remaining balance due on the New Senior Debt without prepayment penalty, premium, yield maintenance or any other charge or fee, other than as expressly set forth in the New Loan Agreement. Furthermore, the Reorganized Debtors following the Effective Date may sell any one or more of the Properties in one or a series of transactions in which case the Senior Lenders' Lien shall be deemed released and upon the reasonable request of the Reorganized Debtors the Senior Lenders shall execute and deliver from time to time partial or full Lien releases, as applicable, with respect to such Properties in consideration of payment of an amount equal to the Lien Release Price set forth on the Lien Release Schedule attached to the New Loan Agreement. Any disposition of the Properties during the term of the Plan shall be free and clear of any and all taxes, assessments and charges to the fullest extent permitted under section 1146(a) of the Bankruptcy Code.

## ARTICLE X – RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors, the Estates, all property of the Estates and the Plan as is legally permissible, including, without limitation, jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

2.      grant, deny or otherwise resolve any and all applications of Professionals or Persons retained in the Chapter 11 Cases for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

3.      resolve any matters related to the assumption, assignment or rejection of any Executory Contract to which a Debtor was party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

4.      ensure that Distributions to Holders of Allowed Claims and Equity Interests are accomplished pursuant to the provisions of the Plan;

5.      decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date, provided, however, the right of the Reorganized Debtors to commence actions in all appropriate jurisdictions shall be fully reserved;

6.       enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan or the Disclosure Statement;

7.       resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

8.       resolve any cases, controversies, suits or disputes that may arise in connection with the New Loan Documents, including the interpretation or enforcement thereof, any Entity's obligations thereunder, and the determination of the Orchard Mall Release Price and/or the Soup Lots Release Price;

9.       8. issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

10.      9. enforce Article IX.B, Article IX.C and Article IX.D hereof;

11.      10. enforce the Injunctions set forth in Article IX.G hereof;

12.      11. implement, interpret and/or enforce any term of the Senior Lender Settlement (if accepted pursuant to the Plan), including, without limitation, the Senior Lender Releases;

13.      12. resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article IX herein, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

14.      13. enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

15.      14. resolve any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement; and

16.      15. enter an order and/or the decree contemplated in Bankruptcy Rule 3022 concluding the Chapter 11 Cases.

## ARTICLE XI – MISCELLANEOUS PROVISIONS

A.       *Final Fee Applications*

The deadline for submission by Professionals of final applications for Bankruptcy Court approval of Accrued Professional Compensation shall be the Professional Fee Claim Bar Date.

B.       *Payment of Statutory Fees*

All fees payable pursuant to section 1930 of title 28 of the United States Code after the Effective Date, shall be reserved by the Debtors on the Effective Date and paid by the Reorganized Debtors prior to the closing of the Chapter 11 Cases on the earlier of when due or the Effective Date, or as soon thereafter as practicable.

C.       *Modification of Plan*

Subject to the limitations contained in the Plan: (1) prior to the entry of the Confirmation Order, the Debtors expressly reserve the right to amend the terms of the Plan (subject to compliance with section 1127 of the Bankruptcy Code) with the consent of the Plan Sponsors (if the Debtors make material changes in the terms of the Plan, the

Debtors will disseminate additional solicitation materials and extend the solicitation period, in each case to the extent required by law or further order of the Court); and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### D.    Revocation or Deferral of Plan

The Debtors, with the consent of the Plan Sponsors, reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order, and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan or if entry of the Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts affected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

The Debtors, with the consent of the Plan Sponsors, reserve the right to defer Confirmation of the Plan in order to continue their current investigation of the Swap Causes of Action and/or other Causes of Action against Bank of America, the Agent and/or the Senior Lenders.  The Debtors further reserve the right to amend the Plan or file a new chapter 11 plan in order to incorporate, among other things, setoffs, recoupments or other relief in connection with Swap Causes of Action against Bank of America, the Agent and/or the Senior Lenders.  Such relief may also include, without limitation, subordination of their Claims pursuant to section 510(c) of the Bankruptcy Code and/or the denial in whole or in part of their Claims.

### E.    Successors and Assigns

The rights, benefits and obligations of any Entity named or referred to herein and the Plan Supplement shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### F.    Governing Law and Construction

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the state of Delaware, without giving effect to the principles of conflict of laws thereof.  Any inconsistency between the Plan and the New Loan Agreement shall be construed in favor of and so as to give effect to the New Loan Agreement. Any inconsistency between the Plan and the Confirmation Order shall be construed in favor of and so as to give effect to the Confirmation Order.  All exhibits and schedules to the Plan and the Plan Supplement shall be incorporated in the Plan by this reference, as though set forth at length herein.

### G.    Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Bankruptcy Court enters the Confirmation Order.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by the Debtors or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of: (1) any Debtor with respect to the Holders of Claims or Equity Interests or other parties-in-interest; or (2) any Holder of a Claim or other party-in-interest prior to the Effective Date.

### H.    Section 1146 Exemption

Pursuant to section 1146(a) of the Bankruptcy Code, the transfer and vesting of the Properties to and in the Reorganized Debtors on the Effective Date and any other transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or

governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

      I.      *Section 1125(e) Good Faith Compliance*

The Debtors and their respective Representatives shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

      J.      *Further Assurances*

The Debtors, the Reorganized Debtors, all Holders of Claims and Equity Interests receiving Distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

      K.      *Service of Documents*

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtors or the Reorganized Debtors, in addition to any direction of service of notice by any order, shall be sent by first class U.S. mail, postage prepaid as follows:

To the Debtors or Reorganized Debtors:

     Security National Properties Funding III, LLC
     3050 Westfork Drive
     Baton Rouge, LA 70816
     Attn: John L. Piland

*with a copy to:*

     Morris, Nichols, Arsht & Tunnell LLP
     1201 North Market Street
     P.O. Box 1347
     Wilmington, DE 19899-1347
     Attn: Robert J. Dehney, Gregory W. Werkheiser and Andrew R. Remming

      L.      *Filing of Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

      M.      *No Stay of Confirmation Order*

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

      N.      *Payment of U.S. Trustee Fees*

Notwithstanding anything to the contrary in the Plan, all fees payable pursuant to section 1930 of title 28 of the United States Code shall be paid on the earlier of when due or the Effective Date, or as soon thereafter as practicable.  From and after the Effective Date, the Reorganized Debtors shall be jointly liable for and shall pay the fees under 28 U.S.C. § 1930 assessed against the Estates under 28 U.S.C. § 1930 until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.  In the event that one or more of the Chapter 11 Cases is converted, dismissed or closed prior to the conversion, dismissal or closing of all the Chapter 11 Cases, the Reorganized Debtors will have no obligations under 28 U.S.C. § 1930 with respect to each closed, converted or dismissed Chapter 11 Case other than those fees due and payable under 28 U.S.C. § 1930 as of the date the Chapter 11

Case is converted, dismissed or closed.  The Debtors or the Reorganized Debtors shall file post-confirmation quarterly reports or any pre-confirmation monthly operating reports not filed as of the Confirmation Hearing in conformity with the U.S. Trustee guidelines, until entry of an order closing or converting the Chapter 11 Cases.  The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which shall be deemed an Administrative Claim against the Debtors.

* * * *

Dated: ~~October 26~~January 14, ~~2012~~ 2013
Baton Rouge, Louisiana

Security National Properties Funding III, LLC

By: _____
Senior V.P. and Chief Financial Officer of Security National Master Manager, LLC

ITAC 190, LLC

By: _____
Senior V.P. and Chief Financial Officer of Security National Master Manager, LLC

Security National Properties Funding, LLC

By: _____
Senior V.P. and Chief Financial Officer of Security National Master Manager, LLC

Security National Properties Funding II, LLC

By: _____
Senior V.P. and Chief Financial Officer of Security National Master Manager, LLC

Sequoia Investments III, LLC

By: _____
Senior V.P. and Chief Financial Officer of Security National Master Manager, LLC

Sequoia Investments V, LLC

By: _____
Senior V.P. and Chief Financial Officer of Security National Master Manager, LLC

Sequoia Investments XIV, LLC

By: _____
Senior V.P. and Chief Financial Officer of Security National Master Manager, LLC

Sequoia Investments XV, LLC

By: _____
Senior V.P. and Chief Financial Officer of Security National Master Manager, LLC

Sequoia Investments XVIII, LLC

By: _____
Senior V.P. and Chief Financial Officer of Security National Master Manager, LLC

Security National Properties-Alaska, LLC

By: _____
Senior V.P. and Chief Financial Officer of Security National Master Manager, LLC

**EXHIBIT A**

**[Plan Support Agreement]**

**<u>EXHIBIT B</u>**

**[Allocated Deficiency Amount Formula]**