**EXHIBIT A**

**[<u>Credit Agreement</u>]**

CREDIT AGREEMENT

Dated as of [                    ] among

SECURITY NATIONAL PROPERTIES FUNDING III, LLC,
as the Borrower, and

BANK OF AMERICA, N.A.,
as Administrative Agent

and

The Other Lenders Now or Hereafter Party Hereto

**TABLE OF CONTENTS**

**PAGE**

ARTICLE I. DEFINITIONS, ACCOUNTING TERMS AND BACKGROUND........................1

    1.01    Defined Terms. ........................................................................................1
    1.02    Other Interpretive Provisions................................................................21
    1.03    Accounting Terms................................................................................21
    1.04    Rounding..............................................................................................22
    1.05    Times of Day........................................................................................22
    1.06    [Reserved]............................................................................................22
    1.07    Borrower, Properties and Property Owners...........................................22
    1.08    Qualified Properties..............................................................................23
    1.09    Qualified Property Owner.....................................................................26
    1.10    [Reserved]............................................................................................27
    1.11    [Reserved]............................................................................................27
    1.12    Pledge Agreement.................................................................................27
    1.13    Security Agreement...............................................................................28
    1.14    Releases of Qualified Properties............................................................32
    1.15    Annual Appraisals................................................................................35

ARTICLE II. THE COMMITMENTS AND CREDIT EXTENSIONS................................35

    2.01    Loan....................................................................................................35
    2.02    Prepayments.........................................................................................35
    2.03    Repayment of Loans; Principal Amortization .......................................35
    2.04    Interest.................................................................................................36
    2.05    [Reserved]............................................................................................36
    2.06    Computation of Interest and Fees..........................................................36
    2.07    Evidence of Debt..................................................................................36
    2.08    Payments Generally; Administrative Agent's Clawback. ...........................37
    2.09    Sharing of Payments by Lenders...........................................................37
    2.10    Term of Loan; Extensions of Maturity Date..........................................38
    2.11    Conditions to Extending Maturity Date.................................................38
    2.12    Principal Payments...............................................................................40
    2.13    [Reserved]............................................................................................41
    2.14    Management Fees..................................................................................41

ARTICLE III. TAXES, YIELD PROTECTION AND ILLEGALITY ....................................41

    3.01    Taxes...................................................................................................41
    3.02    [Reserved]............................................................................................43
    3.03    [Reserved]............................................................................................43
    3.04    Increased Costs....................................................................................43
    3.05    [Reserved]............................................................................................44
    3.06    Mitigation Obligations; Replacement of Lenders...................................44
    3.07    Survival...............................................................................................44

ARTICLE IV. CONDITIONS PRECEDENT TO THIS AGREEMENT ...................................44

    4.01    **Conditions Precedent to Closing.**..................................................................44

ARTICLE V. REPRESENTATIONS AND WARRANTIES ....................................................45

    5.01    **Existence, Qualification and Power; Compliance with Laws.**.........................45
    5.02    **Authorization; No Contravention.**...............................................................46
    5.03    **Governmental Authorization; Other Consents.**..........................................46
    5.04    **Binding Effect.**.............................................................................................46
    5.05    **Indebtedness.**...............................................................................................46
    5.06    **Litigation.**...................................................................................................46
    5.07    **No Default.**..................................................................................................47
    5.08    **Ownership of Property; Liens.**...................................................................47
    5.09    **Environmental Compliance.**.......................................................................47
    5.10    **Insurance.**....................................................................................................47
    5.11    **Taxes.**..........................................................................................................47
    5.12    **ERISA Compliance.**....................................................................................47
    5.13    **Subsidiaries; Equity Interests.**...................................................................48
    5.14    **Margin Regulations; Investment Company Act; Public Utility Holding Company Act.**...........................................................................................48
    5.15    **Disclosure.**..................................................................................................49
    5.16    **Compliance with Laws.**..............................................................................49
    5.17    **Taxpayer Identification Number.**..............................................................49
    5.18    **Intellectual Property; Licenses, Etc.**.........................................................49
    5.19    **Compliance With Covenants, etc.**..............................................................49
    5.20    **Required Licenses and Permits.**................................................................50
    5.21    **No Broker or Finder.**..................................................................................50
    5.22    **Background Information and Certificates.**.................................................50
    5.23    Solvency. ........................................................................................................50
    5.24    **Other Agreements.**......................................................................................50
    5.25    **Investment Due Diligence.**.........................................................................50
    5.26    **No Material Environmental or Structural Risks.**.......................................51
    5.27    **Qualified Property Owner Equity Interests.**..............................................51

ARTICLE VI. AFFIRMATIVE COVENANTS .....................................................................51

    6.01    **Financial Statements.**..................................................................................51
    6.02    **Certificates; Other Information.**................................................................52
    6.03    **Notices.**.......................................................................................................54
    6.04    **Payment of Obligations.**.............................................................................55
    6.05    **Preservation of Existence, Etc.**..................................................................55
    6.06    **Maintenance of Properties.**........................................................................55
    6.07    **Maintenance of Insurance.**.........................................................................55
    6.08    **Compliance with Laws.**..............................................................................56
    6.09    **Books and Records.**.....................................................................................56
    6.10    **Inspection Rights.**.......................................................................................56

6.11    **[Reserved]**...................................................................................56
6.12    **Additional Subsidiaries.**............................................................56
6.13    **Conduct of Business.**.................................................................56
6.14    **Indemnification Against Payment of Brokers' Fees.**...............56
6.15    **Environmental Compliance and Indemnity.**............................57
6.16    **Approved Appraisals.**................................................................58
6.17    **Further Assurances.**...................................................................59
6.18    **Cooperation with Syndication.**.................................................59
6.19    **[Reserved]**...................................................................................59
6.20    **Lost Notes, etc.**..........................................................................59
6.21    **Bank Accounts; Deposit of Proceeds.**......................................59
6.22    **[Reserved]**...................................................................................60
6.23    **Insurance Proceeds and Condemnation Awards.**.....................60

ARTICLE VII. NEGATIVE COVENANTS .....................................................60

7.01    **Liens.**..........................................................................................60
7.02    **Investments.**...............................................................................61
7.03    **Indebtedness.**..............................................................................61
7.04    **Fundamental Changes.**...............................................................62
7.05    **Dispositions.**...............................................................................62
7.06    **Restricted Payments.**..................................................................63
7.07    **Change in Nature of Business.**...................................................63
7.08    **Transactions with Affiliates.**.....................................................63
7.09    **Burdensome Agreements.**...........................................................63
7.10    **Cash Infusion Funds.**.................................................................63
7.11    **Financial Covenant.**...................................................................63
7.12    **Capital Expenditures.**................................................................63
7.13    **Off-Balance Sheet Arrangements and Synthetic Lease Obligations.**............64

ARTICLE VIII. EVENTS OF DEFAULT AND REMEDIES ...........................64

8.01    **Events of Default.**.......................................................................64
8.02    **Remedies Upon Event of Default.**.............................................66
8.03    **Application of Funds.**.................................................................66

ARTICLE IX. ADMINISTRATIVE AGENT ..................................................67

9.01    **Appointment and Authority.**......................................................67
9.02    **Rights as a Lender.**.....................................................................67
9.03    **Exculpatory Provisions.**.............................................................67
9.04    **Reliance by Administrative Agent.**............................................68
9.05    **Delegation of Duties.**.................................................................68
9.06    **Resignation of Administrative Agent.**.......................................68
9.07    **Non-Reliance on Administrative Agent and Other Lenders.**......69
9.08    **[Reserved]**...................................................................................69
9.09    **Administrative Agent May File Proofs of Claim.**......................69

ARTICLE X. MISCELLANEOUS ........................................................................................70

    10.01 **Amendments, Etc.** ...........................................................................................70
    10.02 **Notices; Effectiveness; Electronic Communication.** ..................................71
    10.03 **No Waiver; Cumulative Remedies.** ...............................................................73
    10.04 **Expenses; Indemnity; Damage Waiver.** ........................................................73
    10.05 **Payments Set Aside.** ......................................................................................75
    10.06 **Successors and Assigns.** ................................................................................75
    10.07 **Treatment of Certain Information; Confidentiality.** ....................................78
    10.08 **Right of Setoff.** ..............................................................................................79
    10.09 **Interest Rate Limitation.** ...............................................................................79
    10.10 **Counterparts; Integration; Effectiveness.** .....................................................80
    10.11 **Survival of Representations and Warranties.** ................................................80
    10.12 **Severability.** ...................................................................................................80
    10.13 **Replacement of Lenders.** ...............................................................................80
    10.14 **Governing Law; Jurisdiction; Etc.** ................................................................81
    10.15 Waiver of Jury Trial .........................................................................................83
    10.16 **No Advisory or Fiduciary Responsibility.** ....................................................83
    10.17 **USA PATRIOT Act Notice.** ..........................................................................84
    10.18 **Time of the Essence.** ......................................................................................84
    10.19 **Claims Against Administrative Agent or Lenders.** ........................................84
    10.20 **Entire Agreement.** ..........................................................................................84

Exhibit A       Form of Assignment and Assumption
Exhibit B       Form of Borrower compliance Certificate
Exhibit C       Form of Promissory Note
Exhibit D       Form of Property Owner and Property Qualification Certificate
Exhibit E       Form of Release Request

# CREDIT AGREEMENT

This CREDIT AGREEMENT ("Agreement") is entered into as of the [____] day of January, 2013, among SECURITY NATIONAL PROPERTIES FUNDING III, LLC, an Alaska limited liability company (the "Borrower"), each lender from time to time party hereto (collectively, the "Lenders" and individually, a "Lender"), and BANK OF AMERICA, N.A., as Administrative Agent.

The Lenders and Borrower desire to set forth the terms and conditions under which the Lenders will incur the obligations hereunder.  Accordingly, in consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I.
## DEFINITIONS, ACCOUNTING TERMS AND BACKGROUND

1.01    Defined Terms.  Subject to Section 1.02(d), as used in this Agreement, the following terms shall have the meanings set forth below:

"Administrative Agent" means Bank of America, N.A and its successors, in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"Administrative Agent's Office" means the Administrative Agent's address and, as appropriate, account as set forth on Schedule 10.02, or such other address or account as the Administrative Agent may from time to time notify to the Borrower and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agreed Upon Release Price" means the Release Price for the Soup Lots Property and the Release Price for the Orchards Mall Property, in each case, as agreed upon pursuant to Section 1.14.5.

"Agreement" means this Credit Agreement.

"Applicable Percentage" means with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the Total Outstandings held by such Lender.  The Applicable Percentage of each Lender is set forth opposite the name of such Lender on Schedule 2.01, which Schedule shall be provided to Borrower by Lender prior to the effectiveness of this Agreement, and the Administrative Agent shall update and promptly deliver to Borrower an updated Schedule 2.01 from time to time to reflect any changes therein in accordance with Section 10.06(c).

"Approved Appraisal"- as defined in Section 6.16.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Asset Pool" means, as of any date, the pool of all Assets that are then owned by Borrower and the Qualified Property Owners.

"Asset Value" means as to each Qualified Property in the Asset Pool as of the date hereof (as listed in Schedule 1.09 hereof), the amount set forth in Qualified Properties row in the "Asset Value" column of Schedule 1.09 hereof set forth, which for the avoidance of doubt shall be, for each Qualified Property, the amount set forth in the column entitled "Current Value" in the chart contained in the Stipulation.  As to each Qualified Property added to the Asset Pool after the date of this Agreement, Asset Value means the appraised value of such Qualified Property as set forth in the most recent Approved Appraisal of such Qualified Property, provided that such Approved Appraisal is less than six (6) months old. After **[_____, 2014]**, the Asset Values of all Qualified Properties then in the Asset Pool may or shall (as applicable below) be reset as follows:

(a)     At any time and from time to time during the remainder of the Initial Term, as to each Qualified Property (or all Qualified Properties), Required Lenders may require that a new Independent Appraisal (or an update of an existing Independent Appraisal, as determined by Required Lenders) be prepared at Borrower's expense. Provided, however, during the Initial Term Borrower shall not be required to pay for more than one new Independent Appraisal (or one update of an existing Independent Appraisal, as determined by Required Lenders) for each Qualified Property pursuant to this subsection (a).

(b)     Prior to (and as condition to) each extension of the Maturity Date pursuant to Sections 2.10 and 2.11 below, new Independent Appraisals (or updates of existing Independent Appraisals, as determined by Required Lenders) shall be prepared at Borrower's expense for all Qualified Properties then in the Asset Pool.

(c)     At any time during the Initial Term or any Extended Term, Borrower may, at Borrower's expense, elect to have new Independent Appraisals (or updates of existing Independent Appraisals, as determined by Required Lenders) prepared for Qualified Properties then in the Asset Pool.

(d)     Unless otherwise agreed to by Administrative Agent, all new Independent Appraisals (or updates of existing Independent Appraisals) prepared pursuant to subsections (a) or (b) above shall be ordered by Administrative Agent.

(e)     All new Independent Appraisals (or updates of existing Independent Appraisals) must be in all respects satisfactory to Required Lenders. Upon their receipt and approval of each new Independent Appraisal (or update of an existing Independent Appraisal) pursuant to subsections (a), (b) or (c) above, Required Lenders shall set the new Asset Value of the Qualified Property in question and

such new Independent Appraisal (or update of an existing Independent Appraisal) shall be deemed to be an Approved Appraisal.

"Assets" means Qualified Properties and other Properties added to the Asset Pool to satisfy any Debt Yield covenant or other requirement in a Loan Document.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.06(b), and accepted by the Administrative Agent, in substantially the form of Exhibit A or any other form approved by the Administrative Agent.

"Assignment of Leases and Rents" has the meaning specified in the definition of QPO Security Documents.

"Attributable Indebtedness" means, on any date, (a) in respect of any capital lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with MCBA, and (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease payments under the relevant lease that would appear on a balance sheet of such Person prepared as of such date in accordance with MCBA if such lease were accounted for as a capital lease.

"Audited Financial Statements" means audited consolidated balance sheet of the Borrower and its Subsidiaries and the related consolidated statements of income or operations, members' equity and cash flows for such fiscal year of the Borrower and its Subsidiaries, including the notes thereto.

"Bank of America" means Bank of America, N.A. and its successors.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

**["Base Rate" means [5.25%][1] per annum.]**

"Borrower" has the meaning specified in the introductory paragraph hereto.

"Borrower Materials" has the meaning specified in Section 6.02.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state where the Administrative Agent's Office is located.

"Calculation Date" means such day as may be selected by Administrative Agent during the two (2) week period prior to the last Business Day of each May, August, November and February during the term of the Loan and the last Business Day of such other calendar

---

[1]     Borrowers will have the right to modify the Base Rate at any time prior to the date that is 7 days prior to the Voting Deadline (as defined in the Plan or Reorganization).

months as Administrative Agent may require or as Administrative Agent may agree to and with respect to which Administrative Agent has received all financial information required by Administrative Agent for purposes of determining compliance with <u>Section 7.11</u>.

"<u>Calculation Period</u>" means the one (1) calendar quarter period immediately preceding the calendar month in which a Calculation Date falls (e.g., the Calculation Period with respect to the Calculation Date in each May shall be the period commencing on the preceding January 1 and ending on the preceding March 31).

"<u>Cash Infusion</u>" means the capital contribution to be made to the Borrower on or before the Effective Date (as defined in the Plan of Reorganization).

"<u>Change in Law</u>" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"<u>Change of Control</u>" means an event or series of events by which:

(a)     any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, but excluding any employee benefit plan of such person or its subsidiaries, and any person or entity acting in its capacity as trustee, agent or other fiduciary or administrator of any such plan) becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Securities Exchange Act of 1934, except that a person or group shall be deemed to have "beneficial ownership" of all securities that such person or group has the right to acquire (such right, an "<u>Option right</u>"), whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of twenty percent (20%) or more of the equity securities of the Borrower entitled to vote for members of the board of directors or equivalent governing body of the Borrower on a fully-diluted basis (and taking into account all such securities that such person or group has the right to acquire pursuant to any option right);

(b)     during any period of twelve (12) consecutive months, a majority of the members of the board of directors or other equivalent governing body of the Borrower cease to be composed of individuals (i) who were members of that board or equivalent governing body on the first day of such period, (ii) whose election or nomination to that board or equivalent governing body was approved by individuals referred to in clause (i) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body or (iii) whose election or nomination to that board or other equivalent governing body was approved by individuals referred to in clauses (i) and (ii) above constituting at the time of such election or nomination at least a majority of that board or equivalent governing body (excluding, in the case of both clause (ii) and clause (iii), any individual whose initial nomination for, or assumption of office as, a member of that board or equivalent governing body occurs as a result of an

4

actual or threatened solicitation of proxies or consents for the election or removal of one or more directors by any person or group other than a solicitation for the election of one or more directors by or on behalf of the board of directors); or

(c)        any Person or two or more Persons acting in concert shall have acquired by contract or otherwise, or shall have entered into a contract or arrangement that, upon consummation thereof, will result in its or their acquisition of the power to exercise, directly or indirectly, a controlling influence over the management or policies of the Borrower, or control over the equity securities of the Borrower entitled to vote for members of the board of directors or equivalent governing body of the Borrower on a fully-diluted basis (and taking into account all such securities that such Person or group has the right to acquire pursuant to any option right) representing twenty percent (20%) or more of the combined voting power of such securities.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 10.01.

"Code" means the Internal Revenue Code of 1986.

"Collateral" has the meaning specified in Section 1.13.1.

"Compliance Certificate" means a certificate from the Borrower substantially in the form of Exhibit B to this Agreement.

"Consolidated Net Income" means, for any Calculation Period, for the Borrower and the Qualified Property Owners on a consolidated basis, the net income of the Borrower and the Qualified Property Owners (excluding extraordinary gains and extraordinary losses, including from the sale of an Asset) for that period.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Debtor" means, for purposes of Section 1.13, Borrower.

"Debt Yield" means (x) Debt Yield Net Operating Income (plus any Management Fees paid during such period, to the extent deducted from the Debt Yield Net Operating Income) for the trailing 12 month period as of such date, divided by the Total Outstandings, which first quarterly test period shall be May 1, 2013.

"<u>Debt Yield Net Operating Income</u>" means an amount equal to the sum of the combined Net Operating Incomes for the trailing four (4) Calculation Periods (i.e. 12 months) of all Properties which, on the Calculation Date in question, are included in the Asset Pool.

"<u>Debtor Relief Laws</u>" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"<u>Default</u>" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"<u>Default Rate</u>" means an interest rate equal to (i) the Base Rate plus (ii) 4% per annum.

"<u>Defaulting Lender</u>" means any Lender that (a) has failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within one Business Day of the date when due, unless the subject of a good faith dispute, or (b) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding.

"<u>Disposition</u>" or "<u>Dispose</u>" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property (including any Qualified Property or any Qualified Property Owner Equity Interest) by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"<u>Dollar</u>" and "<u>$</u>" mean lawful money of the United States.

"<u>Domestic Subsidiary</u>" means any Subsidiary that is organized under the laws of any political subdivision of the United States.

"<u>Eligible Assignee</u>" means (a) a Lender; (b) an Affiliate of a Lender; (c) an Approved Fund; and (d) any other Person (other than a natural person) approved by (i) the Administrative Agent, and (ii) unless an Event of Default has occurred and is continuing, the Borrower (each such approval not to be unreasonably withheld or delayed); <u>provided</u> that notwithstanding the foregoing, "Eligible Assignee" shall not include the Borrower or any of the Borrower's Affiliates or Subsidiaries.

"<u>Environmental Laws</u>" means any and all Federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, concessions, grants, franchises, licenses, agreements or governmental restrictions relating to pollution and the protection of the environment or the release of any materials into the environment, including those related to hazardous substances or wastes, air emissions and discharges to waste or public systems.

"<u>Environmental Liability</u>" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of

the Borrower or any other Loan Party directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the release or threatened release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Site Assessment" means an environmental site assessment report conforming to the standards for Phase I (and, where applicable, Phase II) Environmental Site Assessments in ASTM Standard Procedures for Environmental Site Assessments, E 1527-00 or other standards reasonably satisfactory to Administrative Agent (either of which is herein called the "Acceptable Standards"), which has been prepared by a qualified environmental firm (a) indicating that, on the basis of an investigation conducted in accordance with the Acceptable Standards, (i) whether it found any Hazardous Materials present on or in the property that is the subject of its report at levels that require reporting or remediation, or both, pursuant to any Environmental Laws that are applicable to such property ("Prohibited Hazardous Substances"), (ii) whether it learned of any conditions on or in the land adjacent to the property that is the subject of its report that would cause it to believe that there might be Prohibited Hazardous Substances present on or in the property that is the subject of its report, and (iii) whether any notice of violation of any Environmental Laws, or other claim or order issued pursuant to any Environmental Laws, has been duly filed against such property by any Governmental Authority; and (b) if any Prohibited Hazardous Substance was found on such property or if any such notice of violation, claim or order has been filed, determining whether the same creates any Material Environmental or Structural Risk.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, and all rules and regulations from time to time promulgated thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Borrower within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Borrower or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section

4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by the Borrower or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; or (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Borrower or any ERISA Affiliate.

"Event of Default" has the meaning specified in Section 8.01.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable Lending Office is located, (b) any branch profits taxes imposed by the United States or any similar tax imposed by any other jurisdiction in which the Borrower is located and (c) in the case of a Foreign Lender (other than an assignee pursuant to a request by the Borrower under Section 10.13), any withholding tax that is imposed on amounts payable to such Foreign Lender at the time such Foreign Lender becomes a party hereto (or designates a new Lending Office) or is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law) to comply with Section 3.01(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new Lending Office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 3.01(a).

"Exhibit" means, when followed by a letter, the exhibit attached to this Agreement bearing that letter and by such reference is fully incorporated in this Agreement.

"Extended Maturity Date" – as defined in Section 2.10.

"Extended Term" – as defined in Section 2.10.

"Extension Fee" - as defined in Section 2.11.

"Extension Notice" - as defined in Section 2.11.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the

Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to Bank of America on such day on such transactions as determined by the Administrative Agent.

"Financial Covenant" means the covenant of Borrower set forth in Section 7.11 below.

"First Extended Maturity Date"- as defined in Section 2.10.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes. For purposes of this definition, the United States, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"FRB" means the Board of Governors of the Federal Reserve System of the United States.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Gross Income" means all rental income and other revenues (inclusive of reimbursements from tenants for Operating Expenses) derived from the ownership and operation of the Properties that are included in the Asset Pool, which are received by the Qualified Property Owner in question during the Calculation Period in question and, in accordance with modified cash basis accounting, consistently applied, would be classified as income allocable to such Calculation Period; provided however Gross Income shall not include (i) tenant security deposits (unless and until they are applied to rents) and (ii) condemnation and insurance proceeds (other than rent loss insurance proceeds).

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation, or (iv) entered into for the purpose of assuring in any other manner the obligee

in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantor" means Security National Properties Holding Company, LLC, an Alaska limited liability company.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other similar substances or wastes of any nature regulated pursuant to any Environmental Law.

"Improper Restricted Payments" means any Restricted Payments which are made at any time (a) when any Event of Default shall exist or any Default would result therefrom, or (b) when there shall be any outstanding amounts of principal or interest that are then past due and payable to Lenders, or (c) when Borrower is not in full compliance with the Financial Covenant based upon the most recent Compliance Certificates that have been submitted to (and approved by) Administrative Agent, or (d) when the making of such Restricted Payment would cause the Borrower to fail to be in full compliance with any of the Financial Covenant.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with MCBA:

(a)    all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b)    all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c)    all obligations of such Person to pay the deferred purchase price of property or services (other than trade accounts payable in the ordinary course of business and, in each case, not past due for more than 60 days after the date on which such trade account payable was created);

(d)    indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under

conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(e)      capital leases and Synthetic Lease Obligations;

(f)      all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(g)      all Guarantees of such Person in respect of any of the foregoing.  For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person.  The amount of any capital lease or Synthetic Lease Obligation as of any date shall be deemed to be the amount of Attributable Indebtedness in respect thereof as of such date.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitees" has the meaning specified in Section 10.04(b).

"Independent Appraisal" means an MAI appraisal prepared by an independent third party MAI appraiser conforming to the Uniform Standards of Professional Appraisal Practice, which appraisal is prepared on an "as is" basis.

"Interest Payment Date" means the last Business Day of each calendar month and the initial Maturity Date or any applicable Extended Maturity Date.

"Internal Control Event" means a material weakness in, or fraud that involves management or other employees who have a significant role in, the Borrower's internal controls over financial reporting, in each case as described in the Securities Laws.

"Initial Term" has the meaning specified in Section 2.10.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of capital stock or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor Guarantees Indebtedness of such other Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit. For purposes of covenant compliance the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment (but taking into account returns of capital with respect thereto to the extent reflected on the books of such Person).

"IP Rights" has the meaning specified in Section 5.18.

"IRS" means the United States Internal Revenue Service.

"Laws" means, collectively, all international, foreign, Federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lender" has the meaning specified in the introductory paragraph hereto.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"Licenses and Permits" means all licenses, permits, authorizations and agreements issued by or agreed to by any Governmental Authority, and including, but not limited to, building permits, occupancy permits and such special permits, variances and other relief as may be required pursuant to any Laws which may be applicable to any of the Qualified Properties.

"Lien" means any mortgage, deed of trust, deed to secure debt, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"Limited Guaranty" means the unconditional, continuing Limited Guaranty re: Certain Specified Matters from the Guarantor of even date herewith guaranteeing the matters that are set forth therein.

"Loan" means the indebtedness owed to the Lenders by Borrower in the original principal amount of **$[●]** incurred by Borrower under this Agreement.

"Loan Documents" means, singly and collectively, (i) this Agreement, (ii) the Note, (iii) each Pledge Agreement, (iv) the Limited Guaranty, (v) all existing and future QPO Guaranties, and (vi) all existing and future QPO Security Documents.

"Loan Parties" means, singly and collectively, the Borrower, Guarantor and each Qualified Property Owner.

"MAI" means Member of the Appraisers Institute.

"Management Fees" means the management fee payable approximately twice monthly to Security National Properties Servicing Company, LLC ("Servicer"), pursuant to that certain Management Agreement dated [          ] among Servicer, the Borrower and its Subsidiaries as amended pursuant to the Plan of Reorganization.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, affairs, properties, assets, liabilities (actual or contingent), condition (financial or otherwise), prospects, performance, current capital structure or existence of the Borrower, or of the Borrower and the Qualified Property Owners, taken as a whole, after giving effect to any related transactions; (b) a material impairment of the ability of Borrower to perform its obligations under any Loan Document; (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party or the ability of the Administrative Agent and the Lenders to enforce their rights and remedies under any of the Loan Documents; or (d) a material adverse effect upon the use, operations, occupancy or value of the Qualified Properties, taken as a whole.

"Material Environmental or Structural Risk" means any risk relating to Hazardous Materials or Environmental Laws or structural matters (including foundations and roofs) with respect to any property which: (a) involves any material violation of any Law, (b) could reasonably be expected to adversely affect the owner's ability to sell or finance such property to an institutional buyer or lender, or (c) in the case of Qualified Properties, has a prudently estimated cost of remediation that is in excess of five percent (5%) of the Asset Value of the Qualified Property in question (before giving effect to such Material Environmental or Structural Risk).

"Maturity Date" means the later of (a) the 31st day of December 2019, (b) if maturity is extended pursuant to Section 2.10 and Section 2.11, the applicable Extended Maturity Date as determined pursuant to such Sections and (c) the last day of the seventh full year after the Effective Date (as defined in the Plan of Reorganization); provided, however, that, in each case, if such date is not a Business Day, the Maturity Date shall be the next Business Day.

"Maximum Rate" has the meaning specified in Section 10.09.

"MCBA" means modified cash basis accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Mortgage" has the meaning specified in the definition of QPO Security Documents.

"MSA" means a Metropolitan Statistical Area, as such term is defined by the United States Office of Management and Budget on the date of this Agreement.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Borrower or any ERISA Affiliate makes or is

13

obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"Net Operating Income" means as to each Property then included in the Asset Pool, for any Calculation Period, such Property's Gross Income for such Calculation Period minus such Property's Operating Expenses (which for the avoidance of doubt shall not include the Management Fees) for such Calculation Period.

"Net Sales Proceeds" means with respect to the sale of any Property then included in the Asset Pool, the gross proceeds of such sale, minus reasonable and customary closing costs of such sale actually paid by Borrower or the respective Qualified Property Owner to Unrelated Third Parties.

"Note" means that certain promissory note of Borrower payable to the order of Administrative Agent, as agent for Lenders and evidencing the Loan, together with any renewals, extensions or modifications thereof and substitutions therefor.  The Note shall be substantially in the form of Exhibit C.

"Obligations" means all principal, interest, debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to any Loan whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"Off-Balance Sheet Arrangement" means any transaction, agreement or other contractual arrangement to which an entity unconsolidated with the Borrower is a party, under which the Borrower has:

(a)     any obligation under a guarantee contract that has any of the characteristics identified in paragraph 3 of FASB Interpretation No. 45, Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others (November 2002) ("FIN 45"), as may be modified or supplemented, and that is not excluded from the initial recognition and measurement provisions of FIN 45 pursuant to paragraphs 6 or 7 of that Interpretation;

(b)     a retained or contingent interest in assets transferred to an unconsolidated entity or similar arrangement that serves as credit, liquidity or market risk support to such entity for such assets;

(c)     any obligation, including a contingent obligation, under a contract that would be accounted for as a derivative instrument, except that it is both indexed to the Borrower's own stock and classified in stockholders' equity in the Borrower's statement of financial position, and therefore excluded from the scope of FASB Statement of Financial Accounting Standards No. 133, Accounting for Derivative Instruments and Hedging Activities (June 1998), pursuant to paragraph 11(a) of that Statement, as may be modified or supplemented; or

14

(d)     any obligation, including a contingent obligation, arising out of a variable interest (as referenced in FASB Interpretation No. 46, <u>Consolidation of Variable Interest Entities</u> (January 2003), as may be modified or supplemented) in an unconsolidated entity that is held by, and material to, the Borrower, where such entity provides financing, liquidity, market risk or credit risk support to, or engages in leasing, hedging or research and development services with, the Borrower.

"<u>Operating Expenses</u>" all expenses of every kind actually paid in the normal course of business with respect to the Properties then included in the Asset Pool and with respect to the operation of Borrower during the Calculation Period in question, including, but not limited to, expenses for taxes, insurance, repairs, replacements, maintenance, salaries, advertising expenses, wages and utilities; provided, that, management fees and professional fees shall not be included in "Operating Expenses".

"<u>Orchards Mall Property</u>" means the Property located at 1800 Pipestone Road, Benton Harbor, Michigan 49022.

"<u>Organization Documents</u>" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"<u>Other Taxes</u>" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"<u>Outstanding Amount</u>" means with respect to the Loan on any date, the aggregate outstanding principal amount thereof after giving effect to any prepayments or repayments of the Loan, occurring on such date.

"<u>Participant</u>" has the meaning specified in <u>Section 10.06(d)</u>.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation.

"<u>PCAOB</u>" means the Public Company Accounting Oversight Board.

"<u>Pension Plan</u>" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of

a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Percentage Ownership Interest" means at any time of determination, with respect to Borrower and each Qualified Property Owner, the percentage of the proceeds which would be distributed to Borrower or to a Wholly Owned Subsidiary of Borrower or to another member if all of the assets of Borrower or such Qualified Property Owner (as the case may be) were sold at such time at their appraised values and if such Qualified Property Owner (as the case may be) was then liquidated.

"Permitted Ownership Transfers" means transfers of Equity Interests in Borrower so long as Administrative Agent is provided with prior written notice of such transfers and, after giving effect to all such transfers, there shall not have occurred since the date of this Agreement (a) any change in ownership which, on a cumulative basis, exceeds 20% of the total Equity Interests in Borrower or (b) any change in control of the Borrower; and, except as approved in writing by Administrative Agent, Guarantor or an Affiliate thereof shall continue to own more than 80% of the Equity Interests in the Borrower and shall continue to control, directly or indirectly, the Borrower and each Qualified Property Owner.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by the Borrower or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, *any* ERISA Affiliate.

"Plan of Reorganization" means that certain Third Amended Joint Chapter 11 Plan of Reorganization of Security National Properties Funding III, LLC and its Debtor Affiliates, dated January 11, 2013, as the same may be further amended, modified or supplemented from time to time.

"Pledge Agreement" has the meaning specified in Section 1.12.

"Property or Properties" has the meaning specified in Section 1.07.

"Property Owner" has the meaning specified in Section 1.07.

"Property Type" has the meaning specified in Section 1.07.

"Property Owner and Property Qualification Certificate" has the meaning specified as defined in Section 1.08.

"Purchase Price" has the meaning specified in Section 1.08.

"Qualified Property" has the meaning specified in Section 1.08.

"Qualified Property Owner" has the meaning specified in Section 1.09.

"Qualified Property Owner Equity Interest" has the meaning specified in Section 1.09.

"QPO" means Qualified Property Owner.

"QPO Guarantor" means each existing and future Qualified Property Owner that now or at any time in the future executes and delivers to Administrative Agent a QPO Guaranty.

"QPO Guaranty" means an unconditional and continuing Guaranty, in form and substance satisfactory to Administrative Agent, executed and delivered to Administrative Agent by a QPO Guarantor.

"QPO Security Documents" means, as to each Qualified Property, the following documents, each of which shall be in form and substance satisfactory to Administrative Agent, executed and delivered to Administrative Agent by the respective Qualified Property Owner:

(a)    Mortgage. A first priority deed of trust and security agreement or (if applicable) mortgage and security agreement (a "Mortgage") with respect to (i) the Qualified Property in question, (ii) all land, improvements, furniture, fixtures, goods, equipment, and other assets (including, without limitation, accounts, contracts, contract rights, Licenses and Permits (to the extent assignable), general intangibles, documents and instruments), including all after-acquired property, owned, or in which the Qualified Property Owner in question has or obtains any interest in connection with such Qualified Property; (iii) all insurance proceeds and other proceeds therefrom, and (iv) all other assets of the Qualified Property Owner in question, whether now owned or hereafter acquired and whether or not related to the Qualified Property in question; and

(b)    Assignment of Leases and Rents. A first priority assignment of leases and rents (an "Assignment of Leases and Rents") with respect to (i) the Qualified Property in question, and (ii) all leases, subleases and occupancy rights of the Qualified Property in question, and (iii) all income and profits to be derived from the operation and leasing of the Qualified Property in question; and

(c)    UCC Financing Statements. One or more UCC-1 Financing Statements (as required by Administrative Agent in accordance with the respective Mortgage) to be filed in such filing offices as Administrative Agent may deem appropriate with respect to the security interests granted under the respective Mortgage.

"Register" has the meaning specified in Section 10.06(c).

"Registered Public Accounting Firm" has the meaning specified in the Securities Laws and shall be independent of the Borrower as prescribed by the Securities Laws.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Released Asset" has the meaning specified in Section 1.14.1.

"Release Price" has the meaning specified in Section 1.14.2.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Required Lenders" means, as of any date of determination, Lenders holding more than 66.67% of the Total Outstandings.  Provided, however, for purposes of approving (i) any Property as a Qualified Property (including all submissions in connection therewith), (ii) the Asset Value of any Property or any Independent Appraisal thereof, or (iii) any Subsidiary as a Qualified Property Owner (including all submissions in connection therewith), the above 66.67% shall be 51%.

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer, assistant treasurer or controller of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership, limited liability company and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of the Borrower or any Qualified Property, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to the Borrower's stockholders, partners or members (or the equivalent Person thereof); provided, that, for the avoidance of doubt, neither (i) the payment of Management Fees nor (ii) the Disposition of a Released Asset to an Affiliate of Borrower or a Qualified Property Owner shall constitute a "Restricted Payment".

"Sarbanes-Oxley" means the Sarbanes-Oxley Act of 2002, as amended.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Second Extended Maturity Date" has the meaning specified in Section 2.10.

"Section" means, when followed by a number, the section or subsection of this Agreement bearing that number.

"Secured Party" means, for purposes of Section 1.13, Administrative Agent.

"Securities Laws" means the Securities Act of 1933, the Securities Exchange Act of 1934, Sarbanes-Oxley and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the SEC or the PCAOB.

"Soup Lots Property" means the Property located at 1102 and 1114 Dodge Street, Omaha, Nebraska 68102.

"Stipulation" means the Stipulation attached as Exhibit 1 to that certain Order **[D.I. 417, 285 and 382]** entered by the United States Bankruptcy Court for the District of Delaware on December 11, 2012, approving Stipulation between the Debtors and Bank of America, N.A., individually and as Administrative Agent regarding (I) Amended Scheduling Order, and (II) certain Agreements regarding matters established for purposes of the Valuation and Confirmation Hearing.

**[**"**Submitted Property**" **has the meaning specified in** **Exhibits D.]**

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which at least 90% of the shares of securities, membership interests, or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned by such Person, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Borrower (each of which must be at least 90% owned, as provided above, by Borrower and the up to 10% balance of such ownership must be owned by employees or key executives of Borrower or its Affiliates) or to a Wholly Owned Subsidiary of a Wholly Owned Subsidiary of Borrower.

"Synthetic Lease Obligation" means the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term" means the period commencing on the date of this Agreement and ending on the Maturity Date.

"Threshold Amount" means $500,000.

"Total Outstandings" means the aggregate Outstanding Amount of the Loan.

"Treasury Rate" means as of the date of any calculation or determination, the latest published rate for United States Treasury Notes or Bills (but the rate on Notes or Bills issued on a discounted basis shall be converted to a bond equivalent) as published weekly in the Federal Reserve Statistical Release H.15 (519) of Selected Interest Rates having a ten (10) year maturity (or closest thereto) from such date of calculation or determination.

"UCC" means, as applicable, the Uniform Commercial Code in effect in the State of Rhode Island and the jurisdictions where the Borrower and the Qualified Property Owners are located, and the Properties or any other Collateral are situated.

"Unfunded Pension Liability" means the excess of a Pension Plan's benefit liabilities under Section 4001(a)(16) of ERISA, over the current value of that Pension Plan's assets, determined in accordance with the assumptions used for funding the Pension Plan pursuant to Section 412 of the Code for the applicable plan year.

"United States" and "U.S." mean the United States of America.

"Unrelated Third Party" means any Person which is not an Affiliate of Borrower, or of any Qualified Property Owner or any holder of any direct or indirect ownership interest in any of the foregoing.

"Wholly Owned" means (a) with respect to any Property, that fee simple title to such Property is directly owned solely by the Person in question or the leasehold estate in such Property is directly owned solely by the Person in question; and (b) with respect to any corporation, trust, partnership or limited liability company, 100% of the ownership interests therein (however designated) are directly owned solely by (i) the Person in question or (ii) by another Person in which the Person in question directly owns 100% of all ownership interests.

"Year End Surplus" means for such calendar year, the amount by which cash and cash equivalents received by the Borrower and the Qualified Property Owners solely from the ownership and operation of the Properties then included in the Asset Pool exceeds the following during such year:

(a)     expenses paid during such year (including all Management Fees) with respect to the Properties then included in the Asset Pool;

(b)     distributions to Holders of Allowed Claims (other than Class 2 Senior Lender Secured Claims or Class 3 Senior Lender Unsecured Claims) made pursuant to the Plan of Reorganization during such year;

(c)     expenditures for tenant improvement and tenant related capital expenditure obligations made during such year with respect to the Properties then included in the Asset Pool;

(d)     leasing commissions relating to the Properties then included in the Asset Pool paid to Unrelated Third Parties during such year;

(e)     required payments made on the Obligations during such year, including interest and principal;

(f)     the amount of cash and cash equivalents that the Borrower and/or Qualified Property Owners, in their reasonable discretion, determine should be funded to reserves for operation of the Properties, including: (a) distributions to the Holders of Allowed Claims in accordance with the Plan of Reorganization; (b) tenant improvement and/or tenant related capital expenditures relating to the Properties then included in the Asset Pool; (c) leasing obligations relating to the Properties then included in the Asset Pool; (d) interest and/or principal on the Loan; and (e) Management Fees; and

(g)    amount of cash and cash equivalents that the Borrower and/or Qualified Property Owners, in their reasonable discretion, determine should be funded to a reserve for other capital expenditures.  The amount of such capital expenditure reserve shall not exceed $5,000,000 at any point in time.

For 2013, the Year End Surplus shall be calculated based upon a period commencing as of the Effective Date of the Plan of Reorganization and ending December 31, 2013.  For subsequent years, the Year End Surplus shall be calculated using a traditional calendar year.

1.02    **Other Interpretive Provisions**.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall" Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, and (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)    Capitalized terms not otherwise defined in this Agreement shall have the meanings ascribed to such terms in the Plan of Reorganization, unless context requires otherwise.

1.03    **Accounting Terms.**  (a)  Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this

Agreement shall be prepared in conformity with, MCBA applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the Audited Financial Statements, <u>except</u> as otherwise specifically prescribed herein.

(b)    <u>Changes in MCBA</u>.  If at any time any change in MCBA would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in MCBA (subject to the approval of the Required Lenders); <u>provided</u> that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with MCBA prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in MCBA

(c)    <u>Consolidation of Variable Interest Entities</u>.  All references herein to consolidated financial statements of the Borrower and its Subsidiaries or to the determination of any amount for the Borrower and its Subsidiaries on a consolidated basis or any similar reference shall, in each case, be deemed to include each variable interest entity that the Borrower is required to consolidate pursuant to FASB Interpretation No. 46- Consolidation of Variable Interest Entities: an interpretation of ARB No. 51 (January 2003) as if such variable interest entity were a Subsidiary as defined herein.

1.04    **Rounding.**  Any financial ratios required to be maintained by the Borrower pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

1.05    **Times of Day.**  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

1.06    **[Reserved]**

1.07    **Borrower, Properties and Property Owners.**

(a)    The Borrower is a limited liability company which is duly organized, validly existing and in good standing under the laws of the State of Alaska. Each Property Owner is a limited liability company which is duly organized, validly existing and in good standing under the laws of the State of Alaska, the State of North Carolina or other State of formation. Each Property Owner is a Subsidiary of Borrower that is either (a) directly at least 90% owned by Borrower or (b) directly Wholly Owned by another Subsidiary of Borrower that is directly Wholly Owned by Borrower. Borrower is Wholly Owned by the Persons identified on <u>Schedule 5.13.2</u>. Each such Subsidiary of Borrower which owns a Property is referred to herein as a "Property Owner".

(b)    The business purposes of the Borrower are and shall remain (i) to invest in Subsidiaries that invest in, acquire, own, operate, manage, lease, develop and dispose of various office, multi-family residential, industrial and retail properties, undeveloped land and other properties (each a "Property Type") located in the United States (individually a "Property" and collectively the "Properties"), (ii) to invest in Wholly Owned Subsidiaries that own other Wholly Owned Subsidiaries that invest in, acquire, own, operate, manage, lease, develop and dispose of Properties and (iii) to conduct other business incidental thereto

(c)    At no time shall the total Asset Value of all Qualified Properties that are in the "Land" and "Other" Property Type categories exceed fifteen percent (15%) of the total Asset Value of all Qualified Properties. At no time shall the total Asset Value of all Qualified Properties that are in the "Other" category exceed five percent (5%) of such fifteen percent (15%) sublimit. The aggregate Asset Value of all Qualified Properties in any single MSA shall not exceed twenty percent 20% of the total Asset Value of all Qualified Properties, except that the existing Qualified Properties in Greensboro, North Carolina (which currently exceed such 20% limit) shall be an exception to the forgoing covenant). Any Property in the Greensboro, NC MSA which is to be added to the Asset Pool in the future and which will result in the total Asset Values of all Qualified Properties in the Greensboro, NC MSA being greater than the total Asset Values of all such existing Greensboro, NC Qualified Properties, must be approved by all Lenders. No Qualified Property Owner shall engage in any business other than investment in Qualified Properties without the prior written consent of the Required Lenders.

(d)    Borrower shall not (and Borrower shall not permit any of Qualified Property Owners to) engage in any business which is not in accordance with the foregoing without the prior written consent of the Required Lenders.

1.08    **Qualified Properties**.

1.08.1 Except with respect to Properties described in <u>Section 1.08.4</u> below, a Qualified Property is a Property which meets all of the following criteria (individually a "Qualified Property" and collectively "Qualified Properties"): (i) it is Wholly Owned by a Qualified Property Owner; (ii) it is unencumbered by any Liens (other than any Lien held by the Administrative Agent or otherwise permitted under the Loan Documents); (iii) it is not affected by any Material Environmental or Structural Risk; (iv) it is covered by insurance in accordance with the requirements of <u>Sections 5.10 and 6.07</u> hereof, (v) Administrative Agent has received each of the following items with respect thereto (all of which shall be consistent with the terms and conditions of this Agreement), (vi) the conditions of <u>subsection 1.08.2</u> below shall have been satisfied with respect thereto, (vii) the Required Lenders have approved the designation of such Property as a "Qualified Property", as provided in <u>subsection 1.08.2</u> below, and (viii) Administrative Agent shall have received and approved each of the following with respect thereto :

(a)    an accurate certified statement from Borrower stating that the Property in question satisfies all of the criteria to be a Qualified Property hereunder (other than Required Lender approval) and setting forth (i) the purchase price paid by the applicable Property Owner for such Property (the "Purchase Price"), and (ii) Borrower's calculation of the Asset Value of such Property and of the Borrower's Equity Interest therein;

(b)    an Independent Appraisal of the Property that is less than six (6) months old;

(c)    an accurate certified statement from Borrower representing and warranting (i) that Borrower has obtained such information with respect to the Property as would normally be expected of a prudent purchaser of similar real estate (including a survey, structural report (for any improved Property), title insurance policy and Environmental Site Assessment), (ii) that such information has not revealed any Material Environmental or Structural Risks, and (iii) that such Property is covered by insurance in accordance with the requirements of Sections 5.10 and 6.07 hereof;

(d)    (i) an owner's title insurance policy or title report showing fee simple title to the Property to be 100% vested in the applicable Property Owner or the leasehold estate in the Property to be 100% vested in the applicable Property Owner, and (ii) an updated title report showing no adverse changes in the state of title since the effective date of such title insurance policy or title report; which title insurance policy and title report(s) must show that title to the Qualified Property in question is not subject to any mortgage, deed of trust or other Liens securing any indebtedness and, in each case, be issued by a title insurance company reasonably satisfactory to Administrative Agent and (iii) if specifically requested by Administrative Agent, legible copies of any exception appearing in any such title insurance policy or title report;

(e)    a certification from Borrower certifying that upon the addition of such Property to the Asset Pool, the Financial Covenant will not be violated;

(f)    a current "rent roll" and the most recent operating statements and operating expense and capital expenditure budgets with respect to such Property; each certified by Borrower to be true, accurate and complete in all material respects; and

(g)    such other information with respect to such Property as Administrative Agent (whether on its own behalf or on behalf of any Lender) may reasonably require (including without limitation copies of any lease, survey, property management agreement, structural report, Environmental Site Assessment or evidence of insurance requested by Administrative Agent).

In connection therewith, with respect to each Property that Borrower wishes to have qualified as a Qualified Property, Borrower shall submit to Administrative Agent a Property Owner and Property Qualification Certificate substantially in the form of Exhibit D attached hereto (a "Property Owner and Property Qualification Certificate"), together with all other required submissions as set forth therein

1.08.2 Required Lenders' Approval.    After Administrative Agent has received and reviewed all required information and documentation, Administrative Agent will notify Borrower as to whether (or not) the Required Lenders have approved of the Submitted Property as a Qualified Property and as to the Asset Value of such Property approved by Required Lenders. If a Property is so approved by Required Lenders, such Property will be deemed to be a Qualified Property and added to and a part of the Asset Pool at such time as:

(i)    Administrative Agent has received the fully executed respective QPO Guaranty and the fully executed QPO Security Documents with respect to such Property and such QPO Security Documents shall have been properly recorded with the appropriate records of land evidence in the State where such Property is located;

(ii)    Where the Property in question consists of a leasehold estate, Administrative Agent has received a Ground Lessor's Estoppel Certificate and Agreement, in all respects reasonably satisfactory to Administrative Agent, from the ground lessor in question;

(iii)    Administrative Agent has received an updated title report issued by a title insurance company reasonably satisfactory to Administrative Agent showing (1) the proper recording of the respective QPO Security Documents, and (2) no adverse changes in the state of title since the effective date of the title policy or report delivered to Administrative Agent pursuant to subsection 1.08.1(d) above;

(iv)    Administrative Agent has received a favorable opinion letter(s) of legal counsel to the Qualified Property Owner in question (which legal counsel shall be reasonably satisfactory Administrative Agent and which opinion letter(s) shall be in form and substance reasonably satisfactory to Administrative Agent) addressed to Administrative Agent, (1) as to the facts that the respective QPO Guaranty and QPO Security Documents have been duly executed and delivered by the Qualified Property Owner in question and constitute the valid and binding obligations of such Qualified Property Owner and are enforceable in accordance with their respective terms, and (2) if the new Property in question is located in a State where no other Qualified Property is located, as to the fact that the QPO Guaranty and QPO Security Documents comply with the laws of the State in question, and (3) as to such other matters as Administrative Agent may reasonably request;

(v)    Administrative Agent has received a certificate of a Responsible Officer of the Qualified Property Owner in question either (A) attaching copies of all consents, licenses and approvals required in connection with the execution, delivery and performance by such Qualified Property Owner and the validity against such Qualified Property Owner of the QPO Guaranty and QPO Security Documents to which it is a party, and such consents, licenses and approvals shall be in full force and effect, or (B) stating that no such consents, licenses or approvals are so required;

(vi)    Any conditions reasonably imposed by Administrative Agent have been satisfied;

(vii)    Schedule 1.09 to this Agreement shall have been amended to add the respective Qualified Property, the respective Qualified Property Owner, and the Asset Value of such Qualified Property;

(viii)    such other Loan Documents as Agent may require shall have been amended to add the respective Qualified Property to the coverage thereof; and

(ix)    Administrative Agent verifies to Borrower in writing that all conditions to the addition of such Qualified Property to the Asset Pool have been satisfied, as determined by Administrative Agent in its sole discretion.

1.08.3 Except with respect to Properties described in Section 1.08.4, if, at any time after any Property is approved as a Qualified Property, such Property does not fully satisfy any of the conditions or criteria set forth above, or any of the information or certified statements provided to Agent in accordance with the above is not (or becomes not) true and accurate in all material respects, then, unless the condition(s) or criteria(s) in question are fully satisfied within thirty (30) days after notice to Borrower, such Property shall immediately cease to be a Qualified Property.

1.08.4 Notwithstanding anything set forth herein to the contrary, Administrative Agent and Lenders acknowledge and agree that each of the Properties listed in Schedule 1.09 attached hereto constitutes, and during the term of this Agreement shall continue to constitute, "Qualified Properties" for all purposes of this Agreement.

1.09    **Qualified Property Owner**.

(a)    A "Qualified Property Owner" is a duly organized and validly existing limited liability company, which entity is a Subsidiary of Borrower, which Subsidiary has been approved by Required Lenders as a Qualified Property Owner hereunder and which Subsidiary Wholly Owns one or more Qualified Properties and in which Subsidiary Borrower: (i) directly or indirectly owns not less than ninety percent (90%) of the Percentage Ownership Interests, which ownership interests (and any ownership interests in any other Subsidiary which is in Borrower's chain of ownership) is free of any Lien of any kind; (ii) directly or indirectly has a controlling voting interest and controls all significant decisions, including all decisions concerning sale or financing of any Qualified Property that is owned by such Subsidiary; (iii) has the unrestricted right to freely transfer or encumber (without the consent of any other party) Borrower's indirect ownership interests in such Subsidiary and Borrower's direct ownership interests in any other Subsidiary that holds Borrower's interests in such Subsidiary; and (iv) directly or indirectly has the unrestricted right to receive (and to compel) distributions to such Subsidiary's owners of recurring and capital event cash flow.

(b)    With respect to each Property Owner that Borrower wishes to have qualified as a Qualified Property Owner, Borrower shall submit to Administrative Agent: (1) a certified statement from Borrower stating that the proposed Qualified Property Owner is a limited liability company that is a Subsidiary of Borrower and that the proposed Qualified Property Owner in question is a Subsidiary of Borrower which meets all of the requirements of subsections 1.09(a)(i), (ii), (iii) and (iv) above, and (2) if requested by Administrative Agent, copies of the relevant operating agreements, certificates of good standing/legal existence and qualification to do business, and such other Organization Documents or other information as Administrative Agent may reasonably request. In connection therewith, with respect to each such Property Owner that Borrower wishes to have qualified as a Qualified Property Owner, Borrower shall submit to Administrative Agent a Property Owner and Property Qualification Certificate, together with all other required submissions as set forth therein.

(c)    Upon Administrative Agent's receipt of (i) a Property Owner and Property Qualification Certificate that is complete and accurate in all material respects and (ii) all additional submissions with respect thereto that are required pursuant to the terms of this Agreement, Administrative Agent shall forward all such information to Lenders for their

consideration of approval of the designation of the Property Owner identified therein as a "Qualified Property Owner" and the designation of the Property identified therein as a "Qualified Property". Each Lender shall respond within ten (10) Business Days after its receipt of any such submission. Any Lender not responding within such time period shall be deemed to have declined to approve such designations.

(d)     Provided that (i) any Property Owner and Property Qualification Certificate submitted by Borrower pursuant to this Agreement is complete and accurate in all material respects, (ii) all required submissions with respect thereto are delivered to Administrative Agent and (iii) the Required Lenders approve the designation of the Property Owner identified therein as a "Qualified Property Owner" and the designation of the Property identified therein as a "Qualified Property" (as more specifically detailed in Section 1.08 above), for purposes of this Agreement, provided that Administrative Agent receives a satisfactory Pledge Agreement with respect to all membership interests in such Property Owner, such Property Owner shall be deemed a "Qualified Property Owner", Borrower's ownership interest therein shall be deemed a "Qualified Property Owner Equity Interest" and such Property shall be deemed a "Qualified Property".

(e)     The activities of each Qualified Property Owner shall be limited to (i) the acquisition, ownership, operation, management, leasing, development and Disposal of Qualified Properties, and (ii) the conduct of other business incidental thereto.

(f)     As of the date of this Agreement, the current Qualified Properties and the current Qualified Property Owners are listed on Schedule 1.09 attached hereto. It is anticipated that in the future Borrower may request that other Properties and other Property Owners be approved by Required Lenders as additional Qualified Properties and additional Qualified Property Owners. In each such case, upon the approval thereof as provided above, Schedule 1.09 shall be deemed amended to reflect the addition of the respective additional Qualified Properties and additional Qualified Property Owner(s).

1.10    **[Reserved]**

1.11    **[Reserved]**

1.12    **Pledge Agreement**.

Payment and performance of all of the Obligations shall be secured by pledges and security agreements, in form and substance satisfactory to Administrative Agent, (singly, a "Pledge Agreement" and collectively, the "Pledge Agreements"), as to each Qualified Property Owner, (i) from Borrower and the other members of such Qualified Property Owner granting Administrative Agent a first priority perfected security interest in 100% of the membership interests in each Qualified Property Owner that is directly at least 90% owned by Borrower, and (ii) in the case of any Qualified Property Owner that is not directly at least 90% owned by Borrower, from the Wholly Owned Subsidiary of Borrower that owns 100% of the membership interests in such Qualified Property Owner granting Administrative Agent a first priority perfected security interest in 100% of the membership interests in such Qualified Property Owner.

1.13    **Security Agreement.**

1.13.1 <u>Grant of Security Interest</u>.  In addition to the security interests granted to Administrative Agent pursuant to the Pledge Agreements and the other Loan Documents and without limiting any of the provisions of such documents, Borrower, as Debtor, and referred to in this <u>Section 1.13</u> as "<u>Debtor</u>", as security for the Obligations, hereby grants to Administrative Agent and referred to in this <u>Section 1.13</u> as "<u>Secured Party</u>", for its benefit and for the benefit of the Lenders, a security interest in all of Debtor's remedies, powers, privileges, rights, titles and interests (including all of Debtor's power, if any, to pass greater title than it has itself) of every kind and character now owned or hereafter acquired, created or arising in and to all equipment, accounts, claims (including commercial tort claims), causes of action, general intangibles, payment intangibles, fixtures, goods, materials, supplies, furnishings, inventory, chattel paper (including electronic chattel paper), letters of credit, letter of credit rights, supporting obligations of every kind and description, instruments, notes, documents, bank deposits, deposit accounts, investment property , all funds, contract rights, accounts receivable, documents, trademarks, trade names (including all derivatives thereof) service marks and, all permits, licenses, franchises, and all other personal property and other rights and privileges (collectively, the "Collateral"); provided, however, that the grant of a security interest herein does not, and shall not be deemed to, include a grant of a security interest in, and the following property shall not be included in the definition of "Collateral": (i) any portion of the Cash Infusion and any account(s) in which the Cash Infusion is held or (ii) the Swap Causes of Action (as defined in the Plan of Reorganization).

1.13.2 <u>Debtor's Covenants Concerning Personalty Subject to the UCC</u>.  Debtor covenants and agrees with Secured Party that in addition to and cumulative of any other remedies granted to Secured Party in any other Loan Documents, upon or at any time after the occurrence of any Event of Default:

(a)    Secured Party is authorized, in any legal manner and without breach of the peace, to take possession of the Collateral (Debtor hereby WAIVING all claims for damages arising from or connected with any such taking) and of all books, records and accounts relating thereto and to exercise without interference from Debtor any and all rights which Debtor has with respect to the management, possession, operation, protection or preservation of the Collateral, including the right to sell or rent the same for the account of Debtor and to deduct from such sale proceeds or such rents all reasonable costs, expenses and liabilities of every character incurred by Secured Party in collecting such sale proceeds or such rents and in managing, operating, maintaining, protecting or preserving the Collateral and to apply the remainder of such sales proceeds or such rents on the Total Outstandings in such manner as Secured Party may elect. Before any sale, Secured Party may, at its option, complete the processing of any of the Collateral and/or repair or recondition the same to such extent as Secured Party may deem advisable and any sums reasonably expended therefor by Secured Party shall be reimbursed by Debtor. Secured Party may take possession of Debtor's premises to complete such processing, repairing and/or reconditioning, using the facilities and other property of Debtor to do so, to store any Collateral and to conduct any sale as provided for herein, all without compensation to Debtor. All reasonable costs, expenses, and liabilities incurred by Secured Party in collecting such sales proceeds or such rents, or in managing, operating, maintaining, protecting or preserving such properties, or in processing, repairing and/or

28

reconditioning the Collateral if not paid out of such sales proceeds or such rents as hereinabove provided, shall constitute a demand obligation owing by Debtor and shall bear interest from the date of expenditure until paid at the Default Rate (as defined in this Agreement), all of which shall constitute a portion of the Total Outstandings. If necessary to obtain the possession provided for above, Secured Party may invoke any and all legal remedies to dispossess Debtor, including specifically one or more actions for forcible entry and detainer. In connection with any action taken by Secured Party pursuant to this Section, Secured Party shall not be liable for any loss sustained by Debtor resulting from any failure to sell or let the Collateral, or any part thereof, or from other act or omission of Secured Party with respect to the Collateral unless such loss is caused by the willful misconduct or bad faith of Secured Party, nor shall Secured Party be obligated to perform or discharge any obligation, duty, or liability under any sale or lease agreement covering the Collateral or any part thereof or under or by reason of this instrument or the exercise of rights or remedies hereunder.

(b)    Secured Party may, without notice except as hereinafter provided, sell the Collateral or any part thereof at public or private sale (with or without appraisal or having the Collateral at the place of sale) for cash, upon credit, or for future delivery, and at such price or prices as Secured Party may deem best, and Secured Party may be the purchaser of any and all of the Collateral so sold and may apply upon the purchase price therefor any of the Obligations and thereafter hold the same absolutely free from any right or claim of whatsoever kind. Upon any such sale Secured Party shall have the right to deliver, assign and transfer to the purchaser thereof the Collateral so sold. Each purchaser at any such sale and any purchaser at foreclosure shall hold the property sold absolutely free from any claim or right of whatsoever kind, including any equity or right of redemption, stay or appraisal which Debtor has or may have under any rule of law or statute now existing or hereafter adopted. To the extent notice is required by applicable law, Secured Party shall give Debtor written notice at the address set forth herein (which shall satisfy any requirement of notice or reasonable notice in any applicable statute) of Secured Party's intention to make any such public or private sale. Such notice (if any is required by applicable law) shall be personally delivered or mailed, postage prepaid, at least ten (10) calendar days before the date fixed for a public sale, or at least (10) calendar days before the date after which the private sale or other disposition is to be made, unless the Collateral is of a type customarily sold on a recognized market, is perishable or threatens to decline speedily in value. Such notice (if any is required by applicable law), in case of public sale, shall state the time and place fixed for such sale or, in case of private sale or other disposition other than a public sale, the time after which the private sale or other such disposition is to be made. Any public sale shall be held at such time or times, within the ordinary business hours and at such place or places, as Secured Party may fix in the notice of such sale. At any sale the Collateral may be sold in one lot as an entirety or in separate parcels as Secured Party may determine. Secured Party shall not be obligated to make any sale pursuant to any such notice. Secured Party may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at any time and place fixed for the sale, and such sale may be made at any time or place to which the same may be so adjourned. In case of any sale of all or any part of the Collateral on credit or for future delivery, the Collateral so sold may be retained by Secured Party until the selling price is paid by the purchaser thereof, but Secured Party shall incur no liability in case of the failure of such purchaser to take up and pay for the Collateral so sold, and in case of any such failure, such Collateral may again be sold upon like notice. Each and every

method of disposition described in this Section shall constitute disposition in a commercially reasonable manner. Borrower shall remain liable for any deficiency.

(c)     Secured Party shall have all the rights of a secured party after default under the UCC and in conjunction with, in addition to or in substitution for those rights and remedies:

(i)     Secured Party may require Debtor to assemble the Collateral and make it available at a place Secured Party designates which is mutually convenient to allow Secured Party to take possession or dispose of the Collateral; and

(ii)     it shall not be necessary that Secured Party take possession of the Collateral or any part thereof before the time that any sale pursuant to the provisions of this Article is conducted and it shall not be necessary that the Collateral or any part thereof be present at the location of such sale; and

(iii)     before application of proceeds of disposition of the Collateral to the Obligations, such proceeds shall be applied to the reasonable expenses of retaking, holding, preparing for sale or lease, selling, leasing and the like and the reasonable attorneys' fees and legal expenses incurred by Secured Party, Borrower to remain liable for any deficiency; and

(iv)     the sale by Secured Party of less than the whole of the Collateral shall not exhaust the rights of Secured Party hereunder, and Secured Party is specifically empowered to make successive sale or sales hereunder until the whole of the Collateral shall be sold; and, if the proceeds of such sale of less than the whole of the Collateral shall be less than the aggregate of the indebtedness secured hereby, the Mortgage and the security interest created hereby shall remain in full force and effect as to the unsold portion of the Collateral just as though no sale had been made; and

(v)     in the event any sale hereunder is not completed or is defective in the opinion of Secured Party, such sale shall not exhaust the rights of Secured Party hereunder and Secured Party shall have the right to cause a subsequent sale or sales to be made hereunder; and

(vi)     any and all statements of fact or other recitals made in any bill of sale or assignment or other instrument evidencing any foreclosure sale hereunder as to nonpayment of any indebtedness or as to the occurrence of any default, or as to Secured Party having declared all of such indebtedness to be due and payable, or as to notice of time, place and terms of sale and the Collateral to be sold having been duly given, or as to any other act or thing having been duly done by Secured Party, shall be taken as prima facie evidence of the truth of the facts so stated and recited; and

(vii)     Secured Party may appoint or delegate any one *or* more persons as agent to perform any act or acts necessary or incident to any sale held by Secured Party, including the sending of notices and the conduct of sale, but in the name and on behalf of Secured Party; and

30

(viii)   demand of performance, advertisement and presence of property at sale are hereby WAIVED and Secured Party is hereby authorized to sell hereunder any evidence of debt it may hold as security for the secured indebtedness.  All demands and presentments of any kind or nature are expressly WAIVED by Debtor. Debtor WAIVES the right to require Secured Party to pursue any other remedy for the benefit of Debtor and agrees that Secured Party may proceed against any Obligor for the amount of the Obligations owed to Secured Party without taking any action against any other Obligor or any other person or entity and without selling or otherwise proceeding against or applying any of the Collateral in Secured Party's possession.

1.13.3   No Other Financing Statements on the Collateral.  So long as any amount remains unpaid on the Obligations, Debtor will not execute and there will not be filed in any public office any financing statements affecting the Collateral other than financing statements in favor of Secured Party under this Agreement and the other Loan Documents, unless prior written specific consent and approval of Secured Party shall have been first obtained.

1.13.4   Secured Party May File UCC Financing and Continuation Statements.  As to all security interests granted to Secured Party by Debtor or any Qualified Property Owner under this Agreement or any of the other Loan Documents authorized to file one or more separate "all assets" financing statement or statements and one or more continuation statements in any jurisdiction where Secured Party deems it necessary, and at Secured Party's request, Debtor and each respective Qualified Property Owner will join Secured Party in executing one or more financing statements, continuation statements or both pursuant to the UCC, in form satisfactory to Secured Party, and Debtor will pay the costs of filing or recording them, in all public offices at any time and from time to time whenever filing or recording of any financing statement or any continuation statement is deemed by Secured Party or its counsel to be necessary or desirable. In addition, Secured Party is expressly authorized to file or record financing statements and continuation statements without the signature of the Debtor or any Qualified Property Owner in all public offices at any time and from time to time whenever filing or recording of any financing statement or any continuation statement is deemed by Secured Party or its counsel to be necessary or desirable.

1.13.5   Debtor's Warranties Concerning Collateral.  Debtor warrants and represents to Secured Party that Debtor is the legal and equitable owner and holder of the Collateral free of any adverse claim and free of any security interest or encumbrance except only for the security interest granted hereby in the Collateral and those other security interests (if any) expressly referred to or described in this Agreement.  Debtor agrees to defend the Collateral and its proceeds against all claims and demands of any person at any time claiming the Collateral, its proceeds or any interest in either. Debtor also warrants and represents that Debtor has not heretofore signed any financing statement directly or indirectly affecting the Collateral or any part of it which has not been completely terminated of record, and no such financing statement signed by Debtor is now on file in any public office, except in each case, only those statements (if any) true and correct copies of which Debtor has actually delivered to Secured Party.

1.13.6   Certain Powers of Secured Party.  Without limiting any other provision of any of the Loan Documents, Debtor hereby authorizes and directs each account debtor and each other person or entity obligated to make payment in respect of any of the Collateral (each a "Collateral

Obligor") to pay over to Secured Party, its officers, agents or assigns, upon demand by Secured Party, all or any part of the Collateral without making any inquiries as to the status or balance of the Obligations and without any notice to or further consent of Debtor. Debtor hereby releases each Collateral Obligor from all liability to Debtor related to or arising out of any payment it makes to Secured Party pursuant to this paragraph. The powers conferred on Secured Party pursuant to this Section are conferred solely to protect Secured Party's interest in the Collateral and shall not impose any duty or obligation on Secured Party to perform any of the powers herein conferred. No exercise of any of the rights provided for in this Section shall constitute a retention of collateral in satisfaction of the indebtedness as provided for in the UCC.

1.13.7 <u>Standard of Care</u>.  Secured Party shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral in its possession if it takes such action for that purpose as Debtor requests in writing, but failure of Secured Party to comply with such request shall not of itself be deemed a failure to exercise reasonable care, and no failure of Secured Party to take any action not so requested by Debtor shall be deemed a failure to exercise reasonable care in the custody or preservation of any such Collateral.

1.13.8 <u>Change Terms, Release Collateral</u>.  Secured Party may extend the time of payment, arrange for payment in installments, otherwise modify the terms of, or release, any of the Collateral, without thereby incurring responsibility to Debtor or discharging or otherwise affecting any liability of Debtor. Secured Party shall not be required to take steps necessary to preserve any rights against prior parties to any of the Collateral.

1.14    <u>Releases of Qualified Properties</u>.

1.14.1 Borrower may request the release of any Qualified Property (each such Qualified Property being hereinafter referred to as a "Released Asset") at any time; provided, that Borrower may not release any Qualified Property to an Affiliate of Borrower or any Qualified Property Owner unless following such release, the Debt Yield shall be equal to or greater than 11%; provided, that, this requirement shall not affect the quarterly Debt Yield requirement set forth in Section 7.11.  In connection with any such release of a Released Asset, Lenders agree that, as long as Administrative Agent has not given notice to Borrower of the existence of any Event of Default which, at the time in question, has not been cured and as long as Administrative Agent has not accelerated the Obligations, Administrative Agent is authorized to and agrees to release/discharge its liens on the Released Asset in question in connection with Administrative Agent's receipt of the Release Price with respect to such Released Asset, which Release Price shall be applied by Lenders to the outstanding principal balance under the Loan. Unless Administrative Agent has accelerated the Loan or declared an Event of Default which, at the time of the release of any Released Asset, has not been cured, Lenders' consent to any such release shall not be required so long as Lenders are paid 100% of the Release Price applicable to such Released Asset.

1.14.2 The "Release Price" with respect to each Released Asset (except with respect to the release of the Orchards Mall Property and the Soup Lots Property) is defined as an amount equal to the amount set forth in the column entitled "Current Value" on the chart contained in the Stipulation for such Released Asset.  The "Release Price" with respect to the Orchards Mall

Property and the Soup Lots Property shall be the Agreed Upon Release Price determined as provided in Section 1.14.5.

1.14.3   In connection with the release of each Released Asset, Borrower will submit to Administrative Agent, for Administrative Agent's approval, (i) a Release Request in the form of Exhibit E hereto (a "Release Request") signed by a Responsible Officer of Borrower and of the Qualified Property Owner in question, setting forth the Release Price and (ii) an updated proforma Compliance Certificate from Borrower for calculating Borrower's compliance with the Debt Yield Test after the release of the Released Asset in question.   Within fifteen (15) days after Administrative Agent's receipt of a Release Request, such other required financial information as Administrative Agent may reasonably require, and the required Release Price (the "Required Release Price"), (i) Administrative Agent will execute and deliver to Borrower, discharges or reconveyances (as appropriate) of the respective QPO Security Documents, and (ii) if requested by Borrower and if the respective Qualified Property Owner no longer owns any Qualified Properties, Administrative Agent will execute and deliver to Borrower a release of the respective QPO Guaranty.

1.14.4   Notwithstanding anything set forth herein to the contrary, as long as Administrative Agent has not given notice to Borrower of the existence of any Event of Default which, at the time in question, has not been cured and as long as Administrative Agent has not accelerated the Obligations, any Net Sales Proceeds received by the Borrower and/or the Qualified Property Owner in excess of the Release Price shall be used and applied as follows:

First, to the extent that distributions to Holders of Allowed Claims (other than Class 2 Senior Lender Secured Claims or Class 3 Senior Lender Unsecured Claims) that were scheduled to be made on a date prior to the date of the Borrower's and/or Qualified Property Owner's receipt of the Net Sales Proceeds have not been made because Net Operating Income from Qualified Properties, other Properties in the Asset Pool and the Cash Infusion have been inadequate to make such distributions, the Net Sales Proceeds in excess of the Release Price shall be used and applied to make such distributions.   Such Net Sales Proceed shall be used and applied to make such distributions in the order of priority contemplated by the Plan of Reorganization.

Second, to the extent any tenant improvement or tenant related capital expenditure obligations with respect to the Properties have been incurred on a date prior to the date of the Borrower's and/or Qualified Property Owner's receipt of the Net Sales Proceeds and remain unpaid on such date because Net Operating Income from Qualified Properties, other Properties in the Asset Pool and the Cash Infusion have been inadequate to pay such obligations, the Net Sales Proceeds in excess of the Release Price shall be used and applied to pay such obligations.

Third, to the extent that leasing commissions relating to the Properties have been incurred to Unrelated Third Parties on a date prior to the date of the Borrower's and/or Qualified Property Owner's receipt of the Net Sales Proceeds and remain unpaid on such date because Net Operating Income from Qualified Properties, other Properties in the Asset Pool and the Cash Infusion have been inadequate to pay such obligations, the Net Sales Proceeds in excess of the Release Price shall be used and applied to pay such obligations.

<u>Fourth</u>, to the extent any operating expenses relating to the Properties (excluding the Management Fee) have been incurred on a date prior to the date of the Borrower's and/or Qualified Property Owner's receipt of the Net Sales Proceeds and remain unpaid on such date because Net Operating Income from Qualified Properties, other Properties in the Asset Pool and the Cash Infusion have been inadequate to pay such obligations, the Net Sales Proceeds in excess of the Release Price shall be used and applied to pay such obligations.

<u>Fifth</u>, to the extent that any interest payable on an Interest Payment Date occurring prior to the date of the Borrower or Qualified Property Owner's receipt of the Net Sales Proceeds remains unpaid, the Net Sales Proceeds in excess of the Release Price shall be used and applied to pay such interest.

<u>Sixth</u>, to the extent that any principal payment payable pursuant to the Amortization Schedule on a date prior to the date of the Borrower or Qualified Property Owner's receipt of the Net Sales Proceeds remains unpaid, the Net Sales Proceeds in excess of the Release Price shall be used and applied to pay such principal.

<u>Seventh</u>, to the extent that any Management Fee(s) has been incurred on a date prior to the date of the Borrower and/or Qualified Property Owner's receipt of the Net Sales Proceeds and remains unpaid on such date because Net Operating Income from Qualified Properties, other Properties in the Asset Pool and the Cash Infusion have been inadequate to pay such obligations, the Net Sales Proceeds in excess of the Release Price shall be used and applied to pay such obligations.

<u>Eighth</u>, the Borrower and/or Qualified Property Owners, in their reasonable discretion, may use Net Sales Proceeds in excess of the Release Price to establish one or more reserves for future obligations relating to the Properties, including: (i) distributions to the Holders of Allowed Claims in accordance with the Plan of Reorganization; (ii) tenant improvement and/or tenant related capital expenditures relating to the Properties; (iii) leasing commissions relating to the Properties; (iv) any interest and/or principal on the Loan; and (v) the Management Fee.

<u>Ninth</u>, the Borrower and/or Qualified Property Owners, in their reasonable discretion, may use Net Sales Proceeds in excess of the Release Price to establish a reserve for other capital expenditures by the Borrower or any Qualified Property Owner, the amount of which may not exceed $5,000,000 at any point in time.

<u>Tenth</u>, any remaining Net Sales Proceeds in excess of the Release Price shall be used to prepay the Loan, in whole or in part.  For the avoidance of doubt, no Restricted Payment may be made from Net Sales Proceeds until the Obligations have been repaid in full.

1.14.5

(a)    Following the Effective Date (as defined in the Plan of Reorganization), Borrower and the Administrative Agent shall agree upon (i) the Release Price for the Soup Lots Property and (ii) the Release Price for the Orchards Mall Property; provided, that, in the event that the Borrower and the Administrative Agent are unable to agree upon the Release Price for either or both of the Soup Lots Property and/or the Orchards Mall Property within 45 days of the

Effective Date (as defined in the Plan of Reorganization), then either the Borrower or the Administrative Agent may request that the Bankruptcy Court determine the Release Price for such Property based upon an Independent Appraisal that is not more than 180 days old and such other factors as the Bankruptcy Court shall determine to be relevant, which Release Price shall be final, conclusive and binding upon the parties hereto.  The parties acknowledge and agree that the Bankruptcy Court shall retain jurisdiction to resolve any disputes with respect to the Agreed Upon Release Price for either the Orchards Mall Property or the Soup Lots Property.

(b)     Upon the Administrative Agent's receipt of the Agreed Upon Release Price, (i) the Administrative Agent will execute and deliver to Borrower, discharges or reconveyances (as appropriate) of the respective QPO Security Documents, and (ii) if the respective Qualified Property Owner no longer owns any Qualified Properties, Administrative Agent will execute and deliver to Borrower a release of the respective QPO Guaranty.  Any gross proceeds minus reasonable and customary closing costs of such sale actually paid to Unrelated Third Parties, received by the Borrower and/or the Qualified Property Owner in respect of the release of the Orchards Mall Property or the Soup Lots Property, shall be applied as provided in Section 1.14.4.

1.15    **Annual Appraisals**.    The Administrative Agent may order Independent Appraisals of the Properties then included in the Asset Pool at Borrower's expense; provided, that, Borrower shall not be responsible for the expenses, fees or any liabilities related to any Independent Appraisal for any Property if an Independent Appraisal of such Property has been provided to the Administrative Agent within the preceding 12-month period; and provided, further, prior to engaging any appraiser to perform an appraisal under this Section 1.15, the Administrative Agent must consult with the Borrower and obtain Borrower's consent to the engagement of such appraiser, such consent not to be unreasonably withheld.

## ARTICLE II.
## THE COMMITMENTS AND CREDIT EXTENSIONS

2.01    **Loan**.    Effective as of the date hereof, the Borrower shall issue to the Administrative Agent, the Note in the original principal amount of $[●].

2.02    **Prepayments**.  The Borrower may, upon notice to the Administrative Agent, at any time or from time to time voluntarily prepay the Loan in whole or in part without premium or penalty; provided that such notice must be received by the Administrative Agent not later than 11:00 a.m. on the date of prepayment of the Loan.  Each such notice shall specify the date and amount of such prepayment.  The Administrative Agent will promptly notify each Lender of its receipt of each such notice, and of the amount of such Lender's Applicable Percentage of such prepayment.  If such notice is given by the Borrower, the Borrower shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Each such prepayment shall be applied to the portion of the Total Outstandings held by the Lenders in accordance with their respective Applicable Percentages.

2.03    **Repayment of Loans; Principal Amortization**.  The Borrower shall repay the outstanding principal amount of the Loan to the Lenders pursuant to the amortization schedule

attached hereto as <u>Schedule 2.03</u>, which principal amount shall be amortized on a 25 year schedule (the "Amortization Schedule").

2.04 **Interest**.

(a) Subject to the provisions of subsection (b) below, the Loan shall bear interest on the outstanding principal amount thereof from the date hereof at a rate per annum equal to the Base Rate.

(b) (i) If any amount of principal of the Loan is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at an interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii) If any amount (other than principal of any Loan) payable by the Borrower under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, then upon the request of the Required Lenders, such amount shall thereafter bear interest at an interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(iii) Upon the request of the Required Lenders, while any Event of Default exists, the Borrower shall pay interest on the principal amount of all outstanding Obligations hereunder at an interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(iv) Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c) Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

2.05 **[Reserved]**

2.06 **Computation of Interest and Fees.** All computations of interest for the Loan shall be made on the basis of a year of 365 or 366 days, as the case may be, and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year). Each determination by the Administrative Agent of a fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

2.07 **Evidence of Debt**. The proportionate amount of the Total Outstandings of each Lender shall be evidenced by one or more accounts or records maintained by such Lender and by the Administrative Agent in the ordinary course of business. The accounts or records maintained by the Administrative Agent and each Lender shall be conclusive absent manifest error of the amount of the proportionate amount of the Total Outstandings of such Lender and the interest

and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the accounts and records of the Administrative Agent in respect of such matters, the accounts and records of the Administrative Agent shall control in the absence of manifest error.

2.08    **Payments Generally; Administrative Agent's Clawback**.

(a)    General.  All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff.  Except as otherwise expressly provided herein, all payments by the Borrower hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein.  The Administrative Agent will promptly distribute to each Lender its Applicable Percentage (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office.  All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.  If any payment to be made by the Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(b)    Payments by Borrower; Presumptions by Administrative Agent.  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders, the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender, in immediately available funds with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.   A notice of the Administrative Agent to any Lender or the Borrower with respect to any amount owing under this subsection (b) shall be conclusive, absent manifest error.

2.09    **Sharing of Payments by Lenders**.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any portion of the Loan held by it resulting in such Lender's receiving payment of a proportion of the aggregate amount the Loan and accrued interest thereon greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) make such adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate portion of principal of and accrued interest of the Loan held by each Lender, underlined provided that:

(i)     if any such participations or subparticipations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations or subparticipations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii)     the provisions of this Section shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any portion of the Loan held by such Lender to any assignee or participant, other than to the Borrower or any Qualified Property Owner (as to which the provisions of this Section shall apply).

The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

2.10   **Term of Loan; Extensions of Maturity Date**.

(i)     Unless earlier terminated by the Administrative Agent on behalf of the Lenders pursuant to Section 8.02 below, the Loan shall be for an initial term (the "Initial Term") commencing on the date hereof and ending on the initial Maturity Date; provided, however, the initial Maturity Date may be extended for two consecutive one-year terms (each, an "Extended Term") ending on, as applicable, the first anniversary ("First Extended Maturity Date") or the second anniversary ("Second Extended Maturity Date") of the initial Maturity Date, in each case upon satisfaction of the conditions set forth in Section 2.10 below.

(b)     The First Extended Maturity Date and the Second Extended Maturity Date are herein singly and collectively referred to as an "Extended Maturity Date".

(c)     If Borrower does not elect or qualify for an extension of the initial Maturity Date pursuant to Section 2.11 below, all outstanding principal, all interest accrued thereon and all other amounts payable by Borrower pursuant to the Loan Documents shall be due and payable in full on the initial Maturity Date. If Borrower elects and qualifies for an extension pursuant to Section 2.11 below, all outstanding principal, all interest accrued thereon and all other amounts payable by Borrower pursuant to the Loan Documents shall be due and payable in full on the applicable Extended Maturity Date.

(d)     This Section 2.10 and Section 2.11 below shall supersede any provisions in Section 10.01 to the contrary.

2.11   **Conditions to Extending Maturity Date**.  Subject to the satisfaction of each of the following conditions, Borrower, at its option, may elect to extend the initial Maturity Date until the First Extended Maturity Date, and thereafter, subject in each case to the continuing satisfaction of each of the following conditions, Borrower may elect to further extend the First Extended Maturity Date to the Second Extended Maturity Date:

(a)     Notice From Borrower.  As to each Extended Term, Borrower shall have given the Administrative Agent written notice (an "Extension Notice") of Borrower's request to exercise its extension right at least ninety (90) days, but not more than one hundred fifty (150) days, before the initial Maturity Date (or, in the case of a request for an extension for any Extended Term, before such Extended Maturity Date);

(b)     No Event of Default.  No Event of Default shall then exist;

(c)     Financial Covenants.   Borrower shall submit an updated Compliance Certificate evidencing full compliance with the Financial Covenant as of the reporting date set forth therein;

(d)     Conditions Satisfied.  All of the conditions set forth in Article IV of this Agreement, to the extent applicable, shall continue to be satisfied and the representations and warranties contained in this Agreement shall be true and correct in all material respects on and as of the date of such extension and after giving effect thereto, as though made on and as of such date (or, if any such representation or warranty is expressly stated to have been made as of a specific date, as of such specific date);

(e)     Extension Fee.  As to each Extended Term, a separate extension fee in an amount equal to .25% of the then Total Outstandings (an "Extension Fee"), which shall be paid in twelve (12) monthly installments to the Administrative Agent, for the pro rata account of each Lender.  The Extension Fee shall be deemed fully earned by Lenders unless it is determined that Borrower has not satisfied all of the conditions to such extension, in which case any such Extension Fee that has been paid to Lenders shall be refunded to Borrower;

(f)     Additional Documents.  As to each Extended Term, Borrower shall have executed and/or delivered to the Administrative Agent and Lenders such agreements and documents as the Administrative Agent or the Required Lenders may reasonably require incident to the requested extension;

(g)     Loan to Value.  The Total Outstandings at such time is equal to or less than eighty percent (80%) of the fair market value of the Asset Pool based upon new appraisals as  described below in sub-section (l) below.

(h)     Principal Curtailment.  Borrower shall be in compliance with the principal payment terms set forth in Section 2.12.

(i)     **[Reserved]**

(j)     Before End of Current Term.  Each of the foregoing conditions shall be satisfied on the initial Maturity Date (and, in the case of a request for an extension of an Extended Term, on such Extended Maturity Date); and

(k)     Outside Extension of Maturity Date.   Under no circumstances, notwithstanding anything in this Agreement or any other Loan Document to the contrary, shall the Maturity Date be extended to any date that is after the Second Extended Maturity Date.

(l)    New Appraisals.  As to each Extended Term, prior to (and as condition to) each extension of the Maturity Date, new Independent Appraisals (or updates of existing Independent Appraisals, as determined by Required Lenders) shall be prepared at Borrower's expense.

Administrative Agent shall promptly deliver to each of the Lenders copies of any Extension Notice(s) that Administrative Agent may receive from Borrower. Within thirty (30) days following receipt by Administrative Agent of any Extension Notice, Administrative Agent shall notify Borrower in writing as to what other agreements, information or certificates are required to be provided by Borrower to Administrative Agent pursuant to Section 2.11(f) above. If all of the conditions to extension are satisfied, except for the new Appraisals referenced in subsection (l) above, Administrative Agent shall so notify Borrower and Administrative Agent shall order such new Independent Appraisals (or updates of existing Independent Appraisals, as determined by Required Lenders) for all Properties then in the Asset Pool. Upon receipt and approval of such new Independent Appraisals (or updates of existing Independent Appraisals), Administrative Agent shall notify Borrower of the new Asset Values for all Properties then in the Asset Pool and, so long as no Default exists, the Maturity Date shall be extended until the applicable Extended Maturity Date.  In connection with any Extended Term, the Administrative Agent and the Lenders hereby agree that, the Borrower shall have the option in its sole discretion, in order to meet any of the conditions set forth in this Section 2.11, to (i) make a partial prepayment on the principal amount outstanding under the Loan, or (ii) add Assets to the Asset Pool (which Assets shall be valued at an amount equal to the average of the Administrative Agent's and the Borrower's independent appraisers, unless the Borrower elects, in its sole discretion, to accept the Administrative Agent's appraisal valuation).

2.12    **Principal Payments.**

(a)    Borrowers shall make regularly scheduled principal payments pursuant to the Amortization Schedule.  Provided however,

(i)    if at any time, as the result of the sale or other Disposition of any Asset (including without limitation any mortgage or other transfer in connection with any financing), the Borrower will not be in compliance with any of the Financial Covenants, then, in connection with (and as a condition to) any such sale or other Disposition, Borrower will promptly make a principal payment and/or add any additional Property or Properties to the Asset Pool in an amount sufficient to bring the Borrower into full compliance with the Financial Covenant;

(ii)    if at any other time the Borrower is not in compliance with the Financial Covenant, Borrower will promptly make a principal payment and/or add any additional Property or Properties to the Asset Pool in an amount sufficient to bring the Borrower into full compliance with the Financial Covenant; and

(iii)    Following the end of each calendar year, Year End Surplus shall be applied to the payment of the outstanding principal of the Loan.

(b)    In any event, all outstanding principal, together with all accrued and unpaid interest and all other amounts payable pursuant to the terms of the Loan Documents shall be due and payable in full on the initial Maturity Date or, if applicable, on the applicable Extended Maturity Date.

2.13    **[Reserved]**

2.14    **Management Fees.**

So long as Borrower is able to meet its payment obligations hereunder, Borrower shall be permitted to pay the Management Fees.

## ARTICLE III.
## TAXES, YIELD PROTECTION AND ILLEGALITY

3.01    **Taxes**.

(a)    Payments Free of Taxes.  Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, provided that if the Borrower shall be required by applicable law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Administrative Agent or Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    Payment of Other Taxes by the Borrower.  Without limiting the provisions of subsection (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    Indemnification by the Borrower.  The Borrower shall indemnify the Administrative Agent and each Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section) paid by the Administrative Agent or such Lender, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender shall be conclusive absent manifest error.

(d)    Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by

such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Status of Lenders.  Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Without limiting the generality of the foregoing, in the event that the Borrower is resident for tax purposes in the United States, any Foreign Lender shall deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the request of the Borrower or the Administrative Agent, but only if such Foreign Lender is legally entitled to do so), whichever of the following is applicable:

(i)    duly completed copies of Internal Revenue Service Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party,

(ii)    duly completed copies of Internal Revenue Service Form W-8ECI,

(iii)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under section 881(c) of the Code, (x) a certificate to the effect that such Foreign Lender is not (A) a "bank" within the meaning of section 881(c)(3)(A) of the Code, (B) a "10 percent shareholder" of the Borrower within the meaning of section 881(c)(3)(B) of the Code, or (C) a "controlled foreign corporation" described in section 881(c)(3)(C) of the Code and (y) duly completed copies of Internal Revenue Service Form W-8BEN, or

(iv)    any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in United States Federal withholding tax duly completed together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower to determine the withholding or deduction required to be made.

(f)    Treatment of Certain Refunds.  If the Administrative Agent or any Lender determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section with respect to the Taxes or Other Taxes giving rise to such refund), net of all reasonable out-of-pocket expenses of the Administrative Agent, such Lender incurred

in connection therewith, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), provided that the Borrower, upon the request of the Administrative Agent, such Lender agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This subsection shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

    3.02    **[Reserved]**

    3.03    **[Reserved]**

    3.04    **Increased Costs**.

    (a)    <u>Increased Costs Generally.</u>  If any Change in Law shall:

    (i)    impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

    (ii)    subject any Lender to any tax of any kind whatsoever with respect to this Agreement or change the basis of taxation of payments to such Lender in respect thereof (except for Indemnified Taxes or Other Taxes covered by <u>Section 3.01</u> and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender); or

    (iii)    impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement; and the result of any of the foregoing shall be to reduce the amount of any sum received or receivable by such Lender (whether of principal, interest or any other amount) then, upon request of such Lender, the Borrower will pay to such Lender, such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

    (b)    <u>Capital Requirements</u>.  If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the portion of the Loan held by, such Lender, to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

    (c)    <u>Certificates for Reimbursement</u>.  A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Borrower shall

be conclusive absent manifest error.  The Borrower shall pay such Lender, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)     Delay in Requests.  Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section for any increased costs incurred or reductions suffered more than nine (9) months prior to the date that such Lender, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

3.05     **[Reserved]**

3.06     **Mitigation Obligations; Replacement of Lenders**.

(a)     Designation of a Different Lending Office.  If any Lender requests compensation under Section 3.04, or the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender gives a notice pursuant to Section 3.02, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.01 or 3.04, as the case may be, in the future, or eliminate the need for the notice pursuant to Section 3.02, as applicable, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     Replacement of Lenders.  If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, the Borrower may replace such Lender in accordance with Section 10.13.

3.07     **Survival.**  All of the Borrower's obligations under this Article III shall survive repayment of all Obligations hereunder.

## ARTICLE IV.
## CONDITIONS PRECEDENT TO THIS AGREEMENT

4.01     **Conditions Precedent to Closing.**  The effectiveness of this Agreement is subject to satisfaction of the following conditions precedent:

(a)     The Bankruptcy Court's entry of a final order confirming the Plan of Reorganization pursuant to section 1129 of the Bankruptcy Code.

44

(b)    The occurrence of the Effective Date under the Plan of Reorganization.

(c)    The Administrative Agent's receipt of the following, each properly executed by a Responsible Officer of the signing Loan Party, each dated the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) and each in form and substance satisfactory to the Administrative Agent and each of the Lenders:

(i)    executed counterparts of this Agreement sufficient in number for distribution to the Administrative Agent, each Lender and the Borrower;

(ii)    a Note executed by the Borrower in favor of the Administrative Agent;

(iii)    each Pledge Agreement executed by the pledgor thereunder in favor of Administrative Agent and the Limited Guaranty, each duly executed and delivered to Administrative Agent;

(iv)    such certificates of resolutions or other action, incumbency certificates and/or other certificates of Responsible Officers of each Loan Party as the Administrative Agent may require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party;

(v)    such documents and certifications as the Administrative Agent may reasonably require to evidence that each Loan Party is duly organized or formed, validly existing, in good standing and qualified to engage in business in each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and

(vi)    duly completed Compliance Certificate signed by a Responsible Officer of the Borrower demonstrating that upon the effectiveness of this Agreement, Borrower will be in compliance with the Financial Covenant.

(d)    Administrative Agent shall have received such other documents and certificates as Administrative Agent may reasonably request, in form and substance reasonably satisfactory to Administrative Agent, with respect to Borrower's compliance with the terms of the Loan Documents.

## ARTICLE V.
## REPRESENTATIONS AND WARRANTIES

The Borrower represents and warrants to the Administrative Agent and the Lenders that:

5.01    **Existence, Qualification and Power; Compliance with Laws**. Borrower and each Qualified Property Owner (a) is duly organized or formed, validly existing and in good standing under the Laws of the jurisdiction of its incorporation or organization, (b) has all

requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own its assets and carry on its business and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party, (c) is duly qualified and is licensed and in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license, and (d) is in compliance with all Laws; except in each case referred to in clause (b)(i), (c) or (d), to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

5.02    **Authorization; No Contravention**.  The execution, delivery and performance by each Loan Party of each Loan Document to which such Person is party, have been duly authorized by all necessary limited liability company, partnership, corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Person's Organization Documents; (b) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any Contractual Obligation to which such Person is a party or affecting such Person or the properties of such Person or any Qualified Property Owner or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Person or its property is subject; or (c) violate any Law. Each Loan Party and each Qualified Property Owner is in compliance with all Contractual Obligations referred to in clause (b)(i), except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect.

5.03    **Governmental Authorization; Other Consents**.  No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with the execution, delivery or performance by, or enforcement against, any Loan Party of this Agreement or any other Loan Document.

5.04    **Binding Effect.**  This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto.  This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms.

5.05    **Indebtedness**.  Schedule 5.05 sets forth all material Indebtedness and other liabilities, direct or contingent, of the Borrower and its consolidated Subsidiaries as of the date hereof.

5.06    **Litigation**.  Except for the Chapter 11 Cases and related actions and proceedings, there are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of the Borrower after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against the Borrower or any Qualified Property Owner or against any of their properties or revenues that (a) purport to affect or pertain to this Agreement or any other Loan Document, or any of the transactions contemplated hereby, or (b) either individually or in the aggregate, if determined adversely, could reasonably be expected to have a Material Adverse Effect.

5.07    **No Default.**  Except for defaults relating to the commencement and continuation of the Chapter 11 Cases, neither Borrower nor any Subsidiary thereof (including, without limitation, any Qualified Property Owner) is in default under or with respect to any Contractual Obligation that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

5.08    **Ownership of Property; Liens**.

(a)    Each of the Borrower and each Qualified Property Owner has good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business.  The property of the Borrower and each Qualified Property Owner is subject to no Liens.

(b)    The relevant Qualified Property Owner (a) is the lawful current owner of fee simple or leasehold title to each of the Qualified Properties; (b) has valid non-cancellable permanent easements with respect to all areas over, under or on which utility or passage easements are required to make use of each of the Qualified Properties; and (c) is the lawful current owner of, or has valid non-cancellable permanent easements over all areas containing parking as required by any applicable leases or Laws.

(c)    Borrower or the relevant Qualified Property Owner has good title to all Assets.

5.09    **Environmental Compliance.**  The Borrower and each Qualified Property Owner conduct in the ordinary course of business a review of the effect of existing Environmental Laws and claims alleging potential liability or responsibility for violation of any Environmental Law on their respective businesses, operations and properties, and as a result thereof the Borrower has reasonably concluded that such Environmental Laws and claims could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

5.10    **Insurance.**  The properties of the Borrower and each Qualified Property Owner are insured with financially sound and reputable insurance companies not Affiliates of the Borrower, in such amounts, with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Borrower or the applicable Qualified Property Owner operates.

5.11    **Taxes.**  The Borrower and each Qualified Property Owner have filed all Federal, state and other material tax returns and reports required to be filed, and have paid all Federal, state and other material taxes, assessments, fees and other governmental charges levied or imposed upon them or their properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with MCBA. There is no proposed tax assessment against the Borrower or any Qualified Property Owner that would, if made, have a Material Adverse Effect.  Neither any Loan Party nor any Qualified Property Owner is party to any tax sharing agreement.

5.12    **ERISA Compliance**.

(a)     Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other Federal or state Laws. Each Plan that is intended to qualify under Section 401(a) of the Code has received a favorable determination letter from the IRS or an application for such a letter is currently being processed by the IRS with respect thereto and, to the best knowledge of the Borrower, nothing has occurred which would prevent, or cause the loss of, such qualification. The Borrower and each ERISA Affiliate have made all required contributions to each Plan subject to Section 412 of the Code, and no application for a funding waiver or an extension of any amortization period pursuant to Section 412 of the Code has been made with respect to any Plan.

(b)     There are no pending or, to the best knowledge of the Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c)     (i)     No ERISA Event has occurred or is reasonably expected to occur; (ii) no Pension Plan has any Unfunded Pension Liability; (iii) neither the Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any Pension Plan (other than premiums due and not delinquent under Section 4007 of ERISA); (iv) neither the Borrower nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan; and (v) neither the Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to Sections 4069 or 4212(c) of ERISA.

5.13    **Subsidiaries; Equity Interests**.  As of the Effective Date, the Borrower has no Subsidiaries other than those specifically disclosed in Part (a) of Schedule 5.13, and all of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and nonassessable and are owned by Borrower (or by another Subsidiary of Borrower as indicated in Part (a) of Schedule 5.13) in the amounts specified on Part (a) of Schedule 5.13 free and clear of all Liens, other than Liens created hereunder.  The Borrower has no equity investments in any other limited liability company, partnership, corporation or other entity other than those specifically disclosed in Part (b) of Schedule 5.13.  All of the outstanding Equity Interests in the Borrower have been validly issued are fully paid and nonassessable and are owned by the Persons listed and in the respective amounts specified on Part (c) of Schedule 5.13 free and clear of all Liens.

5.14    **Margin Regulations; Investment Company Act; Public Utility Holding Company Act.**

(a)     The Borrower is not engaged and will not engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the FRB), or extending credit for the purpose of purchasing or carrying margin stock.

(b)    None of the Borrower, any Person Controlling the Borrower, or any Subsidiary (i) is a "holding company," or a "subsidiary company" of a "holding company," or an "affiliate" of a "holding company" or of a "subsidiary company" of a "holding company," within the meaning of the Public Utility Holding Company Act of 1935, or (ii) is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

5.15    **Disclosure**.  The Borrower has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any Qualified Property Owner is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document (in each case, as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

5.16    **Compliance with Laws**.  Borrower and each Qualified Property Owner is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties (including, without limitation, each Qualified Property), except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted or (b) the failure to comply therewith, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.17    **Taxpayer Identification Number**.    The Borrower's true and correct U.S. taxpayer identification number is set forth on Schedule 10.02.

5.18    **Intellectual Property; Licenses, Etc.**  The Borrower and each Qualified Property Owner own, or possess the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights (collectively, "IP Rights") that are reasonably necessary for the operation of their respective businesses, without conflict with the rights of any other Person. To the best knowledge of the Borrower, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by the Borrower or any Qualified Property Owner infringes upon any rights held by any other Person. No claim or litigation regarding any of the foregoing is pending or, to the best knowledge of the Borrower, threatened, which, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.19    **Compliance With Covenants, etc.**

Each of the Qualified Properties complies with any and all covenants, conditions, restrictions or other matters which affect any of the Qualified Properties, except to the extent that

any failure to comply either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.20    **Required Licenses and Permits**.

Borrower and each Qualified Property Owner possesses all licenses, permits and franchises, or rights thereto, necessary to conduct its business as now conducted and as presently proposed to be conducted. All Licenses and Permits which are reasonably required in order for the relevant Qualified Property Owner to operate each of the Qualified Properties in the usual course of business have been duly and properly obtained and have been complied with in all material respects except where failure to obtain any such License or Permit would not have a Material Adverse Effect.

5.21    **No Broker or Finder**.

No Loan Party, nor anyone acting on behalf thereof, has dealt with, made any agreement with or retained the services of any broker, finder or other person or entity who or which may be entitled to a broker's or finder's fee, or other compensation, payable by any Loan Party, Administrative Agent or any Lender in connection with the Loan.

5.22    **Background Information and Certificates**.

All of the factual information contained or referred to in Section 1 of this Agreement and in the Schedules to this Agreement or in the other Loan Documents, and in the certificates and opinions furnished to Administrative Agent and/or Lenders by or on behalf of Borrower or any Qualified Property Owner, is as of the date delivered true, accurate and complete in all material respects, and omits no material fact necessary to make the same not materially misleading.

5.23    Solvency.

Borrower and each Qualified Property Owner thereof, and after giving effect to the transactions contemplated under the Loan Documents will be, solvent.  After giving effect to the transactions contemplated under the Loan Documents, Borrower and each Qualified Property Owner thereof: (a) will be able to pay their respective debts as they become due, and (b) will have funds and capital sufficient to carry on their respective businesses and all businesses in which it is about to engage.

5.24    **Other Agreements**.

Neither Borrower nor any Qualified Property Owner thereof is a party to any indenture, loan, or credit agreement, or to any lease or other agreement or instrument, or subject to any charter or limited liability company or corporate restriction which could reasonably be expected to have a Material Adverse Effect.

5.25    **Investment Due Diligence**.

In connection with its investments in Properties or Qualified Property Owners, Borrower and each Qualified Property Owner obtains such information as would normally be expected of a prudent purchaser of real estate (including current surveys, structural reports, title insurance policies and Environmental Site Assessments).

5.26    **No Material Environmental or Structural Risks**.

Neither Borrower nor any Qualified Property Owner knowingly acquires any real estate having any Material Environmental or Structural Risk. Borrower does not and will not knowingly permit any Qualified Property Owner to acquire any real estate having any Material Environmental or Structural Risk.

5.27    **Qualified Property Owner Equity Interests**.

For each Qualified Property Owner Equity Interest investment held by Borrower, the relevant limited liability company agreements, partnership agreements and other Organization Documents are legal, valid and binding and in full force and effect in all material respects; and Borrower has good title to such Qualified Property Owner Equity Interests, subject to no Liens or encumbrances of any kind (other than those created under the Loan Documents or as permitted hereunder).

## ARTICLE VI.
## AFFIRMATIVE COVENANTS

So long as the Loan or other Obligation hereunder shall remain unpaid or unsatisfied, the Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.01, 6.02, and 6.03) cause each Qualified Property Owner, to:

6.01    **Financial Statements.**  Deliver to the Administrative Agent, in form and detail satisfactory to the Administrative Agent and the Required Lenders:

(a)    as soon as available, but in any event within ninety (90) days after the end of each fiscal year of the Security National Master Holding Company, LLC ("SN Master Holding"), (a) a consolidated and consolidating balance sheet of the SN Master Holding and its Subsidiaries (including Borrower) as at the end of such fiscal year and a separate Schedule setting forth a consolidated and consolidating balance sheet of the Borrower and its Subsidiaries, and (b) the related consolidated and consolidating statements of income or operations, members' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with MCBA; such consolidated statements to be audited and accompanied by (i) a report and opinion of a Registered Public Accounting Firm of nationally recognized standing reasonably acceptable to the Required Lenders, which report and opinion shall be prepared in accordance with generally accepted auditing standards and applicable Securities Laws and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit or with respect to the absence of any material misstatement and (ii) an opinion of such Registered Public Accounting Firm independently assessing the Borrower's internal controls over financial reporting expressing a conclusion that contains no statement that

there is a material weakness in such internal controls, except for such material weaknesses as to which the Required Lenders do not object; and such consolidating statements to be certified by a Responsible Officer of SN Master Holding to the effect that such statements are fairly stated in all material respects when considered in relation to the consolidated financial statements of the Borrower and its Subsidiaries;

(b)      as soon as available, but in any event within forty-five (45) days after the end of each of the first three fiscal quarters of each fiscal year of the Borrower (commencing with the fiscal quarter ended March 31, 2013), a consolidated and consolidating balance sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related consolidated and consolidating statements of income or operations, members' equity and cash flows for such fiscal quarter and for the portion of the Borrower's fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail, such consolidated statements to be certified by a Responsible Officer of the Borrower as fairly presenting the financial condition, results of operations, members' equity and cash flows of the Borrower and its Subsidiaries in accordance with MCBA, subject only to normal year-end audit adjustments and the absence of footnotes and such consolidating statements to be certified by a Responsible Officer of the Borrower to the effect that such statements are fairly stated in all material respects when considered in relation to the consolidated financial statements of the Borrower and its Subsidiaries;

(c)      as soon as available, but in any event within thirty (30) days after the beginning of each fiscal year of the Borrower, a projection of all sales of Qualified Properties which Borrower projects will occur during such fiscal year;

(d)      as soon as available, but in any event no later than thirty (30) days after the beginning of each fiscal year of the Borrower, annual operating and capital expenditure budgets for the Borrower and each Qualified Property Owner for such fiscal year, prepared by management of the Borrower; and

(e)      as soon as available, but in any event within forty-five (45) days after the end of each fiscal quarter of the Borrower (commencing with the fiscal quarter ended March 31, 2013), quarterly operating statements and rent rolls as to each Qualified Property and such other information with respect to the Qualified Properties as Administrative Agent may reasonably require.

6.02    **Certificates; Other Information.**  Deliver to the Administrative Agent, in form and detail satisfactory to the Administrative Agent and the Required Lenders:

(a)      concurrently with the delivery of the financial statements referred to in Section 6.01(a), a certificate of the Registered Public Accounting Firm certifying such financial statements and stating that in making the examination necessary therefor no knowledge was obtained of any Default under the Financial Covenant set forth herein or, if any such Default shall exist, stating the nature and status of such event;

(b)    concurrently with the delivery of the financial statements referred to in Sections 6.01(a) and (b) (commencing with the delivery of the financial statements for the fiscal quarter ended March 31, 2013), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower;

(c)    at least ten (10) Business Days prior to the sale or other Disposition of any Qualified Property or any Qualified Property Owner Equity Interest, a duly completed updated Compliance Certificate taking into account the expected results of such sale or other Disposition of such Qualified Property or Qualified Property Owner Equity Interest;

(d)    promptly after any request by the Administrative Agent or any Lender, copies of any detailed audit reports, management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by independent accountants in connection with the accounts or books of such Loan Party or any Qualified Property Owner, or any audit of any of them;

(e)    promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the members, partners or stockholders of any Loan Party, and copies of all annual, regular, periodic and special reports and registration statements which any Loan Party may file or be required to file with the SEC under Section 13 or 15(d) of the Securities Exchange Act of 1934, and not otherwise required to be delivered to the Administrative Agent pursuant hereto;

(f)    promptly after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities of any Loan Party or of any Subsidiary thereof pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Administrative Agent pursuant to Section 6.01 or any other clause of this Section 6.02;

(g)    promptly, and in any event within five Business Days after receipt thereof by any Loan Party or any Qualified Property Owner, copies of each notice or other correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of any Loan Party or any Qualified Property Owner thereof;

(h)    promptly, such additional information regarding the business, financial or corporate affairs of any Loan Party or any Qualified Property Owner, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender may from time to time reasonably request;

(i)    promptly, such additional information (in each case unaudited) as Administrative Agent or any Lender may from time to time reasonably request with respect to any Qualified Property, including, but not limited to, rent rolls, aged receivables, aged payables, budgets, forecasts, reserves, cash flow projections, physical condition of the Qualified Properties and any of the specific items that Administrative Agent could have, but did not, request in

connection with the qualification of any Property as a Qualified Property or of any Property Owner as a Qualified Property Owner under Sections 1.08 or 1.09 of this Agreement;

       (j)    within ten (10) Business Days after Borrower's receipt thereof, copies of the most recent appraisals of Qualified Properties received by Borrower; and

       (k)    promptly after the occurrence thereof, notice of any transfer of any ownership interests in Borrower or in any Qualified Property Owner; and.

       (l)    prior to the Disposition of any Asset by the Borrower or any Qualified Property Owner, *to* the extent required pursuant to Section 7.05(e) below, a proforma Compliance Certificate signed by a Responsible Officer of the Borrower demonstrating that, upon the consummation of such Disposition, Borrower will be in full compliance with all of the Financial Covenants.

       The Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "Borrower Materials") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "Platform") and (b) certain of the Lenders may be "public-side" Lenders (*i.e.,* Lenders that do not wish to receive material non-public information with respect to the Borrower or its securities) (each, a "Public Lender"). The Borrower hereby agrees that (w) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, and the Lenders to treat such Borrower Materials as either publicly available information or not containing any material non-public information with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.07); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Investor;" and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Investor."

    6.03   **Notices.**  Promptly notify the Administrative Agent:

       (a)    of the occurrence of any Default of which it has knowledge;

       (b)    of any matter of which it has knowledge that has resulted or could reasonably be expected to result in a Material Adverse Effect, including (i) breach or non-performance of, or any default under, a Contractual Obligation of the Borrower or any Qualified Property Owner; (ii) any dispute, litigation, investigation, proceeding or suspension between the Borrower or any Qualified Property Owner and any Governmental Authority; or (iii) the commencement of, or any material development in, any litigation or proceeding affecting the Borrower or any Qualified Property Owner, including pursuant to any applicable Environmental Laws;

       (c)    of the occurrence of any ERISA Event;

(d)     of any material change in accounting policies or financial reporting practices by Borrower or any Qualified Property Owner; and

(e)     of the determination by the Registered Public Accounting Firm providing the opinion required under Section 6.01(a)(ii) (in connection with its preparation of such opinion) or the Borrower's determination at any time of the occurrence or existence of any Internal Control Event.

Each notice pursuant to this Section 6.03 shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto. Each notice pursuant to Section 6.03(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

6.04    **Payment of Obligations**.  Pay and discharge as the same shall become due and payable, all its obligations and liabilities, including (a) all tax liabilities, assessments and governmental charges or levies upon it or its properties or assets (including all Assets), unless the same are being contested in good faith by appropriate proceedings diligently conducted and adequate reserves in accordance with MCBA are being maintained by the Borrower or such Qualified Property Owner; (b) all lawful claims which, if unpaid, would by law become a Lien upon its property (including any Qualified Property); and (c) all Indebtedness, as and when due and payable, but subject to any subordination provisions contained in any instrument or agreement evidencing such Indebtedness.

6.05    **Preservation of Existence, Etc**.  (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization except in a transaction permitted by Section 7.04 or 7.05; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business; and (c) preserve or renew all of its registered patents, trademarks, trade names and service marks (if any).

6.06    **Maintenance of Properties**.

(a)     Maintain, preserve and protect all of its Properties (including each Qualified Property) and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted;

(b)     make all necessary repairs thereto and renewals and replacements thereof; and

(c)     use the standard of care typical in the industry in the operation and maintenance of its properties.

6.07    **Maintenance of Insurance**.   Maintain (or cause to be maintained) with financially sound and reputable insurance companies reasonably acceptable to Administrative Agent which are not Affiliates of the Borrower, insurance with respect to its properties (including each Qualified Property) and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such

amounts as are customarily carried under similar circumstances by such other Persons and providing for not less than thirty (30) days' prior notice to the Administrative Agent of termination, lapse or cancellation of such insurance. Pay all insurance premiums prior to the due date thereof.

6.08    **Compliance with Laws**.  Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property (including each Qualified Property), except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; or (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

6.09    **Books and Records**.  (a) Maintain proper books of record and account, in which full, true and correct entries in conformity with MCBA consistently applied shall be made of all financial transactions and matters involving the assets and business of the Borrower or such Subsidiary, as the case may be; and (b) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Borrower or such Qualified Property Owner, as the case may be.

6.10    **Inspection Rights**.  Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties (including each Qualified Property), to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable prior notice to the Borrower; provided, however, that when an Event of Default exists the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and without advance notice.

6.11    **[Reserved]**

6.12    **Additional Subsidiaries**.  Notify the Administrative Agent at the time that any Person becomes a Subsidiary of Borrower or of any Qualified Property Owner.

6.13    **Conduct of Business**.

Continue at all times to engage in a business of the same general type as conducted by it on the date of this Agreement, investing its funds principally in Qualified Property Owners and Qualified Properties. At all times, the Borrower's management of its assets shall be conducted in a manner consistent with sound investment practices.

6.14    **Indemnification Against Payment of Brokers' Fees**.

Defend, indemnify and save harmless Administrative Agent and Lenders from and against any and all liabilities, damages, penalties, costs, and expenses, relating in any manner to any brokerage or finder's fees in respect of the Loan if the same are attributable to any communication or action of any Loan Party or any of their Affiliates.

6.15    **Environmental Compliance and Indemnity**.

(a)    Use all reasonable efforts to keep all property owned or operated by it or owned by any Qualified Property Owner (including each Property), free of Hazardous Materials (except customary materials in small amounts used in normal operations of properties similar to the applicable Property and in compliance with all applicable Environmental Laws) and comply with all applicable Environmental Laws. Borrower shall not use any property, and shall not cause or knowingly permit the use of any property, including any property that is owned or operated by any Qualified Property Owner, to generate, manufacture, refine, transport, treat, store, handle, dispose of, transfer, or produce Hazardous Materials and shall not cause or knowingly permit, as a result of any act or omission on the part of the Borrower or any Qualified Property Owner or any occupant, tenant, subtenant or invitee or licensee, the installation, use, storage, release, disposal or handling of Hazardous Materials on any property, including any property owned or operated by any Qualified Property Owner or Borrower, or cause or knowingly permit the installation, use, storage, release, disposal or handling of Hazardous Materials on any property, including any property owned or operated by any Qualified Property Owner, except, in each case, in compliance with all then applicable Environmental Laws. Borrower shall undertake promptly and pursue diligently to completion appropriate action necessary to address any release of Hazardous Materials on, upon, from or into any property, including any property that is owned or operated by any Qualified Property Owner.

(b)    Defend, indemnify and hold the Administrative Agent and each Lender and their respective successors and assigns, and the employees, agents, officers and directors of each of the foregoing, harmless from and against any and all claims, demands, judgments, fines, penalties (civil or criminal), damages, actions, causes of action, injuries, settlements, administrative orders, consent agreements and orders, liabilities, costs and expenses of whatever kind or nature (including, without limitation, cleanup costs, reasonable consultant's fees and disbursements and laboratory fees and attorneys' fees) related to or arising at any time or from time to time directly or indirectly from, out of or by reason of any of the following:

(i)    the presence, disposal, escape, seepage, leakage, spillage, discharge, emission, release or threat of release of any Hazardous Materials at, over, on, under or from or affecting any property, including any property owned or operated by any Qualified Property Owner, regardless of its origin;

(ii)    non-compliance with any Environmental Laws with respect to Hazardous Materials applicable to the Borrower, any Qualified Property Owner, its businesses, operations, property, assets or equipment, or resulting from the exercise by the Administrative Agent of any right under the Loan Documents or applicable law;

(iii)    any personal injury (including, without limitation, wrongful death, disease or other health condition related to or caused by, in whole or in part, any Hazardous Materials) or property damage (real or personal) arising out of or related to any Hazardous Materials of whatever origin in, on, over, under, from or affecting any property, including any property owned or operated by any Qualified Property Owner, or any part thereof, whether or not disclosed by any environmental report;

(iv)    any action, suit or proceeding brought or threatened by or settlement reached with any Governmental Authority or any other Person, or order of any Governmental Authority relating to such Hazardous Material (whether or not disclosed by any environmental report);

(v)    any violation of the provisions, covenants, representations or warranties of this Agreement or of any Environmental Laws which is in any way related to any Hazardous Materials in, on, over, under, from or affecting any property, including any property that is owned or operated by any Qualified Property Owner, or any part thereof, including, without limitation, the cost of any work performed and materials furnished in order to comply therewith (whether or not disclosed by any environmental report) or to enforce the provisions of this Section 6.15, including, without limitation, the cost of assessment, containment and/or removal, to the extent required by applicable Environmental Laws, of any and all Hazardous Materials on any surrounding areas, the cost of any actions, to the extent required by applicable Environmental Laws, taken in response to the presence, release or threat of release of any Hazardous Materials on, in, under or affecting any portion of any property, including any property that is owned or operated by any Qualified Property Owner, or any surrounding areas, to prevent or minimize such release or threat of release so that it does not migrate or otherwise cause or threaten danger to present or future public health, safety, welfare or the environment, and costs incurred to comply with applicable Environmental Laws in connection with all or any portion of any property, including any property that is owned or operated by any Qualified Property Owner, or any surrounding areas; and/or

(vi)    any act or omission of the Borrower or any Qualified Property Owner, or any owner, operator, manager or receiver of a property, including any property that is owned or operated by any Qualified Property Owner, their respective officers, employees, agents, contractors, invitees or licensees giving rise to liability under any Environmental Laws;

*provided, however,* that the Borrower's obligation to defend under this Section 6.15 shall include the right to assert in good faith any defense available under Environmental Laws; and ***provided, further,*** that indemnification shall not apply with respect to any Person to any matter to the extent such matter is determined to have been caused by such Person's own gross negligence or willful misconduct.

(c)    The Obligations of the Borrower under this Section 6.15, notwithstanding anything contained in this Agreement or in any other document or agreement which may be construed to the contrary, shall survive the repayment of the Loan and the termination and/or discharge of the Notes and other Loan Documents (specifically including the discharge of any QPO Security Documents with respect to any specific Qualified Property).

(d)    Any reasonable sums expended or incurred by the Administrative Agent or any Lender to cure any breach or default by the Borrower under the provisions of this Section 6.15 shall be due and payable within ten (10) days after receipt of an invoice therefor with interest at the Default Rate.

6.16    **Approved Appraisals**.

Within ten (10) Business Days after Borrower's receipt thereof, Borrower shall submit to Administrative Agent (which shall forward copies to Lenders) the most recent Independent Appraisal for each Qualified Property (or for each Property being submitted by borrower for approval as a Qualified Property) that Borrower has obtained. Each such Independent Appraisal that is approved and accepted by the Required Lenders, together with each Independent Appraisal that has been approved and accepted by Required Lenders in connection with the closing of the Loan, is referred to herein as an "Approved Appraisal".

6.17    **Further Assurances**.

At Administrative Agent's request, promptly execute and deliver or cause to be executed and delivered to Administrative Agent any and all documents, instruments and agreements reasonably deemed necessary by Administrative Agent to give effect to or carry out the terms or intent of this Agreement or any of the other Loan Documents.

6.18    **Cooperation with Syndication**.

Assist Bank of America in achieving timely sales of portions of the Loan (whether via syndication or the sale of participation interests), which assistance will be accomplished by a variety of means including direct contact between officers and advisers of the Borrower and any proposed participants or Lenders. Borrower shall provide, and shall cause its advisers and each Qualified Property Owner to provide, all reasonable information deemed appropriate by Administrative Agent in order to accomplish such a sale or sales of interests in the Loan. In connection with the above, Borrower will not be required to make any certifications not otherwise provided for in this Agreement and Borrower will not be required to incur any material expense.

6.19    **[Reserved]**

6.20    **Lost Notes, etc.**

Upon receipt of an affidavit of an officer of any Lender as to the loss, theft, destruction or mutilation of any Note (or of any other Loan Document which is not of public record), Borrower will issue, in lieu thereof, a replacement Note or replacement other Loan Document in the same principal amount and otherwise of like tenor and identical in all respects.

6.21    **Bank Accounts; Deposit of Proceeds**.

(a)    Maintain all of its checking, depository and other "bank" accounts with Administrative Agent. All cash proceeds resulting from the operations of Borrower and the Qualified Property Owners shall be deposited in one or more segregated accounts at Administrative Agent.

(b)    Administrative Agent and Lenders are hereby authorized, on or after the due date, to charge such accounts, or any other deposit account of Borrower at Administrative Agent or at any Lender, with the amount of all payments due under this Agreement, the Notes or the other Loan Documents.  The failure of Administrative Agent or any Lender to so charge any such account shall not affect or limit Borrower's obligation to make any required payment.

(c)       Notwithstanding anything set forth herein to the contrary, including Sections 6.21(a) and 6.21(b) hereof, the Cash Infusion shall be maintained in a separate bank account, which shall not be subject to any Liens, controls, restrictions, or monitoring by the Administrative Agent or the Lenders.

6.22    **[Reserved]**

6.23    **Insurance Proceeds and Condemnation Awards**.

Promptly pay to Administrative Agent, all insurance proceeds payable with respect to any Qualified Property and all condemnation awards and all other payments in lieu of condemnation awards or in any way related to condemnation awards payable with respect to any Qualified Property; which funds will be either (i) applied by Administrative Agent to the then outstanding Obligations (in such order as Administrative Agent may deem appropriate), or (ii) if Administrative Agent, in its sole discretion, shall deem it appropriate, be released to Borrower or the respective Qualified Property Owner for restoration of the Qualified Property in question on such terms and subject to such conditions as Administrative Agent may deem appropriate.

## ARTICLE VII.
## NEGATIVE COVENANTS

So long as the Loan or other Obligations hereunder shall remain unpaid or unsatisfied, the Borrower shall not, nor shall it permit any Qualified Property Owner to, directly or indirectly:

7.01    **Liens.**  Create, incur, assume or suffer to exist any Lien upon any of its property (including any Qualified Property), assets (including any Assets) or revenues, whether or not related to the Qualified Properties, and whether now owned or hereafter acquired, or upon the proceeds or products thereof, other than the following:

(a)       Liens pursuant to any Loan Document;

(b)       Liens subordinate to the Liens granted pursuant to the Loan Documents with respect to any Indebtedness described in Section 7.03(c) below;

(c)       Liens for taxes not yet due or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with MCBA;

(d)       carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which (a) are not overdue for a period of more than 30 days, or (b) are being contested in good faith and by appropriate proceedings diligently conducted if adequate reserves with respect thereto are maintained on the books of the applicable Person and (c) if required by Required Lenders, are discharged or dissolved by bond within ten (10) days after notice from Administrative Agent;

(e)    pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(f)    deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(g)    easements, rights-of-way, restrictions and other similar encumbrances affecting real property which, in the aggregate, are not substantial in amount, and which do not in any case materially detract from the value of the property subject thereto or materially interfere with the use of the property in question in the ordinary conduct of the business of the owner thereof; and which matters (i) do not individually or in the aggregate have a Material Adverse Effect, and (ii) do not make such property unmarketable by the conveyancing standards in effect where such real property is located; and

(h)    Liens securing Indebtedness permitted under Section 7.03(d); provided that (i) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and (ii) the Indebtedness secured thereby does not exceed the cost or fair market value, whichever is lower, of the property being acquired on the date of acquisition.

7.02    **Investments**.  Make any Investments, except:

(a)    Investments held by the Borrower or such Qualified Property Owner in the form of cash or Cash Equivalents Investments;

(b)    Investments of the Borrower in any Subsidiary that is a Qualified Property Owners; and

(c)    Investments by Qualified Property Owners in Qualified Properties.

7.03    **Indebtedness**.  Create, incur, assume or suffer to exist any Indebtedness (including any Guarantee or other contingent obligations), whether secured or unsecured, either directly or as a guarantor, except:

(a)    Indebtedness under the Loan Documents;

(b)    Unsecured Indebtedness incurred in the ordinary course of business (e.g. for operating expenses and capital improvements) and (ii) intercompany loans which are subordinate to the Obligations;

(c)    Secured Indebtedness that is subordinate to the Obligations hereunder, including the Sub-Debt Facility (as defined in the Plan of Reorganization); and

(d)    Indebtedness in respect of capital leases and purchase money obligations for fixed or capital assets within the limitations set forth in Section 7.01(h); provided, <u>however</u>,

that the aggregate amount of all such Indebtedness at any one time outstanding shall not exceed $200,000.

7.04    **Fundamental Changes.**    Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that, so long as no Default exists or would result therefrom:

(a)    any Qualified Property Owner may merge with (i) the Borrower, <u>provided</u> that the Borrower shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries, <u>provided</u> that when any Wholly Owned Subsidiary is merging with another Subsidiary, a Wholly Owned Subsidiary shall be the continuing or surviving Person; and

(b)    any Qualified Property Owner may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to the Borrower or to another Subsidiary or as otherwise permitted under <u>Section 7.05(e)</u>; provided that if the transferor in such a transaction is a Wholly Owned Subsidiary, then the transferee must either be the Borrower or a Wholly Owned Subsidiary.

7.05    **Dispositions.**    Make any Disposition or enter into any agreement to make any Disposition, except:

(a)    (i) Dispositions of obsolete or worn out personal property, whether now owned or hereafter acquired, and (ii) leases of Qualified Properties, in each case in the ordinary course of business;

(b)    Dispositions of equipment or other personal property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property, (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such replacement property or (iii) such Dispositions do not exceed, in the aggregate, $200,000, in each fiscal year;

(c)    Dispositions of property by any Qualified Property Owner to the Borrower or to a Wholly Owned Subsidiary; provided that if the transferor of such property is a Wholly Owned Subsidiary, the transferee thereof must either be the Borrower or a Wholly Owned Subsidiary;

(d)    Dispositions permitted by <u>Section 7.04</u>;

(e)    Dispositions of Assets by the Borrower and any Qualified Property Owner not otherwise permitted under this <u>Section 7.05</u>; provided that (i) at the time of such Disposition, no Default shall exist or would result from such Disposition, (ii) upon the consummation of such Disposition, Borrower shall be in full compliance with the Financial Covenant and all of its other Obligations under the Loan Documents and (iii) prior to the consummation of such Disposition, Borrower shall have submitted to Administrative Agent a proforma Compliance Certificate demonstrating that upon the consummation of such Disposition, Borrower shall be in full compliance with the Financial Covenant

(f)    Dispositions made pursuant to, and in compliance with, the terms and conditions set forth in Section 1.14 hereof.

provided, however, that any Disposition pursuant to clauses (a) through (e) shall be for fair market value.

7.06    **Restricted Payments.**    Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interests, except that, so long as any such Restricted Payment does not constitute an Improper Restricted Payment the Borrower and Qualified Property Owners may make Restricted Payments to and among one another.:

7.07    **Change in Nature of Business.**    Engage in any line of business substantially different from those lines of business conducted by the Borrower and the Qualified Property Owners on the date hereof or any business related or incidental thereto.

7.08    **Transactions with Affiliates.**    Enter into any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Borrower or such Qualified Property Owner as would be obtainable by the Borrower or such Qualified Property Owner at the time in a comparable arm's length transaction with a Person other than an Affiliate of a Loan Party.

7.09    **Burdensome Agreements.**    Except with respect to Indebtedness permitted under Section 7.03(c), enter into any Contractual Obligation (other than this Agreement or any other Loan Document) that (a) limits the ability (i) of Borrower or any Qualified Property Owner to make Restricted Payments or of Borrower or any Qualified Property Owner to otherwise transfer property to the Borrower, (ii) of any Qualified Property Owner to Guarantee the Indebtedness of the Borrower or (iii) of the Borrower or any Qualified Property Owner to create, incur, assume or suffer to exist Liens on property of such Person; provided, however, that this clause (iii) shall not prohibit any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under Section 7.03(d) solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness; or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.

7.10    **Cash Infusion Funds.**    Use the Cash Infusion in a manner inconsistent with the Cash Infusion Waterfall.

7.11    **Financial Covenant.**    Debt Yield.    Permit the Debt Yield on any quarterly Calculation Date to be less than 10%.  In the event that the Debt Yield is less than 10% on any quarterly Calculation Date, the Borrower shall either (i) make a payment on the outstanding principal amount of the Loan, or (ii) add Assets to the Asset Pool, in either event, sufficient to maintain a Debt Yield of no less than 10%.

7.12    **Capital Expenditures**.    Make or become legally obligated to make any expenditure in respect of the purchase or other acquisition of any fixed or capital asset (excluding normal replacements and maintenance which are properly charged to current operations), except for capital expenditures in the ordinary course of business not exceeding, in

the aggregate for the Borrower and any Qualified Property Owner during each fiscal year, the amount set forth in the annual capital expenditure budget for such fiscal year furnished by Borrower pursuant to Section 6.01.

    7.13    **Off-Balance Sheet Arrangements and Synthetic Lease Obligations**.

    Create, incur, assume or suffer to exist any Off-Balance Sheet Arrangements or any Synthetic Lease Obligations.

**ARTICLE VIII.**
**EVENTS OF DEFAULT AND REMEDIES**

    8.01    **Events of Default.**  Any of the following shall constitute an Event of Default:

    (a)    Non-Payment. The Borrower or any other Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of the Loan, or (ii) within five (5) days after the same becomes due, any interest on any Loan, or any fee due hereunder, or (iii) within ten (10) days after the same becomes due, any other amount payable hereunder or under any other Loan Document; or

    (b)    Specific Covenants.  The Borrower fails to perform or observe any term, covenant or agreement contained in any of Section 6.01, 6.02, 6.03, 6.05, 6.10, 6.12, 6.13 or 6.19 or Article VII; or

    (c)    Other Defaults.  Any Loan Party fails to perform or observe any other covenant or agreement (not specified in subsection (a) or (b) above) contained in any Loan Document on its part to be performed or observed and such failure continues for thirty (30) days after the first to occur of (i) the receipt by such Loan Party of written notice from Administrative Agent of such failure or (ii) the date when such Loan Party otherwise acquires actual knowledge of such failure; or

    (d)    Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading when made or deemed made; or

    (e)    Cross-Default. The Borrower or any Qualified Property Owner (i) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) in respect of any Indebtedness or Guarantee (other than Indebtedness hereunder) having an aggregate principal amount (including undrawn committed or available amounts) of more than $1,000,000, or (ii) fails to observe or perform any other agreement or condition relating to any such Indebtedness or Guarantee or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or

64

redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or

(f)        Insolvency Proceedings, Etc. Any Loan Party institutes or consents to the institution of any proceeding under any Debtor Relief Law, or makes an assignment for the benefit of creditors; or applies for or consents to the appointment of any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer for it or for all or any material part of its property; or any receiver, trustee, custodian, conservator, liquidator, rehabilitator or similar officer is appointed without the application or consent of such Person and the appointment continues undischarged or unstayed for 60 calendar days; or any proceeding under any Debtor Relief Law relating to any such Person or to all or any material part of its property is instituted without the consent of such Person and continues undismissed or unstayed for 60 calendar days, or an order for relief is entered in any such proceeding; or

(g)        Inability to Pay Debts; Attachment.  (i) The Borrower or any Qualified Property Owner becomes unable or admits in writing its inability or fails generally to pay its debts as they become due, or (ii) any writ or warrant of attachment or execution or similar process is issued or levied against all or any material part of the property of any such Person (including, without limitation, any Qualified Property Owner Equity Interest or any Qualified Property) and is not released, vacated or fully bonded within 30 days after its issue or levy; or

(h)        Judgments.  There is entered against the Borrower or any Subsidiary (i) one or more final judgments or orders for the payment of money in an aggregate amount (as to all such judgments or orders) exceeding the Threshold Amount (to the extent not covered by independent third-party insurance as to which the insurer does not dispute coverage), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order, or (B) there is a period of ten (10) consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect; or

(i)        ERISA.  (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of the Borrower under Title IV of ERISA to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of the Threshold Amount, or (ii) the Borrower or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of the Threshold Amount; or

(j)        Invalidity of Loan Documents.  Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document; or

(k)     <u>Change of Control</u>.  There occurs any Change of Control; or

(l)     <u>Change of Ownership</u>.   There occurs any sale, transfer, exchange, assignment, pledge of or grant of any security interest in or other Disposition of any Equity Interests in Borrower except for Permitted Ownership Transfers; or

(m)     <u>Intentionally Omitted</u>.

8.02    **Remedies Upon Event of Default**.  If any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders, take any or all of the following actions:

(a)     declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

(b)     exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents; provided, however, that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Borrower under the Bankruptcy Code of the United States, the obligation of each Lender to make Loans shall automatically terminate, the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, without further act of the Administrative Agent or any Lender.

8.03    **Application of Funds.**  After the exercise of remedies provided for in <u>Section 8.02</u> (or after the Loans have automatically become immediately due and payable as set forth in the proviso to <u>Section 8.02</u>), any amounts received on account of the Obligations shall be applied by the Administrative Agent in the following order:

<u>First</u>, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and amounts payable under <u>Article III</u>) payable to the Administrative Agent in its capacity as such;

<u>Second</u>, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders (including fees, charges and disbursements of counsel to the respective Lenders (including fees and time charges for attorneys who may be employees of any Lender) and amounts payable under <u>Article III</u>), ratably among them in proportion to the amounts described in this clause <u>Second</u> payable to them;

<u>Third</u>, to payment of that portion of the Obligations constituting accrued and unpaid on the Loan and other Obligations, ratably among the Lenders in proportion to the respective amounts described in this clause <u>Third</u> payable to them;

<u>Fourth</u>, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders in proportion to the respective amounts described in this clause <u>Fourth</u> held by them; and

<u>Last</u>, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Borrower or as otherwise required by Law.

## ARTICLE IX.
## ADMINISTRATIVE AGENT

9.01    **Appointment and Authority**.

Each of the Lenders hereby irrevocably appoints Bank of America to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders and neither the Borrower nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions.

9.02    **Rights as a Lender.**  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

9.03    **Exculpatory Provisions.**  The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Administrative Agent:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), <u>provided</u> that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law; and

(c)    shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in <u>Sections 10.01 and 8.02</u>) or (ii) in the absence of its own gross negligence or willful misconduct. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent by the Borrower or a Lender.

The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in <u>Article IV</u> or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

9.04    **Reliance by Administrative Agent**.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

9.05    **Delegation of Duties.**  The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent.  The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

9.06    **Resignation of Administrative Agent.**  The Administrative Agent may at any time give notice of its resignation to the Lenders and the Borrower. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30

days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above; provided that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents (if any), the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 10.04 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

9.07    **Non-Reliance on Administrative Agent and Other Lenders.**    Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

9.08    **[Reserved]**

9.09    **Administrative Agent May File Proofs of Claim.**    In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on the Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

(a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loan and all other Obligations that are owing and unpaid and

to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under <u>Section 10.04</u>) allowed in such judicial proceeding; and

(b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same; and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under <u>Section 10.04.</u>

Nothing contained herein shall be deemed to authorize the Administrative Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender Issuer to authorize the Administrative Agent to vote in respect of the claim of any Lender in any such proceeding.

## ARTICLE X.
## MISCELLANEOUS

10.01    **Amendments, Etc.**  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or any other Loan Party therefrom, shall be effective unless in writing signed by the Required Lenders and the Borrower or the applicable Loan Party, as the case may be, and acknowledged by the Administrative Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided,</u> however, that no such amendment, waiver or consent shall:

(a)    postpone any date fixed by this Agreement or any other Loan Document for any payment (or mandatory prepayment) of principal, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under any other Loan Document without the written consent of each Lender directly affected thereby;

(b)    reduce the principal of, or the rate of interest specified herein on, the Loan, or (subject to clause (iv) of the second proviso to this <u>Section 10.01</u>) any fees or other amounts payable hereunder or under any other Loan Document, without the written consent of each Lender directly affected thereby; <u>provided</u>, however, that only the consent of the Required Lenders shall be necessary (i) to amend the definition of "Default Rate" or to waive any obligation of the Borrower to pay interest at the Default Rate or (ii) to amend any financial covenant hereunder;

(c)    change <u>Section 2.09</u> or <u>Section 8.03</u> in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender; or

(d)    change any provision of this Section or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender; and, provided further, no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document.  Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except that the Commitment of such Lender may not be increased or extended without the consent of such Lender.

10.02    **Notices; Effectiveness; Electronic Communication**.

(a)    Notices Generally.    Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopier as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i)    if to the Borrower, or the Administrative Agent, to the address, telecopier number, electronic mail address or telephone number specified for such Person on Schedule 10.02; and

(ii)    if to any other Lender, to the address, telecopier number, electronic mail address or telephone number specified in its Administrative Questionnaire.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices delivered through electronic communications to the extent provided in subsection (b) below, shall be effective as provided in such subsection (b).

(b)    Electronic Communications.    Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of

an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), <u>provided</u> that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)    <u>The Platform</u>. THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM.  In no event shall the Administrative Agent or any of its Related Parties (collectively, the "<u>Agent Parties</u>") have any liability to the Borrower, any Lender, or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; <u>provided</u>, however, that in no event shall any Agent Party have any liability to the Borrower, any Lender, or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)    <u>Change of Address; Etc</u>.  Each of the Borrower and the Administrative Agent may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the other parties hereto.  Each other Lender may change its address, telecopier or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent.  In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, telecopier number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)    <u>Reliance by Administrative Agent; and Lenders</u>.  The Administrative Agent, and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify the Administrative Agent, each Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower. All telephonic notices

to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent, and each of the parties hereto hereby consents to such recording.

10.03 **No Waiver; Cumulative Remedies.** No failure by any Lender, or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

10.04 **Expenses; Indemnity; Damage Waiver**.

(i) <u>Costs and Expenses</u>. The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent and its Affiliates (including the reasonable fees, charges and disbursements of counsel for the Administrative Agent), in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all recording, filing, title insurance and related costs reasonably incurred by Administrative Agent in connection with this Agreement, the Loan or the transactions contemplated hereby (including any note or mortgage taxes and all revenue stamps) payable on account of the execution or delivery of this Agreement, or the execution, delivery, issuance or recording of any of the other Loan Documents, or the creation of any of the Obligations hereunder, by reason of any existing or hereafter enacted federal or state statute, and (iii) all out-of-pocket expenses incurred by the Administrative Agent or any Lender (including the fees, charges and disbursements of any counsel for the Administrative Agent or any Lender), and shall pay all fees and time charges for attorneys who may be employees of the Administrative Agent or any Lender, in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section, or (B) in connection with the Loan made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Loan.

(b) <u>Indemnification by the Borrower</u>. The Borrower shall indemnify the Administrative Agent (and any sub-agent thereof), each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys who may be employees of any Indemnitee, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or by any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder, the consummation of the transactions contemplated hereby or thereby, or, in the case of the Administrative Agent (and any sub-agent thereof) and its Related Parties only, the administration

73

of this Agreement and the other Loan Documents, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property (including any Qualified Property) owned or operated by the Borrower or by any Qualified Property Owner, or any Environmental Liability related in any way to the Borrower or any Qualified Property Owner including any Qualified Property Owner, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)     Reimbursement by Lenders.    To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof), or any Related Party of any of the foregoing, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent), or such Related Party, as the case may be, such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent), or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity.

(d)     Waiver of Consequential Damages, Etc.    To the fullest extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and non-appealable judgment of a court of competent jurisdiction.

(e)     Payments.    All amounts due under this Section shall be payable not later than ten Business Days after demand therefor.

(f)  <u>Survival</u>.  The agreements in this Section shall survive the resignation of the Administrative Agent, the replacement of any Lender, and the repayment, satisfaction or discharge of all the other Obligations.

10.05  **Payments Set Aside**.  To the extent that any payment by or on behalf of the Borrower is made to the Administrative Agent, or any Lender, or the Administrative Agent, or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent, or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred, and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

10.06  **Successors and Assigns**.

(a)  <u>Successors and Assigns Generally</u>.  The provisions of this Agreement shall·be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Borrower nor any other Loan Party may assign or otherwise transfer any of its rights or obligations hereunder or under any other Loan Document without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an Eligible Assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (f) of this Section (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)  <u>Assignments by Lenders</u>.  Any Lender may at any time assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans (including for purposes of this subsection (b), participations in the Loan) at the time owing to it); <u>provided</u> that any such assignment shall be subject to the following conditions:

(i)  <u>Minimum Amounts</u>.

(A)    in the case of an assignment of the entire remaining amount of the assigning Lender's Loan at the time owing to it or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B)    in any case not described in subsection (b)(i)(A) of this Section, the principal outstanding balance of the Loan of the assigning Lender subject to each such assignment, determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date, shall not be less than $5,000,000 unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Borrower otherwise consents (each such consent not to be unreasonably withheld or delayed); provided, however, that concurrent assignments to members of an Assignee Group and concurrent assignments from members of an Assignee Group to a single assignee (or to an assignee and members of its Assignee Group) will be treated as a single assignment for purposes of determining whether such minimum amount has been met.

(ii)    Proportionate Amounts.  Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan;

(iii)    Required Consents.    No consent shall be required for any assignment except to the extent required by subsection (b)(i)(B) of this Section and, in addition:

(A)    the consent of the Borrower (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; and

(B)    the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required if such assignment is to a Person that is not a Lender, an Affiliate of such Lender or an Approved Fund with respect to such Lender.

(iv)    Assignment and Assumption.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount, if any, required as set forth in Schedule 10.06; provided, however, that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v)    No Assignment to Borrower.  No such assignment shall be made to the Borrower or any of the Borrower's Affiliates or Subsidiaries.

(vi)    No Assignment to Natural Persons.  No such assignment shall be made to a natural person.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the Eligible Assignee thereunder shall be a party to this Agreement and, to the

extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.01, 3.04, and 10.04 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Upon request, the Borrower (at its expense) shall execute and deliver a Note to the assignee Lender.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section.

(c)    Register. The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by each of the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice.  In addition, at any time that a request for a consent for a material or substantive change to the Loan Documents is pending, any Lender wishing to consult with other Lenders in connection therewith may request and receive from the Administrative Agent a copy of the Register.  Promptly following any Assignment hereunder, the Administrative Agent shall deliver to Borrower an updated Schedule 2.01 reflecting any changes therein.

(d)    Participations.  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement; provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent, the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, waiver or other modification described in the first proviso to Section 10.01 that affects such Participant.  Subject to subsection (e) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.01 and 3.04 to the same extent as if it were a Lender and had acquired its interest by

77

assignment pursuant to subsection (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 10.08</u> as though it were a Lender, provided such Participant agrees to be subject to <u>Section 2.09</u> as though it were a Lender.

(e)    <u>Limitations upon Participant Rights</u>.  A Participant shall not be entitled to receive any greater payment under <u>Section 3.01</u> or 3.04 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent. A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of <u>Section 3.01</u> unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with <u>Section 3.01(e)</u> as though it were a Lender.

(f)    <u>Certain Pledges</u>.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; <u>provided</u> that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)    <u>Electronic Execution of Assignments</u>.  The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

10.07  **Treatment of Certain Information; Confidentiality.**    Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, officers, employees, agents, advisors and representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or

(y) becomes available to the Administrative Agent, any Lender, or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower.

For purposes of this Section, "Information" means all information received from the Borrower or any Subsidiary relating to the Borrower or any Subsidiary or any of their respective businesses, other than any such information that is available to the Administrative Agent any Lender on a nonconfidential basis prior to disclosure by the Borrower or any Subsidiary, provided that, in the case of information received from the Borrower or any Subsidiary after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Each of the Administrative Agent and the Lenders acknowledges that (a) the Information may include material non-public information concerning the Borrower or a Subsidiary, as the case may be, (b) it has developed compliance procedures regarding the use of material non-public information and (c) it will handle such material non-public information in accordance with applicable Law, including Federal and state securities Laws.

10.08    **Right of Setoff.**  If an Event of Default shall have occurred and be continuing, each Lender, and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender, or any such Affiliate to or for the credit or the account of the Borrower against any and all of the obligations of the Borrower now or hereafter existing under this Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or any other Loan Document and although such obligations of the Borrower may be contingent or unmatured or are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender, and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender, or their respective Affiliates may have.  Each Lender agrees to notify the Borrower and the Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

10.09    **Interest Rate Limitation.**  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude

voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

10.10 **Counterparts; Integration; Effectiveness.** This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

10.11 **Survival of Representations and Warranties.**  All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

10.12 **Severability.**  If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

10.13 **Replacement of Lenders.**  If any Lender requests compensation under Section 3.04, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.01, or if any Lender is a Defaulting Lender, or if any other circumstance exists hereunder that gives the Borrower the right to replace a Lender as a party hereto, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.06), all of its interests, rights and obligations under this Agreement and the related Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment), provided that:

(a)     the Borrower shall have paid to the Administrative Agent the assignment fee specified in Section 10.06(b);

(b)     such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts);

(c)     in the case of any such assignment resulting from a claim for compensation under Section 3.04 or payments required to be made pursuant to Section 3.01, such assignment will result in a reduction in such compensation or payments thereafter; and

(d)     such assignment does not conflict with applicable Laws.  A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

10.14   **Governing Law; Jurisdiction; Etc.**

(a)     Substantial Relationship.  It is understood and agreed that all of the Loan Documents shall be deemed to have been executed and delivered in the State of Rhode Island which state the parties agree has a substantial relationship to the parties and to the underlying transactions embodied by the Loan Documents.

(b)     Governing Law.  This Agreement and, except as otherwise provided below in this Section 10.14(b), each of the other Loan Documents shall in all respects be governed, construed, interpreted, applied and enforced in accordance with the internal laws of the State of Rhode Island without regard to principles of conflicts of law.

Exceptions.  Notwithstanding the foregoing choice of law:

(i)     matters relating to (i) the creation, transfer, perfection, priority and enforcement of the liens on and security interests in the Properties or other assets situated in states other than Rhode Island, including by way of illustration, but not in limitation, actions for foreclosure, for injunctive relief, or for the appointment of a receiver, and (ii) the nature of the interest in a Property created, transferred or perfected; the method for foreclosure of the liens on a Property; the nature of the interest in real property that results from foreclosure and the manner and effect of recording or failing to record evidence of a transaction that transfers or creates an interest in real property, shall be governed by the laws of the state where the Property in question is situated;

(ii)     Administrative Agent and Lenders shall comply with applicable law in the state where the Property in question is situated to the extent required by the law of such jurisdiction in connection with the foreclosure of the security interests and liens created under the Mortgages and the other Loan Documents with respect to the Properties or any other assets situated in states other than Rhode Island ; and

(iii)     provisions of Federal law and the law of the state where the Property in question is situated shall apply in defining the terms Hazardous Materials, Environmental Laws applicable to the Property as such terms are used in this Credit Agreement and the other Loan Documents.

Nothing contained herein or any other provisions of the Loan Documents shall be construed to provide that the substantive laws of the states where the Properties are situated shall apply to any parties' rights and obligations under any of the Loan Documents, which, except as expressly provided in clauses (1), (2) and (3) of this Section 10.14(b), are and shall continue to be governed by the substantive law of the State of Rhode Island. In addition, the fact that portions of the Loan Documents may include provisions drafted to conform to the law of the states where the Properties are situated is not intended, nor shall it be deemed, in any way, to derogate the parties' choice of law as set forth or referred to in this Credit Agreement or in the other Loan Documents. The parties further agree that Administrative Agent and Lenders may enforce their rights under the Loan Documents including, but not limited to, their rights to sue the Borrower or to collect any outstanding indebtedness in accordance with applicable law.

(C)     SUBMISSION TO JURISDICTION.     TO THE FULLEST EXTENT PERMITTED UNDER APPLICABLE LAW, EACH PARTY HERETO HEREBY CONSENTS AND AGREES THAT THE BANKRUPTCY COURT SHALL HAVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES AMONG THE BORROWER, AND ONE OR MORE OF THE AGENT, AND THE LENDERS PERTAINING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; PROVIDED THAT THE ADMINISTRATIVE AGENT, THE LENDERS AND THE BORROWER ACKNOWLEDGE THAT ANY APPEAL FROM AN ORDER OR JUDGMENT OF THE BANKRUPTCY COURT MAY BE REQUIRED TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; PROVIDED FURTHER THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE THE ADMINISTRATIVE AGENT FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER IN FAVOR OF THE ADMINISTRATIVE AGENT. EACH PARTY HEREBY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR SUIT COMMENCED IN ANY SUCH COURT.

(d)     WAIVER OF VENUE.     EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (C) OF THIS SECTION.     EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(e)    SERVICE OF PROCESS.  EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 10.02.  NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

10.15  Waiver of Jury Trial.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.16  **No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated hereby, the Borrower acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) the credit facility provided for hereunder and any related arranging or other services in connection therewith (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document) are an arm's-length commercial transaction between the Borrower and its Affiliates, on the one hand, and the Administrative Agent, on the other hand, and the Borrower is capable of evaluating and understanding and understands and accepts the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents (including any amendment, waiver or other modification hereof or thereof); (ii) in connection with the process leading to such transaction, the Administrative Agent and the Arranger each is and has been acting solely as a principal and is not the financial advisor, agent or fiduciary, for the Borrower, any other Loan Party or any of their respective Affiliates, stockholders, creditors or employees or any other Person; (iii) the Administrative Agent has assumed or will assume an advisory, agency or fiduciary responsibility in favor of the Borrower or any other Loan Party with respect to any of the transactions contemplated hereby or the process leading thereto, including with respect to any amendment, waiver or other modification hereof or of any other Loan Document (irrespective of whether the Administrative Agent or the Arranger has advised or is currently advising the Borrower, any other Loan Party or any of their respective Affiliates on other matters) and neither the Administrative Agent has any obligation to the Borrower, any other Loan Party or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; (iv) the Administrative Agent and its respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, the other Loan Parties and their respective Affiliates, and neither the Administrative Agent nor the Arranger has any obligation to disclose any of such interests by virtue of any advisory, agency or fiduciary relationship; and (v) the

Administrative Agent has not provided and will not provide any legal, accounting, regulatory or tax advice with respect to any of the transactions contemplated hereby (including any amendment, waiver or other modification hereof or of any other Loan Document) and the Borrower has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate. The Borrower hereby waives and releases, to the fullest extent permitted by law, any claims that it may have against the Administrative Agent and the Arranger with respect to any breach or alleged breach of agency or fiduciary duty.

10.17  **USA PATRIOT Act Notice**.   Each Lender that is subject to the Act (as hereinafter defined) and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Loan Party that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the Act.

10.18  **Time of the Essence**.  Time is of the essence of the Loan Documents.

10.19  **Claims Against Administrative Agent or Lenders**.

(a)  <u>Borrower Must Notify</u>.  Neither Administrative Agent nor any Lender shall be in default under this Agreement, or under any other Loan Document, unless a written notice specifically setting forth the claim of Borrower shall have been given to Administrative Agent or such Lender within thirty (30) days after Borrower first had actual knowledge or actual notice of the occurrence of the event which Borrower alleges gave rise to such claim and Administrative Agent or such Lender does not remedy or cure the default, if any shall exist, with reasonable promptness thereafter.

(b)  <u>Remedies</u>.  If it is determined by the final order of a court of competent jurisdiction, which is not subject to further appeal, that Administrative Agent or any Lender breached any of their obligations under the Loan Documents and have not remedied or cured the same with reasonable promptness following notice thereof, Administrative Agent or such Lenders' responsibilities shall be limited to the payment of any actual, direct, compensatory damages sustained by Borrower as a result thereof.

(c)  <u>Limitations</u>.  In no event, however, shall Administrative Agent or any Lender be liable to Borrower or anyone else for other damages such as, but not limited to, indirect, speculative or punitive damages whatever the nature of the breach by Administrative Agent or any such Lender of their obligations under this Loan Agreement or under any of the other Loan Documents. In no event shall Administrative Agent or any such Lender be liable to Borrower or anyone else unless a written notice specifically setting forth the claim of Borrower shall have been given to Administrative Agent or any such Lender within the time period specified above.

10.20  **Entire Agreement**.   THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR

SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.


[Signatures on Following Pages.]


6946834.1

## **EXHIBIT A**

**Form of Assignment and Assumption**

## **EXHIBIT B**

**Form of Borrower Compliance Certificate**

# **EXHIBIT C**

## **Form of Promissory Note**

## **EXHIBIT D**

**Form of Property Owner and Property Qualification Certificate**

# **EXHIBIT E**

## **Form of Release Request**