**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SECURITY NATIONAL PROPERTIES | ) | Case No. 11-13277 (KG) |
| FUNDING III, LLC, *et al.*,[1] | ) | |
| | ) | Joint Administration |
| Debtors. | ) | **Hearing Date: March 18, 2013, at 9:30 a.m. ET** |
| | ) | **Obj. Deadline: March 11, 2013** |

**DEBTORS' (I) PRELIMINARY OBJECTION, PURSUANT TO 11 U.S.C. §
502(b)(1) AND FED. R. BANKR. P. 3007,  TO CLAIM NOS. 22-30, 120-128 AND
137 FILED BY BANK OF AMERICA, N.A., AS AGENT; AND (II) MOTION FOR
ENTRY OF AN ORDER, PURSUANT TO 11 U.S.C. §§ 105 AND 1126 AND FED.
R. BANKR. P. 3018(a), TEMPORARILY ALLOWING IN PART AND
DISALLOWING IN PART SUCH CLAIMS FOR VOTING PURPOSES**

The above-captioned debtors and debtors-in-possession (collectively, the
"Debtors"), by and through their undersigned counsel, hereby file: (i) this preliminary objection
(the "Preliminary Objection"), pursuant to section 502(b)(1) of title 11 of the United States Code
(as amended, the "Bankruptcy Code"), to proofs of claim numbers 22-30, 120-28 and 137
(collectively, the "Agent Claims") filed by Bank of America, N.A. ("Bank of America"), as
agent (the "Administrative Agent"), on behalf of itself and purportedly on behalf of the Senior
Lenders (as defined below); and (ii) this motion (the "Estimation Motion," and together with the
Preliminary Objection, the "Objection/Estimation Motion"), pursuant to sections 105(a) and
1126 of the Bankruptcy Code and Rule 3018(a) of the Federal Rules of Bankruptcy Procedure
(the "Bankruptcy Rules"), for entry of an order estimating, temporarily allowing in part and
temporarily disallowing in part the Agent Claims solely for the purpose of voting to accept or

---

[1] These jointly administered cases are those of the following debtors:  Security National
Properties Funding III, LLC (4558), ITAC 190, LLC (4378), Security National Properties
Funding, LLC (4037), Security National Properties Funding II, LLC (9204), Sequoia
Investments III, LLC (7204), Sequoia Investments V, LLC (5313), Sequoia Investments XIV,
LLC (1115), Sequoia Investments XV, LLC (3814), Sequoia Investments XVIII, LLC (6160),
and Security National Properties – Alaska, LLC (6563).  The mailing address for all of the
Debtors for the purpose of these cases is 3050 Westfork Drive, Baton Rouge, LA 70816.

reject the *Third Amended Joint Chapter 11 Plan Of Reorganization Of Security National Properties Funding III And Its Debtor Affiliates,* dated January 14, 2013 (D.I. 464) (as the same may be amended from time to time, the "Plan").  In support of this Objection/Estimation Motion, the Debtors also rely upon and incorporate the Declaration of John Piland (the "Piland Declaration"), filed contemporaneously herewith, and respectfully state as follows:

### PRELIMINARY STATEMENT[2]

1.      This Objection/Estimation Motion is necessary because the Administrative Agent appears to be advancing irreconcilable litigation positions that present a paradox for this Court in connection with the rapidly approaching hearing on confirmation of the Debtors' Plan and the Administrative Agent's Valuation and Stay Relief Motion (Piland Dec., Ex. C) now scheduled to commence on March 18, 2013 (the "March Hearing").   Per the Valuation/Scheduling Stipulation (**Exhibit A** hereto), for the upcoming March Hearing it is undisputed that the debt owed as of the Petition Date to the Senior Lenders under the Credit Agreement is fully secured on an aggregate basis by liens and mortgages encumbering the Debtors' 33 real estate Properties. Indeed, after maintaining for much of these proceedings that it was undersecured, the Administrative Agent now appears to be relying on this excess collateral value to press for allowance and payment of interest, default premiums, professional fees and disbursements, and charges that as of February 11, 2013, it alleged to be in excess of $██████.

2.      Yet, the Administrative Agent's continued prosecution of its request for relief from the automatic stay and its stated intention to oppose confirmation of the Plan appear to be premised, in large part, on the fiction that the Administrative Agent is the holder of substantial deficiency claims against each of the Property-owning Debtors by virtue of their respective obligations under guarantees provided in connection with the Credit Facility.  That is to say, the

---

[2] Capitalized terms not otherwise defined in this Preliminary Statement have the meanings ascribed to them elsewhere in this Objection/Estimation Motion.

Administrative Agent would have this Court ignore the realities that: (1) its claims, whether against SNPF III, as Borrower, or against the property-owning Debtors, as QPO Guarantors, are nothing more than different means of recovering on the same debt that was incurred under the Credit Facility; and (2) the Administrative Agent and Senior Lenders have more than enough collateral on an aggregate basis to fully satisfy the debt that was owed under the Credit Facility as of the commencement of these Chapter 11 Cases.

      3.     According to the Administrative Agent, the Debtors owed it and the Senior Lenders approximately $164,341,863.11 when these Chapter 11 Cases were filed on October 13, 2011. (Piland Dec., Ex. B)  Although for much of these Chapter 11 Cases, the Administrative Agent maintained that it was an undersecured creditor, the Administrative Agent now agrees that the Debtors' 33 commercial real estate Properties encumbered by its liens had an aggregate value of $166,365,000 as of the Petition Date and an aggregate value of $171,465,000 as of November 21, 2012.  The Administrative Agent also now further acknowledges that it and the Senior Lenders have the added protection of pledges by SNPF III of its membership interests in the Property-owning Debtors.  In short, even without considering the Debtors' working capital, the approximately $6,195,572 the Debtors have paid since the Petition Date to discharge property taxes encumbering the Properties the Administrative Agent claims as its collateral and the approximately $9,539,518.86 the Debtors have paid to the Administrative Agent pursuant to interim cash collateral orders entered since the Petition Date, it cannot be disputed that at all times during the pendency of these Chapter 11 Cases, the Administrative Agent has had more than adequate collateral to fully secure the liquidated obligations due and owing under the Loan Documents as of the Petition Date.

      4.     Against this backdrop, pursuant to its Valuation and Stay Relief Motion, the Administrative Agent still maintains that all but one of the eight Property-owning Debtors owes it a substantial deficiency claim.  Indeed, as set forth in Exhibit A to its Valuation and Stay Relief Motion (Piland Dec., Ex. C), the Administrative Agent alleged that the QPO Guarantor-Debtors together owed it deficiency claims in excess of **$65 million** even though as of its filing

of the Valuation and Stay Relief Motion it conceded that the liquidated prepetition indebtedness of the Debtors was not greater than $164,341,863.11 and alleged that the Properties had an aggregate value of $162,460,000.00. Under no accepted principle of mathematics did the following equation ever compute:

$$\begin{array}{r} \mathbf{\$162{,}460{,}000.00} \\ \underline{-\mathbf{\$164{,}341{,}863.11}} \\ \neq (\mathbf{\$65{,}000{,}000.00}) \end{array}$$

Correct Answer: ($1,881,863.11)

5.       Although the parties have now stipulated to Property values that definitively establish in connection with the March Hearing that the aggregate value of the Properties exceeds the debt owed under the Credit Facility as of the Petition Date, the Administrative Agent still appears to be pressing the strained position that, at least as to individual Property-owning Debtors, it is undersecured. Even were we to try the math again using the current stipulated Property values that the parties now agree will apply for the March Hearing, and calculating the purported deficiency claims across Debtors using the same formula that the Administrative Agent relied upon in Exhibit A to the Valuation and Stay Relief Motion, the Administrative Agent is thwarted by basic arithmetic:

$$\begin{array}{r} \mathbf{\$171{,}465{,}000.00} \\ \underline{-\mathbf{\$164{,}341{,}863.11}} \\ \neq (\mathbf{\$59{,}342{,}000.00}) \end{array}$$

Correct Answer: $7,123,136.89 excess Property value

In short, the Administrative Agent has stipulated to Property values that would make it now **oversecured** on an aggregate basis, but would have this Court accept the notion that it remains simultaneously **undersecured** as to seven of the eight QPO Guarantor-Debtors. As illustrated above and as explained below, the Administrative Agent's math simply does not work.

6.       Before proceeding further with this Objection/Estimation Motion, it may be helpful to pause and consider what likely has motivated the Administrative Agent to press such inconsistent and equitably unappealing arguments. The simple answer is that the Administrative Agent needs both of these mutually exclusive positions to be accepted by the Court in order to

4

have a chance at thwarting the Debtors' reorganization efforts. Were the Administrative Agent to abandon its dubious position that it can assert deficiency claims against each of the Debtors while simultaneously being oversecured on an aggregate basis, it would undermine its litigation strategy to use those deficiency claims to attempt to block the Debtors from confirming the Plan on a "cram down" basis pursuant to Section 1129(b) of the Bankruptcy Code. Thus, the Administrative Agent needs to hold on to these phantom deficiency claims as a cornerstone of its strategy to swamp the votes of the true Class 6 General Unsecured Creditors and prevent Class 6 from accepting the Plan by the requisite two-thirds in amount required by section 1126(c) of the Bankruptcy Code.

7.      At the same time, relying on Section 506(b) of the Bankruptcy Code, the Administrative Agent wants to soak up all of the excess collateral value to maximize its potential recovery for postpetition interest, default premiums, professional fees and disbursements, and other charges. Hence, the Administrative Agent continues to urge this Court not to look behind the proverbial curtain. Whereas, the Administrative Agent is employing a highly technical, and highly contorted, reading of the Loan Documents in an effort to maintain the illusion that it has deficiency claims in order to block confirmation the Plan, it no doubt prefers that the Court ignore any such deficiency claims when it comes to determining whether the Administrative Agent is entitled to postpetition interest and fees as an oversecured creditor under section 506(b) of the Bankruptcy Code. This it cannot do.

8.      This is the paradox created by the Administrative Agent's irreconcilably inconsistent positions that this Objection/Estimation Motion is, in part, intended to address. Consistent with the Plan, by this Objection/Estimation Motion, the Debtors request that for voting purposes, that the alleged deficiency claims of the Administrative Agent (and the Senior Lenders to the extent that they may later be determined to be the holders of separate claims) be disregarded. Instead, as against each Debtor, for voting purposes, the Administrative Agent

should be deemed to hold a single Class 2 Senior Lender Secured Claim.[3]  The claims of the Administrative Agent and the Senior Lenders (other than the aforementioned Class 2 Senior Lender Secured Claim(s)) should not be considered for voting on the Plan either as Class 3 Senior Lender Unsecured Claim(s) or as Class 6 General Unsecured Claim(s).

9.      The "single satisfaction" rule is a longstanding rule of law and equity holding that a claimant is entitled to recover only once on account of a claim.  Once a claimant is satisfied in full with respect to its losses, it cannot assert a second claim for those same losses.  This Hornbook principle remains alive and well in the Bankruptcy Code.  As recently reaffirmed by the Third Circuit, sections "502 and 506(a) [of the Bankruptcy Code] do not change the outcome that a creditor cannot collect more in total than it is owed." *Nuveen Mun. Trust v. WithumSmith+Brown, P.C.,* 692 F.3d 283, 296 (3d Cir. 2012) (Ambro, J.).  In sum, for reasons that are discussed herein, the Agent Claims should be disallowed in their entirety to extent that they seek duplicate recoveries for the same underlying debt that will be satisfied in full under the Plan.

10.      The Agent Claims, which consist of 19 largely identical proofs of claim filed by the Administrative Agent, are also objectionable for a host of additional reasons, including those that follow:

•      Ignoring the limitations of section 506(b) of the Bankruptcy Code, the Agent Claims seek to recover postpetition interest, fees and charges beyond the extent that such claims have been oversecured over the course of these Chapter 11 Cases.  Although the Administrative Agent and Senior Lenders now maintain that they are owed in excess of $███████ on account of postpetition non-default and default interest, professional fees and expenses and other charges,

---

[3] Because the Administrative Agent (or possibly the Senior Lenders) would be the only holders of that Class 2 Claim, the amount of the Class 2 Claim is unimportant for voting purposes in connection with the Plan.

the Property values the Administrative Agent has stipulated to for the March Hearing support recovery of, at most, a small fraction of that amount.

- Numerous equitable considerations, which ultimately dictate whether postpetition interest, fees, expenses and charges are recoverable under section 506(b) of the Bankruptcy Code, warrant the reduction and/or disallowance in part of the Agent Claims, including the following:

    o Since the Petition Date, the Administrative Agent has unilaterally converted the outstanding loans under the Credit Facility from "Eurodollar Rate" loans to "Base Rate", which the Administrative Agent asserts has resulted in an increase of the **non-default interest rate** from approximately 5.75% to 8.75%.  The Administrative Agent implemented this change in violation of established rate-setting procedures under the Credit Facility that the parties had followed for years before the Petition Date. Furthermore, it implemented this unilateral escalation of the non-default rate within then initial 30 days of these Chapter 11 Cases event though under established precedents interest was deemed to stop accruing upon the Debtors' bankruptcy filing and even though it would have no right to payment of postpetition interest until a plan of reorganization was confirmed and effective.  Moreover, for much of these Chapter 11 Cases – especially when it suited the Administrative Agent to do sue in furtherance of its Valuation and Stay Relief Motion and its objections to the Debtors' use of cash collateral – the Administrative Agent has directly asserted or at least implied that it was undersecured.  By unilaterally modifying the way non-default interest is calculated under the Credit Facility, the Administrative Agent has subjected the Debtors to approximately **$6.5 million** of additional interest obligations.

    o In addition to unilaterally increasing the non-default interest rate by nearly 300 basis points, the Administrative Agent has socked the Debtors with a 400 basis point Default Interest premium.  Under the circumstances of these Chapter 11 Cases, this 4.00% default interest does not serve the proper purpose of compensating the Administrative Agent and Senior lenders for any unforeseen risk and costs of collection.  As discussed herein, By April 2011, the

7

Administrative Agent and Senior Lenders had already increased the variable "Applicable Rate" on loans from its starting point of 1.50% to its current level of 5.50%. The record indicates that this 400 basis point increase in the non-default interest rate was principally designed to allow the Senior Lenders to receive all of the benefits of charging default interest without formally resorting to use of the Default Rate (and thereby the ability to impose the Default Rate later to enhance their recovery and leverage in these Chapter 11 Cases).

   o Moreover, as the debt has continued to trade since the Debtors have filed for bankruptcy, a significant portion of the debt has now been acquired by two holders, Banc of America Credit Products, Inc. ("BACP"), and Top Fund II, LLC ("Top Fund"), ███████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████ Under no circumstances can they claim not to have foreseen the likelihood of incurring additional collection risk and costs at the time of those transactions.

   o Moreover, the Administrative Agent and Senior Lenders have bound themselves through the Valuation/Scheduling Stipulation to Property values well in excess to the $164 million in obligations allegedly outstanding as of the Petition Date. Accordingly, none of the Senior Lenders was ever in material jeopardy of not being able to collect this debt.

   o The progress of these Chapter 11 Cases has been materially delayed for reasons that were beyond the Debtors' control, but well within the control of the Administrative Agent and its professionals. As discussed below, after inducing the Debtors to commit resources to a prolonged negotiation process with the Administrative Agent, five months into these Chapter 11 Cases, the Administrative Agent suddenly and without explanation to the Debtors dismissed its original bankruptcy counsel and terminated the employment of the workout banker who had been the Debtors' primary contact on the deal to that point. Had the Debtors known that the Administrative Agent would abandon advanced settlement discussions, the Debtors from the outset would have moved much more quickly to seek confirmation of a plan of reorganization. Under these circumstances, the Debtors should not have to bear the burden of the postpetition

interest, default premiums, professional fees and disbursements and other fees and charges that allegedly accrued during the first five months of these cases. Nor should the Debtors have to compensate the Administrative Agent for the cost of installing new lead bankruptcy counsel to represent it midway through these cases.

• Less than a week ago, the Administrative Agent disclosed to the Debtors that as of February 11, 2013, its various professionals have billed it for the eye-popping figure of $███████ in fees and expenses since the start of these Chapter 11 Cases. Piland Dec., Ex. D) A figure that large is almost presumptively unreasonable. Here, the inappropriateness of that figure is compounded by the fact that the Administrative Agent and Senior Lenders have made no effort to carry their burden to document such fees and expenses for the Debtors and this Court or to establish the reasonableness and necessity of such monumental professional fees and expenses. The portion of the Agent Claims attributable to such professional fees and expenses should be disallowed.

• A subset of Agent Claims consisting of 9 proofs of claim (identified as Claim Nos. 22 through 30) filed by the Administrative Agent on January 17, 2012 against each of the Debtors other than SNP-Alaska, should be disallowed because they have been amended and superseded by a substantially identical set of 9 proofs of claim (identified as Claim Nos. 120 through 128) the Administrative Agent filed against the same Debtors on March 1, 2012.

• The Agent Claims include a proof of claim against SNP-Alaska (identified as Claim No. 137) for all obligations under the Credit Facility, but the Administrative Agent has alleged no contractual or other basis upon which SNP-Alaska, which is neither a borrower or guarantor under the Credit Facility, would be liable for those debts.

11.    For all of the reasons set forth herein, the Debtors respectfully submit that the relief requested by this Objection/Estimation Motion should be granted.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157 and 1334. Venue is proper pursuant to 28 U.S.C. § 1408 and 1409.  The Debtors consent to the Court's entry of final orders and judgments with respect to this Preliminary Objection and Estimation Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## BACKGROUND

### A.  About the Debtors

13.     The Debtors, which are headquartered in Eureka, California, own and operate thirty-three office, multi-family residential, industrial, retail and mixed use properties located in Alabama, Alaska, Illinois, Kansas, Maine, Michigan, Minnesota, Mississippi, Montana, Nebraska, New York, North Carolina, South Carolina, Texas, and Wyoming (collectively, the "Properties").  In all, the Debtors own over more than four million square feet of property.

14.     In general, the Debtors have focused their business strategy on the acquisition of underperforming commercial assets and subsequent stabilization of these and other properties through aggressive leasing and cost-cutting measures.  As needed, the Debtors also have made capital improvements that further support the long-term value of their business and Properties.

15.     The Debtors acquired most of the Properties from 1993 through 2007.  The Debtors generally hold the Properties long-term; however, strategic sales also are pursued.

16.     The Properties are managed by Security National Properties Servicing Company, LLC ("SNP Servicing"), pursuant to that certain servicing agreement dated October 12, 2006, as amended from time to time, between SNP Servicing and the various Property-owning Debtors.

### B.  The Chapter 11 Cases

17.     The Commencement of the Chapter 11 Cases. On October 13, 2011 (the "Petition Date") each Debtor commenced with this Court a voluntary case under chapter 11 the Bankruptcy Code (collectively, the "Chapter 11 Cases"). The Debtors are authorized to operate

their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On October 18, 2011, the Court entered an Order (D.I. 21), pursuant to Bankruptcy Rule 1015(a) and Local Bankruptcy Rule 1015-1, authorizing the Chapter 11 Cases to be jointly administered for procedural purposes.

18.    Although approximately 186 proofs of claim (in addition to 19 proofs of claim filed by the Administrative Agent) would eventually be filed in these Chapter 11 Cases, no official committee of unsecured creditors was formed by the Office of the United States Trustee.

19.    <u>The Debtors' Efforts to Reach a Consensual Restructuring</u>.  One of the principal reasons the Debtors sought bankruptcy protection when they did was fear that the Administrative Agent was going to attempt to exercise remedies because it had broken off meaningful negotiations to restructure the prepetition debt.  The Debtors wanted what they then thought would be a brief breathing spell to stabilize their situation and try to reach a negotiated deal with the Administrative Agent and Senior Lenders.

20.    Since the Debtors were the last party to relay a restructuring proposal before the bankruptcy filing, almost immediately after these cases were commenced, the Debtors invited the Administrative Agent and Senior Lenders to respond to the Debtors' proposal or make a counter-proposal.  For example, John Piland, on behalf of the Debtors, had multiple conversations with representatives Alvarez & Marsal, which since the beginning of these Chapter 11 Cases has been the Administrative Agent's financial advisor, about moving forward with settlement discussions. Counsel for the Debtors also had multiple conversations with lawyers from Bryan Cave, which was then counsel to the Administrative Agent.

21.    After some back and forth, the Administrative Agent informed the Debtors that it was working on a counter-offer which would be transmitted in the near term.  The Administrative Agent finally shared a settlement term sheet with the Debtors on November 25, 2011, and with it invited further negotiations.  The Debtors produced revisions to the settlement term sheet and delivered it within two weeks thereafter on December 10, 2011.

22.     Thereafter, the Administrative Agent asked that the parties meet in person to negotiate over their remaining areas of disagreement.  Throughout January and into February, the Administrative Agent unilaterally adjourned this meeting several times to the increasing frustration of the Debtors.  On February 15, 2012, the Administrative Agent finally presented the Debtors with a second term sheet.  Within nine days, the Debtors provided comments to the Administrative Agent.

23.     In response, the Administrative Agent requested an in person settlement meeting to be held in New York, an invitation to which the Debtors were receptive.  The Debtors made multiple attempts to schedule this meeting with the Administrative Agent, but could never obtain final confirmation that it would go forward.  Finally, on or about March 1, 2012, the Administrative Agent stopped responding to the Debtors' inquiries.

24.     Approximately a week later, representatives of the Administrative Agent contacted the Debtors about obtaining information necessary to perform appraisals on the Properties, a request that suggested they were abandoning further settlement discussions and instead pursuing litigation.  The Debtors immediately inquired of the Administrative Agent's representatives about the information requests and their import.  Only then, on March 9, 2012, did the Debtors receive the stunning news that the Administrative Agent had dismissed both its original bankruptcy counsel and the workout banker who was the Debtors' primary point of contact within Bank of America in connection with the ongoing efforts to restructure the Credit Facility.  From that point forward, the Administrative Agent, acting through its new counsel Troutman Sanders LLP, adopted a significantly more aggressive litigation posture.

25.     Regrettably, whatever schism or other event at Bank of America or among Bank of America and/or the Senior Lenders that produced this dramatic change in approach effectively wasted several months of effort by the Debtors to reach a consensual resolution with the Administrative Agent and the Senior Lenders.  Had the Debtors been able to predict the future and known that the Administrative Agent would, after several months of negotiation, suddenly

pull back from the cusp of reaching a deal in such dramatic fashion, the Debtors never would have tolerated the more than four months of delay caused by the Administrative Agent.

26.    <u>The Plan, the Valuation and Stay Relief Motion and Other Contested Matters Currently Pending</u>.  On April 24, 2012, the Debtors filed the *Proposed Joint Chapter 11 Plan of Reorganization of Security National Properties Funding III, LLC and its Debtor Affiliates* (the "<u>Original Plan</u>") (D.I. 196) and an accompanying disclosure statement (D.I. 197).

27.    After the Debtors filed the Original Plan, Debtors requested the appointment of a mediator to help restart the parties' stalled restructuring discussions.  On May 15, 2012, the Court entered an Order (D.I. 220) appointing The Honorable Raymond T. Lyons of the United States Bankruptcy Court for the District of New Jersey as mediator.  Judge Lyons conducted in-person mediation sessions on June 26 and July 27, 2012, and made many more informal efforts over the next several months to try to bring the parties closer together on terms.

28.    Prior to the conclusion of the mediation, the Administrative Agent commenced an extensive litigation effort against the Debtors.  On July 24, 2012, the Administrative Agent filed the *Objection of Bank of America, N.A. to Disclosure Statement filed by Security National Properties Funding III, LLC and its Debtor Affiliates* (D.I. 269).   On that same day, the Administrative Agent objected (D.I. 270) to the Debtors' use of cash collateral.

29.    Just three days later, the Administrative Agent filed the *Motion of Bank of America, N.A. for (a) Valuation of Collateral and (b) Relief from the Automatic Stay* (D.I. 271) (the "<u>Valuation and Stay Relief Motion</u>"). (Piland Dec., Ex. C) In the Valuation and Stay Relief Motion, the Administrative Agent requests that the Court (i) grant it relief from the automatic stay proceed to enforce its rights and remedies against the Properties and (ii) value the Properties pursuant to section 506(a) of the Bankruptcy Code.

30.    In support of the Valuation and Stay Relief Motion, the Administrative Agent alleged, among other things, that (i) the Debtors lack equity in the Properties, (ii) the

Administrative Agent is undersecured by over **$65 million**,[4] and (iii) the Properties are not necessary for an effective reorganization of the Debtors.  The Debtors dispute these allegations, and will later file formal opposition to the Valuation and Stay Relief Motion.

31.    In connection with the Valuation and Stay Relief Motion, the Administrative Agent also alleged that accrued and unpaid non-default and default rate interest in the approximate amount of $20,285,512.25 was owed to it under the Credit Agreement. Additionally, as of approximately July 27, 2012, the Administrative Agent maintained that approximately $2,076,822.63 of expenses (including attorneys' fees, advisor fees and appraisal costs), fees and other charges were owing to it under the Credit Facility.

32.    On October 1, 2012, the Debtors filed with this Court the *Amended Joint Chapter 11 Plan of Reorganization of Security National Properties Funding III, LLC and its Debtor Affiliates* (D.I. 329) (the "Amended Plan") and an accompanying disclosure statement (D.I. 330).

33.    Following a hearing held on October 15, 2012, the Debtors made further revisions to the Amended Plan and accompanying disclosure statement.  On October 21, 2012, the Debtors filed the *Second Amended Joint Chapter 11 Plan of Reorganization of Security National Properties Funding III, LLC and its Debtor Affiliates* (the "Second Amended Plan"), and an accompanying disclosure statement (both docketed at D.I. 373).

34.    On October 31, 2012, the Court entered its Order (D.I. 382) (the "Disclosure Statement Order"), which, among other things, approved the disclosure statement for the Second Amended Plan as further modified and attached as Exhibit B to the Disclosure Statement Order (the "Disclosure Statement") and authorized the Debtors to commence solicitation of votes on

---

[4] The Administrative Agent arrives at this bizarre figure even though by its own calculations it and the Senior Lenders were owed not more than $164,341,863.11 under the Credit Agreement as of the Petition Date and even though by the Administrative Agent's own calculations its aggregate "Secured Position" was $155,776,500 and the Properties had an aggregate value of $162,460,000 (both of which figures exclude the Soup Lots Property that the Administrative Agent inexplicably then maintained was not part of its collateral package).

the Second Amended Plan as further modified and attached as Exhibit C to the Disclosure

Statement Order (the "Plan").

35.     The Disclosure Statement Order, at pp. 6-7, also established certain "Agent Claim

Procedures" to govern the voting of the Agent Claims (as defined below) in the event that the

Debtors filed objections thereto prior to the hearing on confirmation of the Plan. The Disclosure

Statement Order also specifically reserves the Debtors' right to raise matters and have them

adjudicated at the Confirmation Hearing:

> (iii) The Plan and this Order contemplate that objections and other issues
> relating to Agent Claims (e.g., objections to amount, secured status, and extent
> and value of Collateral) will be adjudicated at or in connection with the
> Confirmation Hearing and/or the hearing on the Stay Relief Motion. Accordingly,
> these Agent Claim Procedures are without prejudice to the later adjudication of
> such matters with respect to any Agent Claim, including, but not limited to, voting
> and distribution purposes under the Plan.

Disclosure Statement Order, at 7.[5]

36.     On December 10, 2012, in an effort to further streamline matters for the March

Hearing, the Debtors entered into the *Stipulation Between the Debtors and Bank of America,*

*N.A., Individually and as Administrative Agent, Regarding (I) Amended Scheduling Order and*

*(II) Certain Agreements Regarding Matters Established for Purposes of the Valuation and*

*Confirmation Hearing* (as amended from time to time, the "Valuation/Scheduling Stipulation"),

which the Court approved by Order, dated December 11, 2012 (D.I. 422), the scheduling aspects

of which have been subsequently amended and approved by Order, dated January 10, 2013 (D.I.

455).[6] Pursuant to the Valuation/Scheduling Stipulation, the Debtors and Administrative Agent

---

[5] This Preliminary Objection and Estimation Motion have been filed out of an abundance of
caution and without prejudice to the Agent Claims Procedures.  As set forth in part (iii) of the
Agent Claims Procedures, the Debtors are not required to file an objection or Rule 3018 motion
in advance of the Confirmation Hearing in order to preserve their ability to contest the Agent
Claims for voting and other purposes under the Plan.

[6] As of the date of filing of this Objection/Estimation Motion, the parties have reached an
agreement further amending the Valuation/Scheduling Stipulation and had submitted the
amended stipulation for Court approval (D.I. 496).

have agreed to values of the Debtors' 33 Properties for use in connection with the March Hearing. As stipulated by the parties, Debtors' 33 Properties had an aggregate value of $166,365,000 for the period from the Petition Date through November 20, 2012, and have an aggregate value of $171,465,000 from November 21, 2012, through the April 22, 2013.

37. On January 14, 2013, the Debtors filed the current Plan and the Plan Supplement containing, among other things, draft credit documents evidencing the New Senior Debt.

### C. Claims Administration

38. By Order, dated October 18, 2011 (D.I. 22), this Court authorized the retention and appointment of GCG, Inc., as claims, noticing and balloting agent in these Chapter 11 Cases (the "Claims Agent").

39. On January 6 and 7, 2012, each of the Debtors filed their schedules of assets and liabilities and statements of financial affairs (D.I. 100, 101, 102, 103, 104, 105, 106, 107, 108, and 109), and amended them on June 20, 2012 (D.I. 240, 241, 242, 243, 244, 245, 246, 247 and 249) (as amended, the "Schedules"). In their Schedules, the Debtors acknowledged the indebtedness owing to the Administrative Agent, but identified such claims as disputed.

40. On January 26, 2012, the Court entered the *Order Granting Debtors' Motion to Establish Bar Dates for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* (D.I. 139) (the "Bar Date Order"). The Bar Date Order fixed a general bar date of March 1, 2012, and a bar date for claims by governmental units of April 10, 2012 (together, the "Bar Dates"). Nothing in the Bar Date Order excused parties in interest from the obligation to file with any proof of claim a copy of any writing upon which its claim is based.

### D. The Bank of America Agented Pre-Petition Credit Facility

41. Debtor Security National Properties Funding III, LLC ("SNPF III") is the Borrower under a $200,000,000 revolving credit facility (the "Credit Facility") evidenced by that certain Credit Agreement, dated as of October 18, 2006 (as amended, the "Credit Agreement") (Piland Dec., Ex. A), among SNPF III and Bank of America, N.A. ("Bank of America"), as Administrative Agent (the "Administrative Agent"), Swing Line Lender and L/C Issuer, and

certain other lenders from time to time party thereto (the "Senior Lenders"). In connection with the Credit Agreement, certain subsidiaries of SNPF III (designated as "Qualified Property Owners" in the Credit Agreement and referred to herein as the "QPO Guarantors"), consisting of the Debtor entities that are the owners of the Properties (designated "Qualified Properties" in the Credit Agreement), have executed guarantees (referred to in the Credit Agreement as "QPO Guarantees") for the benefit of the Administrative Agent and the Senior Lenders. Security National Properties Holding Company, LLC ("SNPHC"), a non-debtor affiliate and the majority member of SNPF III, also executed and delivered a limited guaranty (the "Limited Guarantee").[7]

42.    The Administrative Agent asserts that it is the holder of valid, perfected and enforceable liens against the Qualified Properties.[8]

43.    Additionally, the Administrative Agent maintains that it is the holder of valid, perfected and enforceable pledges of SNPF III's membership interests in the QPO Guarantors.

**E.  The Pre-Petition and Post-Petition Claims of the Administrative Agent**

44.    Pursuant to the Credit Agreement, principal in the amount of $159,991,940.51 was outstanding on the Petition Date.

45.    On January 17, 2012, the Administrative Agent filed nine (9) identical proofs of claims (Claim Nos. 22 through 30 (the "January 17 Agent Claims")) against each of the Debtors other than Security National Properties-Alaska, LLC ("SNP-Alaska"). On March 1, 2012, the Administrative Agent filed nine (9) additional identical proofs of claim (Claim Nos. 120 through 128) (the "March 1 Agent Claims")) against each of the Debtors other than SNP-Alaska. Also on March 1, 2012, the Administrative Agent filed a proof of claim (Claim No. 137 (the "SNP-

---

[7] The Credit Agreement, associated Promissory Note, QPO Guarantees, the Limited Guarantee, collectively with all other documents, indemnities, and agreements delivered or executed in connection with or relating to the Credit Facility and all exhibits, amendments, modifications and supplements thereto are referred to herein as the "Loan Documents".

[8] Solely for the purpose of the March Hearing, the Debtors and the Administrative Agent have stipulated, among other things, that the Administrative Agent has valid, perfected and enforceable liens on the Properties. See Valuation/Scheduling Stipulation, ¶ 14.

Alaska Claim," and collectively with the January 17 Agent Claims and the March 1 Agent Claims, the "Agent Claims")) against SNP-Alaska even though that entity is not an obligor under the Credit Facility.

46.     Each of the Agent Claims is in substance identical, asserting a claim as of the Petition Date in the amount of $164,341,863.11, "plus unliquidated amounts . . . ." Each of the Agent Claims attaches a "Statement of Claim" describing only in general terms that the claims are for the Debtor's alleged obligations under the Loan Documents.  Further, each of the Agent Claims asserts that "[t]he Debtor's obligations under the Loan Documents are secured by duly perfected and first priority security interests in and liens against all or substantially all of the Debtor's property, as more particularly set forth in the Loan Documents."

47.     None of the Loan Documents or any evidence of perfection was attached to any of the Agent Claims.

## **RELIEF REQUESTED**

48.     By this Preliminary Objection, the Debtors object to the Agent Claims as follows:

(a)     The Agent Claims should be disallowed to the extent the Agent Claims seek duplicate recoveries for the same underlying debt that will be satisfied in full.

(b)     The Agent Claims should be disallowed to the extent that they seek to recover postpetition interest, fees and charges beyond the extent that the Administrative Agent and Senior Lenders are oversecured.

(c)     The Agent Claims should be disallowed to the extent that they include postpetition interest calculated using an Interest Rate premised on the Base Rate, rather than the Eurodollar Rate that was in use on the Petition Date.

(d)     The Agent Claims should be disallowed to the extent that they include amounts for postpetition default interest.

(e)     The Agent Claims should be disallowed to the extent that they include unreasonable or inadequately documented fees and expenses of attorneys and other professionals representing the Administrative Agent and/or Senior Lenders.

(f)     The Agent Claims should be disallowed to the extent that they include postpetition interest and the fees and expenses of attorneys and other professionals representing the Administrative Agent and/or Senior Lenders during the period from the Petition Date through March 9, 2012.

(g)    The January 17, 2012 Agent Claims (Claim Nos. 22 through 30) should disallowed as amended and superseded by the March 1, 2012 Agent Claims.

(h)    The SNP-Alaska Claim should be disallowed because SNP-Alaska is not a borrower, guarantor or otherwise obligated for the Credit Facility.

49.    Additionally, by this Estimation Motion, the Debtors request, pursuant to sections 105(a) and 1126 of the Bankruptcy Code and Bankruptcy Rule 3018(a), that the Court estimate and temporarily disallow in part the Agent Claims so that, for the purpose of voting on the Plan as Class 3 Senior Lender Unsecured Claim(s) or as Class 6 General Unsecured Claim(s), the Agent Claims are disallowed and valued at $0.00.

## BASIS FOR RELIEF REQUESTED

### I.    OBJECTIONS TO AGENT CLAIMS

50.    Pursuant to section 101 of the Bankruptcy Code, a creditor holds a claim against a bankruptcy estate only to the extent that (a) it has a "right to payment" for the asserted liabilities and (b) the claim is otherwise allowable.  11 U.S.C. §§ 101(5) and 101(10).

51.    As this Court recently explained, "[t]he burden of proof as to the validity of [a] claim shifts between the parties." *In re Landsource Communities, Dev't, LLC,* Case No. 08-11111 (KJC), --- B.R. ----, 2013 WL 149464, at *5 (Bankr. D. Del. Jan. 11, 2013).  When asserting a claim against a bankrupt estate, a claimant must allege facts that, if true, would support a finding that the debtor is legally liable to the claimant.  *See In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173 (3d Cir. 1992); *In re Int'l Match Corp.,* 69 F. 2d 73, 76 (2d Cir. 1934) (finding that a proof of claim should at least allege facts from which legal liability can be seen to exist); *Landsource,* 2013 WL 149464, at *5.  Where the claimant alleges sufficient facts to support its claim, its claim is afforded prima facie validity.  *Allegheny Int'l, Inc.,* 954 F.2d at 173.  A party wishing to dispute such a claim must produce evidence in sufficient force to negate the claim's prima facie validity.  *Id.*  In practice, the objecting party must produce evidence that would refute at least one of the allegations essential to the claim's legal sufficiency. *Id.* at 173-74.  Once the objecting party produces such evidence, the burden shifts back to the claimant to prove the

validity of his or her claim by a preponderance of the evidence. *Id.* at 174.   The burden of persuasion is always on the claimant.   *Id.*

52.     For the reasons that follow, the Agent Claims should be reduced and disallowed, in part.

### A. The Agent Claims Should Be Disallowed To The Extent They Seek Duplicate Recoveries For The Same Underlying Debt That Will Be Satisfied In Full Pursuant To The Plan.

53.     As recently reaffirmed by the Third Circuit, sections "502 and 506(a) [of the Bankruptcy Code] do not change the outcome that a creditor cannot collect more in total than it is owed." *Nuveen Mun. Trust v. WithumSmith+Brown, P.C.,* 692 F.3d 283, 296 (3d Cir. 2012) (Ambro, J.).   This principle – that a creditor is entitled only to a single satisfaction – is a bedrock teaching of both bankruptcy and non-bankruptcy law. *See, e.g., Ivanhoe Bldg. & Loan Assn. v. Orr,* 295 U.S. 243, 246 (1935) (holding that creditor which has partially satisfied its claim from the property of another obligor "may not collect and retain dividends which with the sum realized from the foreclosure will more than make up that amount"); *State v. Sutcliffe,* 16 A. 710, 711 (R.I. 1889) ("Of course the creditor is entitled to only one satisfaction, and when the judgment debt is paid by either party it is paid for both."); *Hannigan v. Italo-Petrol. Corp. of Amer.,* 181 A. 4, 5 (Del. Super. 1935) ("A creditor is entitled to but one satisfaction, but, in most cases, he may use all possible remedies for the collection of his debt."); *Whitestoen S&L Assn. v. Allstate Ins. Co.,* 270 N.E. 2d 694, (N.Y. App. 1971) ("[A] mortgagee is entitled to one satisfaction of his debt and no more . . . .").

54.     The Administrative Agent, however, seems to have forgotten these basic teachings.   Its opposition to the Debtors' reorganization appears premised in large part on the notion that the structure of this Credit Facility gives it the ability to assert artificial deficiency claims based on the potential that each QPO Guarantor (subject to the caps and other limitations on enforcement contained in its QPO Guarantee) may be indebted to the Senior Lenders for an amount greater than the value of the Collateral and held by that Debtor.   What this position ignores, however, is that SPNF III and each Debtor that is a QPO Guarantor have obligated

themselves on the same debt (subject to certain contractual limitations in the QPO Guarantees). By obligating the QPO Guarantors and obtaining liens against their assets, the Administrative Agent and Senior Lenders have merely given themselves multiple remedies to collect that debt. Yet, once the debt is satisfied, it is satisfied.  Nothing in the Bankruptcy Code or applicable law changes this result.

55.     Here, all of the Debtors are co-proponents of a Plan that will provide the Senior Lenders with New Senior Debt in satisfaction of their existing claims under the Credit Facility. To the extent that the Senior Lenders are currently secured creditors, under the Plan they are entitled to and will get at least as good as what they have now.  That in the classic sense is a satisfaction of a debt.  Accordingly, no legal or factual basis exists for the Administrative Agent and Senior Lenders to hold more than a single secured claim.  Any contention that the Administrative Agent or Senior Lenders hold deficiency claims in these cases should be rejected and the Agent Claims should be disallowed to the extent that they purport to assert such claims.

### B.  The Agent Claims Should Be Disallowed To The Extent That They Seek To Recover Postpetition Interest, Fees And Charges Beyond The Extent That The Administrative Agent And Senior Lenders Are Oversecured.

56.     Even without considering the various equitable deficiencies that undermine the Administrative Agent's attempt to recover postpetition interest, fees and charges,  section 506(b) of the Bankruptcy Code constrains the Administrative Agent's ability recover such amounts in these Chapter 11 Cases.  Section 506(b) recognizes a right to recover postpetition interest and reasonable fees, costs and other charges provided for under the agreement pursuant to which a claim arises only "*[t]o the extent* that an allowed secured claim is secured by property the value of which after any recovery under subsection (c) [of section 506], is greater than the amount of such claim . . . ." 11 U.S.C. § 506(b) (emphasis added).  With respect to section 506(b), the meaning could not be more clear – the holder of a secured claim is entitled to postpetition interest, fees and charges only *to the extent* such claim is oversecured. 11 U.S.C. § 506(b). Thus, when valuing collateral for the purpose of determining a creditor's right to recovery under

section 506(b), value must be measured using a flexible approach that best meets the goals of determining when and to what extent a creditor was oversecured measured over a period of time.

57.     The most widely accepted approach to analyzing a creditor's ability to recover postpetition interest, fees and charges under section 506(b) is the "flexible approach" developed in *Financial Sec. Assurance, Inc. v. T-H New Orleans L.P. (In re T-H New Orleans L.P.),* 116 F.3d 790, 798 (5th Cir. 1997).  The court explained its approach as follows:

> [W]e conclude that for purposes of determining whether a creditor is entitled to accrue interest under § 506(b) in the circumstance where the collateral's value is increasing and/or the creditor's allowed claim has been or is being reduced by cash collateral payments, such that at some point in time prior to confirmation of the debtor's plan the creditor may become oversecured, valuation of the collateral and the creditor's claim should be flexible and not limited to a single point in time, such as the petition date or confirmation date.

*Id.* Applying this approach, "a secured creditor's entitlement to accrue interest under § 506(b) matures at the point in time where the creditor's claim becomes oversecured." *Id.* at 799.  And, as to the quantum of what can be recovered under section 506(b), "[t]he Supreme Court has made it clear that an oversecured creditor is entitled to postpetition interest on its claim only 'to the extent that such interest, when added to the principal amount of the claim, [does not] exceed the value of the collateral.'" *Id.* (quoting *United Sav. Ass'n. of Texas v. Timbers of Inwood Forest Assoc., Ltd. (In re Timbers of Inwood Forest Assoc., Ltd.),* 484 U.S. 365, 372 (1988)).[9]

58.     Under the *T-H New Orleans* flexible approach, "[t]he creditor . . . bears the ultimate burden to prove by a preponderance of evidence its entitlement to postpetition interest, that is, that its claim was oversecured, to what extent, and for what period of time." *Id.*  Placing the burden on the creditor to establish why its claim should be enlarged through the addition of

---

[9] *See also, e.g., In re SW Boston Hotel Venture, LLC,* 479 B.R. 210, 223 (1st Cir. B.A.P. 2012) ("We agree with the flexible approach espoused in T-H New Orleans . . . ."); *In re Urban Communicators PCS L.P.,* 379 B.R. 232, 242-44 (Bankr. S.D.N.Y. 2007), *aff'd in part and rev'd in part on other grounds,* 394 B.R. 325 (S.D.N.Y. 2008).

postpetition interest, fees and charges "recognizes the discretionary nature of bankruptcy courts as courts of equity." *Id.*

59.    Pursuant to the Valuation/Scheduling Stipulation, the value of the Properties, which are the primary source of collateral value in these Chapter 11 Cases, have an aggregate value of $166,365,000 from the October 13, 2011 commencement of these Chapter 11 Cases through November 20, 2012.  After November 21, 2012, the aggregate value of the Properties is then deemed to increase to $171,465,000, and remain fixed there until April 22, 2013.  Accepting the Administrative Agent's position that it and the Senior Lenders were owed $164,341,863.11 as of the Petition Date and relying on the Properties as their collateral, for the period from October 13, 2011, through November 20, 2012, the Agent Claims could have increased by, at most, **$2,023,136.89** ($166,365,000 - $164,341,863.11) on account of postpetition interest, fees and charges incurred during such period.  And, for the period November 21, 2012, through the anticipated confirmation of the Plan (assumed to be prior to April 22, 2013), the Agent Claims could have further increased by, at most, **$5,100,000** ($171,465,000 - $166,365,000) on account of postpetition interest, fees and charges incurred during such period.

60.    Notably, calculating what is recoverable by the Administrative Agent as postpetition interest, fees and charges in manner described above would likely overstate the value of the collateral available to the Administrative Agent without the consolidation of the estates proposed in the Plan (something, in information and belief, the Administrative Agent intends to object to).  As the Administrative Agent has conceded, the express terms of the QPO Guarantees limit each QPO Guarantor's liability to 95% of the value of such QPO Guarantor's properties as of 2006 (or in some cases 2007).  Further, each individual Property held by a QPO Guarantor secures the Loan only up to 95% of such Property's 2006 value (or in some cases 2007 value). (Valuation and Lift Stay Motion, ¶ 7)  If the value of the properties held by a QPO Guarantor have remained stable or sufficiently appreciated since 2006 (or 2007, as applicable), this structure makes it possible that a portion of such value would not be encumbered by the Administrative Agent's liens.

61.     The Administrative Agent still has the theoretical ability to capture unencumbered value through its additional security taking the form of pledges of each QPO Guarantor's membership interests. This form of security, however, is by its nature structurally subordinated to the claims of creditors of each QPO Guarantor.  In the Disclosure Statement, the Debtors have estimated the total amount of other debt (excluding intercompany obligations to Debtor and non-debtor affiliates) to be at least several million dollars, which, but for the provision made by the Debtors and Plan Sponsors to pay such claims through the Plain, might consume the value the Administrative Agent might otherwise access through enforcement of the equity pledges.[10]

62.     The precise value of the collateral available to the Administrative Agent is a matter to be determined at the March Hearing.  But, as explained above, no realistic scenario exists under which the Administrative Agent and Senior Lenders could add to the Agent Claims the more than $30 million in postpetition nondefault and default interest, fees, charges and professional expenses that they now contend have been incurred since the Petition Date. Any portion of the Agent Claims that exceeds the amount to which the Administrative Agent and Senior Lenders are entitled under section 506(b) should be disallowed.

**C.  Equitable Considerations Warrant The Disallowance And/Or Reduction Of The Agent Claims With Respect To Postpetition Non-default And Default Interest, Reimbursement Of Professional Fees And Expenses And Other Fees And Charges.**

63.     This Court clearly possesses the equitable power to reduce, limit and disallow postpetition non-default and default interest, the reimbursement of professional fees and expenses and other fees and charges claimed as part of the Agent Claims.

64.     With respect to interest, section 506(b) of the Bankruptcy Code states only that, to the extent a creditor is oversecured, it is entitled to "interest" on its claim. 11 U.S.C. § 506(b). Section 506(b) says nothing of the rate to be applied and in *United States v. Ron Pair Enters.,*

---

[10]In the Disclosure Statement, the Debtors estimate Class 6 General Unsecured Claims alone, which represent primarily obligations of the QPO Guarantors, to be approximately $1.7 million.

489 U.S. 235, 241 (1989), the United Supreme Court declined to reach the issue. Accordingly, "[t]he Bankruptcy Code does not specify . . . that an oversecured creditor must receive interest indefinitely or at the contract rate." *In re Nixon,* No. 09-3135, 404 Fed. Appx. 575, 2010 WL 514339, at *3 (3d Cir. Dec. 15, 2010) (Unpublished).

65.     In this statutory vacuum, Courts, including this one, have employed "presumption in favor of the contractual rate of interest subject to rebuttal based upon the equitable considerations specific to each case." *In re Ace-Texas, Inc.,* 217 B.R. 719, 723 (Bankr. D. Del. 1998) (collecting cases). *See also In re Desa Holdings Corp.,* No. 02-11672, 2004 WL 316451, at *1 (D. Del. Feb. 9, 2004) (recognizing default interest is subject to disallowance or adjustment based on equitable considerations); *In re LaGuardia Assoc., LP,* No. 04–34512, 2006 WL 6601650, at *38 (Bankr. E.D. Pa. Sept. 1, 2006) ("[T]he Bankruptcy Code has the equitable power and duty to examine the circumstances of the oversecured creditor in each particular case and consider notions of fairness and equity in determining whether to award default rate interest."). Working within this framework, "[i]n several instances, courts have used equitable considerations to modify the interest awarded oversecured creditors within the parameters of the code."[11] *Nixon,* 2010 WL 5141339, at *3 (collecting cases).

---

[11] In the Third Circuit, a bankruptcy judge's equitable assessments of the facts and circumstances to determine what interest rate to apply and for how long interest should be recoverable are generally given broad deference. *See, e.g., Nixon,* 2010 WL 514339, at *3 (affirming the bankruptcy court's discretion to toll accumulation of interest because of secured creditor's purposeful delays); *Desa Holdings,* 2004 WL 316451, at *2 (affirming bankruptcy court's disallowance of default interest because "Third Circuit precedent instructs . . . that a 'bankruptcy court in passing on claims sits as a court of equity, and [i]n the exercise of its equitable jurisdiction the bankruptcy court has the power to sift the circumstances surrounding any claim to see that injustice or unfairness is not done in the administration of the bankruptcy estate'") (quoting *In re Laskin,* 316 F.2d 70, 73 (3d Cir. 1963) (internal quotations omitted)).

       ***1.   The Agent Claims Should Be Disallowed To The Extent That They Include Postpetition Interest Calculated Using An Interest Rate Premised On The Base Rate, Rather Than The Eurodollar Rate That Was In Use On The Petition Date.***

66.    Historically, under the Credit Facility, the Administrative Agent has provided SNPF III, the Borrower, with periodic opportunities to designate which of two different methods would be applied to the calculation of interest in connection with new borrowings and existing loans under the Credit Facility.  First, SNPF III had the opportunity to have loans bear interest using the "Eurodollar Rate". (Credit Agree., § 2.02; Piland Dec., Ex. A) In general, the Eurodollar Rate loans would bear interest at a rate that is premised on the British Bankers Association London InterBank Offered Rate (commonly referred to as "<u>LIBOR</u>").  Alternatively, the "Base Rate" could be used in connection with new borrowings or an existing loan.  In practice, the Base Rate equals Bank of America's prime rate then in effect.  Whether the Eurodollar Rate or the Base Rate was in use, the Interest Rate would then be determined by adding the "Applicable Rate" to it. At various times over the life of the Credit Facility, the Applicable Rate has ranged between 1.50% to 5.50% per annum.

67.    From the outset of the Credit Facility, whenever given the opportunity to choose, SNPF III almost always utilized the Eurodollar Rate in connection with new borrowings and extensions thereunder. Thus, as a practical matter, the only question for SNPF III over the life of the Credit Facility, was for how long it would "lock in" a specific LIBOR rate, which was generally one, two, three or six months.

68.    In practice, Interest Rates were determined under the Credit Facility as follows: A few days before the expiration of a LIBOR rate period, a representative of the Administrative Agent would transmit a Pre-Notice of Pricing Options (the "<u>Proposed Interest Rate Notice</u>") (Piland Dec., Ex. E), which identified the available "lock in" terms, the proposed LIBOR rates, the "Spread" (what is referred to in the Credit Agreement as the Applicable Rate) and the all in interest rate.  Notably, SNPF III's practice of selecting the Eurodollar Rate option under the Loan Agreement was so established, that the Proposed Interest Rate Notices did not even quote the Bank of America Prime Rate for SNPF III.

69.     Upon receipt of a Proposed Interest Rate Notice, either John Piland or Daniel Robinson, SNP Servicing's controller, usually on the same day, would mark the Proposed Interest Rate Notice to indicate which LIBOR pricing option (one, two, three or six months) was being selected, sign and date the notice and return it to the Administrative Agent.  Usually, within one to two business days, the Administrative Agent would respond in writing to confirm the pricing of the LIBOR rate for the selected loan period.  This established practice was still being followed by SNPF III and the Administrative Agent on October 13, 2011 when SNPF III and the other Debtors commenced their Chapter 11 Cases.

70.     Indeed, this practice continued and SNPF III was able to use the Eurodollar Rate under the Credit Facility all through 2011 until the Petition Date even though the Administrative Agent had SNPF III in default under the Credit Agreement for almost that entire period. (Piland Dec., Ex. F) From November 2010 until September 2011 on at least five occasions, the Administrative Agent either noticed alleged Events of Default to SNPF III or transmitted documents containing references to alleged then existing Events of Default.  Nevertheless, SNPF III's access to loan pricing under the Eurodollar Rate and using the procedures the parties had established continued uninterrupted through the Petition Date.

71.     As of the October 13, 2011 Petition Date, SNPF III had "locked in" interest rate pricing through at least the end of October 2011 using the Eurodollar Rate.  However, after these Chapter 11 Cases were commenced, the Administrative Agent unilaterally abandoned the parties' established procedures under the Credit Agreement and did not send SNPF III a Proposed Interest Rate Notice prior to the expiration of the interest rate period.  Nor did the Administrative Agent send SNPF III any formal notice under the Credit Agreement purporting to alter the interest rate for the loans thereunder.[12]

---

[12]The Debtors were not the only ones for whom this practice had become ingrained by the Petition Date.  Through discovery produced by the Administrative Agent, the Debtors have obtained communications among Bank of America personnel and representatives occurring

(Continued . . .)

72.     At the time, there was no reason for the Debtors to attached significance to the cessation of delivery of the Proposed Interest Rate Notices – the Debtors had just filed for bankruptcy.  It is well established that "[i]nterest stops accruing as of the petition date and creditors will generally not be entitled to unmatured postpetition interest on their claims, . . . except where the debtor is solvent after all distributions or made or the creditor is determined to be over secured." *In re Plunkett,* 191 B.R. 768, (Bankr. E.D. Wisc. 1995) (citing 11 U.S.C. §§ 502(b) & 506(b)), *aff'd,* 82 F.3d 738 (7th Cir. 1996); *In re W.R. Grace & Co.,* Case No. 01-1139, 2009 WL 1469831, at *2 (Bankr. D. Del. 2009), *aff'd,* 475 B.R. 34 (D. Del. 2012).  It is not until "the date of confirmation [that] the allowed claim of an oversecured creditor is augmented by the inclusion of section 506(b) pendency interest." *In re Milham,* 141 F.3d 420, 424 (2d Cir. 1998). *See also, e.g., Orix Credit Alliance, Inc. v. Delta Resources, Inc. (In re Delta Resources, Inc.),* 54 F.3d 722, 729 (11th Cir.) ("[A]n oversecured creditor . . . is entitled to receive postpetition interest as part of its claim at the time of confirmation of a plan of reorganization . . . .").[13] Indeed, in *T-H New Orleans,* the Fifth Circuit held it was error for the bankruptcy court to authorize payment of postpetition interest to an oversecured creditor during the pendency of the case. *T-H New Orleans,* 116 F.3d at 800.

73.     To hold the Debtors and their estates to a perfect hindsight standard here would be particularly unfair.  At the outset of these Chapter 11 Cases, the Administrative Agent objected to, among other things, the Debtors' request to use cash collateral, arguing that that the adequate

---

(. . . continued)

shortly after the Petition Date in which they express confusion about being instructed not to transmit a Proposed Interest Rate Notice to SNPF III. *See* **Exhibit B.**

[13]"The timing of the payment of accrued interest to an oversecured creditor (at the conclusion of the proceeding) is doubtless based on the fact that it is not possible to compute the amount of § 506(c) recovery (*and, accordingly the net allowed secured claim on which interest is computed*) until the termination of the proceeding." *United Sav. Ass'n. of Texas v. Timbers of Inwood Forest Assoc., Ltd. (In re Timbers of Inwood Forest Assoc., Ltd.),* 793 F.2d 1380, 1407 (5th Cir. 1986), *on reh'g,* 808 F.2d 363 (5th Cir. 1987) (en banc court reinstating panel opinion), *aff'd,* 484 U.S. 365 (1988) (emphasis added).

protection then offered by the Debtors was inadequate and disputing the Debtors' ability to surcharge their collateral under section 506(c) of the Bankruptcy Code. *See* Objection *of Prepetition Secured Lenders to Debtors' Motion for Interim and Final Orders (I) Authorizing the Debtors to Use Cash Collateral, (II) Scheduling a Final Hearing, and (III) Granting Related Relief*, dated November 4, 2011 (D.I. 50). Nine months later, in July 2012, the Administrative Agent filed the Valuation and Lift Stay Motion in which it maintained that the aggregate value of the 33 Properties was $162,460,000 (approximately $2 million less than what the Administrative Agent claimed was owed to it as of the Petition Date) and that the collateral value of its secured position in the Properties was $155,776,500 (approximately $8.6 million less than what the Administrative Agent claimed was owed to it as of the Petition Date). Only five months later in December 2012 (approximately 14 months after these cases were commenced), did the Administrative Agent finally agree pursuant to the Valuation/Scheduling Stipulation to higher Property values.

74.     Having staked out positions for much of these Chapter 11 Cases premised on a purported lack of security and lack of adequate protection, the Administrative Agent cannot at this late stage (approximately 16 months after these cases were commenced) say that the Debtors should have known from the outset that they would be exposed to the Administrative Agent's claims for postpetition interest under section 506(b). Case law is clear that a "creditor's right to post-petition interest is still subject to equitable defenses such as estoppel." *In re Huhn,* 145 B.R. 872, 878 (W.D. Mich. 1992). *See also Matter of Lapiana,* 909 F.2d 221, 223-24 (7th Cir. 1990). The Administrative Agent's inconsistent positions throughout these Chapter 11 Cases, coupled with the Debtors' justifiable reliance on the understanding that there is no *per se* right for a creditor to recover postpetition interest, make this proceeding an appropriate one for the application of the estoppel doctrine.

75.    According to the Administrative Agent, since October 31, 2011, non-default interest has been accruing at an annual rate of 8.75% (Prime + 5.50% spread)[14] and, as a result, non-default interest has been accruing at $38,354.23 per day since the Petition Date. (Piland Dec., Ex. D)   However, had the Administrative Agent not unilaterally converted the loans to Base Rate loans, non-default interest would be accruing at an annual rate of approximately 5.75210%  (The Petition Date LIBOR rate + 5.50% spread). (Piland Dec., Ex. E)  This equates to a $25,213.41 *per diem* accrual of non-default interest. Thus, through its unilateral postpetition conversion of the loans from Eurodollar Rate loans to Base Rate loans, the Administrative Agent has purported to increase the *per diem* interest obligation by approximately $13,140.82.

76.    As of the filing of this Preliminary Objection and Estimation Motion, these Chapter 11 Cases will have been pending for 492 days.  Accordingly, the Administrative Agent's improper actions have imposed an unwarranted additional interest burden, accounting for incremental non-default interest alone, of approximately $6,465,283.44.  For the reasons stated herein, the Debtors respectfully submit that this Court should exercise its equitable discretion to disallow all such postpetition non-default interest.

### 2.    *The Agent Claims Should Be Disallowed To The Extent That They Include Amounts For Postpetition Default Rate Interest.*

77.    Default interest is perhaps the aspect of a secured lender's section 506(b) claim that most often receives scrutiny, and with good reason.   "Default rates are designed to compensate for the unforeseeable costs associated with defaults." *Ace-Texas,* 217 B.R. at 725 (citing *In re Terry L.P.,* 27 F.3d 241, 244 (7th Cir. 1994)).  *See also, e.g., In re La Guardia Assoc., L.P.,* No. 04-34512, 2006 WL 6601650, at *39 (Bankr. E.D. Pa. Sept. 13, 2006) (same). However, "[w]hen this function is not implicated there is the risk that a default rate may function

---

[14] According to Bank of America's website, the Bank of America Prime Rate has been fixed at 3.25% since December 16, 2008. *See* http://newsroom.bankofamerica.com/press-kit/prime-rate-information, retrieved on February 14, 2013. *See* **Exhibit C.**

as a coercive penalty." *Id.* In such circumstances, "many courts have held that it would be inequitable to allow its impact to destroy a Debtor's opportunity to reorganize." *Id.*

78.     Among the considerations courts commonly give weight to in determining that postpetition default interest should be reduced or disallowed, several are present here. First, most courts disfavor a larger interest rate differential between default and non-default rates as a sign that the default rate is not really compensatory. Under this Credit Agreement, the Default Rate is 4.00% in excess of the non-default rate. But, to stop there without examining the history of the lending relationship does not capture the full measure of the premium the Administrative Agent and Senior Lenders have been capturing since before these bankruptcy cases were filed.

79.     Under the Credit Agreement, prior to various amendments, loans (whether Eurodollar Rate or Base Rate) were to include a risk premium defined in the Credit Agreement as the "Applicable Rate". (Credit Agree., §§ 1.01 & 2.08) Under the pre-amendment Credit Agreement, the Applicable Rate depended upon the Leverage Ratio and varied within a band of 1.50% to 1.80%.

80.     By early 2010, of course, the national real estate market had significantly eroded and SNPF III found itself unable to repay the Loan by the original Maturity Date of January 29, 2010. To address the Borrower's inability to repay the Loan by the original maturity date, the parties executed the Seventh Amendment to the Credit Agreement, dated April 20, 2010. (Piland Dec., Ex. G) The Seventh Amendment, among other things extended the Maturity Date for the Loan through January 29, 2012, subjected the Borrower to significantly more rigorous financial covenants, required the Borrower to meet certain milestones to make principal payments, and obligated the Borrower to pay an extension fee of $848,745.00 and to reimburse the Administrative Agent's legal fees and expenses.

81.     In consideration for this extension, in addition to the commitments referenced above, the Administrative Agent and Senior Lenders extracted an increase in the Applicable Rate to its present level of 5.50%. The language in Seventh Amendment describing the modifications to the Applicable Rate is revealing:

Lenders have agreed to charge interest during the period January 29, 2010 through the date of this Agreement based upon an Applicable Rate of 4% per annum *(in lieu of charging interest at the Default Rate)*. The Applicable Rate in effect as of the date of this Agreement is 4.0% per annum; which 4% Applicable Rate shall remain in effect through April 29, 2010. From and after April 30, 2010 through and including the day proceeding the last Business Day of April 2011, the Applicable Rate shall be 2.5% per annum and *from and after the last Business Day of April 2011, the Applicable Rate shall be 5.50% per annum,* and the definition of "Applicable Rate" set forth in the Credit Agreement is hereby amended accordingly.

Seventh Amendment, § 1.2 (emphasis added). Thus, by January 2010, the Administrative Agent and Senior Lenders had already jacked up the Applicable Rate to 4.0% "in lieu of charging interest at the Default Rate". And, in April 2011, the Applicable Rate increased yet again to its current 5.50%. In context, this means that the Applicable Rate, which originally was to be within a band of 1.50% - 1.80% had, by May 2011, been escalated by 3.80% - 4.00%, an escalation (not coincidentally) almost identical to the 4.00% Default Rate premium.

82.     Flash forward to present day. Even though the Administrative Agent and Senior Lenders have already compensated themselves for the unforeseeable risk and additional cost of a borrower in default by increasing the Applicable Rate by almost precisely a margin equal to the Default Rate, they now want to double-dip by recovering the 4.00% Default Rate premium as postpetition interest under section 506(b) of the Bankruptcy Code. Thus, the "real" default premium the Senior Lenders are seeking to recover here is more in the range of 7.80% to 8.00%, essentially double the original contractual Default Rate in the Credit Agreement. When viewed in context of the history of this Loan, it is clear that the additional 4.00% Default Rate premium that the Administrative Agent and Senior Lenders seek goes well beyond what is necessary to be compensatory and, thus, should be disallowed.

83.     A second examination that Courts make in determining whether to allow postpetition default rate interest is whether the costs and risks associated with a given borrower in default are truly unforeseen. For example, in *La Guardia Assocs.,* the bankruptcy court disallowed postpetition interest to the holder of secured bonds that acquired the bulk of its

holdings in the months before the debtor filed its bankruptcy case at a time it was publicly known that the bonds were in default. Judge Raslavich explained his reasoning as follows:

> Additional costs associated with a default can scarcely be said to have been unforeseen. Such circumstances, the Court concludes, would clearly have been factored into the purchase price in 2004, a fact which no doubt contributed to sale of the bonds at roughly 73 cents on the dollar. . . . Allowing a default rate of interest in this setting would unquestionably confer an enormous windfall on the Bondholders.

*La Guardia Assoc.,* 2006 WL 6601650, at *39.

84.    Here, the likelihood of a windfall to certain of the Senior Lenders seems even more evident. The debt has been trading since the Petition Date. On information and belief, both BACP and Top Fund, ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

85.    ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████    Just as was true in *LaGuardia,* allowing these distressed debt investors to invoke the equitable powers of this Court to recover postpetition default rate interest would also produce a wrong. The Debtors respectfully submit that a fraction of the Default Interest equal to the fraction that the senior debt held by Top Fund and BACP represents to the entire senior debt outstanding on this basis ought to be disallowed.

86.     Third, courts have considered the risk of nonpayment as a factor that may warrant the disallowance of default interest. *See In re W.S. Sheppley & Co.,* 62 B.R. 271, (Bankr. N.D. Iowa 1986) (weighing that the secured creditor had "never faced any realistic risk of nonpayment of its debt" as a factor in disallowing default interest).  Certainly, in these Chapter 11 Cases, it must be presumed that the Administrative Agent and Senior Lenders have faced no risk of nonpayment of the debt owed them since these cases were commenced.  Pursuant to the Valuation/Scheduling Stipulation, the parties have agreed that the Properties were worth more on the Petition Date than was owed to the Senior Lenders on that date.  Moreover, by the commencement of the Confirmation Hearing, the Debtors will have made postpetition payments to the Administrative Agent and Senior Lenders of more than $10 million.

87.     On their own, these factors create a compelling case for the disallowance of postpetition default interest.  However, when, as discussed further below, they are considered in the context of how the Administrative Agent's own conduct has contributed to delays in these cases, the conclusion that equity mandates a reduction or disallowance is inescapable.

### 3.     *The Agent Claims Should Be Disallowed To The Extent That They Include Postpetition Interest And Fees And Expenses Of Attorneys And Other Professionals Representing The Administrative Agent And/Or Senior Lenders During The Period From The Petition Date Through March 9, 2012.*

88.     In conducting the equitable analysis contemplated by section 506(b), courts frequently consider how the secured creditor's conduct may have contributed to delays or other difficulties in the case. *See, e.g., Nixon,* 2010 WL 5141339, at *3 (affirming bankruptcy court's tolling of accrual of postpetition interest based on finding that secured creditor purposefully delayed case to "run up the tab" on the debtor); *In re Coram Healthcare Corp.,* 315 B.R. 321, 347 (Bankr. D. Del. 2004) (denying portion of postpetition interest to note holders because their failure to disclose relationship with CEO had increased costs of administration and delayed debtor's emergence from bankruptcy).

89.     As discussed in the Piland Declaration, nearly five months of progress at the outset of these Chapter 11 Cases was erased when the Administrative Agent in mid-stream

suddenly changed counsel and replaced the workout banker that was the Debtors' primary contact on this deal.  The Debtors are not suggesting that the Administrative Agent should be precluded from hiring counsel of its choosing or making personnel choices as it deems necessary.  It certainly has those rights.  However, the Administrative Agent should not be able to make such changes in the midst of ongoing Chapter 11 Cases and expect the Debtors to bear the cost in terms of the additional accrual of postpetition interest and professional fees.

90.    As to interest accrual during the first five months of the case, the record reflects that the Debtors were prepared to make every effort to exit bankruptcy promptly.  At the first hearing of consequence in the case on November 10, 2011, counsel for the Debtors explained that the Debtors intended to file a plan and disclosure statement promptly and were targeting to have a disclosure statement hearing on December 20, 2011. *See* Transcript of November 10, 2011 Hearing, at 17:15-16 (D.I. 68).  However, after that hearing the Administrative Agent's counsel at the time expressed an intent to have settlement discussions with the Debtors, which led the Debtors to make an earnest effort with the Administrative Agent (the first of many that would follow) to get the case resolved on a consensual basis.  As reported in the Piland Declaration, from the Debtors' perspective, the Debtors had everyone indication that these settlement efforts were progressing a successful conclusion.  It was only in March 2012, that the Administrative Agent notified the Debtors of the change in counsel and withdrew the term sheet that had been under discussion.

91.    In fairness, the Debtors should not have to reimburse fees and expenses incurred through March 9, 2012 by the original set of professionals or other fees and expenses incurred by the replacement (and current set of professionals) to rapidly get up to speed in this ongoing reorganization.

**D. The Agent Claims Should Be Disallowed To The Extent That They Include Unreasonable Or Inadequately Documented Fees And Expenses Of Attorneys And Other Professionals Representing The Administrative Agent And/Or Senior Lenders**

92.    This same equitable discretion to reduce and disallow a secured creditor's claim based on equitable considerations also extends to this court's review of fees, costs and charges claimed under section 506(b). Debtors do not dispute the basic principle that "[s]ection 506(b) allows oversecured creditors to add reasonable post-petition, pre-confirmation attorney fees, interest, and costs to the amount of their secured claim." *In re Joubert,* 411 F.3d 452, 454 (3d Cir. 2005). However, "[b]ecause an award under section 506(b) may reduce distributions made to other creditors and equity holders, a secured creditor seeking allowance of postpetition fees (and expenses) under section 506(b) 'bears the burden of proving entitlement by establishing: (1) that it is oversecured in excess of the fees requested; (2) that the fees are reasonable; and (3) that the agreement giving rise to the claim provides for attorney fees." *South Canaan Cellular Invest., LLC v. Lackawaxen Telecom, Inc. (IN re South Canaan Cellular Invest., LLC),* No. 09-10473bf, 2010 WL 3294177, at *18 (Bankr. E.D. Pa. Aug. 19, 2010) (quoting *In re McGuier,* 346 B.R. 151, 158 (Bankr. W.D. Pa. 2006)).

93.    The Administrative Agent and Senior Lenders have failed entirely to carry their burden to demonstrate that they are entitled to recover the astronomical figure of $4.1 million of professional fees they now claim to have incurred. Except for the summary statement provided as part of the Valuation and Lift Stay Motion in August 2012 (Piland Dec., Ex. C) and another summary statement produced to the Debtors in discovery approximately 4 days ago (Piland Dec., Ex. D), the Administrative Agent has provided virtually no meaningful or usable information about the millions in fees and expenses it would subject these estates to. "Determining the § 506(b) reasonable fee requires consideration of 'not only the fee agreement, but the overall fairness and reasonableness of the fee under all of the circumstances.'" *In re Kalian,* 178 B.R. 308, 317 (Bankr. D.R.I. 1995) (quoting *In re Huhn,* 145 B.R. 872, 875 (W.D. Mich. 1992)). "A creditor's counsel's fee application should be unambiguous and virtually self-contained so that

by reviewing it and the underlying itemized billing information, the court can reach an informed determination of the reasonable fee." *Kalian,* 178 B.R. at 317.

94.     The Administrative Agent and Senior Lenders have provided the Debtors and this Court with none of the information necessary to make the reasonableness determination. Although minimal and scattered documentation has shown up in the Administrative Agent's documentation, it is woefully insufficient to allow an assessment of the reasonableness and necessity of the fees occurred.  The Debtors respectfully submit that, in light of the failure of the Administrative Agent to carry its burden with respect to the claimed entitlement to recover professional fees, such fees should be disallowed.

### E.  The January 17, 2012 Agent Claims (Claim Nos. 22 Through 30) Should Disallowed Because They Have Been Amended And Superseded By The March 1, 2012 Agent Claims

95.     The nine March 1, 2012 Agent Claims (Claim Nos. 120 – 28) are nearly identical respect to the nine January 17, 2012 Agent Claims (Claim Nos. 22 – 30).  Accordingly, these later filed claims should be deemed to supersede the January 17, 2012 Claims and Claim Nos. 22 through 30 should be disallowed.

### F.  The SNP-Alaska Claim Should Be Disallowed Because SNP-Alaska Is Not A Borrower, Guarantor Or Otherwise Obligated For The Credit Facility

96.     The Administrative Agent has filed a proof of claim, identified as Claim No. 137, against SNP-Alaska that is nearly identical to the other Agent Claims filed against SNPF III and the QPO Guarantor Debtors.  Claim 137 asserts that SNP-Alaska is in default of obligations under the Credit Facility. SNP-Alaska, however, is neither a borrower nor a guarantor under any of the Loan Documents.  Based on the Debtors' books and records, no basis exists for the Administrative Agent to have asserted that SNP-Alaska is liable for any obligations in connection with the Credit Facility.  The SNP-Alaska Claim should be disallowed.

## II.  <u>VOTING ESTIMATION OF AGENT CLAIMS</u>

97.     Bankruptcy Rule 3018(a) provides a bankruptcy court with broad discretion to temporarily allow, disallow or estimate a creditor's claim for the limited purpose of voting on a

plan of reorganization.   Fed. R. Bankr. P. 3018(a).  *See Bittner v. Borne Chem. Co., Inc.,* 691 F.2d 135-36 (3d Cir. 1982); *Pension Benefit Guaranty Corp. v. Enron Corp.*, No. 04-5499 (HB), 2004 WL 2432928, at * 5 (S.D.N.Y. Nov. 1, 2004) (holding temporary allowance of a claim for voting purposes is committed to the sound discretion of the court); *In re Zolner*, 173 B.R. 629, 633 (Bankr. N.D. Ill. 1994) (same).  *See also Stone Hedge Prop. v. Phoenix Capital Corp.* (*In re Stone Hedge Prop.*), 191 B.R. 59, 63 (Bankr. M.D. Pa. 1995) ("Since claims litigation is often drawn out . . . the bankruptcy rules provide that, for voting purposes only, the court can temporarily allow a claim in such an amount as the 'court deems proper.'").  Relief pursuant to Bankruptcy Rule 3018(a) is properly granted, *inter alia,* "when fully hearing the objection would delay the administration of the case . . . ."  *Armstrong v. Rushton* (*In re Armstrong*), 294 B.R. 344, 354 (B.A.P. 10th Cir. 2003).

98.    A proceeding under Bankruptcy Rule 3018(a) concerning the temporary allowance of a claim for the purpose of voting is distinct from the estimation process contemplated under section 502(c)(1) of the Bankruptcy Code, which involves the estimation for distribution purposes of "contingent or unliquidated claims, the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case." *See Stone Hedge,* 191 B.R. at 62-63.  "Under Rule 3018(a), a summary-type hearing is contemplated." *Zolner,* 173 B.R. at 633.  "[A] very truncated trial process may be developed which is consistent with the dictates of due process of law." *In re FRG, Inc.,* 121 B.R. 451, 456 (Bankr. E.D. Pa. 1990).

99.    The process employed should serve the principal purpose of voting estimation to "ensure that the voting power is commensurate with the creditor's economic interests in the case." *In re Quigley Co.,* 346 B.R. 647, 654 (Bankr. S.D.N.Y. 2006).  Exercising such discretion to prevent one or few creditors from exercising a disproportionate voting share is clear meets "the desideratum of expanded suffrage and participation in the reorganization by all parties in interest." *Matter of Johns-Manville Corp.,* 68 B.R. 618, 631 (Bankr. S.D.N.Y. 1986).

100.    In these Chapter 11 Cases, it is plainly appropriate, for voting purposes, to disallow and estimate at $0.00 the Agent Claims to the extent that the Administrative Agent or

Senior Lenders would otherwise attempt to vote any portion of such claims as Class 3 Senior Lender Unsecured Claims or as Class 6 General Unsecured Claims. Based on the record that exists, including the Valuation/Scheduling Stipulation, it is indisputable that aggregate collateral available to the Administrative Agent has a value greater than the $164,341,863.11 purportedly owed under the Credit Facility as of the Petition Date. The Administrative Agent and Senior Lenders are entitled to a single satisfaction. No more.

101. As discussed above, the only means by which the Administrative Agent arrives at the conclusion that it may have deficiency claims against certain Debtors is to ignore the availability of QPO Guarantees from other QPO Guarantors and to ignore the value of the collateral securing those guarantee obligations. Essentially, to maintain its argument that deficiency claims exist, the Administrative Agent must pretend that the other QPO Guarantors do not exist and that the Properties they own likewise do not exist. This, of course, is nonsense. Moreover, it is especially disingenuous nonsense, given the position the Administrative Agent and Senior Lenders apparently have taken on their entitlement to recover postpetition interest, fees and charges. To prevail on that irreconcilably inconsistent argument, the Administrative Agent must convince this Court that the collateral securing repayment of obligations under the Credit Facility exceeds the amount that was owed to the Senior Lenders on the Petition Date. It can only do that by relying on the values of the Debtors' 33 Properties.

<u>**RESERVATIONS**</u>

102. This Objection/Estimation Motion constitutes the Debtors' preliminary objection to the Agent Claims and, to the fullest extent permitted by the Bankruptcy Code, the Bankruptcy Rules and the rules and Orders of this Court, is without prejudice to the ability of the Debtors or other parties' in interest to raise other objections to the Agent Claims or any claims that have been or may be filed by individual Senior Lenders or other parties in interest. Moreover, Debtors have limited the objections they are raising at this time consistent with the Debtors' agreement (subject to temporal and other qualifications) in paragraph 14 of the Valuation/Scheduling

Stipulation not to challenge the validity, perfected status and enforceability of the Administrative Agent's liens on the Properties and reserve all such additional objections that may be available to them to the extent that the stipulations contained in paragraph 14 of the Valuation/Scheduling Stipulation are later withdrawn.

103.    Additionally, the Debtors expressly reserve all defenses, challenges, requests for relief and arguments otherwise available to them under section 506 of the Bankruptcy Code with respect to, among other things, (a) the determination of the value of the Administrative Agents alleged interest in any Property, any Debtor or any Debtor's assets, (b) any request by the Administrative Agent, the Senior Lenders or any other person or entity for the allowance and/or payment of postpetition interest, fees, costs or charges and (c) any recovery that may be had from the property securing any allowed secured claim of the Administrative Agent, the Senior Lenders or any other party in interest pursuant to section 506(c).

104.    Debtors also reserve all objections to the voting of the Agent Claims and any other claims and to the tabulation of any such claims for the purpose of determining under section 1126(c) of the Bankruptcy Code whether any class has accepted the Plan.

105.    Finally, nothing in this Preliminary Objection and Estimation Motion is intended to or shall restrict or limit in any way any argument available to Debtors in connection with the Valuation and Lift Stay Motion and/or proceedings on confirmation of the Plan.

WHEREFORE, for all of the foregoing reasons, the Debtors respectfully request that this Court enter an Order, substantially in the form attached hereto as **<u>Exhibit D</u>**, (i) granting the relief requested by this Objection/Estimation Motion and (ii) granting such other and further relief as the Court deems just and proper.

Dated:  February 15, 2013              MORRIS, NICHOLS, ARSHT & TUNNELL LLP
        Wilmington, Delaware

                                   /s/ Gregory W. Werkheiser

                                  Robert J. Dehney (No. 3578)
                                  Donna L. Culver (No. 2983)
                                  Gregory W. Werkheiser (No. 3553)
                                  Andrew R. Remming (No. 5120)
                                  1201 N. Market Street
                                  P.O. Box 1347
                                  Wilmington, DE  19899-1347
                                  Telephone:  (302) 658-9200
                                  Facsimile:  (302) 658-3989
                                  rdehney@mnat.com
                                  dculver@mnat.com
                                  gwerkheiser@mnat.com
                                  aremming@mnat.com

                                  *Attorneys for the Debtors and*
                                  *Debtors in Possession*